IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ESTATE OF JORDAN BAKER, by and through administrator, JANET BAKER, | ) ) ) | No. 4:15-cv-3495 |
| Plaintiff, | ) ) | |
| v. | ) ) | Hon. Judge Sim Lake |
| JUVENTINO CASTRO, THE CITY OF HOUSTON, RPI MANAGEMENT COMPANY, LLC, and RPI INTERESTS I, LTD, | ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiff, ESTATE OF JORDAN BAKER, by and through administrator

JANET BAKER, complains of Defendants JUVENTINO CASTRO, the CITY

OF HOUSTON, RPI MANAGEMENT COMPANY, LLC, and RPI INTERESTS

I, LTD, as follows:

### Introduction

1.     Houston Police Department Officer Juventino Castro shot and killed

Jordan Baker without any lawful justification. Before Defendant Castro shot

Jordan Baker—a 26-year-old father and college student—he had been simply riding

his bike through a strip mall near his home. Baker had been committing no crimes

at all. Nonetheless, Defendant Castro chose to confront Jordan Baker because he

was an African-American man wearing a hooded sweatshirt. That confrontation

ended with Jordan Baker being murdered by Defendant Castro.

2.     Because of his status as a police officer, Defendant Castro has not been held accountable for his actions. No criminal charges were ever filed, and he has not even been removed from the Houston police force.

3.     Tragically, the shooting of an unarmed citizen by a member of the Houston Police Department was not an isolated incident. Instead, the City of Houston has experienced a rash of such police-involved shootings of unarmed individuals, and particularly African-Americans, in such a manner that they are de-facto City policy. Nonetheless, the City of Houston has not done anything to address the pervasive shooting of unarmed individuals by its officers. And, like Defendant Castro, the City has not been held accountable for its actions (and inactions) concerning the shooting of unarmed individuals by its officers.

4.     This action, brought under 42 U.S.C. § 1983, seeks justice—and accountability—for the wrongful, unjustified killing of Jordan Baker and seeks to deter the wrongful, unjustified shootings of others at the hands of the HPD.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction under 28 U.S.C. § 1331.

6.     Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to the claims asserted herein all occurred within this district, and, upon information and belief, all or most of the parties reside in Harris County.

## PARTIES

7.     The Estate of Jordan Baker represents the property and legal interests of decedent Jordan Baker.

8.      Janet Baker, the mother of Jordan Baker, is the court-appointed administrator of the Estate of Jordan Baker. The Estate also includes any legal interests arising out of Jordan Baker's death that Janet Baker or Jordan Baker's son, J.B., may have. The Estate brings those claims on their behalves.

9.      Defendant Juventino Castro is a Houston Police Department officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. In addition, Defendant Castro was also, at all times relevant, simultaneously acting on behalf of RPI Management Company and RPI Interests I, Ltd., and within the scope of his employment with RPI Management Company and RPI Interests I, Ltd. as law enforcement for the 5700 W. Little York property.

10.      Defendant City of Houston is a Texas municipal corporation that operates the Houston Police Department (the "HPD" or "Department"), which in turn sets city-wide policy for police officers employed by the Department.

11.      RPI Management Company ("RPI Management") is a commercial real estate management company in Houston, Texas. RPI Management manages the property located at 5700 W. Little York.

12.      RPI Interests I, Ltd ("RPI Interests I") is a commercial real estate company in Houston, Texas, which owns several commercial properties in the Houston area. RPI Interests I owns the property located at 5700 W. Little York, and utilizes RPI Management Company, an affiliated entity, to manage the 5700 W. Little York property.

13.     RPI Management and RPI Interests I (collectively, RPI Group) hired Defendant Castro to perform law enforcement at the 5700 W. Little York strip mall on January 14, 2014.

## FACTUAL ALLEGATIONS

### Defendant Castro Works at 5700 W. Little York as an HPD Officer

14.     On January 16, 2014, Defendant Castro was a full-time patrol officer for the Houston Police Department assigned to work the Narcotics Division.

15.     That evening, Defendant Castro was working an extra job through the Department's "Extra Employment System."

16.     In so doing, Defendant Castro was working to enforce all federal, state, and city laws at the strip mall with approval from the Houston Police Department.

17.     To that end, Defendant Castro was wearing his Department-issued uniform, wearing an HPD badge or insignia, armed with his service weapon, and acting in a full capacity as an HPD officer.

