Andrew Scott
February 05, 2018

1            IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
2                   HOUSTON DIVISION
                CASE NO.4:15-CV-003495
3

4    ESTATE OF JORDAN BAKER, by and through administrator,
     JANET BAKER,
5

6            Plaintiff,
     -vs-
7

     JUVENTINO CASTRO, THE CITY OF HOUSTON, AND RPI
8    MANAGEMENT COMPANY, LLC,

9            Defendants.
     _____

10

11

12      VIDEOTAPED DEPOSITION OF ANDREW J. SCOTT, III

13

14           Monday, February 5, 2018
                10:00 - 3:00 p.m.

15

16

17           1900 Northwest Corporate Blvd.
                    Suite 200
18           Boca Raton, Florida 33431

19

20   Reported By:
     Antoinette Garza, RPR, FPR
21   Notary Public, State of Florida

22

23

24

25

EXHIBIT
C
tabbies

Andrew Scott
February 05, 2018                                    2 to 5

Page 2

1   APPEARANCES:
2   On behalf of the Plaintiff:
3       MARK LOEVY-REYES, ESQUIRE
        LOEVY & LOEVY
4       311 N. Aberdeen
        3rd Floor
5       Chicago, IL 60607
6
7
8   On behalf of the Defendants:
9       JENNIFER F. CALLAN, ESQUIRE
        CAMELA J. SANDMANN, ESQUIRE
10      CITY OF HOUSTON CITY ATTORNEY
        900 Bagby
11      3rd Floor
        Houston, TX 77002
12
13
14
15
16  ALSO PRESENT:
17      U.S. LEGAL SUPPORT VIDEOGRAPHY
18
19
20
21
22
23
24
25

Page 3

1              I N D E X
2
3   WITNESS:    DIRECT    CROSS    REDIRECT   RECROSS
    ANDREW J. SCOTT, III
4
5   By Ms. Callen   5                217
6   By Mr. Loevy-Reyes      211
7
                 - - -
8           E X H I B I T S
                 - - -
9
    NUMBER    DESCRIPTION                      PAGE
10
11  Exh. No. 1  Notice                          6
12  Exh. No. 2  Report                          8
13  Exh. No. 3  Supplemental report            59
14  Exh. No. 4  CV                             32
15  Exh. No. 5  Updated CV                     32
16  Exh. No. 6  Model Policy                  114
17  Exh. No. 7  Invoice                        10
18  Exh. No. 8  Documents reviewed             12
19  Exh. No. 9  Bulletin                      146
20  Exh. No. 10 Photo                         134
21  Exh. No. 11 Fryer report                  175
22  Exh. No. 12 Witness statement             176
23  Exh. No. 13 Castro IED                    176
24
25

Page 4

1              P R O C E E D I N G S
2                    - - -
3       Deposition taken before Antoinette Garza,
4   Registered Professional Reporter and Notary Public
5   in and for the State of Florida at Large, in the
6   above cause.
7                    - - -
8       THE VIDEOGRAPHER:  Good morning.  We're now
9   on the video record.  Today is Monday, the 5th day
10  of February 2018.  The time on the monitor is
11  10:07 a.m.  We're here at 1900 Northwest Corporate
12  Boulevard, Boca Raton, Florida, for the purpose of
13  taking the deposition of Andrew Jay Scott, III,
14  taken by the defendant in case number
15  415-CV-003495.  The case is the Estate of Jordan
16  Baker versus Juventino Castro, et al, which was
17  filed in the Southern District of Texas.
18      The court reporter is Antoinette Garza of
19  U.S. Legal Support.  The videographer is Michael
20  Hollander of U.S. Legal Support.
21      Would all counsel please state their
22  appearances for the record.
23      MS. CALLAN:  Jennifer Callan, City of Houston
24  and Officer Castro.
25      THE VIDEOGRAPHER:  Camela Sandmann, City of

Page 5

1   Houston and Officer Castro.
2       MR. LOEVY-REYES:  Mark Loevy-Reyes on behalf
3   plaintiff.
4   Thereupon,
5           (ANDREW J. SCOTT, III)
6   having been first duly sworn or affirmed, was examined
7   and testified as follows:
8       THE WITNESS:  I do.
9              DIRECT EXAMINATION
10  BY MS. CALLAN:
11      Q.   Mr. Scott, for the record could you please
12  state your full name?
13      A.   Andrew Jay Scott, III.
14      Q.   How are you currently employed?
15      A.   I'm employed, I have a background screening
16  company called Scott-Roberts and Associates.  That's
17  one of my companies.  The other is AJS Consulting,
18  which I supply or provide, excuse me, expert witness
19  consultation to both plaintiffs and defense as well as
20  provide security assessments for companies that need
21  assessments of their particular facilities.
22      Q.   We'll get into those in a little bit.  But
23  before we start, you understand you are here for a
24  deposition that -- and you received a notice which I'm
25  marking as Exhibit 1.

Andrew Scott
February 05, 2018                              18 to 21

Page 18

1      Q.   Those are the only photos you have of
2  Mr. Baker would be at the crime scene?
3      A.   Yes.
4      Q.   And you used all of these to formulate your
5  opinion that is in the exhibits that we have here
6  today?
7      A.   Yes.
8      Q.   Exhibit 2 actually.
9           Okay.  Anything else?
10     A.   I'm not understanding the question.
11     Q.   Anything else that you reviewed?
12     A.   Yes.  I have material that I used to support
13 and substantiate my opinions.
14     Q.   Okay.
15     A.   They are all contained in this file right
16 here.
17     Q.   What is your hourly rate, Mr. Scott?
18     A.   I charge $250 an hour.
19     Q.   And when you were -- when you signed your
20 agreement on April 3rd, your letter of engagement,
21 what were you hired to actually do?
22     A.   I was asked to provide my expert opinion on
23 the use of force relative to Mr. Baker, if it was
24 acceptable within police practices and procedures.  And
25 also to take a look at the data relative to the

Page 19

1  practices of Houston Police Department to see if there
2  is perhaps a disparity impact as to how the agency
3  deals with individuals of color or minorities.
4      Q.   Anything else?
5      A.   Not that I recall.
6      Q.   And besides reviewing the documents that you
7  have in front of you, what other activities have you
8  undertaken to formulate your opinion in this case?
9      A.   Other than conducting research based on the
10 information provided and writing my report, nothing
11 else.
12     Q.   What research did you conduct?
13     A.   I believe that you will find that research
14 noted in the group of documents I have here.  Shall I
15 read them off to you?
16     Q.   Please.
17     A.   I reviewed the Mathematical Methods in the
18 Social Sciences, Houston, Texas Police Department
19 Project On Officer Involved Shooting, author by Anthony
20 L. Colucci, C-O-L-U-C-C-I, John Patrick McCleary, and
21 Yang G, I can't pronounce the last.  I'll spell it.
22 N-G is the last name.  It's out of Northwestern
23 University and it was published June 4, 2014.
24          I also reviewed a document titled, An
25 Imperial Analysis of Racial Differences in Police Use

Page 20

1  of Force, authored by Ronald G. Fryer, F-R-Y-E-R, Jr.
2  I'm not sure -- excuse me.  It's July 2016 is when it
3  was published.
4          I reviewed an article from the American
5  Psychological Association titled, Policing In Black And
6  White.  That was published in December of 2016, volume
7  47, number 11.
8          I reviewed an article from the International
9  Association of Chiefs of Police titled, Implicit Bias
10 Versus the Ferguson Effect, Psychological Factors
11 Impacting Officers' Decisions to Use Deadly Force.
12 That was February 2016.
13          I reviewed an article from Police One News,
14 titled, the Science of Training, Unpacking Implicit
15 Bias and Policing, dated November 7, 2016.
16          I reviewed a document referred to as the Law
17 of Implicit Bias through the Yale Law School Legal
18 Scholarship Repository.
19          I reviewed an article titled, The Reverse
20 Racism Effect, Are Cops More Hesitant To Shoot Black
21 Than White Suspects.  That's dated 2016 through the
22 American Society of Criminology.  And that's authored
23 by Lois James, Steven M. James and Brian J. Vila.
24          I reviewed the City of Houston demographic
25 profile 2015.

Page 21

1          I reviewed the Supreme -- United States
2  Supreme Court case, Terry v. Ohio.
3          I reviewed the International Association of
4  Chief of Police National Law Enforcement Policy Center
5  article titled, Foot Pursuits, Concepts and Issues
6  paper, February 2003.
7          I reviewed IACP, International Association of
8  Chiefs of Police Training Key, number 517 titled,
9  Suspects Who Run, Supreme Court Expands Terry Rule.
10         I reviewed the International Association of
11 Chiefs of Police Model Policy titled, Use of Force,
12 February 2006.
13         And I believe I also used the same policy but
14 updated by the IACP titled, Rest.  I don't think I have
15 it with me.
16         I reviewed --
17     Q.   If it's not with you, you are not sure if you
18 have reviewed it or not?
19     A.   I'm certain I reviewed it.  It's just not
20 with me.
21     Q.   Okay.
22     A.   I reviewed IACP Training Key Number 387
23 titled, Stop and Frisk.
24         I reviewed training -- IACP Training Key
25 Number 552 titled, Foot Pursuits.