18.     On January 13, 2014, Defendant Castro was hired by RPI Group to serve as law enforcement for the strip mall at 5700 W. Little York. Defendant Castro worked in such capacity January 16, 2014.

19.     RPI Group hired Defendant Castro to a "permanent" position due to his status as an HPD officer, and relied upon that fact in choosing to hire Defendant Castro to work at the strip mall at 5700 W. Little York from January 13, 2014 and beyond.

20.     In so doing, RPI Group anticipated that Defendant Castro would be able to exercise his full authority as a member of the Houston Police Department, including the ability to detain suspects and use force against individuals at the strip center.

## Jordan Baker is Shot By Defendant Castro

21.     On the evening of January 16, 2014, Jordan Baker rode his bicycle to the shopping mall near 5700 West Little York.

22.     Jordan Baker lived near 5700 West Little York, and regularly frequented the strip mall without incident.

23.     That evening, Jordan Baker was wearing flip-flop sandals, pajama pants, and a hooded sweatshirt.

24.     When he was confronted by Defendant Castro, Jordan Baker was completely unarmed.

25.     When he was confronted by Defendant Castro, Jordan Baker was simply riding his bike among the stores at the mall. In so doing, Jordan Baker was not breaking any laws or engaged in any unlawful conduct.

26.     Defendant Castro claims that he confronted Jordan Baker because he looked "suspicious."

27.     Defendant Castro's basis for claiming Jordan Baker looked "suspicious" was based on Jordan's race and the fact that he was wearing a hooded sweatshirt.

28.     However, given that Jordan was riding his bike and wearing flip-flop sandals, it was obvious that Jordan was not engaged in any unlawful behavior.

29.     At the time that this incident began, Jordan Baker had a right to walk and ride his bike without being confronted by police because he was not committing any crimes, and there was no reasonable suspicion to believe he had committed any crimes or to stop him for any reason.

30.     Nonetheless, Defendant Castro engaged Jordan and unlawfully detained him.

31.     During this time, when Jordan protested his unlawful detention, Defendant Castro used unconstitutional force against Jordan Baker.

32.     In addition, at certain or various points throughout this encounter, Defendant Castro used excessive non-deadly force against Jordan Baker, causing injuries all over his body.

33.     These injuries, caused by Defendant Castro, include cuts and abrasions to Jordan's forehead, scalp, chest, knees, and left arm, wrists, and shoulder.

34.     Video recordings depict the unconstitutional non-deadly force that Defendant Castro used against Jordan Baker.

35.     At some point, due to Officer Castro's force, Jordan Baker's hooded sweatshirt was removed from his body.

36.     Shirtless and unarmed, Jordan Baker attempted to prevent Defendant Castro from harming him any further.

37.     To do so, Jordan Baker backed away from Defendant Castro slowly and defensively.

38.     The video recordings of the incident show that when Jordan Baker backed away from Defendant Castro he was shirtless, unarmed, and posed no threat to the officer.

39.     At some point, Jordan Baker, still shirtless and unarmed, fled Defendant Castro.

40.     Defendant Castro eventually chased Jordan, and both ended up behind the strip mall.

41.     The area behind the strip mall includes a "side portion" near the bayou, which includes a trail that extends far beyond the mall.

42.     The area behind the strip mall also includes "back alley" completely behind the front of the mall, which is lined by a fence that dead-ends hundreds of feet away from the "side portion" near the bayou.

43.     The chase ended when Defendant Castro shot Jordan Baker—who was still shirtless and unarmed—directly in the chest.

44.     According to Defendant Castro, when he shot Jordan Baker in the chest, Baker was more than 10 feet away.

45.     According to Defendant Castro, the shooting took place near the "side portion" and open area near the bayou, not the alley.

46.     Upon information and belief, video depicts some of the interaction between Jordan and Defendant Castro behind the strip center.

47.     This shooting was unlawful. At no point during Jordan Baker's encounter with Defendant Castro did Jordan take any action that would have justified Castro's use of deadly force.

48.     At no point during Jordan Baker's encounter with Defendant Castro did Jordan pose an imminent threat of death or serious bodily harm sufficient to justify the use of deadly force by Defendant Castro.