Page 22

1    I reviewed the expert report of Stephanie
2  Seguino, University of Vermont, regarding this case,
3  State of Jordan Baker v. Juventino Castro, et al.
4    I reviewed expert reports provided by the
5  defense, one authored by Terry A. Bratton, another
6  expert report for the defense authored by Michael
7  Anthony Dirden.  And then I also reviewed a
8  supplemental report, I believe it's by Officer Bratton
9  based upon my supplemental report.
10    I reviewed a number of articles that were
11  provided to me by my client.  Would you like me to go
12  through them?
13    Q.   Yes, please.
14    A.   Sure.  The one article is titled, Unarmed and
15  Dangerous Bulletproof Part One from the Houston
16  Chronicle Investigation.  The title of it, I have
17  already given that, I apologize.  Another article, Hard
18  To Charge Bulletproof, Part Three by the Houston
19  Chronicle Investigation titled, Investigation Raised
20  Questions About Whether Grand Jury System in Harris
21  County Favors Police.  Another article by the Houston
22  Chronicle titled, A Crash, A Scream and Gunfire,
23  Bulletproof Part Two.  An article by the Texas
24  Observer.org titled, The Horror Everyday Police
25  Brutality in Houston Goes Unpunished.  Another article

Page 23

1  by the Texas Observer.org titled, Houston Cops Always
2  Justified in Shootings Always.  Another article by the
3  Texas Observer.org titled, Crimes Unpunished in the
4  Houston Police Department, a Lax Discipline System
5  Keeps Negligent Cops On The Streets.  Another article
6  by the Texas Observer, Houston Cops Always Justified In
7  Shootings Always.  That might have been a repeat and I
8  apologize if it was.
9    Q.   Is that it?
10    A.   No, ma'am.
11    Q.   Okay.
12    A.   Another article titled, Area Officers
13  Continue To Be Cleared In Shootings.  And it looks like
14  it's coming from Chrons -- I apologize, CHRON.com.
15  Another article titled, Grand Jury Never Told That Off
16  Duty Police Officer Was Drunk When He Shot Unarmed
17  Brothers, from the Houston Chronicle.  Another article
18  from the Houston Chronicle titled, HPD Cleared Officer
19  in 2012 Shooting Without Considering Eyewitness
20  Accounts, Witnesses Dispute Officers Account in 2012
21  Shooting.  Another article from Chron.com titled, One
22  of Two Men Shot By Off-Duty Officer In Fight Dies.
23  Another article by Chron.com titled, Police Focal and
24  Officer in Deadly Shooting was Legally Intoxicated.
25  The next article titled, HPD: Threatened Officer Kills

Page 24

1  Man, published by Chron.com.  Another article published
2  Chron.com titled, Witness Dispute HPD's Account of
3  Fatal Shooting.
4    I think that's going to do it, ma'am.
5    Q.   Okay.  So when I asked you about research, my
6  apologies.  I should have been more clear.
7    Did you personally conduct any research, any
8  running mathematical equations, go and conduct blood
9  spatter, do any type of independent research
10  investigation other than reading these articles?
11    A.   The only other research that I did relative
12  to the statistical data provided in my reports was
13  based upon the information that was provided by the
14  Houston Police Department.
15    Q.   You didn't go out to the scene?
16    A.   No, I did not.
17    Q.   Have you ever been out to Houston to look at
18  the scene of the crime?
19    A.   No.
20    Q.   Have you spoken to any of the witnesses that
21  were named in any of the testimony that you were
22  provided deposition testimony, grand injury testimony?
23    A.   No.
24    Q.   Have you spoken to anybody in Houston Police
25  Department regarding this?

Page 25

1    A.   No.
2    Q.   Have you spoken to anybody at the Harris
3  County District Attorney regarding their investigation?
4    A.   No.
5    Q.   So is it fair to say then that your
6  investigation or your research to formulate your
7  opinions was based on reviewing of documents only?
8    A.   Yes, ma'am.
9    Q.   And with regard -- we'll get into this in
10  more detail.  But with regards to newspaper articles,
11  did you verify any of the information provided in those
12  articles?
13    A.   No, ma'am, I did not.
14    Q.   Do you know if any newspaper or news media
15  verifies their information?
16    A.   Well, ma'am, based on most of the articles
17  that I -- well, the articles that I had relative to
18  statistical data, that data was retrieved from the
19  Houston Police Department.  And there was no issue of
20  dispute of the legitimacy of that data that I had.
21    Q.   Okay.  But did you call anybody who wrote
22  those articles and ask what their data source was?  You
23  know it's from Houston Police Department, but the
24  parameters of their data source was?
25    A.   No, ma'am.

Page 26

1    Q.   So you don't know if they had reviewed -- if
2  they got for hypothetical purposes 100 pieces of
3  documents, 100 documents of various reports from the
4  Houston Police Department, and they only considered two
5  of those; would you know that?
6    A.   Well, based on the articles, they didn't say
7  they considered only two of them.  They considered, I
8  think, hundreds.
9         MS. CALLAN:  Objection, nonresponsive.
10        THE WITNESS:  I believe I was.
11 BY MS. CALLAN:
12   Q.   Sir, when I make an objection, you don't get
13 to respond back.
14   A.   Okay.
15   Q.   Please, the question was, did you contact
16 anybody who wrote these articles to ask them what the
17 parameters of their database was?
18   A.   No, I didn't have to because based on the
19 article it appeared that they had a sufficient amount
20 of data and they provided that number.
21   Q.   But you are making a presumption that you
22 didn't verify, correct?
23   A.   I'm not presuming.  I'm telling you that I
24 did not verify from the source.
25   Q.   In the newspaper articles, did they have a

Page 27

1  footnote indicating how many documents they reviewed
2  and how many documents they did not review in the data
3  source?
4    A.   I don't recall.
5    Q.   That would be something important, correct?
6    A.   It would be helpful.
7    Q.   Because they might be skewed one way versus
8  another, correct?
9    A.   Could be.
10   Q.   So usually a newspaper article is bias in
11 one -- towards one person or one thing, correct?
12   A.   I don't know about that.
13   Q.   Okay.  You don't -- did these newspaper
14 articles that you relied on, did they give both sides
15 of the story?
16   A.   Based on what the information was provided in
17 the reports versus what was -- people that were
18 interviewed, they gave that balance.  Did they
19 interview anybody from the police department, yes, they
20 did.
21   Q.   Did they state that in the articles?
22   A.   Yes.
23   Q.   Did they give the police department side of
24 the story in the articles?
25   A.   Based on my recollection, yes, not every

Page 28

1  article though.
2    Q.   Not every article.  So some articles are
3  bias?
4         MR. LOEVY-REYES:  Objection, foundation.
5         Go ahead.
6         THE WITNESS:  They could be.  I'm not saying
7  they are.  I'm not making that judgment.
8  BY MS. CALLAN:
9    Q.   But we can agree that you didn't contact
10 anybody to verify the veracity of the information in
11 the reports?
12   A.   That's correct.  That's what I have testified
13 to.
14   Q.   Well, let's discuss because you had several
15 reports that are newspaper articles that referenced the
16 grand jury in Houston.
17        Are you familiar with Texas law?
18   A.   No, not completely.  Absolutely not.
19   Q.   Do you understand the grand jury system in
20 Texas?
21   A.   I would only imagine it's very similar to
22 that of the state of Florida based on what I have read.
23   Q.   Tell me what the state of Florida does, and I
24 will tell you what the state of Texas does?
25   A.   Sure.  Here Florida convenes civilians to act

Page 29

1  as jurors in grand jury.
2    Q.   Who convenes them?
3    A.   The state attorney.  The state attorney then
4  presents its case.  Relative to the facts of the case,
5  they bring individuals to testify.  Normally, it is
6  one-sided, normally.  And when I say one-sided, they
7  will present the case.  If there's eyewitnesses, they
8  will have the eyewitnesses also present their
9  testimony.  And then they present the case to the grand
10 jury for the grand jury to make their decision whether
11 there is a true bill or not.
12   Q.   So the determination of what is presented to
13 a grand jury is determined by the Florida state's
14 attorney general?
15   A.   Correct.
16   Q.   And the state's attorney general is separate
17 and apart from any police department, correct?
18   A.   Are you referring to the state attorney
19 general or the state attorney's office?
20   Q.   Both.  Is the state attorney general the
21 local police department?
22   A.   No.
23   Q.   Is the state attorney general's office, the
24 attorneys themselves part of the local police
25 department?

Andrew Scott
February 05, 2018                           58 to 61

Page 58

1  Florida publications?
2      A.   Yes, ma'am.
3      Q.   And even the IACP one was based on Florida
4  law?
5      A.   You are referring to the crime prevention?
6      Q.   Yes.  Your personal knowledge of Florida, did
7  it include stats from other agencies in other states?
8      A.   There was no -- I'm sorry to interrupt.
9           There were no statistic based on what I
10 recall.
11     Q.   Okay.
12     A.   It was describing our crime prevention model,
13 and it did not deal specifically with a state.  It
14 could be quite applicable to anybody in the nation if
15 they wanted to use it.
16     Q.   Fair enough.  But your knowledge is based on
17 Florida, your Florida background, right?
18     A.   Not necessarily.
19     Q.   Florida law enforcement?
20     A.   I'm a Florida law enforcement officer who has
21 dealt with a number of agencies around the country in
22 various states.
23     Q.   This is your first Texas case though,
24 correct?
25     A.   I don't recall.

Page 59

1      Q.   So if we go --
2      A.   I don't think so.
3      Q.   If we go through your list of cases that you
4  have on Exhibit 4.  It was on your CV.
5      A.   Are you looking for my testimony list, ma'am?
6      Q.   Yes, sir.
7      A.   I don't know what you did with it.
8      Q.   It was attached to your report, your
9  October 12 report, and it should be attached to
10 Exhibit 4.
11          MR. LOEVY-REYES:  Was the curriculum vitae
12     Number 1?
13          MS. CALLAN:  No.  Number 1 was the notice of
14     deposition.  Number 2 is the October 12 report.
15     Number 3 is the supplemental report.
16          (Defendant's Exhibit No. 3 was
17          marked for identification.)
18          THE WITNESS:  Here is Number 4.
19          MR. LOEVY-REYES:  There you go.
20          THE WITNESS:  So your question, again, ma'am?
21 BY MS. CALLAN:
22     Q.   The testimony list on Exhibit 4, does it say
23 anywhere in there any Texas cases?
24     A.   No, because I have not testified or given
25 deposition in a case involving a Texas jurisdiction,

Page 60

1  however, I have had cases that involved Texas
2  jurisdictions.
3      Q.   Which Texas jurisdiction?
4      A.   Don't recall.
5      Q.   When was it then?
6      A.   Probably about 2012.
7      Q.   And you don't recall what entity was
8  involved?
9      A.   No, offhand I don't.  It did involve a police
10 pursuit though.
11          MS. CALLAN:  I would ask, counsel, that we
12     leave a line in the deposition so that Mr. Scott
13     can include the Texas jurisdiction that he has
14     just referenced.
15          MR. LOEVY-REYES:  I'm not agreeable to that.
16     You are certainly welcome to examine him on the
17     context of the case, but I don't see the relevance
18     of it, first of all.  Yeah, I just don't see the
19     relevance of it.
20 BY MS. CALLAN:
21     Q.   Mr. Scott, when you were involved in this
22 Texas review, was it for plaintiff or defendant?
23     A.   Plaintiff.
24     Q.   And you believe it was in 2012 involving a
25 pursuit?

Page 61

1      A.   It's a guess, yes.
2      Q.   You are not sure -- did you provide a report?
3      A.   I may have.
4      Q.   But you are saying you did not go to a
5  deposition?
6      A.   No, I did not.  The case settled prior to any
7  other testimony.
8      Q.   Do you remember the attorney who hired you?
9      A.   No, not offhand.
10     Q.   Do you remember the case?
11     A.   No.  Well, when you say the case, the case
12 name or the circumstances?
13     Q.   The case name.
14     A.   No.
15     Q.   Do you remember if it was in federal or state
16 court?
17     A.   It was federal.
18     Q.   And was it a pursuit -- was there a death?
19     A.   Yes.
20     Q.   So what were you asked to review?
21     A.   I was asked to review if the pursuit fell
22 within generally accepted police practices and
23 procedures.
24     Q.   In Texas law or generally across the nation?
25     A.   Both.