### Jordan Baker Dies from Defendant Castro's Gunshot Wound

49.     In the wake of this unjustified shooting, Jordan Baker did not immediately die.

50.     In these moments, Jordan Baker experienced unspeakable pain due to the gunshot wound he had suffered

51.     Nonetheless, after shooting him Defendant Castro did nothing to save Jordan Baker's life. Defendant Castro provided no medical treatment whatsoever.

52.     Instead—adding insult to fatal injury—Defendant Castro handcuffed Jordan Baker as he lay dying, writhing in pain, on the ground behind the mall.

53.     Jordan Baker died from the gunshot wound he suffered at the hands of Defendant Castro.

### Defendant Castro Attempts to "Cover-Up" His Unlawful Shooting

54.     After the shooting, Defendant Castro told authorities and investigators that he shot Jordan Baker because he thought shirtless-and-unarmed Baker "put his hands close to his waist," purportedly causing him to fear for his life.

55.     Defendant Castro's claim that Jordan Baker put his hands near his waist was a lie that Defendant Castro told to attempt to justify his unlawful acts.

56.     Defendant Castro knew that falsely claiming Jordan put his hands "near his waistband" during the chase would likely be sufficient to absolve him of

criminal liability for this homicide, since the only other witness to the shooting—Jordan Baker—was dead.

57.     Defendant Castro's accounting of events is extremely implausible, includes falsehoods, and belied by the external evidence.

58.     For example, Defendant Castro's account to authorities investigating the shooting incident is at odds with, and contradicted by, video captured from the front of the strip mall.

59.     Likewise, Defendant Castro's account to authorities is also inconsistent with the autopsy report prepared by the Harris County Coroner.

60.     Specifically, the autopsy report revealed a number of injuries Jordan Baker suffered and sustained during his encounter with Defendant Castro that are at odds with the version of events Defendant Castro provided to investigators after the shooting.

## The City of Houston and RPI Group Fail
## To Discipline Defendant Castro

61.     Despite all of the inconsistencies and implausible version of events provided by Defendant Castro, his employers—the City of Houston and RPI Group—failed to discipline Defendant Castro in any meaningful way.

62.     Indeed, neither the City of Houston nor RPI Group ended Defendant Castro's "Extra Employment" at the 5700 W. Little York strip center in the wake of the shooting.

63.     Instead, records indicate that Defendant Castro continued to work for RPI Group after the shooting for at least another year. Defendant Castro was not disciplined or fired by RPI Group for killing Jordan Baker.

64.     Likewise, following the shooting (though after a short stint on administrative leave) Defendant Castro returned to full duty for the Department. Defendant Castro was not, and has not been, disciplined by the HPD for killing Jordan Baker.

65.     The City of Houston did not require Defendant Houston to stop serving as law enforcement at the 5700 W. Little York Strip Center after the shooting either.

66.     Indeed, just 10-days after the shooting the Department approved a different "Extra Employment" assignment for Defendant Castro in addition to his ongoing work for RPI Group.

## Houston's Policy and Practices Were the Moving Force behind the Constitutional Violations Inflicted Against Jordan Baker

67.     The shooting of Jordan Baker—an unarmed African-American—was not an isolated incident for the Houston Police Department.

68.     In fact, on information and belief, between 2008 and 2012 HPD shot at least 121 people, killing at least 52.

69.     On information and belief, more than one quarter of these individuals were unarmed. The fact that more than 25% of the HPD's police-involved shootings between 2008 and 2012 involved unarmed individuals is indicative of the HDP's policies, practices, and procedures.

70.     The fact that more than one-quarter of the HPD's police-involved shootings between 2008 and 2012 involved unarmed individuals is also indicative of the HPD's deliberate indifference to the constitutional rights of Houston residents, which was again illustrated by the shooting of Jordan Baker as and others shot by HPD officers since 2012.

71.     Tellingly, for some unarmed individuals shot by HPD officers, the purported justification for the use of deadly force was that the individual was "reaching for the waistband"—the same excuse Defendant Castro invoked in an attempt to justify shooting Jordan Baker.

72.     For example, in February of 2010, an HPD officer shot Steven Guidry in the neck in southwest Houston after claiming Guidry "reached into his waistband as if to get a weapon." Likewise, in October of 2012, an HPD officer shot Ricardo Salazar-Limon in the back by claiming that, as he walked away from the officer, Salazar-Limon "reached for his waistband."

73.     The Houston Police Department has also failed to meet firearm training requirements recommended by national police agencies. In addition, at the time of the shooting, the Department failed to have meaningful internal controls or policies that would prevent unlawful police shootings like the one that killed Jordan Baker.