Andrew Scott
February 05, 2018                          62 to 65

Page 62

1    Q.   When you do a report in a specific
2  jurisdiction, though, isn't it necessary to know the
3  specific state law?
4    A.   Sure.
5    Q.   Did you learn the specific state law in 2012
6  for Texas?
7    A.   I don't recall, ma'am.  I have probably 500
8  cases that I have been involved with.
9    Q.   But is it your practice to learn state law
10  for the given case in a specific jurisdiction?
11    A.   Sometimes, yes.
12    Q.   Sometimes.  What do you mean sometimes?
13    A.   Sometimes.  Sometimes I do, sometimes I
14  don't.
15    Q.   Why wouldn't you learn the specific state
16  law?
17    A.   It depends on the case, ma'am.
18    Q.   And in this death case in 2012 and this death
19  case herein that we're here today with the Baker case,
20  did you learn Texas law?
21    A.   Did I learn it, ma'am, or did I -- I'm not
22  quite sure when you say did I learn it.
23    Q.   Did you review it?
24    A.   You know, I think -- I don't recall if I read
25  the statute on use of force in the state of Texas.  I

Page 63

1  don't recall if I did or not.
2    Q.   That would be something important, wouldn't
3  you agree?
4    A.   Sure.
5    Q.   And that would go to your credibility as an
6  expert is for you to reference state law?
7         MR. LOEVY-REYES:  Objection, foundation,
8      calls for a legal conclusion.
9         You could go ahead.
10         THE WITNESS:  I'm not quite sure if that's
11      going to question my credibility, ma'am.  I just
12      don't recall, I've had so many documents to
13      review.
14  BY MS. CALLAN:
15    Q.   In your opinion that you gave in Exhibit 2
16  and Exhibit 3 -- well, more Exhibit 2, you reference
17  law, right?  You reference Terry v. Ohio, Tennessee v.
18  Garner, Graham v. Connor; yes?
19    A.   Yes, those are the United States Supreme
20  Court cases.
21    Q.   Are you a lawyer?
22    A.   No, ma'am.
23    Q.   Have you been to law school?
24    A.   No, ma'am.
25    Q.   So you are reading these and giving a legal

Page 64

1  conclusion based on your understanding of your
2  interpretation of that case law?
3    A.   Well, not at all.  I'm not providing any
4  legal opinion.  What I am doing though is using my
5  expertise, training and knowledge predicated on those
6  particular cases that I have used in my career and
7  making an opinion as to the delivery of police
8  practices and procedures relative to the court cases.
9  I'm not giving any legal opinion.
10    Q.   Your opinions in our Exhibit 2 and Exhibit 3
11  are void of any reference to Texas law?
12    A.   That's correct.
13    Q.   But it's important to know Texas law because
14  you are referencing federal cases that interpret
15  Tennessee v. Garner was interpreting a Tennessee
16  statute, not a Texas statute.  Were you aware of that?
17         MR. LOEVY-REYES:  Objection, foundation,
18      calls for a legal conclusion.
19         You could go ahead.
20         THE WITNESS:  I am, ma'am.  But the United
21      States Supreme Court guides all behavior as it
22      relates to whatever the case might be.  So if the
23      state of Texas is going to violate Tennessee v.
24      Garner, I suspect that there is going to be a
25      number of lawsuits and/or other issues so.

Page 65

1         MS. CALLAN:  Objection, nonresponsive and
2      narrative.
3  BY MS. CALLAN:
4    Q.   Mr. Scott, I wasn't asking you if Texas law
5  violated Tennessee v. Garner.  But you did not consider
6  Texas law when you were looking at Tennessee v. Garner,
7  did you?
8    A.   I don't recall.
9    Q.   You didn't look at Chapter 9 of the Texas
10  Penal Code, did you?
11    A.   No, I did not.
12    Q.   Did you look at the Texas Code of Criminal
13  Procedures as to the use of force?
14    A.   That I recall.  I think I did, but I just
15  don't know when.
16    Q.   Okay.  Do you know the chapter?
17    A.   No, no, I don't.
18         MS. CALLAN:  Can I take a quick break?
19         THE VIDEOGRAPHER:  Time on the monitor is
20      11:20.  We're going off video record.
21         (A break was had.)
22         THE VIDEOGRAPHER:  We're back on video
23      record.  The time is 11:31 a.m.
24  BY MS. CALLAN:
25    Q.   Mr. Scott, Exhibit 2 and Exhibit 3 have been

Andrew Scott
February 05, 2018                    74 to 77

Page 74

1      Q.   So you were running a consulting firm during
2  the last couple of years of being chief of police?
3      A.   Yes, ma'am.
4      Q.   And that AJS does review 1983 lawsuits?
5      A.   It does now, but specifically when I was
6  chief of police, the only consulting services I
7  provided was on accreditation.
8      Q.   So do you recall when you started reviewing
9  1983 lawsuits?
10     A.   Yes, ma'am, in 2006.
11     Q.   Right after you retired.  Well, close to
12 retirement?
13     A.   No, ma'am.  I apologize.  I'm not trying to
14 mince your words.  But, no, not right after.  Probably
15 in November of 2006.  Retired out of law enforcement in
16 February 2006.
17     Q.   Okay, okay.  So since about November 2006 to
18 today approximately how many 1983 lawsuits have you
19 reviewed?
20     A.   Approximately 450 to 475.
21     Q.   And I believe you had testified earlier that
22 you had not provided deposition or trial testimony in
23 all of those, correct?
24     A.   That's correct.
25     Q.   And as far as you can recall sitting here

Page 75

1  today, you have only had one other Texas 1983 suit,
2  lawsuit that you reviewed?
3      A.   Based on recollection, that's correct.
4      Q.   How do you -- what is your percentage of
5  review for plaintiff on 1983 cases?
6      A.   About 75 to 80 percent.
7      Q.   Generally are you deposed and provide trial
8  testimony in these cases?
9      A.   No.
10     Q.   Have you ever given testimony in Texas
11 regarding a 1983 case?
12     A.   No.
13     Q.   Have you ever been challenged as an expert in
14 any 1983 case?
15     A.   Not to my recollection.
16     Q.   What about the Lisa Thompson vs. Officer
17 Davenport, Miami-Dade County case.  Do you recall that?
18     A.   The name sounds familiar.  I don't know what
19 had transpired on that.
20     Q.   So if I told you that the court documents
21 show you were challenged, that would be the first you
22 knew about it?
23     A.   Yes, ma'am.
24     Q.   Well, there are court documents.
25     A.   When you say challenged, I'm not quite sure

Page 76

1  what you are saying.
2      Q.   The opposing counsel says that you are not
3  qualified to be an expert.
4      A.   Oh.
5      Q.   What we call in legal terms, and counsel here
6  will correct me if I'm wrong, is it a Daubert
7  challenge.
8      A.   Yes, I understand.  No, I wasn't aware of
9  that.  That's news to me.
10     Q.   So you were unaware that you were challenged
11 on the basis that you make impermissible credibility
12 determinations and legal conclusions?
13     A.   No, ma'am.
14     Q.   Do you know what TCOLE stands for?
15     A.   I'm sorry.
16     Q.   T-C-O-L-E?
17     A.   No.
18     Q.   It's a Texas Commission On Law Enforcement.
19     A.   Okay.
20     Q.   Which is the state licensing entity for
21 Texas.
22     A.   Understood.
23     Q.   Since you didn't -- are you aware of TCOLE or
24 you just had never heard it called TCOLE?
25     A.   I wasn't aware of the acronym, no.

Page 77

1      Q.   It used to be called TCOLE notes.  Does that
2  ring a bell?
3      A.   No.
4      Q.   They just changed it two years ago to TCOLE.
5           Do you know what the annual requirements are
6  in Texas to maintain your law enforcement license?
7      A.   I believe there's a minimum mandatory of four
8  hours.  I'm not sure if it's a year or if it's every
9  two years or four years.  I apologize for that.
10     Q.   Do you know what TCOLE requires to become
11 certified in the state of Texas.
12     A.   Offhand, no, I do not know the number of
13 hours that's required of that.
14     Q.   Do you know how TCOLE breaks down police
15 officer certification?
16     A.   No.
17     Q.   You don't know what levels or hierarchy that
18 they have?
19     A.   No, ma'am.
20     Q.   We've already testified that all of your
21 opinions today are in Exhibits 2 and 3, correct?
22     A.   Yes, ma'am.
23     Q.   Do you plan on appearing at trial to testify
24 in this case?
25     A.   Yes, ma'am.

Andrew Scott
February 05, 2018                                    78 to 81

Page 78

1    Q.   You provided a list of your cases attached to
2  your CV.  We have discussed that briefly; yes?
3    A.   Yes, ma'am.
4    Q.   Have you ever provided an opinion based on
5  that list of cases that an officer involved shooting
6  was, some people say justified, I say within policy.
7         But I'm letting you know the two mean the
8  same thing.
9    A.   Yes.  Your question is clear.
10         I don't recall.
11    Q.   Does that mean -- let me ask it this way.  If
12  you had provided an opinion stating that a shooting, an
13  officer involved shooting was within policy, it would
14  stand out in your mind since the majority of your case
15  work is plaintiff based?
16    A.   No, that's not what I'm saying.  It's just
17  that I don't recall.
18    Q.   It's possible though?
19         MR. LOEVY-REYES:  Objection, foundation,
20         calls for speculation.
21         Go ahead.
22         THE WITNESS:  It's possible.
23  BY MS. CALLAN:
24    Q.   Have you ever been to Houston, Texas?  I'm
25  sure there's other Houstons.