74.     The City's failure to discipline Defendant Castro was not the first time the City of Houston failed to discipline an officer who unlawfully used deadly force.

75.     In fact, on information and belief, in the over 600 police-involved shootings between 2008 and 2012 in Houston, the Department did not ever

11

determine that an intentional discharge was unjustified. Indeed, neither officer involved in the Guidry or Salazar-Limon shootings described above were disciplined for their shooting of unarmed individuals.

76.     The Department's failure to train and discipline officers regarding the proper use of deadly force causes, and/or encourages the use of unconstitutional deadly force by Houston Police officers.

77.     The Department's record concerning its failure to train and discipline officers regarding the use of deadly force illustrates the City's deliberate indifference to the rights of individuals, particularly including the rights of citizens who, like Jordan Baker, were completely unarmed when they were shot.

78.     In fact, and as further evidence of both the Department's policies and the City's deliberate indifference, since the shooting of Jordan Baker, other unarmed African-American men have been shot by HPD officers in a fashion similar to Jordan Baker.

79.     For example, in September of 2015, Alan Pean, an African-American, was unarmed and shot by two HPD officers working law enforcement for a private hospital through the "Extra Employment System." And, like Jordan Baker, Mr. Pean was 26-year-old student with no criminal history of violence.

80.     The City's failures to train and discipline their officers with respect to their uses of excessive force also extend to HPD officers' unconstitutional use of an individual's race, both when deciding to detain an individual and when electing to use force. Like Jordan Baker, a number of unarmed individuals shot by HPD

officers are people of color—Mr. Guidry, Mr. Salazar-Limon, and Mr. Pean stand out as such examples.

81.     As a consequence, and upon information and belief, the City's police officers frequently use race in their policing, both in determining when and whom to detain but also in their decisions to use force.

82.     Houston officers use race when determining to detain and use force against people of color in a manner disproportionate to their proportionate representation in the population, illustrative of the Department's unconstitutional race-based practices.

83.     The City retains data regarding its police-involved shootings. That data indicates that HPD officers, pursuant to de-facto City policy and/or widespread practice, use deadly force against African-Americans in a disproportionate, racially significant manner.

84.     For example, at the time of filing, for the year 2015, out of 26 victims wounded or killed in police involved-shootings, 57.6% of those individuals were African-American. This startling figure is over double the proportion of Houston residents that are African-American; a number U.S. Census data puts under 25%.

85.     Other data confirms that the HPD's use of force against persons of color is disproportionate. For example, consistent with the numbers seen in 2015, a statistical profiling of every closed HPD officer-involved-shooting from 2005 to 2013 concluded that black suspects were involved in the most total number of officer-involved shootings (comprising over 50% of the police-involved shootings), and that

Hispanic and Black suspects had a much higher probability of being the targets of officer involved shootings than White or Asian suspects.

86.     As concerns stops made by HPD officers, the City maintains a de-facto, race-based policing system despite the fact that its own "Racial Profiling Reports."

87.     Indeed the City's own reports support an inference that race-based policing has occurred, owing to the fact that African-American individuals make up a disproportionate number of traffic stops and searches conducted by HPD officers.

88.     For example, according to the City's data, in 2014, almost 40% of traffic stops made by the HPD were of African-Americans, despite the fact that African-Americans make up less than 25% of the City's population.

89.     In addition, according to the City's own data, African-Americans are more likely to be searched following a stop in a disproportionately higher rate than other demographic groups.

90.     Despite these skewed results, in its "Racial Profiling Reports," the HPD maintains that there is no statistically significant evidence of racial profiling against any racial or ethnic group in Houston.

91.     This Conclusion illustrates the City's deliberate indifference to its own race-based, and racially disproportionate police practices.

**Plaintiffs' Damages**

92.      The Defendants' actions imposed substantial harm on Jordan Baker during the period of time after which he was shot by Defendant Castro until Jordan

Baker ultimately passed away. The amount of excruciating pain Jordan Baker felt during those final moments is unquantifiable.

93.     In addition, Jordan Baker, a 26-year-old college student and father of a seven-year-old, lost the opportunity to live the rest of his life. Jordan Baker lost the opportunity to finish college; the opportunity to earn wages based upon his college education; and the ability to see his young son, J.B., grow up. These damages are tragic and substantial.