Page 79

1    A.   I believe I have, but I remained in the
2  airport.
3    Q.   Didn't venture out into the community?
4    A.   The time between flights wouldn't allow me.
5    Q.   So is it fair to say that you are not
6  familiar with the community as a whole, personal
7  knowledge of the community as a whole?
8    A.   No.
9    Q.   No, you have no personal knowledge?
10    A.   That is correct.
11    Q.   And I think, I believe you've already
12  testified that you have never been to the location of
13  this shooting, correct?
14    A.   That's correct.
15    Q.   And I will tell you that the location, just
16  for clarification of the record, was 5700 West Little
17  York Road in Houston.
18         Do you plan to go out there before you come
19  to trial?
20    A.   That's going to be solely up to my client.
21    Q.   And you have not discussed that with him?
22    A.   At this juncture, no.
23    Q.   And I believe you've already testified, so if
24  I am repetitive forgive me.  But do you have personal
25  knowledge of the Houston Police Department other than

Page 80

1  what you have read in the documents provided?
2    A.   No, I do not.
3    Q.   Do you know any of the -- any of the chain of
4  command at the police department today, the chief of
5  police, his assistants, any of them?
6    A.   No.
7    Q.   Have you ever met them at IACP?
8    A.   Not to my recollection, but it would not be
9  surprising if I did.
10    Q.   Because you are a life member, correct?
11    A.   Yes, ma'am.
12    Q.   As well as I am, so.
13         And I will agree with you or you can agree
14  with me IACP has multiple seminars that you could go
15  to, so you could go with somebody from your own agency
16  and never see them until it's time to go home?
17    A.   Correct.
18    Q.   So this happened in 2014.  Did you know Chief
19  McClelland, Charles McClelland?
20    A.   The name was familiar to me, but no, I don't
21  believe I ever met him.
22    Q.   Familiar in what sense?
23    A.   His name had come up in circles that I knew
24  in IACP, that's all, that he was the chief of police of
25  Houston Police Department.

Page 81

1    Q.   But you never met him?
2    A.   No, I have not.
3    Q.   And I believe we touched on this briefly, but
4  you are not familiar with the Texas Code of Criminal
5  Procedure?
6    A.   Not completely, no, I'm not.
7    Q.   And you are not familiar with the Texas Penal
8  Code?
9    A.   No.
10    Q.   How about the Texas local government code?
11    A.   No, ma'am.
12    Q.   How about the Texas Occupations Code?
13    A.   No, ma'am.
14    Q.   So would you be surprised if all of those
15  govern various aspects of the Houston Police
16  Department?
17    A.   I'm not surprised at all because it's
18  similarly applicable here in the state of Florida.
19    Q.   Are you familiar with the Houston Code of
20  Ordinances?
21    A.   No.
22    Q.   How about the Houston Charter, city charter?
23    A.   No, ma'am, I haven't reviewed those.
24    Q.   You would agree with me, though, that the
25  operation of a police department is governed by

Page 86

1   of force, Chapter 9 of the penal code?
2       A.   I don't recall specifically if that's the
3   area that I looked at.
4       Q.   What about penal code 9.32, when deadly force
5   can be used?
6       A.   Most likely that's what I read.
7       Q.   What about the Code of Criminal Procedure
8   regarding the use of force?
9       A.   I don't recall.
10      Q.   What about Code of Criminal Procedure
11  regarding when an officer can make a warrantless arrest
12  and use force?
13      A.   That, I don't recall.
14      Q.   You would agree with me that these are all
15  parameters that a Texas police officer would have to
16  comply with?
17           MR. LOEVY-REYES:  Objection, foundation,
18      calls for a legal conclusion.
19           Go ahead.
20           THE WITNESS:  I would imagine that they
21      would.
22  BY MS. CALLAN:
23      Q.   So did you read Article 6.05 of the Texas
24  Code of Criminal Procedure, on duties of police
25  officers when they are threatened?

Page 87

1       A.   I may have, but I don't specifically recall.
2       Q.   But again, your opinion is void of any
3   reference to Texas law?
4       A.   True.
5       Q.   Did you review the Texas penal statute on
6   what an assault was?
7       A.   No, I did not.
8       Q.   Did you know that assaulting a police officer
9   is a felony in the state of Texas?
10      A.   I would imagine it is.
11      Q.   A weapon is involved, it becomes an
12  aggravated assault?
13      A.   Is that a question?
14      Q.   Yes.
15      A.   It's a statement.  Are you asking?
16      Q.   I asked you, do you understand that if a
17  weapon is involved during the assault, it becomes an
18  aggravated assault?
19           MR. LOEVY-REYES:  Objection, relevance.
20           THE WITNESS:  I apologize.  Yes.
21  BY MS. CALLAN:
22      Q.   As a law enforcement officer, you know the
23  difference between -- let me ask it this way.
24           As a law enforcement officer, do you
25  understand that usually an offense becomes aggravated

Page 88

1   when a weapon is involved?
2       A.   Yes.
3       Q.   And that the weapon could be anything based
4   on the manner and means of its use?
5       A.   Particularly if it's going to inflict bodily
6   harm or death.
7       Q.   And anything can inflict bodily harm,
8   correct?
9       A.   I don't understand that, ma'am.
10      Q.   Anything in the manner and means of its use
11  could inflect bodily harm?
12           MR. LOEVY-REYES:  Objection, foundation.
13           But you could go ahead and answer.
14           THE WITNESS:  I'm still not understanding
15      what you are trying to get at.  I apologize.
16  BY MS. CALLAN:
17      Q.   If I pick up a pen and come at you, and if I
18  hit you just right in the neck, it could cause bodily
19  harm or even death, correct?
20           MR. LOEVY-REYES:  Objection, relevance.
21           Go ahead.
22           THE WITNESS:  Sure.
23  BY MS. CALLAN:
24      Q.   So anything could be used as a weapon based
25  on manner and means of its use?

Page 89

1           MR. LOEVY-REYES:  Objection, foundation.
2           Go ahead.
3           THE WITNESS:  For sake of this deposition,
4       that global ubiquitous "anything," yes.
5   BY MS. CALLAN:
6       Q.   For instance, are you aware of Texas case law
7   that says a peanut butter and jelly sandwich could be
8   used as a weapon if someone is shoving it down your
9   thought?
10           MR. LOEVY-REYES:  Objection, relevance.
11           THE WITNESS:  I'm not aware of that.
12  BY MS. CALLAN:
13      Q.   It goes to manner and means, you would agree
14  with that; yes?
15           MR. LOEVY-REYES:  Same objection.
16           THE WITNESS:  Sure.
17  BY MS. CALLAN:
18      Q.   So in your analysis when you were a chief of
19  police, you looked at manner and means of the object;
20  yes?
21      A.   I would imagine I did.
22      Q.   Certainly would you in today's world, a hand,
23  a fist could be used in the manner and means it's used
24  because we have some MMA fighters, if it's used just
25  right or if you hit the person just right, manner and

Page 94

1  dismissed by the judge.
2      Q.   Any other lawsuits?
3      A.   Not to my knowledge.
4      Q.   Any car accident lawsuits?
5      A.   No.
6      Q.   Any divorces?
7      A.   Yep.  Yes.  Excuse me.
8      Q.   When was your divorce?
9      A.   I'm not going to answer that question.  You
10  could have it certified.
11         MR. LOEVY-REYES:  I'm going to make a late
12     objection on relevance.
13  BY MS. CALLAN:
14     Q.   But it was a lawsuit?
15     A.   Sorry?
16     Q.   The divorce was a lawsuit that was filed?
17     A.   I'm not aware that's a lawsuit.
18     Q.   But a petition was filed?
19     A.   Yes.
20     Q.   Do you still maintain your police officer
21  certification?
22     A.   No.
23     Q.   Why don't you maintain it?
24     A.   No need to.  No desire to.
25     Q.   Florida allows retirement to continue with

Page 95

1  your certification after you retire?
2      A.   You can, yes.
3      Q.   When you were a police officer, were you ever
4  disciplined by your agency?
5      A.   Yes, for a traffic crash when I was a rookie
6  police officer in North Miami.
7      Q.   This shooting in 1988, there was a separate
8  investigation?
9      A.   Yes.
10     Q.   Administrative and criminal?
11     A.   Yes.
12     Q.   You weren't -- you were taken before a grand
13  jury?
14     A.   No.
15     Q.   No, you weren't personally in front of the
16  grand jury or, no, you don't know if your case went
17  before a grand jury?
18     A.   I was not taken before a grand jury and the
19  case was not brought before the grand jury.
20     Q.   Were you disciplined?
21     A.   No.
22     Q.   So the shooting was found to be within
23  policy?
24     A.   Yes.
25     Q.   Any other discipline?

Page 96

1      A.   Yes.  As chief of police I was sanctioned by
2  the ethics commission.  Well, actually it was after my
3  tenure as chief of police.
4      Q.   But for conduct during your tenure as chief
5  of police?
6      A.   Yes.
7      Q.   And it was the ethics?
8      A.   Florida State Ethics Commission.
9      Q.   Is that your licensing, they are part of the
10  Florida licensing?
11     A.   No.
12     Q.   What was the -- what were you sanctioned for?
13     A.   I was sanctioned for allowing a news reporter
14  to get an interview of a contractor within my community
15  that scammed an elderly couple.  The news reporter made
16  it very clear that the individual that she wanted to
17  get an interview from was running red lights, running
18  stop signs, driving erratically.  And she wanted to
19  have us post an officer at his intersection down the
20  block because he was going to run the stop sign.  And
21  then she had asked if she could possibly get an
22  interview if he was stopped and issued a citation.
23         That occurred.  It happened exactly the way
24  she said it.  And when my officer was finished writing
25  the summons, he told the driver, you are free to leave.

Page 97

1  And because the news reporter was coming with the
2  cameraman.  And ultimately he stayed, and the issue of
3  the shoddy construction work was resolved.  But the
4  union took exception to that and felt that I misused my
5  position as chief of police.
6      Q.   When you were sanctioned, how did that impact
7  your law enforcement license, if any?
8      A.   It didn't.
9      Q.   It just was placed on your record?
10     A.   Not even.  Well, when you say record, no.
11  Was it placed on my law enforcement career record, no,
12  it wasn't.  It was sanctioned through the governor's
13  office.
14     Q.   Okay.  With regards to the lawsuit that we
15  have here today, are you familiar with Officer
16  Juventino Castro?
17     A.   Only as much as I have read.
18     Q.   Through the documents that were presented to
19  you by plaintiff's counsel, correct?
20     A.   Yes, ma'am.
21     Q.   You have never contacted anybody in the
22  Houston Police Department regarding him?
23     A.   No.
24     Q.   Anybody in Texas law enforcement regarding
25  him?