94.     Likewise, Jordan Baker's son, J.B., has suffered an immeasurable loss: growing up without a father. His upbringing will now be forever altered by the difficulties that he and his caretakers will face as a result of his father's death.

95.     Janet Baker, Jordan's mother, has experienced monumental loss as well. Janet Baker was close with her son and will never again have this relationship nor the opportunity to see Jordan grow. In addition, Janet has been further harmed by the actions subsequent to the shooting—both by the failure of any authorities to bring any accountability to Defendant Castro, but also by the substantial life changes that she has endured in assisting with caretaking for J.B.

### Count I - 42 U.S.C. § 1983
### Excessive Deadly Force

96.     Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

97.     As described in the preceding paragraphs, Defendant Castro's actions toward Jordan Baker violated Baker's constitutional rights, including but not

limited to those under the Fourth and Fourteenth Amendments of the United States Constitution.

98.     The misconduct described in this Count was objectively unreasonable and undertaken with willfulness and reckless indifference to the rights of others. In addition, the misconduct and excessive force described in this Count "shocks the conscience."

### Count II – 42 U.S.C. § 1983
### Unlawful Seizure/Detention

99.     Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

100.    In the manner described in this Complaint, Defendant Castro violated Plaintiff's constitutional rights, causing him damage by detaining him with the absence of probable cause or reasonable suspicion in violation of the Fourth Amendment of the United States Constitution.

101.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Jordan Baker's constitutional rights.

### Count III— 42 U.S.C. § 1982
### Equal Protection

102.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

103.     In the manner described in this Complaint, Defendant Castro violated Plaintiff's constitutional rights intentionally subjecting him to unlawful,

unequal treatment on the basis of his race in violation of the Fourteenth Amendment of United States Constitution.

104.     Defendant Castro's conduct created discriminatory effect by targeting Jordan Baker for police action based on his race.

105.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Jordan Baker's constitutional rights.

## Count IV—42 U.S.C. § 1983
## Failure to Provide Medical Care

106.     Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

107.     As described in the preceding paragraphs, Defendant Castro's actions toward Jordan Baker violated Baker's constitutional rights, including but not limited to the Fourth and Fourteenth Amendments of the United States Constitution due to his failure to render any medical care to Jordan Baker after having detained him by shooting him in the chest.

108.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Jordan Baker's constitutional rights.

## Count V—42 U.S.C. § 1983
## Municipal Liability: *Monell*

109.     Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

110.    As described in the preceding paragraphs, the misconduct described in Counts I-IV was undertaken under the policy and practice of the City of Houston, such that Defendant City of Houston is also liable, in that:

a.    As a matter of both policy and practice, the City of Houston encourages, and is thereby the moving force behind, the very type of misconduct at issue in Counts I-IV by failing to adequately train, supervise, control and discipline its officers such that its failure to do so manifests deliberate indifference;

b.    As a matter of both policy and practice, the City of Houston facilitates the very type of misconduct at issue in Counts I-IV by failing to adequately investigate, punish, and discipline prior instances of similar misconduct, thereby leading Houston police officers to believe their actions will never be meaningfully scrutinized. Accordingly, in that way, the City of Houston directly encouraging future uses of excessive deadly force, unlawful detention, failures to intervene, and race-based policing such as those Plaintiff complains of;

c.    Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, officers of the Houston Police Department violate the constitutional rights of individuals in a manner similar to that alleged by Jordan Baker in Counts I-IV on a regular basis, yet the Houston Police Department investigates officer misconduct and makes findings of wrongdoing in a disproportionately small number of cases.

111.    As a result of the City of Houston's policies and practices, and the unjustified and unreasonable conduct of the Defendant Castro, Plaintiff has suffered injuries, including severe emotional distress and ultimately death.

## Count VI—State Law Claim
## Assault & Battery

112.    Each paragraph of this Complaint is incorporated as if restated fully herein.

113.    As described above, Defendant Castro used force against Jordan Baker, resulting in harmful or offensive contact.

114.    In using force against Jordan Baker, Defendant Castro intended to cause physical pain or injury, to be insulting, and/or to cause offensive contact.

115.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

116.    All Defendants are liable for damages arising from Defendant Castro's unlawful assault and battery in that Jordan Baker's injuries were caused by Defendant Castro's wrongful act, neglect, carelessness, unskillfulness, or default while Castro was acting as an agent of the City of Houston and RPI Group.