Andrew Scott
February 05, 2018                              106 to 109

Page 106

1    A.   That's correct, ma'am.  Yes.  My apologies
2  for that.
3    Q.   Let's look at number 61, if you would.  The
4  HPD annual racial profiling statistical comparative
5  report from 2009 to 2016.
6         Are you aware of the statutory requirement
7  regarding racial profiling reporting in Texas.
8    A.   No, I'm not familiar with it verbatim, but I
9  know in general it's a requirement for the police
10  department is to produce that report.
11    Q.   And what else do you understand about that
12  law?
13    A.   That's it.
14    Q.   Do you understand or are you aware that it
15  only focuses on motor vehicle stops?
16    A.   Yes, ma'am, that's my understanding.
17    Q.   And this case is not involving a motor
18  vehicle stop?
19    A.   No, it does not.
20    Q.   And that motor vehicle stops -- would you
21  agree with me motor vehicle stops in any jurisdiction
22  can be based on -- let me rephrase that.
23         When law enforcement conducts a traffic stop,
24  the individual may or may not be part of the community
25  in which the stop is being made.  For instance, it

Page 107

1  could be somebody traveling through the city?
2    A.   Sure.
3    Q.   But that is a statistic that would be
4  replaced in a traffic stop?
5    A.   Sure.
6    Q.   And on number 63, HPD IAD investigation
7  summaries, number 63, are officer involved shootings,
8  correct?
9    A.   That's correct, yes, ma'am.
10    Q.   Anything else that you asked for?
11    A.   I'm sorry.  That I asked for?
12    Q.   Yes.  Anything else that you asked for other
13  than the statistician's report?
14    A.   No, everything else was supplied to me.
15    Q.   And then just real quick, if you will look at
16  the November 12th report, anything in there?
17    A.   That I specifically asked for, no, these were
18  supplied to me by --
19    Q.   No, no, that you used to formulate your
20  stats.
21    A.   Oh, I'm sorry.
22         No.
23    Q.   Okay.
24         Is a, based on your law enforcement training
25  and experience an officer has discretion to conduct a

Page 108

1  traffic stop?
2    A.   Yes, predicated upon a violation of the law
3  or has reasonable suspicion that an individual has been
4  involved in some type of crime or there's a crime
5  afoot.  But has to have articulable reasonable
6  suspicion.
7    Q.   When you render expert opinions, do you
8  normally rely on newspaper articles as your basis to
9  formulate an opinion?
10    A.   Sometimes.
11    Q.   And you find these reliable sources?
12    A.   It depends.
13    Q.   When you were formulating your opinion in
14  this case, did you conduct any research as to how
15  municipalities in Texas handle their use of force?
16    A.   I don't understand.
17    Q.   Did you do any independent studies or
18  research, call anybody in other Texas cities to see how
19  they handle use of force so that you could compare them
20  to Houston?
21    A.   When you say handle use of force, I didn't
22  call any agency.  But I'm not understanding when you
23  say, how they handle use of force.
24    Q.   Did you call them to ask them how they
25  investigate use of force?

Page 109

1    A.   No, ma'am.
2    Q.   How they draft their policies for use of
3  force?
4    A.   No.
5    Q.   How they conduct training on use of force?
6    A.   No.
7    Q.   Would that be something necessary to
8  formulate an opinion?
9    A.   Not necessarily, no.
10    Q.   Did you consult with any municipality in
11  formulating this opinion?
12    A.   No.
13    Q.   When you were formulating your opinion, did
14  you have -- discuss it with any of your peers?
15    A.   No.
16    Q.   Did you discuss it with any other experts?
17    A.   No.
18    Q.   Did you talk with, I believe your partner,
19  Mr. Roberts, in your Scott-Roberts firm?
20    A.   No.
21    Q.   Did you give drafts of your report to anybody
22  to review?
23    A.   Yes.
24    Q.   Who?
25    A.   That would be Mr. Owens, and it was a draft.

Page 110

1    Q.    And I believe you already testified that you
2    did not conduct any independent investigations into
3    this case?
4    A.    I did not.
5    Q.    In arriving at your conclusions, did you make
6    any assumptions regarding the case?
7    A.    No.
8    Q.    When you formulate an expert opinion, do you
9    consider all the evidence equally?
10   A.    Yes, of course.
11   Q.    So in this case, did you give equal weight to
12   the independent witness, Ms. Reyes?
13   A.    Yes.
14   Q.    And that would be reflected in your opinion?
15   A.    It's indicative in my report, sure.
16   Q.    Exhibit Number 2, point to me where in
17   opinions one through five you relied on Ms. Reyes?
18   A.    Oh, I apologize.  No, they are not in the
19   opinions per se.  They are in the summary and they are
20   considered as part of my overall deciding which
21   opinions I'm going to have.
22   Q.    When formulating your opinions, did you make
23   credibility determinations based on witnesses in this
24   case?
25   A.    No.

Page 111

1    Q.    Did you choose to believe facts provided to
2    you by plaintiff's counsel versus what was actually in
3    the case?
4    A.    Plaintiff supplied me only the facts that
5    were provided to them.  Plaintiff did not -- I'm sorry.
6    My attorney did not provide me with any facts outside
7    the case.
8    Q.    Are your conclusions based on your perception
9    of facts provided to you by plaintiff's counsel?
10   A.    Repeat the question.  Sorry.
11   Q.    Are your conclusions, are your opinions based
12   on your perception of the facts as provided to you by
13   plaintiff's counsel.
14   A.    My opinions are based upon the facts
15   presented by your agency and your agency alone, in
16   addition to the research material that I used to
17   support my basis.
18   Q.    And research material or the newspaper
19   articles, the IACP stuff that we already discussed?
20   A.    In part.
21   Q.    What was the methodology you used to
22   formulate the opinion in Exhibit 2?
23   A.    Which opinion?
24   Q.    In Exhibit 2, your October 12th report.
25         No, this one, sir.

Page 112

1    A.    Okay.  So which opinion are you referring to?
2    Q.    This is your complete opinion as of
3    October 12, correct?
4    A.    Okay.
5    Q.    Pages 1 through 5?
6    A.    So collectively you are saying --
7    Q.    What methodology did you use to formulate
8    those opinions?
9    A.    I first and foremost researched the material
10   that was provided to me by my client.  I reviewed
11   material from the Houston Police Department,
12   particularly policies.  I used IACP model policies and
13   training keys to assist in determining my opinions.
14         I also used my knowledge, experience and
15   training to formulate my opinions so that was my
16   methodology.
17   Q.    Let's discuss, I think we both have different
18   perception and definition of what the word research
19   means.
20         When I ask if you have researched something,
21   I'm asking did you go out and conduct any studies, if
22   you reviewed an article, did you verify the information
23   that was used in that article to form their opinions.
24   Did you do anything independently to come up with your
25   opinions, when I say research.

Page 113

1    A.    My opinions are based upon my independent
2    thoughts predicated upon research so, and my training
3    and experience.  So what I first do is I -- and if I'm
4    answering your question, I don't want to belabor this.
5    So when I first get a case, I'm reviewing all of the
6    material that's presented to me.  And then from that, I
7    then can take a look at the particular practices and
8    procedures, perhaps promulgated by the agency or by the
9    IACP or the Police Executive Research Forum.
10         And then from there I develop my basis as to
11   my opinions and formulate my opinions.  And then
12   subsequently I provide them in writing.
13   Q.    Did I answer that question?
14   A.    Yes, yes, you did.
15         The articles though that you referred to were
16   given to you, the newspaper articles were given to you
17   by plaintiff's attorney.  You didn't go pull those
18   yourself, did you?
19   A.    No, I didn't.
20   Q.    What about the IACP stuff, did you pull it
21   yourself?
22   A.    I did.
23   Q.    I don't recall any reference to any PERF
24   article.  Is there PERF articles that you referred to?
25   A.    No, not in this particular case.

Page 162

1    A.   I'm not perceiving anything.  I'm telling you
2  what I'm seeing from my law enforcement experience and
3  what I could see in the deposition -- excuse me, in the
4  video.
5    Q.   You say on Page 13 the video clearly shows
6  Mr. Baker riding his bicycle past the Little Caesars
7  store, but there is no evidence that Mr. Baker was
8  casing the premises.  Rather Mr. Baker was casually
9  riding his bicycle and may have looked into the store
10  front, which does not remotely indicate somebody casing
11  the place.
12        We have already discussed that, and that's
13  your perception of what you see in the video; yes?
14    A.   Yes, ma'am.
15    Q.   It's not based on any actual investigation or
16  methodology, is it?
17    A.   It's based on the information that I received
18  from my client provided by Houston Police Department.
19  That's what I have to base my opinion on.
20    Q.   Anywhere in opinion one did you take into
21  account, since we're talking about totality of
22  circumstances, the description of Mr. Baker given by
23  Ms. Reyes?
24    A.   The description provided by Ms. Baker.  What
25  are you saying?  I'm sorry.  I'm missing something.

Page 163

1    Q.   The description of Mr. Baker provided by
2  Ms. Reyes.
3    A.   Yes, what about it.  I'm sorry.
4    Q.   Did you take that into consideration in
5  opinion one?
6    A.   Yes.
7    Q.   Where is that?
8    A.   I didn't cite it.
9    Q.   Would Mr. Baker's aggressive behavior be
10  something that needs to be taken into consideration
11  when analyzing totality of circumstances?
12    A.   Yes.
13    Q.   On Page 14 you say, quote, actions of Officer
14  Castro were inconsistent with generally accepted police
15  practices and procedures.
16        That's a pretty general statement.  So what
17  are these specific police practices and procedures you
18  are referencing?
19    A.   Sure.  As it relates to articulable
20  reasonable suspicion, Officer Castro had a hunch that
21  perhaps Mr. Baker might be a robbery suspect based upon
22  a few things; number one, Mr. Baker was a black male.
23  Number two; Mr. Baker was wearing a hoody; that
24  Mr. Baker was casing the stores; and that when upon
25  seeing Officer Castro, he immediately turned away and

Page 164

1  started to pedal quickly.
2        Based on everything I have seen, that's not
3  necessarily the case.  Mr. Baker was black.  He's
4  wearing a ubiquitous hoody.  He is riding in sandals
5  and it does not fit the method of operation of the
6  previous robbers.  So therefore there is no articulable
7  reasonable suspicion other than Mr. Baker is black and
8  he's wearing a hoody.
9    Q.   So the fact that he is in a hoody, a dark
10  hoody, African American male, what Officer Castro
11  believes to be casing, the unprovoked flight, robberies
12  being committed -- he is present on the property where
13  robberies are being committed during the time of day or
14  time of night, his aggressive behavior, and that's not
15  enough to ask him under Terry v. Ohio to additional
16  questions?
17    A.   Well, a couple of things.  You are testifying
18  of what I'm saying.  I'm telling you that you're
19  claiming that he's engaged in flight when video doesn't
20  indicate that he is pedaling any faster, although he
21  may have turned away.
22        The second thing, if I was Mr. Baker, I would
23  be pissed the way I got stopped by Officer Castro.
24  Sure, almost get hit by a car or at least the car is
25  positioned in such a way to prevent me from traveling

Page 165

1  out of the parking lot, sure, I would be a little
2  pissed, absolutely.
3        So given that, given all of that, I don't
4  think there was articulable reasonable suspicion to
5  stop Mr. Baker.
6        MS. CALLAN:  Objection, nonresponsive.
7  BY MS. CALLAN:
8    Q.   So you are basically making a credibility
9  determination on what Officer Castro said?
10        MR. LOEVY-REYES:  Objection, that misstates
11        testimony.
12        THE WITNESS:  Not at all.  Not at all.
13  BY MS. CALLAN:
14    Q.   Are you supplying legal standards in this
15  opinion?
16    A.   I'm not an attorney, ma'am.
17        MR. LOEVY-REYES:  Objection, foundation,
18        legal opinion.  I was going to say answer anyway.
19  BY MS. CALLAN:
20    Q.   Let's go to opinion number two on Page 14.
21        Under basis it says, according to the
22  American Psychological Association -- do you see that?
23    A.   Yes.
24    Q.   And that is referencing the WEIR article that
25  you referenced?