117.    As a proximate result of this misconduct, Jordan Baker suffered severe physical pain and emotional distress, and anguish.

## Count VII—State Law Claim
## Wrongful Death

118.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

119.     All Defendants are liable for damages arising from Defendant Castro's unlawful conduct that caused Jordan Baker's death in that Jordan Baker's injuries and death were caused by Defendant Castro's wrongful act, neglect, carelessness, unskillfulness, or default while Castro was acting as an agent of the City of Houston and RPI Group.

120.     Defendant Castro's actions as described in this Complaint were a substantial factor in bringing about Jordan Baker's death, and without those actions, the death of Jordan Baker would not have occurred.

121.     Both Janet Baker, Jordan Baker's mother, and J.B., Jordan Baker's son, suffered loss of companionship and mental anguish as a result of the wrongful death of Jordan Baker.

122.     Both Janet Baker and J.B. suffered from pecuniary loss as a result of the wrongful death of Jordan Baker.

## Count VIII—State Law Claim
## Survival Action

123.     Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

124.     Plaintiff Janet Baker is the legal representative authorized to pursue these claims against Defendants.

125.     Prior to his death, Jordan Baker suffered serious personal injuries including but not limited to severe pain and emotional distress during the period after he was shot but before he died from the gunshot wounds Defendant Castro inflicted upon him.

126.    All Defendants are liable for these damages arising from Defendant Castro's unlawful conduct that caused Jordan Baker's severe pain and emotional distress in that Jordan Baker's injuries were caused by (or were substantially caused by) Castro's wrongful act, neglect, carelessness, unskillfulness, or default while Castro was acting as an agent of both City of Houston, RPI Management Company and RPI Interests I.

127.    Defendant Castro's actions as described in this Complaint were a substantial factor in bringing about the injuries described in this Count, and without those actions, these injuries would not have occurred.

### Count IX—State Law Claim
### Intentional Infliction of Emotional Distress

128.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

129.    In the manner described more fully above, by causing the death of Jordan Baker, the Defendants intended to cause both physical and emotional distress.

130.    In so doing, Defendant Castro's conduct was extreme and outrageous and caused Jordan Baker severe, disabling physical distress, emotional distress, and ultimately death.

131.    The misconduct described in this Count was intentional and undertaken with malice, willfulness, and reckless indifference to the rights of others.

132.     All Defendants are liable for damages arising from Defendant Castro's intentional inflection of emotional distress against Jordan Baker in that the infliction of such distress was caused by Defendant Castro's wrongful act, neglect, carelessness, unskillfulness, or default while Castro was acting as an agent of the City of Houston and RPI Group.

## Count X—State Law Claim
## Municipal Liability

133.     Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

134.     Public entities must pay any tort judgment for damages for which employees are liable within the scope of their employment activities for mandatory functions of the municipality. 102 V.T.C.A. § 102.0215.

135.     During all times relevant to this complaint, Defendant Castro was an employee of the Houston Police Department, who acted within the scope of his employment in committing the acts described herein.

## Count XI—State Law Claim
## *Respondeat Superior*

136.     Each paragraph of this Complaint is incorporated as if restated fully herein.

137.     In committing the acts alleged in the preceding paragraphs, Defendant Castro acted at all relevant times within the scope of his employment on behalf of the Houston Police Department and RPI Group.

138.     These Defendants are principals liable for all torts committed by their agents, including Counts VI-IX above.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants JUVENTINO CASTRO, CITY OF HOUSTON, RPI MANAGEMENT COMPANY, LLC, and RPI INTERESTS I; award compensatory damages and attorneys' fees; award punitive damages against JUVENTINO CASTRO; and provide any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

/s/ David B. Owens
*One of Plaintiffs' Attorneys*

Jon Loevy
Mark Loevy-Reyes
David B. Owens
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

Billy Joe Mills
FIRMEQUITY
858 West Armitage Avenue
Suite 101
Chicago, IL  60614
(847) 207-9064

**CERTIFICATE OF SERVICE**

I, David B. Owens, an attorney, hereby certify that on January 12, 2016, I filed the foregoing First Amended Complaint using the Court's CM/ECF system, which effected service on counsel for RPI Management Company, and that the First Amended Complaint was served by First Class Mail, sent January 13, 2016, on the City of Houston and Juventino Castro.

/s/ David B. Owens
*One of Plaintiff's Attorneys*