Andrew Scott
February 05, 2018                    166 to 169

Page 166

1   A.   Yes.
2   Q.   And have you recently read this article?
3   A.   Maybe a month ago.
4   Q.   And has it been peer reviewed?
5   A.   Don't recall.
6   Q.   Would that be something you should check
7   before relying on it?
8   A.   Not necessarily, ma'am.
9        The American Psychological Association is a
10  reputed association, and the fact that it's being
11  published within the publication associated with the
12  American Psychological Association, they would not just
13  arbitrarily print anything that was either not
14  consistent with their standards and what have you.  So
15  being peer reviewed, no.
16  Q.   What does peer review mean to you?
17  A.   That means your fellow peers, those that are
18  in the same business, either have reviewed it and/or
19  conducted additional testing based upon your hypothesis
20  and conclusions.
21  Q.   So its an intensive evaluation of the
22  analytical validity of the proposed conclusion; isn't
23  that the actual definition of peer reviewed?
24  A.   I wouldn't know, ma'am.  But since you quoted
25  it, I imagine you are correct.

Page 167

1   Q.   Do you know if an intensive evaluation has
2   been done on this article?
3   A.   Not to my knowledge.
4   Q.   Is it your opinion that everything that the
5   APA prints has to be valid because they printed it?
6   A.   No, not necessarily.  But they wouldn't print
7   trash, and so because one individual author has a
8   different opinion doesn't necessarily mean that it's
9   not valid or it can't be used as a substance for basis.
10  Q.   But that's not what we're talking about here.
11  We're talking is how do you know the information in
12  this is valid if you don't know it's been peer
13  reviewed?
14  A.   With regards to the conclusion that was cited
15  here with regards to black African Americans being
16  considered, as I stated in the report, one of the most
17  well demonstrated types of implicit bias is the
18  unconscious association between black individuals and
19  crime.  That association can influence an officer's
20  behavior even if she doesn't hold or express explicitly
21  racist beliefs.
22       And by the way, that comment has also been
23  supported by other studies.
24  Q.   We're not talking about other studies though,
25  we're talking about this article right here, sir.

Page 168

1   A.   Sure.
2   Q.   And where is the list of other studies that
3   they referenced to come up with that conclusion?
4   A.   I believe there is an article that I cited as
5   to -- use to support my facts.  It's here from the
6   police chief magazine that also states that black
7   American males -- or excuse me, African American males
8   based on a perception are considered to be either
9   dangerous or possess a weapon.
10       MS. CALLAN:  Objection, nonresponsive.
11  BY MS. CALLAN:
12  Q.   My question, sir, was where are those
13  articles referenced in here that they relied on?
14       MR. LOEVY-REYES:  Objection, foundation and
15  relevance.  But go ahead.
16       THE WITNESS:  May I take a look at it?
17  Thank you.
18       Well, there's a number of them here.  Further
19  reading, racial bias and policing, why we know
20  less than we should, final report of the
21  president's task force on 21st century policing,
22  implicit bias and policing, and then related
23  articles, adoption of implicit bias is hasty.
24  I'm not understanding your question.
25  BY MS. CALLAN:

Page 169

1   Q.   That doesn't mean -- further reading does not
2   mean that they were actually relied upon, does it?
3   A.   It might be.
4   Q.   It does not necessarily mean that it was
5   though, was it, because they would have to cite it to
6   in this article?
7       MR. LOEVY-REYES:  Objection, foundation and
8   argumentative.
9       THE WITNESS:  Okay.
10  BY MS. CALLAN:
11  Q.   They are just saying additional reading,
12  further reading, additional reading, correct?
13       MR. LOEVY-REYES:  Objection, foundation.
14  Go ahead.
15       THE WITNESS:  Yes.
16  BY MS. CALLAN:
17  Q.   Is anywhere in this article do they reference
18  the Houston Police Department?
19  A.   No.
20  Q.   But in this article they do state that roots
21  of disparity aren't always clear.  Do you recall that?
22  A.   That's correct.
23  Q.   And also in this article they state that
24  psychologists have preconceived ideas about law
25  enforcement, so a preconceived idea tends to make one

Andrew Scott
February 05, 2018                    170 to 173

Page 170

1  bias.  Isn't that what they are saying?
2      A.   Or it could skew the results or the
3  interpretation of the results.
4      Q.   They also say that implicit bias looks at
5  one's character; yes?
6      A.   Repeat the question.
7      Q.   Do you recall this article stating that
8  implicit bias looks at one's character?
9      A.   I don't recall off the top of my head.
10     Q.   Do you recall this statement from this
11 article it says, character is a weak predictor of
12 behavior, but situations are strong predicters of
13 behavior?
14     A.   Yes.
15     Q.   So what does that mean to you?
16     A.   That a nebulous concept of character can't be
17 considered a good particular of -- a particular action
18 of an individual.
19     Q.   Or that they are saying, in essence, you need
20 to look at the totality of circumstances and what's
21 happening at that time?
22     A.   Well, they are not using those terms.  They
23 are saying other factors come into play.
24     Q.   But in essence, that's what they are saying
25 when they say that the situation is a strong predictor

Page 171

1  of behavior?
2      A.   Yes.
3      Q.   Because you and I could be in the same
4  situation but we're going to act differently, correct?
5      A.   We might.
6      Q.   Well, but you are older than I am I'm going
7  to bet; yes?  I'm 50, so you are older than me?
8      A.   The jury doesn't need to hear that.
9      Q.   So the answer is yes?
10          MR. LOEVY-REYES:  Object to relevance.
11 BY MS. CALLAN:
12     Q.   And I was raised in Upstate New York.  You
13 were raised in Florida?
14     A.   No.
15     Q.   Well, most of your career has been in
16 Florida?
17     A.   Yes.
18     Q.   So we have been raised differently; yes?
19          MR. LOEVY-REYES:  Objection, foundation.
20          You could go ahead.
21          THE WITNESS:  Ma'am, I can't answer that
22      question.  I don't know anything about you.
23 BY MS. CALLAN:
24     Q.   Exactly, that's what I'm trying to get, we
25 are different.  So if we're in the same situation

Page 172

1  because we are different people, the way we behave to a
2  situation is going to be based on the individual?
3          MR. LOEVY-REYES:  Objection, relevance,
4      mischaracterizes prior testimony.
5          Go ahead.
6          THE WITNESS:  Sure.
7          MR. LOEVY-REYES:  Well, you already have.
8  BY MS. CALLAN:
9      Q.   The paper still says there's lot to learn on
10 this.  And this is basically meaning this is not
11 indicative of anything, right?
12     A.   I don't understand indicative of anything
13 part of the question.  I'm sorry.
14     Q.   Does the paper state they still have a lot to
15 learn?
16     A.   Sure.
17     Q.   And the paper states that there's still
18 information that needs to be deduced?
19     A.   No dispute.
20     Q.   So how can this be reliable?
21          MR. LOEVY-REYES:  Objection, foundation.
22 BY MS. CALLAN:
23     Q.   Regarding the Houston Police Department?
24          MR. LOEVY-REYES:  Foundation.  Go ahead.
25          THE WITNESS:  Because it cites a possible

Page 173

1  implicit bias by individuals related to law
2  enforcement.  It's just one of a number of
3  articles that are out there that talk about
4  implicit bias and what it is, and so why wouldn't
5  I want to use that.
6  BY MS. CALLAN:
7      Q.   It doesn't reference Officer Juventino
8  Castro, does it?
9      A.   Directly into the article?
10          MR. LOEVY-REYES:  Objection, relevance.
11          Go ahead.
12 BY MS. CALLAN:
13     Q.   Yes.
14     A.   No.
15     Q.   And it doesn't directly or specifically
16 reference the Houston Police Department?
17          MR. LOEVY-REYES:  Objection to relevance.
18          Go ahead.
19          THE WITNESS:  No.
20 BY MS. CALLAN:
21     Q.   And because we don't know if this has been
22 peer reviewed or not, and it says itself that more
23 information needs to be done and that psychologists
24 have a preconceived notion of law enforcement, it's not
25 really reliable?

Andrew Scott
February 05, 2018                          174 to 177

Page 174

1        MR. LOEVY-REYES:  Objection, foundation,
2   relevance, argumentative.
3        Go ahead.
4        THE WITNESS:  I disagree.
5   BY MS. CALLAN:
6        Q.   Let's go on to the next one.
7        Well, let me go back.  Did you participate in
8   any of these racial bias studies that are referenced in
9   this APA article?
10       A.   No, ma'am.
11       Q.   Your knowledge of this article is limited to
12  this article?
13       A.   My knowledge of the article is limited to
14  this article.
15       Q.   Did you call Dr. Weir?
16       A.   No.
17       Q.   Did you call anybody at APA?
18       A.   No, ma'am.
19       Q.   Did you reach out to any of the organizations
20  referenced in here?
21       A.   No, ma'am.
22       Q.   Did you reach out to any of the other
23  psychologists that are referenced in here?
24       A.   No.
25       Q.   Did you look up anything under the NCBI

Page 175

1   website?
2        A.   No, I did not.
3        Q.   So your knowledge of the information in this
4   article is this article itself?
5        A.   Sure.
6        Q.   You did not go and do independent
7   investigation?
8        A.   No.  Why would I?
9        Q.   You do not know what the methodology that was
10  used to garner this information?
11       A.   No, other than what's described in there.
12       Q.   Let's look at Dr. Fryer's article.
13       Was this peer reviewed?
14       A.   I believe it was.
15       MS. CALLAN:  So on the first page -- I'm
16  going to mark this Exhibit 11.
17            (Defendant's Exhibit No. 11 was
18            marked for identification.)
19       MS. CALLAN:  Counsel, I will make a clean
20  copy.  It will be marked as Exhibit 11.
21       MR. LOEVY-REYES:  Exhibit Number 11.  Okay.
22       MS. CALLAN:  Could we go off the record for a
23  second?
24       THE VIDEOGRAPHER:  Time on monitor is 1:51.
25  We're going off video record.

Page 176

1        (A break was had.)
2        THE VIDEOGRAPHER:  We're back on video
3   record.  The time is 2:00 o'clock p.m.
4        MS. CALLAN:  Mr. Scott, I'm going to go back
5   before we get into the Fryer report that's marked
6   as Exhibit 11.  And I want you to look at Exhibit
7   12 and 13 that I handed you.
8            (Defendant's Exhibit Nos. 12 &
9            13 were marked for
10           identification.)
11  BY MS. CALLAN:
12       Q.   Twelve is the homicide statement given by
13  Officer Castro, and 13 is a summary of his, well,
14  actually it's a cut and paste version of his IED
15  statement.
16       When we're discussing your term or your
17  opinion that he, meaning Mr. Baker, was forcibly
18  stopped by Officer Castro, we went through the grand
19  jury testimony and we went through the deposition
20  testimony, and you correct me if I'm wrong, stated I
21  believe it's in one of his statements.
22       These are the only two statements, and I'm
23  asking you to see where it says in there that it was
24  forcibly stopped.
25       A.   And in retrospect, ma'am, I know that in one

Page 177

1   of his statements, whether it's written or deposition
2   or grand jury, that he indicated, and I could not find
3   it right now unless we spend another hour, I cannot
4   find it.  But I'm certain that he indicated that he
5   pulled in front of Mr. Baker and caused him to stop, is
6   my recollection.
7        Q.   All right.  That's fine.  But we read the
8   deposition testimony where he said side by side; do you
9   recall that?
10       A.   Yes, ma'am.
11       Q.   And we read the grand jury testimony where he
12  said that he pulled -- we read the grand jury testimony
13  also, and there was no indication that he pulled in
14  front, do you remember that?
15       A.   Okay.  It states in his -- looks like his
16  witness statement, that's Exhibit 12.
17       Q.   His homicide statement?
18       A.   Could it be Baker COH00342.  He states, I
19  finally drove in the fourth full -- I'm sorry, the
20  fourth paragraph, middle of the paragraph, I finally
21  drove up a little past him and asked him to stop for a
22  second because I needed to talk to him.  This time the
23  male finally acknowledged me and stopped his bike.  I
24  got out of my car to talk to him.
25       Q.   May I see that?

Andrew Scott
February 05, 2018                    178 to 181

Page 178

1       But a little past him does not mean he
2   stopped in front of him?
3       A.   Based on the video -- excuse me, the crime
4   scene photographs, ma'am, it is very indicative that he
5   used his car to compel him to stop.
6       Q.   So Exhibit Number 10, show me where it's
7   indicative that you forcibly compelled him to stop, is
8   your testimony.
9       A.   This is probably not the actual location of
10  where Mr. Baker ultimately dropped his or initially
11  stopped.  You have Officer Castro's car who's edging in
12  a direction that is preventing Mr. Baker from riding
13  along the hedge line.  And as a result, Mr. Baker must
14  have assumed that he couldn't go any farther or was
15  going to get struck by the car.
16      Q.   You are speculating as to what Mr. Baker was
17  thinking, correct?
18      A.   Let me put it this way.
19      Q.   It's a simple yes or no.
20      MR. LOEVY-REYES:  I'm going to object.  That
21      mischaracterizes his testimony.
22  BY MS. CALLAN:
23      Q.   It's a simple yes or no question.  Are you
24  speculating what Mr. Baker is thinking?
25      A.   No.

Page 179

1       Q.   You know what Mr. Baker was thinking?
2       MR. LOEVY-REYES:  Objection, mischaracterizes
3       testimony.
4       THE WITNESS:  You just asked me if I was
5       speculating on what Mr. Baker was thinking, and I
6       said, no, ma'am, I'm not.
7   BY MS. CALLAN:
8       Q.   So, no, you are not speculating?
9       A.   No, I'm not speculating.
10      Q.   Are you saying that the bicycle was moved in
11  this picture?
12      A.   No, I'm not saying that it was moved, but
13  most likely was not the initial position of the bike
14  when Mr. Baker was stopped.
15      Remember, Mr. Baker drops the bicycle.  So
16  what I'm stating to you is that this is not a normal
17  path by which Officer Castro would be driving his car
18  other than to block his way.
19      Q.   And that's based on your opinion?
20      A.   It's based upon my law enforcement experience
21  when I have attempted to pull in front of somebody to
22  ensure that they either don't go in a direction I want
23  them to.
24      Q.   Do you know what Officer Castro was thinking?
25      MR. LOEVY-REYES:  Objection, foundation.

Page 180

1       Go ahead.
2       THE WITNESS:  No.
3   BY MS. CALLAN:
4       Q.   So it's based on your opinion.  You don't
5   know what either party was thinking, correct?  There's
6   no evidence that he struck the bike, correct?
7       A.   That's not my testimony.
8       Q.   My question is very simple, sir.  And if you
9   don't understand it, let me know and I will rephrase
10  it.
11      A.   You were asking multiple questions in one
12  line of questioning, ma'am.
13      Q.   You don't know what Mr. Castro -- I'm sorry,
14  Officer Castro was thinking, correct?
15      A.   No, other than what he's testified to.
16      Q.   You don't know what Mr. Baker was thinking,
17  correct?
18      A.   No, he's dead.
19      Q.   You don't know -- I'm sorry.  There's no
20  evidence that the car came in contact with this
21  bicycle?
22      A.   There is no evidence and I never testified to
23  that.
24      Q.   And you -- Let's go to Exhibit Number 11,
25  Mr. Fryer or Dr. Fryer's report.

Page 181

1       The question I posed to you before we went on
2   break was was this article peer reviewed.  And you
3   testified you believed it was.  Do you remember that?
4       A.   Yes, ma'am.
5       Q.   On the very first page there at the bottom
6   says Baker POA001576?
7       A.   Yes.
8       Q.   Above the copyright 2016, read that paragraph
9   please, for the record?
10      A.   Which?
11      Q.   The paragraph that starts MBER working
12  papers.
13      A.   Sure.  Okay.  My mistake.
14      Q.   Please read it for the record.
15      A.   Sure.  MBER working papers are circulated for
16  discussion and common purposes.  They have not been
17  peer reviewed or subject to the review by the MBER
18  board of directors that accompanies official MBER
19  publications.
20      Q.   So that means it wasn't peer reviewed,
21  correct?
22      A.   That's correct.
23      Q.   Did you contact Mr. Fryer?
24      A.   No, I did not.
25      Q.   Did you contact anybody in this article?

Andrew Scott
February 05, 2018                    182 to 185

Page 182

1    A.    No.
2    Q.    So your review of this article is simply
3    based on your reading of the article only?
4    A.    Yes.
5    Q.    No independent investigation by you?
6    A.    No, ma'am.
7    Q.    This article discusses New York City's stop
8    and frisk program?
9    A.    In part, yes.
10   Q.    Actually, let me step back.  This article
11   breaks down in four subsets; is that correct?
12   A.    Yes.
13   Q.    One was New York City stop and frisk.  And
14   then another subset, and then the third subset is
15   actually Houston Police Department, isn't it?
16   A.    Yes.
17   Q.    I'm sorry.  The second subset is police
18   public contract survey.  And then it's Houston Police
19   Department, correct?
20   A.    What pages are you on, ma'am.
21   A.    I'm just flipping through it actually.
22   A.    Okay.
23   Q.    Go to Page 35, the conclusions.
24   A.    Yes, ma'am.
25   Q.    Discussion regarding the use of force in

Page 183

1    nonlethal situations, that incorporates the New York
2    City information in the public police survey; does it
3    not?
4    A.    Yes, referring to officer involved shootings,
5    correct.
6    Q.    With regards to officer involved shootings,
7    this study actually found that on the most extreme use
8    of force officer involved shootings, we are unable to
9    detect any racial differences in raw data or when
10   accounting for control; is that correct?
11   A.    Yes.
12   Q.    Doesn't this article also say on Page 36 that
13   it is plausible that racial differences in lower level
14   uses of forces are simply a distraction -- seek own
15   communities rather than changing the behavior of other
16   external forces?
17   A.    It's almost like you are mumbling, ma'am.
18   I'm sorry.  One more time.
19   Q.    Let me go back.
20         You are being questioned by myself, correct?
21   A.    Yes, ma'am.
22   Q.    And you just handed documents to
23   Mr. Loevy-Reyes, correct?
24   A.    Yeah, sure.
25   Q.    And so what did you just hand him?

Page 184

1    A.    I handed him --
2         MR. LOEVY-REYES:  I will just state for the
3    record that, and I appreciate I said I didn't need
4    a copy, but I did not get a copy of this document
5    when you handed it to the witness.  So Mr. Scott
6    just handed me his copy of the study that you are
7    questioning him about.
8         MS. CALLAN:  Okay.
9         MR. LOEVY-REYES:  So this is the only copy I
10   have to review.
11        MS. CALLAN:  That's fine.  We could make you
12   a copy.  I just want to make sure what the witness
13   is handing to counsel.
14        Turn to the last page.
15        THE WITNESS:  I don't have a last page,
16   ma'am.  I don't have Page 36.
17   BY MS. CALLAN:
18   Q.    You don't have the Page 36 of.
19        Counsel, for the record we'll just redo the
20   copy because we're missing the last page.
21        Would you like me to read it for the record?
22   Q.    I did.  But the highlighted portion is what
23   you said I was mumbling on.
24   A.    Yes, ma'am.
25   Q.    Could you read that to yourself again.  And

Page 185

1    then my question to you is is that what it states?
2    A.    Yes.
3    Q.    Let's look at the Northwestern University
4    study that you referenced on page 15.
5         This study did not include just Houston
6    Police Department, did it?
7    A.    Based on my recollection it did.
8    Q.    So when it references Las Vegas Metropolitan
9    Police Department, Portland Oregon Police Bureau.
10   A.    Are we looking at the same report, ma'am?
11   I'm sorry.
12   Q.    Baker BLA001639?
13   A.    Yes.
14   Q.    So it wasn't just HPD?
15   A.    Based on what I'm reading in the
16   acknowledgment, it appears to be related to
17   predominantly HPD.
18   Q.    Will you agree with me HPD provided
19   information for this report?
20   A.    Yes.
21   Q.    But they reference other law enforcement
22   agencies?
23   A.    That's correct.
24   Q.    That was my question.  We could move on.
25        You know if that Northwestern University was

Page 186

1  peer reviewed?

2      A.   No, it was not based on what I recall.

3      Q.   Let's go to Page 16 and discuss the racial

4  profiling opinion that you gave.

5           You say it's based on?

6      A.   Which opinion are you on?  I'm sorry.  Which

7  opinion are you on, ma'am?

8      Q.   I'm referencing your racial profiling that

9  you comment for on Page 16.

10     A.   Page 15.

11     Q.   Sixteen.

12     A.   Sixteen.

13     Q.   Furthermore, Texas state law HPD are required

14  to conduct annual racial profiling reports.

15           As we discussed earlier you are aware that

16  this is limited to discretionary and nondiscretionary

17  traffic stops, motor vehicle stops?

18     A.   Yes, ma'am.

19     Q.   And nondiscretionary would mean that clear

20  violation of the law or perhaps a warrant or some

21  reason the officer has to stop them?

22     A.   Sure.

23     Q.   Let's go to opinion three, excessive force.

24  Page 16, you state a review of surveillance

25  camera from one of the stores in the shopping center

Page 187

1  shows Officer Castro positioning his police car in

2  front of Mr. Baker as he was riding his bicycle thus

3  forcibly stopping him.  It's uncertain if Officer

4  Castro's positioning his car caused Mr. Baker to,

5  quote, wreck on his bicycle and fall to the ground.

6           Where do you come up with wreck?

7      A.   You know, and that's something that I'm

8  mistaken at.  That's not correct.

9      Q.   What is the mistake?

10     A.   I can't tell for sure if Mr. Baker fell to

11  the ground or the bicycle went to the ground as he was

12  being stopped by Officer Baker (sic).  My mistake on

13  that.

14     Q.   Or if he actually put it down himself?

15     A.   Correct, yes.

16     Q.   So let's go to opinion four.

17     A.   Can I break for the restroom again.  I am so

18  sorry.

19     Q.   Yes, that's fine.

20          THE VIDEOGRAPHER:  Time on the monitor is

21  2:17.  We're going off video record.

22          (A break was had.)

23          THE VIDEOGRAPHER:  We're back on video

24  record.  The time on the monitor is 2:22 p.m.

25  BY MS. CALLAN:

Page 188

1      Q.   Mr. Scott, we're going to start discussing

2  opinion number four, which starts on Page 17.

3      A.   Yes, ma'am.

4      Q.   And this is -- your opinion is that it was

5  excessive and unnecessary force that was used; is that

6  correct?

7      A.   Yes.

8      Q.   And based on case law as well as the best

9  practice in law enforcement, the standard used to

10  determine if the force is reasonable and necessary is

11  an objective reasonable standard; is that correct?

12     A.   Yes, ma'am.

13     Q.   And in fact, the supreme court has told us we

14  shouldn't do a 20/20 hindsight review; is that correct?

15     A.   That's correct.

16     Q.   Do you think your opinion is based on a 20/20

17  hindsight review?

18     A.   No.  It's based upon the facts presented to

19  me and what my experience, training and knowledge have

20  led me to conclude.

21     Q.   Did you conduct your own independent

22  investigation to determine if the force was reasonable

23  and necessary?

24     A.   No, I did not.

25     Q.   And the methodology you used is what, the

Page 189

1  same methodology we have been discussing all day?

2      A.   Yes, ma'am.

3      Q.   On Page 17, it's above opinion four, so

4  forgive me if I'm going backwards.  It states, quote,

5  if -- that's two paragraphs above opinion four; if the

6  additional injury suffered by Mr. Baker were due to

7  falling off his bicycle because of being nearly struck

8  by Officer Castro's car, the degree of force was

9  unjustified and not objectively reasonable.

10          Do you see that?

11     A.   Yes, ma'am.  But I believe that I testified

12  already that I was mistaken relevant to the wreck or

13  causing him to fall off the bicycle.

14     Q.   You are not providing an opinion as to a

15  medical cause of his injuries?

16     A.   No, ma'am.

17     Q.   All right.  Paragraph right above where it

18  says opinion four, where it says there's little wonder

19  as to why Mr. Baker was agitated.

20          What is the basis of that opinion other than

21  speculation?

22     A.   There's no speculation.  I believe that one

23  of the witnesses indicated that Mr. Baker was agitated

24  and was cursing at the police officer and what have

25  you.  Mr -- excuse me, Officer Castro identified in his

Andrew Scott
February 05, 2018                    218 to 221

Page 218

1   made by, in our case, the District Attorney's Office;
2   is that true?
3           MR. LOEVY-REYES:  Objection, foundation.
4           Go ahead.
5   BY MS. CALLAN:
6       Q.   I'm sorry?
7       A.   That is correct.
8       Q.   And so the police department, pursuant to the
9   Brady obligation as well as the Michael Morton
10  Statutory Obligation in Texas, they turn over their
11  entire case file?
12      A.   Yes, you would hope so, correct.
13      Q.   And there's no evidence in this case that
14  they violated that, is there?
15      A.   That's not been an issue of contention here.
16      Q.   With regards to the trajectory, if the
17  autopsy photos and the medical examiner plus Dr. Arden,
18  plaintiff's expert, and Dr. Adler, defense's expert,
19  have taken the autopsy photos and shown the actual
20  trajectory through all of the organs that you
21  mentioned, and showed and testified that it is
22  consistent with Mr. Baker running at a slightly bent
23  angle starting to bleed when he was shot?
24          MR. LOEVY-REYES:  Objection, mischaracterizes
25      the evidence in the record.

Page 219

1           THE WITNESS:  I have not seen that testimony,
2       however, they're medical examiners -- excuse me,
3       they're medical doctors.
4   BY MS. CALLAN:
5       Q.   So you won't -- you will rely on the medical
6   expert testimony and you are not going to use your
7   opinion regarding trajectory if it conflicts with the
8   medical examiners or medical doctors?
9       A.   Well, I'm going to state my opinion based
10  upon what I have seen in the autopsy reports.
11          MS. CALLAN:  One moment.
12          I reserve the remaining questions for trial.
13          MR. LOEVY-REYES:  No more questions.
14          THE VIDEOGRAPHER:  The time is 2:58 p.m.
15  We're going off video record.
16          THE WITNESS:  I will read.
17          MS. CALLAN:  I'm ordering the transcript for
18  Monday.
19          MR. LOEVY-REYES:  We'll hold off on a copy
20  for now.
21                  (Witness excused.)
22                  (Deposition was concluded.)
23
24
25

Page 220

1               CERTIFICATE OF OATH
2   THE STATE OF FLORIDA
3   COUNTY OF PALM BEACH
4
5
6               I, the undersigned authority,
7               certify that ANDREW J. SCOTT,
8               III personally appeared before
9               me and was duly sworn on the 5th
10              day of February, 2018.
11
12              Dated this 10th day of February,
13              2018.
14
15
16
17
   _____
18
   Antoinette Garza, RPR, FPR
19  Notary Public - State of Florida
   My Commission Expires:  7/1/20
20  My Commission No.:  FF 971325
21
22
23
24
25

Page 221

1               C E R T I F I C A T E
2   THE STATE OF FLORIDA
3   COUNTY OF PALM BEACH
4
5       I, Antoinette Garza, Registered Professional
    Reporter and Notary Public in and for the State of
6   Florida at large, do hereby certify that I was
    authorized to and did report said deposition in
7   stenotype; and that the foregoing pages are a true
    and correct transcription of my shorthand notes of
8   said deposition.
9       I further certify that said deposition was
    taken at the time and place hereinabove set forth
10  and that the taking of said deposition was commenced
    and completed as hereinabove set out.
11
        I further certify that I am not attorney or
12  counsel of any of the parties, nor am I a relative
    or employee of any attorney or counsel of party
13  connected with the action, nor am I financially
    interested in the action.
14
        The foregoing certification of this transcript
15  does not apply to any reproduction of the same by
    any means under the direct control and/or
16  direction of the certifying reporter.
17      Dated this 10th day of February, 2018.
18
19
20
21
   _____
   Antoinette Garza, RPR, FPR
22
23
24
25

Andrew Scott
February 05, 2018                          222 to 224

Page 222

```
 1   DATE:      February 10th, 2018
 2   TO:        ANDREW J. SCOTT, III
                c/o Mark Loevy-Reyes, Esq.
 3
     IN RE:     Baker v. Castro
 4
 5
          Please take notice that on Monday, the 5th of
 6   February, 2018, you gave your deposition in the
     above-referred matter.  At that time, you did not
 7   waive signature.  It is now necessary that you sign
     your deposition.
 8        Please call our office at the below-listed
     number to schedule an appointment between the hours
 9   of 9:00 a.m. and 3:00 p.m., Monday through Friday.
          If you do not read and sign the deposition
10   within a reasonable time (i.e., 30 days unless
     otherwise directed) the original, which has already
11   been forwarded to the ordering attorney, may be
     filed with the Clerk of the Court.  If you wish to
12   waive your signature, sign your name in the blank at
     the bottom of this letter and return it to us.
13
              Very truly yours,
14
15
16
              Antoinette Garza, RPR
17
18   I do hereby waive my signature.
19   _____
20   ANDREW J. SCOTT, III
21   Cc:  Via transcript:  Jennifer Callan, Esquire
22   file copy
23
24
25
```

Page 223

```
 1            C E R T I F I C A T E
 2                - - -
 3   THE STATE OF FLORIDA
 4   COUNTY OF PALM BEACH
 5        I hereby certify that I have read the foregoing
 6   deposition by me given, and that the statements
 7   contained herein are true and correct to the best of
 8   my knowledge and belief, with the exception of any
 9   corrections or notations made on the errata sheet,
10   if one was executed.
11
12        Dated this ____ day of _____,
13   2018.
14
15
16
17
18   _____
19
20
21
22
23
24
25
```

Page 224

```
 1            E R R A T A   S H E E T
 2   IN RE:  Baker v. Castro
 3   CR:  Antoinette Garza, RPR, FPR
 4   DEPOSITION OF:  ANDREW J. SCOTT, III
 5   TAKEN: 2/5/2018
 6
 7     DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 8   PAGE # LINE #   CHANGE              REASON
                                                    _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   Please forward the original signed errata sheet to
     this  office so that copies may be distributed to
20   all parties.
21   Under penalty of perjury, I declare that I have read
     my deposition and that it is true and correct
22   subject to any changes in form or substance entered
     here.
23   DATE:  _____
24   SIGNATURE OF
     DEPONENT:_____
25
```