IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ESTATE OF JORDAN BAKER, by and through administrator, JANET BAKER, | ) ) ) | No. 4:15-cv-3495 |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | Hon. Judge Sim Lake |
| v. | ) ) | |
| JUVENTINO CASTRO, *et al.* | ) ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**PLAINTIFF'S RESPONSE TO DEFENDANT CASTRO'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

I.     Nature and Stage of Proceedings ........................................................ 1

II.    Issues to Be Decided ........................................................................... 1

III.   Summary of Argument ........................................................................ 2

IV.    Applicable Legal Standard .................................................................. 3

V.     Relevant Undisputed Facts .................................................................. 6

VI.    Castro's Is Not Entitled to Summary Judgment For Unlawfully
       Stopping Baker ................................................................................... 10

       A.  Castro Violated Baker's Rights Under the Fourth Amendment By
           Forcibly Stopping Him Without Reasonable Suspicion ...................... 10

       B.  There is a Dispute of Fact as to When Baker Was Seized .................. 13

VII.   Castro Violated Baker's Rights Under the Equal Protection Cause By
       Targeting and Stopping Baker on Account of His Race ................................. 15

VIII.  Castro's Use of Deadly Force Was Excessive and Unreasonable ................... 22

       A.  Applicable Law ............................................................................... 22

           1.  Deadly Force is Not Justified Without a Significant Threat of Death or
               Serious Bodily Harm ................................................................ 22

           2.  Summary Judgment is Particularly Inappropriate Here .................... 23

       B.  The Shooting of Jordan Baker Was Unlawful and Unreasonable ................. 27

       C.  Material Disputes of Fact Preclude Granting Summary Judgment On
           Plaintiff's Deadly Force Claim ......................................................... 30

           1.  Disputes Concerning Whether Baker Was Running Away From Or
               Charging At the Officer ............................................................ 30

           2.  Disputes Concerning Baker's Location At the Time of the Shooting ....... 33

           3.  Disputes Concerning the Video and Whether Baker—Unarmed and
               Unclothed—Was Ever a "Threat" ............................................... 41

i

4. Disputes Whether Castro Fabricated the "Waistband" issue as Excuse He Knew Would be Credited ........................................................................ 44

5. Disputes About Baker's Injuries ............................................................. 46

6. Baker Was, At Most, A Misdemeanor Suspect ......................................... 47

D. Summary Judgment Is Improper, Even On Qualified Immunity Grounds, Due to the Extensive Material Factual Disputes ............................................. 48

E. Castro Violated The Constitution By Refusing to Provide Medical Care to Jordan Baker After Shooting Him .................................................................. 51

F. Plaintiff's Wrongful Death and Survival Claims Are Federal Claims............ 54

CONCLUSION ................................................................................................... 56

## TABLE OF AUTHORITIES

*Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005) ..................................... 24

*Abraham v. Raso*, 183 F.3d 279 (3d Cir.1999) ........................................................... 25

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ....................................................... 3

*Aldini v. Johnson*, 609 F.3d 858 (6th Cir.2010) ........................................................ 52

*Baker v. Putnal*, 75 F.3d 190 (5th Cir. 1996) ............................................................. 50

*Baldwin v. Harris Cty. Sheriff Dep't*, No. 4:16-CV-2966, 2018 WL 496957
    (S.D. Tex. Jan. 19, 2018) .......................................................................... 52

*Baulch v. Johns*, 70 F.3d 813 (5th Cir. 1995) .................................................. 39,48, 50

*Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481 (5th Cir. 2001) .......... 4, 23, 25, 47

*Brazier v. Cherry*, 293 F.2d 401 (5th Cir. 1961) ....................................................... 55

*Bridges v. Wilson,* 718 F. App'x 636 (10th Cir. 2017) ............................................... 44

*Brosseau v. Haugen*, 543 U.S. 194 (2004) .................................................................. 5

*California v. Hodari D.*, 499 U.S. 621 (1991) ............................................................ 11

*Carroll v. Ellington*, 800 F.3d 154 (5th Cir. 2015) ...................................................... 4

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................ 3

*Chambers v. Pennycook*, 641 F.3d 898 (8th Cir.2011) ................................................ 52

*Club Retro, L.L.C. v. Hilton*, 568 F.3d 181 (5th Cir. 2009) ....................................... 11

*Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014) ...................................... 26, 43

*Cruz v. Texas Health & Human Servs. Comm'n,* No. 1:16-CV-072, 2017 WL 3605234
    (S.D. Tex. Aug. 22, 2017) ......................................................................... 19

*Currie v. Chhabra*, 728 F.3d 626 (7th Cir. 2013) ....................................................... 52

*Cyrus v. Town of Mukowonago,* 624 F.3d 856 (7th Cir. 2010) ................................... 26

*Davis v. Romer*, 600 F. App'x 926 (5th Cir. 2015) ...................................................... 27

*Dawson v. Anderson Cty., Tex.,* 566 F. App'x 369 (5th Cir. 2014) ............................ 14

*Deville v. Marcantel*, 567 F.3d 156 (5th Cir.2009)....................................................... 14

*Dufour-Dowell v. Cogger*, 152 F.3d 678 (7th Cir. 1998) ............................................ 50

*Duke v. Duckworth*, 236 F. App'x 86 (5th Cir. 2007).................................................. 22

*Dyer v. City of Mesquite, Texas*, 2017 WL 118811 (N.D. Tex. Jan. 12, 2017)...... 54, 55

*Ellison v. Lesher*, 796 F.3d 910 (8th Cir. 2015) ......................................................... 51

*Estate of Sizer by & through Sizer v. Cameron*, No. A-15-CA-01143-SS,
   2017 WL 2418316, (W.D. Tex. June 1, 2017)................................................... 55

*Farmer v. Brennan*, 511 U.S. 825 (1994) ................................................................... 52

*Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411, 2418 (2013) ................................ 15

*Flores v. Cameron Cty.*, 92 F.3d 258 (5th Cir. 1996) ................................................ 54

*Flores v. City of Palacios*, 381 F.3d 391 (5th Cir. 2004) ............................ 4, 22, 23, 24

*Flythe v. District of Columbia*, 791 F.3d 13 (D.C. Cir. 2015) .................................... 25

*Fraire v. City of Arlington*, 957 F.2d 1268 (5th Cir. 1992)........................................ 23

*Gates v. Tex. Dep't of Protective & Reg. Servs.*, 537 F.3d 404 (5th Cir. 2008) ............. 3

*Gooden v. Howard County, Md.*, 954 F.2d 960 (4th Cir.1992)................................... 25

*Graham v. Connor*, 490 U.S. 286 (1989) ............................................................. 22, 48

Haggerty *v. Tex. S. Univ.*, 391 F.3d 653 (5th Cir. 2004) ............................................. 4

*Hampton Co. Nat'l Sur., LLC v. Tunica Cnty., Mississippi*, 543 F.3d 221
   (5th Cir. 2008) ...................................................................................................... 22

*Hare v. City of Corinth, Miss.*, 74 F.3d 633 (5th Cir. 1996) ...................................... 52

*Hartman v. Cty. of Nassau*, 350 F. App'x 477 (2d Cir. 2009).................................... 28

*Hatcher v. Bement*, 676 F. App'x 238 5th Cir. 2017) ............................................ 23, 29

*Hegarty v. Somerset County*, 53 F.3d 1367 (1st Cir. 1995) ........................................ 26

*Hein v. North Carolina*, 135 S. Ct. 530 (2014) ............................................................ 11

*Hope v. Pelzer*, 536 U.S. 730 (2002) ............................................................................ 30

 In *Tolan v. Cotton*, 134 F. Ct. 1861 (2014) ....................................................... 4, 5, 24

*Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191 (4th Cir.2006) ........................... 25

*Jefferson v. Lewis*, 594 F.3d 454 (6th Cir.2010) ......................................................... 25

*Johnson v. Eggebrecht*, No. 9:14-CV-144, 2015 WL 9703791,
    (E.D. Tex. Dec. 28, 2015) ....................................................................................... 13

*King ex rel. Chaney v. Texas Med. Bd.,* 576 F. App'x 353 (5th Cir. 2014) ................ 55

*Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) ....................................................... 52

*Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004) ........................................................ 36

*Kirby v. Duva*, 530 F.3d 475 (6th Cir. 2008) ............................................................... 29

*Lincoln v. Turner*, 874 F.3d 833 (5th Cir. 2017) ......................................................... 11

*Lindquist v. City of Pasadena Tex.*, 669 F.3d 225 (5th Cir. 2012) ............................. 21

*Ludwig v. Anderson*, 54 F.3d 465 (8th Cir.1995) ........................................................ 26

*Lytle v. Bexar County*, 560 F.3d 404 (5th Cir. 2009) ............................................ 27, 49

*Mace v. City of Palestine*, 333 F.3d 621 (5th Cir. 2003) ............................................. 52

*Meadours v. Ermel*, 483 F.3d 417 (5th Cir. 2007) ................................................... 4, 49

*Madours v. Ermel*, 2005 WL 1S923596 (S.D. Tex. Aug. 10, 2005) ........................... 23

*Manis v. Lawson*, 585 F.3d 839 (5th Cir. 2009) .......................................................... 42

*Maravailla v. United States*, 60 F.3d 1230 (7th Cir. 1995) ........................................ 26

*Martin v. Tipton*, 2006 WL 1804621 (E.D. Tex. June 28, 2006) ................................ 13

v

*Mason v. Lafayette City-Parish Consol. Gov't,* 806 F.3d 268 (5th Cir. 2015) .. 6, 23, 47

*McIntosh v. Smith*, 690 F. Supp. 2d 515 (S.D. Tex. 2010) .......................................... 52

*McLin v. Ard*, 866 F.3d 682 (5th Cir. 2017)................................................................ 10

*Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012) ........................................................ 6

*O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29 (2d Cir.2003) .......................... 25

*Pierre ex rel. Pierre v.* Hardy, 2014 WL 454945 (E.D. La. Sept. 12, 2014) ............... 43

*Plakas v. Drinski*, 19 F.3d 1143 (7th Cir. 1994) .................................................. 24, 25

*Ramirez v. Martinez*, 716 F.3d 369 (5th Cir 2013) ........................................................ 4

*Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991) ....................................................... 42

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000)........................... 18

*Releford v. Rosemon*, 678 F. App'x 267 (5th Cir. 2017) .............................................. 28

*Resendiz v. Miller*, 203 F.3d 902 (5th Cir. 2000) ........................................................ 11

*Reyes v. Bridgwater*, 362 F. app'x 403 (5th Cir. 2010) ................................................ 48

*Rhyne v. Henderson County*, 973 F.2d 386 (5th Cir.1992) .......................................... 54

*Richards v. Lufkin Indust., Inc.*, 2017 WL 5988591 (E.D. Tex. Dec. 1, 2017)........... 14

*Robinson v. Johnson*, 975 F. Supp. 950 (S.D. Tex. 1996)............................... 54, 55, 56

*Robinson v. Orient Marine Co.*, 505 F.3d 364 (5th Cir. 2007)...................................... 3

*Rockwell v. Brown*, 664 F.3d 985 (5th Cir. 2011) ....................................................... 23

*Rutherford v. Harris County, Texas,* 197 F.3d 173 (5th Cir.1999) ............................. 56

*Samples on Behalf of Samples v. City of Atlanta*, 846 F.2d 1328 (5th Cir.1988)...... 44

*Sanchez v. Fraley*, 376 F. App';x 499 (5th Cir. 2010) ................................................. 23

*Scott v. Harris*, 550 U.S. 372 (2007)..................................................................... 4, 23

*Shaw v. Reno*, 509 U.S. 630 (1993) ............................................................................ 15

*Sherrod v. Berry,* 856 F.3d 802 (7th Cir. 1988) ....................................................... 43

*Tarver v. City of Edna*, 410 F.3d 745 (5th Cir. 2005) ........................................... 4, 14

*Taylor v. Johnson*, 257 F.3d 470 (5th Cir. 2001) .................................................... 15

*Tennessee v. Garner*, 471 U.S. 1 (1985).................................................................... 2

*Terry v. Ohio*, 392 U.S. 1, 19 (1968) ......................................................................... 10

*Thomas v. Great Atl. & Pac. Tea Co.*, 233 F.3d 326 (5th Cir. 2000) ........................ 25

*Trammell v. Gruge*, 868 F.3d 332, 340 (5th Cir. 2017) ............................................ 48

*Trent v. Wade*, 776 F.3d 368 (5th Cir. 2015)............................................................ 29

*Turk v. Mangum*, 268 F.Supp.3d 921 (S.D. Tex. 2017) ........................................... 55

*United States v. Am. Commercial Lines, L.L.C.,* 875 F.3d 170 (5th Cir. 2017) .......... 3

*United States v. Brown*, 561 F.3d 420 (5th Cir. 2009) .............................................. 15

*United States v. Hackett*, 638 F.2d 1179 (9th Cir. 1980)........................................... 45

*United States v. Lomprez*, 472 F.2d 860 (7th Cir. 1972) ........................................... 45

*United States v. Ramos,* 537 F.3d 439 (5th Cir. 2008) .............................................. 28

*Vaughn v. Woodforest Bank*, 665 F.3d 632 (5th Cir. 2011) ................................. 18, 19

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 266 (1977) ....................................................................................... 15

*Wallace v. City of Alexander, Arkansas*, 843 F.3d 763 (8th Cir. 2016) ..................... 28

*Williams v. Village of Maywood*, 2016 WL 4765707 (N.D. Ill. Sept. 13, 2016) ......... 51

*Zia Trust Co. ex. rel. Causey v. Montoya*, 587 F.3d 1150 (10th Cir. 2010) ............... 51

## STATUTES AND OTHER AUTHORITIES

Catherine T. Struve, *The Conditions of Pretrial Detention*,
   161 U. PENN L. REV. 1009 (2013) .................................................................... 52

Cynthia Lee, *Making Race Salient: Trayvon Martin & Implcit Bias in a
   Not Yet Post-Racial Society*, 91 N.C. L. REV. 101, 115-25 (2013) ................... 20

Rebecca L. Toprek, *Violence against Individuals and Communities: Reflecting
   on the Travon Martin Case*, 5 J. SOC. ACTION IN COUNSELING &
   PSYCH. 1, 4 (2013) .......................................................................................... 20

FED. R. CIV. P. 56 ............................................................................................... 3

TEX. CIV. PRAC. & REM. CODE § 71.004 .............................................................. 54

Texas Penal Code § 22.01 ................................................................................. 48

U.S. CONST. AMD. XIV, § 1 ................................................................................ 15

**SUMMARY JUDGMENT EVIDENCE**

In support of this response, Plaintiff relies upon and incorporates herein by reference the following evidence:

1.      Deposition Excerpts of Janet Baker – FILED UNDER SEAL

2.      Wireless Store Video

3.      Enlarged Wireless Store Video

4.      Castro Homicide Statement – FILED UNDER SEAL

5.      Castro Internal Affairs Statement – FILED UNDER SEAL

6.      Castro Grand Jury Transcript – FILED UNDER SEAL

7.      Deposition Excerpts of Juvenito Castro

8.      Selected Scene Photos – FILED UNDER SEAL

9.      Statement of Magnolia Martinez – FILED UNDER SEAL

10.     Autopsy Report – FILED UNDER SEAL

11.     Dr. Jonathan Arden Declaration & Exhibits

12.     Deposition Excerpts of Dr. Roger Milton – FILED UNDER SEAL

13.     Brian T. Weaver Declaration & Exhibits

14.     Deposition Excerpts of Michael Dirden & Exhibit 2

15.     Stephanie Seguino Declaration & Exhibits

16.     Deposition Excerpts of Lt. Brady

17.     Deposition Excerpts of Lt. Becker

18.     Jonathyn Priest Report

19.     Deposition Excerpts of Jonathyn Priest

20.     Jonathan Priest Supplemental Report

21.   Deposition Excerpts of Bender

22.   Exhibit 4 from Investigator Torres Deposition (Scene Photo)

23.   Deposition Excerpts of Ofc. Menefee

24.   Andrew Scott Declaration & Exhibits

25.   Article, Making Race Salient: Trayvon Martin and Implicit Bias in a Not Yet
      Post-Racial Society, Cynthia Lee

26.   Article, Violence against Individuals and Communities: Reflecting on the
      Trayvon Martin Case – An Introduction to the Special Issue, Rebecca
      Toporek

27.   Deposition Excerpts of Brian T. Weaver

## I.      Nature and Stage of Proceedings

This action is before the Court on Defendant Castro's motion for summary judgment. Defendant Castro has not sought summary judgment on Plaintiff's claim that his use of non-fatal force violated his constitutional rights, in so far as Plaintiff can tell. So, this matter will proceed to trial. Because Plaintiff settled this action with Defendant RPI Management Company, LLC & RP Interest I, Plaintiff agrees that dismissal of the 42 U.S.C. § 1985 conspiracy claim is appropriate. Subject to that one caveat, the motion should be denied.

## II.     Issues to Be Decided

A. Whether Castro's Motion Should Be Denied for Failing to Apply Rule 56

B. Whether Fact Disputes Preclude Summary Judgment on Plaintiff's Unlawful Stop Claim Under the Fourth Amendment

C. Whether Disputes Preclude Summary Judgment on Plaintiff's Equal Protection Claim

D. How to Evaluate Plaintiff's Deadly Force Claim, Since Castro Is the Only Surviving Witness

E. Whether Castro Can Obtain Summary Judgment For Killing an Unarmed, Fleeing Suspect

F. Whether Fact Disputes Preclude Summary Judgment on Plaintiff's Deadly Force Claim

G. Whether Castro Has Carried His Burden With Respect to The Remaining Claims

### III.    Summary of Argument

This action concerns the treatment of Jordan Baker by Defendant Juventino Castro—an HPD officer working an extra job—after Baker entered a place of public accommodation and broke no laws. Though he had committed no crime and there was no reasonable suspicion, Defendant Castro stopped Baker because he was an African-American man wearing a hooded sweatshirt, a violation of the Fourth Amendment. As the foregoing suggests, and as Castro has admitted, Baker was stopped at least in part, due to his race, in violation of the Equal Protection Clause of the Fourteenth Amendment.

Thereafter, Defendant Castro shot and killed Jordan Baker. Plaintiff maintains that Jordan Baker—unarmed, wearing sandals, and shirtless—was moving away from Officer Castro at the time Castro shot and killed him. Under this version of events, Castro violated clearly established law. *Tennessee v. Garner*, 471 U.S. 1 (1985). By contrast, Officer Castro's account, which is beyond implausible, has Baker "charging" at the officer while he was pointing a gun at Baker (who, it's undisputed, was unarmed, sandal-wearing, and shirtless).

Unfortunately, Castro has sought summary judgment while presuming his version of events. But, Castro cannot seek summary judgment while presuming his version of events: (1) it would be contrary to the summary judgment standards applicable here; (2) there are significant material disputes of fact, given that Castro's version of events is contradicted by objective evidence; and (3) even Castro's own story is so inconsistent that it precludes granting summary judgment.

These are the sorts of fact disputes the Fifth Circuit and other courts have consistently found precluded summary judgment in deadly force cases.

After the shooting, rather than attempting to render any medical aid whatsoever, Castro handcuffed Baker and left him lying face-down to die in a pool of his own blood. This violated the Fourth Amendment, too. Jordan Baker left a young son, who is now growing up without his dad. Baker also left a mother, whose grief is unimaginable. They have brought claims that cannot be dismissed either.

There are deep, contentious issues at the core of this suit. But they cannot be decided at summary judgment; the task must be left to the jury.

## IV.    Applicable Legal Standard

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is only appropriate when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *United States v. Am. Commercial Lines, L.L.C.,* 875 F.3d 170, 173  (5th Cir. 2017) (citing *Robinson v. Orient Marine Co.*, 505 F.3d 364, 365 (5th Cir. 2007)). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Gates v. Tex. Dep't of Protective & Reg. Servs.*, 537 F.3d 404, 417 (5th Cir. 2008). The burden is on the moving party to make such a showing. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 161 (1970).

When seeking summary judgment, the moving party must accept as true the *opposing* party's version of events in order assess whether, in the absence of factual disputes, judgment as a matter of law is appropriate. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *cf. Ramirez v. Martinez*, 716 F.3d 369, 374, 379 (5th Cir 2013) (looking at the plaintiff's "versions of the facts as supported by the summary judgment record"); *Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005) ("Any credibility determination made between the officers' and [plaintiff's] version of events is inappropriate for summary judgment. (citing *Bazan v. Hidalgo County,* 246 F.3d 481, 492 (5th Cir. 2001)); *Carroll v. Ellington*, 800 F.3d 154, 168 (5th Cir. 2015) ("If a fact is not undisputed, we must 'accept the plaintiffs' version of the facts as true.' " (quoting Haggerty *v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004) (a court's qualified immunity inquiry at summary judgment requires the court "accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true"). Where disputes of material fact exist, they preclude the imposition of summary judgment. *Cf. Meadours v. Ermel*, 483 F.3d 417, 423 (5th Cir. 2007) ("In order to determine the reasonableness in the case at bar, several key factual disputes must be resolved. . . . Given the need to determine these types of facts, this dispute is material to the outcome of the case and the officers are not entitled to summary judgment." (citing *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004)).

These rules apply even where officers invoke the defense of qualified immunity. In *Tolan v. Cotton*, the Supreme Court explained that under either

immunity prong, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." 134 F. Ct. 1861, 1866 (2014) (citing *Brosseau v. Haugen*, 543 U.S. 194, 195 n. 2 (2004)). There, the Court emphasized the "importance of drawing inferences in favor of the nonmovant, even when . . . a court decides only the clearly established prong of the [qualified immunity] standard." *Id.* *Tolan* dealt with an excessive force claim and reversed the grant of summary judgment because the Fifth Circuit had "failed to view the evidence at summary judgment in the light most favorable to Tolan with respect to the central facts" of the case. *Id.*

## V.    Relevant Undisputed Facts[1]

Jordan Baker used to live just a few blocks away from 5700 West Little York, and would frequently ride his bicycle over there. Ex. 1, Janet Baker Dep. at 60. In 2014, Jordan Baker had a 10 year old son, whom he was the primary caretaker for. The most important thing for Jordan Baker was his son. In addition, Baker was extremely close with his mother—they were close friends. *Id*. at 51.

On January 16, 2014, Mr. Baker left his home on his bicycle. He did not plan on being gone long—he was not wearing an undershirt and only put on sandals as he left the house.

Jordan Baker entered the parking lot of a strip mall at 5700 West Little York, Houston, TX while riding his bicycle. Ex. 2, Video at 20:41:19 to 20:41:23 Ex. 3. Enlarged Video, at 20:41:19 to 20:41:23. He was alone, riding his bike at a normal pace, and had not committed any crimes.  *Id*. Nor was there a "crime in progress" or anything of that nature.  *Id*. Ex. 4, Castro Homicide Statement at 2; Ex. 5, Castro IA Statement, at 3; Ex. 6, Castro Grand Jury Tr. at 45. *Id*. Jordan Baker was unarmed, had sandals on his feet, and was not wearing any sort of bandana or mask over his face. Ex. 2, at 20:41:19 to 20:41:23; Ex. 3, at 20:41:19 to 20:41:23. As Jordan Baker entered the parking lot, he was not peering into the window of the Little Caesars restaurant (or any other business); he was just riding his bike through the parking lot. *Id*. Though Baker was wearing a sweatshirt with a hood, at the time he

---

[1] At this juncture, the facts must be stated and considered in the light most favorable to Plaintiff. *See Mason v. Lafayette City-Parish Consol. Gov't,* 806 F.3d 268, 271-72 (5th Cir. 2015) (citing *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012). As discussed below, *infra Part VI*, Castro's motion should be denied because it is premised upon assuming *his* version of the facts, which are hotly disputed.

6

entered the parking lot and rode his bike by, the hood was down on his neck and his head was exposed. Ex. 2, at 20:41:22-23.[2]

That night, Defendant Castro was working a second job in police uniform at that strip mall. Ex. 4, at 1. Castro saw Jordan Baker and decided to stop him, even though Baker had committed no crime. Part of the reason Castro stopped Baker was due to his race: he saw that Baker was an African-American man. Ex. 6, at 46. Castro did not have reasonable suspicion to believe Baker committed a crime, because Baker had not done anything criminal—he had ridden solely in one "U" through the parking lot. Ex. 2, at 20:41:42; Ex. 6, at 45.  Nonetheless, Officer Castro used his unmarked police car to initiate a traffic stop. Ex. 2, at 20:41:53; Ex. 3, at 20:41:53.

In so doing, Castro did not actually strike Mr. Baker. However, while he claims he had good reason making the stop, Castro ended up " ████████████ ████████ ██ ██████████ ; Ex. 2, at 20:41:53; Ex. 3, at 20:41:53. Castro admits that Baker had a right to peddle away on his bicycle at that time. Ex. 6 at 129. However, Baker had been seized by the fact Castro had initiated a stop and by the manner in which Castro had placed his car, nearly pinning Baker against a hedge. Ex. 8, Scene Photos, at 518, 522.[3] Castro also knew that Baker did not want to be

---

[2] Plaintiff understands the quality is not ideal, but, after watching this portion of the video dozens of times, including at a number of speeds, one can make out the features of Mr. Baker's head in the video just before he exists the screen (meaning his hood was down, not up) especially if the tape is viewed from 20:41:22 to 20:41:24.

[3] The photos have been Bates-stamped by the City of Houston, and references to this exhibit 8 are to the BAKER-COH bates stamp.

stopped and talking to the officer. Ex. 7, Castro Dep. at 129 (testifying that "he was trying to avoid me," "he wanted to run," "he walked away from me").[4]

Castro got out of the car. *Id.* at 177-78. After some discussion, Officer Castro drew his firearm and pointed it at Jordan Baker, who turned away from Castro and tried to run away. *Id* at 195. Castro grabbed Baker's sweatshirt to prevent him from leaving, but Baker was able to unzip it and move away from the Castro, leaving the sweatshirt inside out and unzipped on the ground. *See* Ex. 8, at 522, 525; ███████

███████████████████████████████████████████████████████████████

███████ Castro then pursued Baker and followed him as Baker walked away from the officer with his back facing him through the well-lit parking lot. *See* Ex. 8, at 550, 552-53, & 555 (Photos of Parking lot)[5]; Ex. 2, at 20:32:37 to 43:00; Ex. 3, at 20:32:37 to 43:00. Baker then turned to face the officer and continued backing away slowly. Ex. 2, at 20:32:37 to 43:00; Ex. 3, at 20:32:37 to 43:00. Baker eventually stopped and Castro had the opportunity to observe Baker standing face to face. Ex. 2, at 20:32:37 to 43:00; Ex. 3, at 20:32:37 to 43:00; Ex. 6, at 75-76. Castro and Baker argued, but the only even remotely aggressive thing Baker did was yell loudly at Castro, who was also yelling at Baker. Ex. 2, at 20:32:37 to 43:00; Ex. 3, at 20:32:37 to 43:00; Ex. 9, Statement of Magnolia Martinez, at 2; Ex. 6, at 77 ████████

████████████████████████ ).

---

[4] Castro claims ████████████████████████████████████████████████
████ Ex. 6, at 51-52. There is no way Castro can now claim that this interaction was "consensual."

[5] The circle of individuals in the photos is of the group that did the "walkthrough" of the scene with Castro and his attorney the night of the shooting.

Castro then pointed his gun at Baker, who turned and ran back behind the strip mall. Ex. 2, at 20:32:55 to 43:05; Ex. 3, at 20:32:55 to 43:05. Officer Castro began to walk (not run) back to his car, but eventually decided to follow Baker. *Id.*

Behind the strip mall, Jordan Baker tripped and fell on the concrete in the alley. Ex. 10, Autopsy Report; Ex. 11, Declaration of Jonathan Arden, with exhibits, at 3; Ex. 12, Milton Deposition at 40-50, 58-59. These wounds caused damage to Mr. Baker's torso. Ex. 10, Autopsy Report; Ex. 12, Milton Deposition at 40-50.

Baker then saw Castro coming his way, toward the alley, and Castro again pointed his firearm at Baker. Ex. 4, at 4; Ex. 5, at 3. Castro was shirtless, unarmed, and wearing sandals. Ex. 8, 649, 655; Ex. 6 at 87.

Not wanting to be shot, Baker again tried to get away. This time, however, Castro shot Baker as he turned away to his right. Ex. 11, at 4; Ex. 13, Weaver Report at 21, 24-27. Baker was turned so significantly to the right that the bullet struck him on the left side of his chest, near his nipple, and went almost completely side-to-side through his body; traveling through both of the lungs and heart. Ex. 12, at 29-34; Ex. 10; Ex. 11, at 3; Ex. 13, at 10; Ex. 20, Priest Supp. Report at 5.

At the time of the shooting, in the alley, facing to the west, very near where his spent bullet casing was marked. At the time of the shooting, Baker was down the alley and near to the backside of the building, where he left a trail of blood. Ex. 8, at 649; Priest Deposition at 100-02. Castro was located at an upward elevation from Baker, Ex. 22, Torres Exhibit 4; Ex. 13, at 10, resulting in a slight downward trajectory. Ex. 10; Ex. 11, Arden Report at 3.

9

Baker continued to attempt to move away from the officer, but struggled mightily, owing to the fact that his lungs were filling with blood and he was in extreme pain. Ex. 11, Arden Report at 5.  Baker lost a sandal, made it a few more feet, and then collapsed on the ground. See Ex. 8, at 611,667; Ex. 23, Menefee Dep. at 59; Ex. 19, Priest Dep. at 161; Baker left a trail of blood from the location where he was shot to the place where he would ultimately fall, documenting his path. Ex. 8, at 146-48, 150-51, 154   The pain was unimaginable.  Ex. 12, at 53-54; Ex. 11, at 5.

Rather than provide any care, and though he could hear Baker breathing heavily, Castro handcuffed Baker's hands to his belt without even checking for a pulse. Ex. 7, at 83-84, 230-31. Baker died at the scene. *Id.* at 83.

As a consequence, J.B., Baker's son, will grow up without a father, and has suffered tremendous emotional pain. Ex. 1, at 68-73. Likewise, Janet Baker, Jordan Baker's mother, will never get her only child back. Ex. 1, 61-63. Nor will she ever be able to fill the gap caused by Castro's decision to shoot and kill an unarmed citizen.

## VI.   Castro Is Not Entitled to Summary Judgment For Unlawfully Stopping Baker

### A.  Castro Violated Baker's Rights Under the Fourth Amendment By Forcibly Stopping Him Without Reasonable Suspicion

"A person is 'seized' for Fourth Amendment purposes 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *McLin v. Ard*, 866 F.3d 682, 691 (5th Cir. 2017) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 & n.16 (1968)). A seizure occurs where, "in view of all of the

circumstances surrounding the incident, a reasonable person would have believed that [they were] not free to leave." *Id.* (internal quotation marks omitted) (alteration in original). "The reasonable-person test is objective." *Id.* "Physical force is not required to effect a seizure; however, absent physical force, 'submission to the assertion of authority' is necessary." *Id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). A central Fourth Amendment tenant is that the reason for stopping a *particular individual* must be based upon that *particular individual*. Put differently, a seizure "must be based on probable cause particularized with respect to that person." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 208 (5th Cir. 2009). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000) (per curiam).

In the context of a traffic stop, officers need a "particularized and objective basis for suspecting the particular person stopped of breaking the law." *Hein v. North Carolina*, 135 S. Ct. 530, 536 (2014). Accordingly, "suspicion of unidentified criminal activity is not the kind of particularized and objective basis for suspecting legal wrongdoing that is necessary to support detention." *Lincoln v. Turner*, 874 F.3d 833, 843 (5th Cir. 2017) (citation omitted).

Here, it is puzzling that Officer Castro would seek summary judgment on this claim. The video of the traffic stop indicates that it was just that: a traffic stop of Jordan Baker (on a bicycle) being stopped by a police officer (in a car). Ex. 3, at

20:41:53. Given the video, and images there is no doubt that no reasonable person, and Baker did not, feel free to leave; he was seized.

And, on Castro's own account, that is the only reasonable interpretation of events. According to Castro, Baker was trying to avoid him, and Castro then drove his car across a parking lot to interact with him, and then continued to pursue and command Baker. Even when after the stop (which Plaintiff contends actually caused Baker to be knocked off of his bike), Castro would not let him be. Ex. 6, at 51-52; Ex. 7, at 129, 177.  Castro has testified that it is clear Baker did not want to be interacting with the officer, and testified that Baker *tried* to walk away before the officer called him back. Ex. 6, at 57-58. Thus, regardless of whether Castro caused Baker to fall off of his bike (an act of force), or whether Castro merely used his show of authority as a police officer to get Baker to stop, there is no doubt that Baker was stopped, *and* that he was stopped without particularized suspicion to believe Baker was committing a crime.

Indeed, Office Castro admits that he did not have reasonable suspicion to stop Baker when he drove across the parking lot and stopped him. Ex.6 at 129; Ex. 7 at 138, 164.

Castro no doubt intends to link Baker to the "rash" of robberies that had happened in the weeks before. But Castro's position only proves that he was over-zealous. The video of the encounter contradicts Castro's claim that Baker was "casing" the Little Ceasars; and, in the light most favorable to plaintiff, the video also shows that Baker's hood was down. *See supra* at 8 n.2; Ex. 2, at 40:21:21-23.

12

Castro's attempt to link Baker to the robberies is fundamentally flawed and totally unreasonable—Baker was not wearing a bandana or any sort of covering. Baker was alone, and all of the crimes had happened with multiple offenders. None of them were committed by someone riding a bicycle, and certainly not by someone wearing sandals. *See* Bulletin, Def. City Ex. E-3.

At the end of the day, Castro's only reason for stopping Baker outside of his race and benign clothing is that Baker rode away from him after they allegedly made eye contact. But this was certainly not enough to stop Baker, as even Castro admits. Ex. 6 at 129; *see Johnson v. Eggebrecht*, No. 9:14-CV-144, 2015 WL 9703791, at *6 (E.D. Tex. Dec. 28, 2015) ("Whether Bester appeared nervous during questioning is a fact issue for the jury." (citing *Martin v. Tipton*, 2006 WL 1804621, at *4 (E.D. Tex. June 28, 2006) (denying summary judgment in part because the officer's qualified immunity defense required the resolution of a fact dispute about whether the driver appeared nervous during a traffic stop).

Summary judgment is therefore inappropriate on this claim.

### B. There is a Dispute of Fact as to When Baker Was Seized.

Castro's motion does not even attempt to contend with the facts above, as he must. Instead, he implausibly asserts a contradiction: that Baker was completely willing to stop and chat with the officer but that the entire time Baker and Castro were speaking Baker was acting like he wanted to run or leave. Castro's own testimony then belies the basis for his motion, which seeks to paint the stop as a "consensual encounter." At a minimum, there is a fundamental dispute about when

13

Baker was initially detained. The video, and even Castro's testimony, supports finding that the initial stop was just that—a stop where Baker did not feel free to leave. And, it was a stop made without reasonable suspicion. Accordingly, summary judgment is improper on this claim.

There are many disputes of fact about what happened during the stop itself, even after Baker was off of his bike. The only thing known for sure is that Baker ended up without his shirt on. Castro did not see Jordan Baker commit a crime before the stop, and the video—Plaintiff contends—undermines Castro's account of the entire affair, as the video suggests both that Baker was stopped by the unmarked car, which would have provided a clear reason for his being agitated throughout the remainder of the encounter, as even Castro admits.

In the end, these are the sort of factual disputes that preclude summary judgment. *See, e.g., Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir.2009) (reversing summary judgment when the nature of the plaintiff's response to officer's directives during a minor traffic stop was in dispute); *Tarver v. City of Edna*, 410 F.3d 745, 754 (5th Cir. 2005) ("At a minimum, determining whether [the defendant officer's] conduct was objectively reasonable requires fact finding and credibility assessments; dismissal is thus inappropriate at the summary judgment phase."); *cf. Dawson v. Anderson Cty., Tex.,* 566 F. App'x 369, 374 (5th Cir. 2014) ("The record evidence presents a factual dispute as to whether Dawson was argumentative during the strip search or rather whether any verbal noncompliance on her part was justified given the officers' alleged harassment."); *Goodson v. City of Corpus*

14

*Christi*, 202 F.3d 730, 737-40 (finding disputed facts about the appearance of the plaintiff precluded summary judgment on a Fourth Amendment detention claim).

## VII. Castro Violated Baker's Rights Under the Equal Protection Cause By Targeting and Stopping Baker on Account of His Race

Under the Equal Protection Clause of the Fourteenth Amendment, state actors are prohibited from denying "any person . . . the equal protection of laws." U.S. CONST. AMD. XIV, § 1. It has long been recognized that a central purpose of the Equal Protection Clause "is to prevent the States from purposely discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993). Indeed, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." *Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411, 2418 (2013). To prove an equal protection claim, Plaintiff need only demonstrate that Defendant Castro singled out Jordan Baker for "disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group." *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001). However, "[r]acial discrimination need only be one purpose, and not even a primary purpose, of an official action for a violation to occur." *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009).

In considering this question at summary judgment, a court must make a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 266 (1977). Indeed, whether a discriminatory purpose exists "may

often be inferred from the totality of relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976).

As an initial matter, Officer Castro's decisions in stopping Jordan Baker were informed by the practices, policies, and customs of the Houston Police Department. Ex. 14, Dirden Deposition, at 71-73; Deposition Exhibit 2, Dirden Report, at 6-8 (discussing how the department's "internal directives," the "department's philosophy and culture of the expectation how to treat people" are "more than sufficient to control the discretion of employees"). On that score, Jordan Baker was part of a police department that has widespread disparities in the rate at which black citizens are subject to traffic stops. *See generally* Ex. 15, Seguino Report at 4-7. Black citizens are disproportionately stopped for police action; they are more likely to be searched, at nearly double the rate than White and Hispanic citizens; and they are generally arrested at much higher rates than other Houstonians. *Id.* at 15, 17.

These sorts of practices—and widespread racial disparities that reveal African-Americans are stopped at far high rates than others in Houston—certainly impact the analysis of Castro's decisions in interacting with Baker; the culture, customs, and philosophy of the department influence his every day decisions. Ex. 14, at 71-73; Seguino Report at 23-24. In other words, these statistical disparities raise an inference, especially here, that race motivated Castro's decision.

Moreover, in Plaintiff's version of the facts—based on Castro's own testimony—race motivated Castro's decision to stop Baker. Castro considered him

suspicious because he was "a Black male, uh, wearing a hoodie." Ex. 6, at 46. The

other basis for considering Baker suspicious, on Castro's account, was that he

"made eye contact" and then "made a U turn in the opposite direction." *Id.*

This "eye contact" rationale—not a crime at all—is pretext. Indeed, the entire

suggestion that Baker could be considered a "robbery suspect" reveals that this "eye

contact" notion is pretext.

For present purposes, what matters is that a number of disputes of fact

support the inference that Castro's reasons are pretext, making summary judgment

inappropriate:

- The video of Baker entering the parking lot contradicts entirely

  Castro's claim that Baker was "casing" the businesses. On one hand,

  Castro claims that "he was looking inside towards the Little Caesar's

  like if he was checking to see who was working or who was inside the

  store." Grand Jury at 40. On the other hand, the video shows that

  Baker just rides by the Little Caesars at far too fast a pace, and too

  fast a distance, to be looking into the restaurant. Ex. 3 at 20:41-20:23.

- The video of Baker entering the parking lot supports an inference that

  Baker's hood was down. Castro claims that "he had his hoodie on his –

  over his head," but the video supports an inference that Baker was *not*

  wearing a hood. *Id.* [6]

---

[6] *See supra* pg. 8 n. 2.

- The video also shows that Castro's claim that Baker was going slowly before seeing the officer and then accelerated to somehow get away is false; Baker is going roughly the same pace when he enters the parking lot (and then leaves the view of the camera) and after he had done his "U" turn and proceeded near the bushes. Ex. 3 at 20:41:22-23 and 20:42:00.

- Baker contradicted the description of the robbery suspects in a number of respects, including: (1) not having any facial covering, like a bandana or ski mask; (2) being on a bicycle; (3) being alone; and (4) wearing sandals.

Again, even though there was no crime in progress, and there was no other characteristic of the "burglary" suspect that matched Baker, Castro has admitted that *part of* the reason he considered Baker suspicious was in fact his race.

All of that should raise an inference that his "race neutral" reason for stopping Baker—"making eye contact"—is the sort of pretext question that must be resolved by a jury, not at summary judgment. *See, e.g.*, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133,147 (2000). ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."); *Vaughn v. Woodforest Bank*, 665 F.3d 632, 639 (5th Cir. 2011) ("This evidence is sufficient to raise a genuine issue of material fact as to whether Woodforest's explanation is not the true reason for firing Vaughn but rather pretext for race

discrimination. A jury could draw inferences from this evidence and reasonably conclude that Woodforest intentionally exaggerated its concern over Vaughn's "unsatisfactory" conduct and that her workplace comments were not the real reason she was fired."); *Cruz v. Texas Health & Human Servs. Comm'n,* No. 1:16-CV-072, 2017 WL 3605234, at *6 (S.D. Tex. Aug. 22, 2017) ("When there is a fact issue on pretext, summary judgment is improper, and the question should be submitted to the jury for resolution."); *Richards v. Lufkin Indust., Inc.*, 2017 WL 5988591, at *2 (E.D. Tex. Dec. 1, 2017) (whether stated reasons for given action were pretext was "left to the jury to decide, especially where there are inconsistencies in the summary judgment record").

As a final note, Castro claims that there were no "similarly situated" individuals to Baker, but Castro's claim misses the mark. The only thing that might distinguish Baker is the pretextual "eye contact" claim.

But, for at least three reasons, that does not mean Baker was not similarly situated in a manner that would somehow entitle Castro to summary judgment. For one, as explained above, the notion that Baker was "suspicious" is subject to factual disputes. Second, in light of those factual disputes, and in *Vaughn* above, a reasonable jury could find that Castro "intentionally exaggerated" his rationale. 665 F.3d at 639.

Third, the fact that Castro admits that there were other African American males in hooded sweatshirts, including some on bikes, who entered the strip mall makes matters *worse*, not *better*. All inferences are taken in Plaintiff's favor at this

juncture, and Baker was similarly situated to these individuals in materially relevant respects. The "eye contact" excuse is the only different circumstance and it is pretext; an exaggeration. This Court should reject finding that, as a matter of law, all an officer who admits to using race as a factor to stop an individual committing no crime and when no crime is in progress has to do to avoid even *potential* liability on an Equal Protection Claim at summary judgment is identify a single fact, however irrelevant or immaterial, as some sort of distinguishing factor.[7]

Fourth, it is impossible to deny the role that implicit bias played in Castro's entire interpretation of Baker. It is not illegal to be a black man in a hooded sweatshirt, but to Castro (and others) this bespeaks some sort of inherent dangerousness. Implicit bias was at work here. *See* Ex. 24, Scott Report at 15; *see also* Cynthia Lee, *Making Race Salient: Trayvon Martin & Implicit Bias in a Not Yet Post-Racial Society*, 91 N.C. L. Rev. 101, 115-25 (2013), attached as Ex. 25; Rebecca L. Toprek, *Violence against Individuals and Communities: Reflecting on the Trayvon Martin Case*, 5 J. Soc. Action in Counseling & Psych. 1, 4 (2013) (discussing the assumption of criminality of African-American men, including the wearing of hoodies and the collecting relevant authorities), attached as Ex. 26.

Indeed, even Defendant's own expert has opined that "the Houston Police Department recognizes that the concept of implicit bias may be a factor in understanding police encounters with citizens, especially citizens of color." Ex. 14,

---

[7] It must be emphasized that there was not a dispatch or "BOLO" indicating that a crime had been occurring. Castro was not "dispatched" to the scene of a crime where he had any particular suspect in mind.

Deposition Exhibit 2, Dirden Report at 11; see also Ex. 14, Dirden Dep, at 106

("[Y]ou agree that implicit bias occurs and that it's something that the Houston

Police Department recognizes can occur when confronting or interacting with people

of color, including African American males, right? You agree on those two things? A.

Yes."); *see also id.* at 109 (testifying that the Houston Police Department "did

recognize implicit bias before this shooting and before this incident").  The City's

30(b)(6) designee, Captain Lori Bender, claims implicit bias training is an important

issue for the department.  Ex. 21, Bender Deposition at 60-61.  But the City has

produced no document concerning such training.  Nor could Dirden confirm that

Castro, by 2014, had been given any training on bias.  Ex. 14 at 109-110.

Instead, in addition to the fact that the entire "burglary suspect" rationale is

race-based, and in addition to the fact that Castro's claim that Baker was "casing"

places is contradicted by the video, the law provides that a determination of who is

similarly situated, is case-specific. Courts must consider "the full variety of factors

that an objectively reasonable ... decision-maker would have found relevant in

making the challenged decision." *Lindquist v. City of Pasadena Tex.*, 669 F.3d 225,

233-34 (5th Cir. 2012) (citation omitted). Here, Castro knew that he could not,

without violating the Fourth Amendment, stop Baker without believing that he

committed a crime.[8] But Baker had committed no crime. And he had not "cased"

---

[8] Put differently, an "objectively reasonable decisionmaker" would have known that
conducting a traffic stop of a biker committing no crime would require reasonable
suspicion, which Castro admits he did not have. For that reason, and the fact that
his claims are contradicted by other evidence, summary judgment is improper.

any business. He was materially similar to others, or at least a reasonable jury could so find. Accordingly, summary judgment is improper.

Finally, Castro's vague and passing reference to qualified immunity fails. "There is no qualified immunity for racial discrimination as such discrimination is clearly unconstitutional." *Hampton Co. Nat'l Sur., LLC v. Tunica Cnty., Mississippi*, 543 F.3d 221, 229 (5th Cir. 2008).

## VIII.  Castro's Use of Deadly Force Was Excessive and Unreasonable

### A.  Applicable Law

#### 1.  Deadly Force is Not Justified Without a Significant Threat of Death or Serious Bodily Harm

*Graham v. Connor*,  490 U.S. 286, 395 (1989), articulated the general excessive force test; where courts consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers, and whether the suspect was actively resisting or trying to escape. That test is not the one at issue here.

Instead, a narrower standard applies to Plaintiff's deadly force claim because, "[w]hen an officer uses deadly force," test "is constrained" and it "is objectively unreasonable to use deadly force 'unless it is necessary to prevent [a suspect's] escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Flores v. City of Palacios,* 381 F.3d 391, 399 (5th Cir. 2004) (quoting *Garner*, 471 U.S. at 3).

Thus, the only question before the Court on this claim is whether Baker "pose[d] a *significant threat* of death or serious physical injury to the officer." *Duke*

*v. Duckworth*, 236 F. App'x 86, 88 (5th Cir. 2007) (cites omitted); *see also Hatcher v. Bement*, 676 F. App'x 238 (5th Cir. 2017) (citing *Bazan v. Hidalgo*, 246 F.3d 481, 488, 493 (5th Cir. 2001)); *Bazan*, 246 F.3d at 488, 493) (explaining that deadly force is a subset of excessive force, which "violates the Fourth Amendment *unless* 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." (quoting *Garner*, 471 U.S. at 11); *see also, e.g.*, *Scott v. Harris*, 550 U.S. 382 n.9 (2007) (discussing immediate threat of serious physical harm); *Sanchez v. Fraley*, 376 F. App';x 499, 451 (5th Cir. 2010) (applying *Flores*); *Madours v. Ermel*, 2005 WL 1S923596, at *7-*8 (S.D. Tex. Aug. 10, 2005) (same);

The deadly-force inquiry is further "confined to whether the [officer or another person] was in danger *at the moment* of the threat that resulted in the [officer's use of deadly force]." *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011) (citing *Bazan*, 246 F.3d at 493 (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th Cir. 1992)) (emphasis added); *see also Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268, 276 (5th Cir. 2015) ("Our inquiry is limited to whether the officer was in danger at the moment of the threat" that resulted in the use of force." (citations omitted)).

## 2.  Summary Judgment is Particularly Inappropriate Here

As a general matter, summary judgment is inappropriate as to the question of whether deadly force was justified, as the facts and circumstances of the case control. And those facts and circumstances can be interpreted in vastly different

ways. *See Tolan*, 134 S. Ct. at 1868 ("The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved for juries in our adversarial system."); *Flores v. City of Palacios,* 381 F.3d 391, 399 (5th Cir. 2004).

As explained below, Castro's account conflicts in significant respects with the material evidence. Of course, through autopsy reports, videos, and other evidence Plaintiff cannot possibly put together every single detail of what happened in the alley. That's because the only other witness to the shooting, Jordan Baker, is deceased.

Accordingly, in addition to the typical summary judgment rules, which require taking inferences in Plaintiff's favor, "summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify." *Abdullahi v. City of Madison*, 423 F.3d 763, 772 n.7 (7th Cir. 2005) (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994)). That is, because Baker cannot provide evidence, and Castro "knows that the only person likely to contradict him or her is beyond reach," this Court "must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial. *Id.* (quoting *Plakas*, 19 F.3d at 1147).

The Fifth Circuit, like other courts of appeals, has recognized this important consideration. *See Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 492 (5th Cir.

24

2001); (affirming the denial of summary judgment in a deadly force case; scrutinizing the officers account against the physical evidence (e.g., an autopsy report); and noting skepticism in the fact that "the evidence the Trooper claims is uncontradicted and unimpeached comes for the most part, if not exclusively, from an interested witness—Trooper Vargas" (citing *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir.1999) ("Cases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment."), and *Gooden v. Howard County, Md.*, 954 F.2d 960, 971 (4th Cir.1992) (Phillips, J., dissenting) ("[B]ecause inevitably—liability being disputed—the officer's account will be favorable to himself, the credibility of that account is crucial.")); *cf. Thomas v. Great Atl. & Pac. Tea Co.*, 233 F.3d 326, 331 (5th Cir. 2000) ("Nevertheless, when the circumstances are conducive to lying, well-supported suspicion of mendacity may serve as a legitimate basis for the factfinder's reasonable inferences concerning the ultimate facts at issue."). Indeed, "every circuit to have confronted this situation"—where the only other witness in the use of force situation is dead—requires a critical examination of the officer's account versus other evidence. *Flythe v. District of Columbia*, 791 F.3d 13, 18-82 (D.C. Cir. 2015). (citing *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir.1994); *Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir.2010); *Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir.2006);  *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir.2003); *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir.1999); *Ludwig v. Anderson*, 54 F.3d 465, 470 n. 3 (8th Cir.1995);

and *Hegarty v. Somerset County*, 53 F.3d 1367, 1376 n. 6 (1st Cir. 1995)); *see also*

*Cruz v. City of Anaheim,*765 F.3d 1076, 1077-80 (9th Cir. 2014).

> As the Court in *Cruz* put it:

> Nobody likes a game of "he said, she said," but far worse is the game of "we said, he's dead." Sadly, this is too often what we face in police shooting cases like this one." . . . . But in the deadly force context, we cannot simply accept what may be a self-serving account by the police officer. Because the person most likely to rebut the officers' version of events—the one killed—can't testify, the judge must carefully examine all the evidence in the record to determine whether the officer's story is internally consistent and consistent with other known facts. This includes circumstantial evidence that, if believed, would tend to discredit the police officer's story.

765 F.3d at 1077-80 (internal quotes and cites omitted); *see also Cyrus v. Town of*

*Mukowonago,* 624 F.3d 856 (7th Cir. 2010) ("[S]ummary judgment is often

inappropriate in excessive-force cases because the evidence surrounding the officer's

use of force is often susceptible of different interpretations. This principle is

particularly relevant where, as here, the one against whom force was used has died,

because the witness most likely to contradict the officer's testimony—the victim—

cannot testify."); *Maravailla v. United States*, 60 F.3d 1230, 1233-34 (7th Cir. 1995)

("[W]e are mindful of the practical problems a plaintiff alleging deadly force may

face in resisting summary judgment. As in the case before us the witness most

likely to contradict the officers' testimony is dead. In these situations we think it

wise to examine all the evidence to determine whether the officers' story is

consistent with other known facts.").

> Applying these rules, it is plain summary judgment cannot be granted here.

### B. The Shooting of Jordan Baker Was Unlawful and Unreasonable

As detailed above, Plaintiff's facts are as follows: Jordan Baker ran away from Officer Castro behind the strip mall and into the alley. Baker was wearing sandals, was unarmed, and was shirtless. At some point, Baker tripped in the concrete alley. In the meantime, Officer Castro had made up the gap between himself and Baker which existed because Castro had started back toward his car before deciding to chase Baker into the alley. This is the crucial moment: as Baker tried to continue running away from the officer down the alley, Castro then discharged his firearm. Baker did not ever threaten or charge the officer. And it was plain that he was unarmed, owing to the fact that Castro had seen both Baker's front and back in the well-lit area in the parking lot.

Under Plaintiff's version of events, the shooting was completely unjustified. Castro shot an unarmed person who did not pose any threat to himself or the officer, and who was fleeing. The Supreme Court long ago held: "[w]here [a fleeing] suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner*, 471 U.S. at 11; *see also Lytle*, 506 F.3d at 417 ("[I]t has long been clearly established that . . . it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others."); *Davis v. Romer*, 600 F. App'x 926, 931 (5th Cir. 2015) ("[I]t is constitutionally unreasonable to use deadly force on an unarmed suspect by shooting him while he was fleeing on foot.").

27

In short, a "police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11*; see also United States v. Ramos,* 537 F.3d 439, 456 (5th Cir. 2008) ("A suspect who poses no physical threat while fleeing . . . does not present the tense situation and uncertainty that justifies the use of deadly force."); *Releford v. Rosemon*, 678 F. App'x 267, 268 (5th Cir. 2017) ("The Supreme Court established in 1985 that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead."); *see generally id.* (case involving Houston Police Department officer who shot and killed an unarmed suspect where officer claimed that suspect was advancing on him but his claim was disputed by other evidence and, therefore, factual disputes existed and summary judgment was not warranted); *Hartman v. Cty. of Nassau*, 350 F. App'x 477, 479 (2d Cir. 2009) ("Assuming Hartman's version of the disputed facts and drawing all inferences in his favor, at the time of Officer Snelders's allegedly illegal conduct it was not reasonable to believe that Hartman posed a danger to the officers or the public. At that time, Hartman was running away from the officers on foot, he was wanted only on misdemeanor charges, and there was no evidence that Hartman then possessed a weapon."). *Moore v. Indehar*, 514 F.3d 756, 763 (8th Cir. 2008) (denying summary judgment and qualified immunity after "assuming the facts as we must, Officer Indehar's use of excessive force against an unarmed man who was simply fleeing from the officers was unreasonable and a violation of the Fourth Amendment").[9]

---

[9] Other Courts have denied summary judgment in circumstances even more trying than the one made out by Plaintiff's facts here. *See, e.g.*, *Wallace v. City of Alexander, Arkansas*, 843

As the cases above make clear, there should be no doubt that on Plaintiff's facts, Castro is not entitled to summary judgment, including on qualified immunity grounds. This is, on Plaintiff's facts, the precise circumstance defined in *Garner*— the use of deadly force against an unarmed fleeing suspect who posed no risk of harm to the officer or anyone else. Fourth Amendment cases "clearly establish—and did so by 2013—that when a suspect is on foot, an officer may shoot the suspect only if a reasonable officer could reasonably perceive that the suspect posed an immediate and significant threat to the officer or others." *Hatcher*, 676 F. App'x at 243; *see also id.* (discussing cases from 2007 and 2001 as clearly establishing this proposition).

Indeed, even without these cases, and in light of *Garner* alone, Castro would certainly have had "fair warning" that shooting a fleeing, unarmed, half-naked suspect who had done no more than try to escape an unlawful arrest was unconstitutional. *Cf. Trent v. Wade*, 776 F.3d 368, 383 (5th Cir. 2015) ("A case directly on point is not required; rather, '[t]he central concept is that of 'fair warning': The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated

---

F.3d 763, 769–70 (8th Cir. 2016) ("Wallace did not pose an immediate and significant threat of serious injury to Cummings or bystanders because he may not have committed any violent felony, the physical struggle was minimal, and he was not "holding a firearm" when he attempted to flee."); *Kirby v. Duva*, 530 F.3d 475 (6th Cir. 2008) (denying qualified immunity in deadly force case because, despite car chase and other facts, the officers were not in danger if plaintiffs' account was accepted).

constitutional rights.'" (quoting *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004)

(*en banc*) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

### C. Material Disputes of Fact Preclude Granting Summary Judgment On Plaintiff's Deadly Force Claim

Defendant Castro's motion is particularly problematic because, despite the

known existence of material facts, it simply ignores them and plows forward with

Castro's self-serving version of events.

Castro's account is contradicted in fundamental ways by the objective

forensic evidence. And, nearly every material fact related to the shooting is

disputed. Castro claims that he "reasonably believed that" Jordan Baker "posed an

immediate threat to his safety when [Mr. Baker] ran at him in a crouched position

because [Mr. Baker] had assaulted him seconds prior and . . . was reaching for his

waistband, a known common location for concealing a weapon, as he ran towards

him." Br. 23. Plaintiff disputes that Baker was charging at the officer; disputes that

Baker ran at the officer in a "crouch"; disputes that Castro was assaulted; disputes

that Baker was reaching for his waistband; and the list goes on.

Some of these disputes of material fact include:

### 1. Disputes Concerning Whether Baker Was Running Away From Or Charging At the Officer

Putting aside the entirely incredible notion that an unarmed, half-naked

civilian in sandals would charge headlong at a police officer pointing a gun at him,

the parties disagree sharply about whether Baker was moving away from the officer

or, as Castro claims, charging directly at him.

Castro's account is that, after running behind the building, Baker stopped and "turned to face me";  that Baker "was facing me directly and obviously knew that I had him at gun point"; that Baker said "I'm not going to jail!"; and then began charging towards the officer. Ex. 4, at 2, Ex. 5, at 4.

Castro's account is contradicted by the physical evidence. To start, the autopsy report makes it clear that the wound trajectories are significantly left to right; essentially a side-body shot, not one consistent with someone facing the officer directly and charging at him. *See* Ex. 10. The medical examiner who did the autopsy on Mr. Baker agreed that the front-to-back trajectory was "fairly shallow," *i.e.*, "tangential" and not front to back directly. Ex. 12, at 32. As Dr. Arden put it, the "trajectory of the gunshot wound to Mr. Baker was predominately to his right, with much lesser components of travel backwards and downward" Arden Report at 4.

Given the angles, Baker could not have been facing directly at Castro and then charging at him, as Castro claimed. Indeed, in examining the autopsy report and other evidence, "the trajectory of the fatal gunshot wound . . . is directly contrary to the trajectory of the bullet wound that would result from the relative positioning in the account given by" officer Castro. Ex. 11, at 4. Indeed, the "actual trajectory . . . indicates that [Mr. Baker] was largely turned sideways to the gun when it was fired." Ex. 11, Arden Rebuttal Report at 2.

Contrary to Castro's account, the predominately left-to-right trajectory is consistent with Mr. Baker moving *away* from the officer.   Ex. 11, Arden Report at

31

6. Put differently, "the evidence is consistent with Mr. Baking turning away and to the right from the officer at the point he was shot." *Id*. at 4.

Both sides also have retained reconstruction experts who have weighed in on the bullet trajectories. Plaintiff's expert, Brian Weaver, opined that Baker's torso was rotated clockwise in the axial plane—aka, turned to the right—with respect to Officer Castro's weapon, "which is consistent with a scenario in which Mr. Baker was rotating his body clockwise and away from Officer Castro while attempting to accelerate in the opposite direction at the time Officer Castro discharged his weapon." Ex. 13, at 4. As a consequence, "the physical evidence is inconsistent with Castro's account regarding the location and posture of Mr. Baker when he discharged his weapon." *Id.* ("The physical evidence is inconsistent with Officer Castro's statement, affidavits, deposition testimony and grand jury testimony regarding the location and the posture of Mr. Baker when he discharged his weapon."). Tellingly, Defendants' own reconstruction expert has not opined that the evidence is consistent with Baker directly charging at Castro as the officer claims. Indeed, Mr. Priest agrees that the wound trajectory requires Mr. Baker to be "bladed" to the right, consistent with Dr. Arden's opinion. And, Mr. Priest even made an anatomical model that, especially when taking all inferences in Plaintiff's favor, plainly shows that the wound trajectories contradict Castro's claim that Baker was charging directly at him when he discharged his firearm:



In plain terms, Castro claims that Baker was charging directly at him, and that claim is contradicted by the wound trajectory in significant respects. Summary judgment is improper on this basis alone.

### 2. Disputes Concerning Baker's Location At the Time of the Shooting

In his motion, Officer Castro has ignored another material important fact: the location of Baker when the shots were fired. Baker's location relates directly to the trajectory issues concerning the left-to-right angles discussed above, but also relates to the slightly downward trajectory of the wound. Indeed, summary judgment is entirely improper because Castro has changed his account about the location of Baker at the time he discharged his weapon since this litigation began.

Initially, in his statements to the department and in his grand jury testimony, Castro claimed that Jordan Baker was on the grass north of the Bayou,

which is next to a storage center. Ex. 6, at 33; Ex. 16, Brady Dep., at 130; Ex. 17, Becker Dep. at 52-54. In other words, Castro fired *north* at Baker who had passed the alley and was next to the storage center, but began to charge the officer while running *south*, toward that alley. The pulled back perspective of the entire location looks like this:



On the northeast corner of the strip mall there is a bayou that runs at a southwest angle along the side of the building. The alley runs *east* to *west*. On the north side of the alley is the storage facility; on the south side of the alley is the back side of the 5700 W. Little York strip mall. Zoomed in, the area looks like this:



Officer Castro claimed initially claimed that Baker was well onto the grass area north of the concrete alley when Baker stopped running. Ex. 6, at 84-85.

████████████████████████████████████████████████████████

████████████████████████████████████████████████). Castro also told this to others the night of the shooting, indicating that Jordan Baker was well onto the grassy area and that he turned around, directly faced Castro, and started charging at him, which is when Castro shot Baker. Ex. 17, at 54. Lt. Becker

puts Baker and Castro on the approximate location of the cars, right next to the

storage facility, located in the following picture:



Castro repeated these statements—that Baker was near the storage facility—at his

deposition in this matter. Ex. 7, at 218-219.

Without the police cars, that area looks like this:



The problem with Castro's account is that it is contradicted by the physical evidence, and the "physical evidence is going to override" Castro's statements. Ex. 19 at 93. The physical evidence indicates: Jordan Baker was not north of the alley in the grass next to the storage facility when he was shot. And, Castro was <u>not</u> facing north, when he shot Jordan Baker, as he claimed. Instead, the physical evidence shows that Baker was down the alley and Castro was facing west.

To elaborate: the night of the shooting, HPD crime scene analyst Officer Menefee documented important physical evidence about the shooting: (1) a spent gun cartridge, (2) one of Jordan Baker's sandals, (3) a trail of blood near the building and going west down the alley, and (4) the location of Mr. Baker's body. Exhibit 23, at 19-20; *see also* Ex. 8, at 611 (showing the bullet casing marked as "1" with Baker's body in the distance); *id.* at 615 (from the perspective of the location of the bullet casing); *id.* at 649-51, 653-57 (documenting Baker's body and the trail of blood); *id.* at 664 (showing the sandal, blood trail, and bullet casing in the distance); *id.* at 667 (showing the alley with markings).

37

As a result, Officer Menefee created the following map: [10]



Ex. 23, at 66-68 (discussing maps).

All of the expert testimony in this case that bears on this issue—including Castro's own expert—puts Baker to the *west* of Castro at the time of the shooting. The key points here are the location of the spent bullet casing and the beginning of the trail of blood. Castro's own expert put it this way: "Mr. Baker's position at the moment of firearm discharge must exist between the position of Officer Castro and the beginning of the undocumented blood trail." Ex. 18, at 13. Plaintiff's experts reached similar conclusions. *See* Ex. 13, at 21, 26-27; Ex. 11, Arden Report at 5.

That being the case, contrary to Castro's testimony, the physical evidence indicates that Castro fired his weapon while facing to the *west* not the *north*. As Castro's expert put it, "the strongest statement I can make regarding Officer Juventino Castro's position at the time of the firearm discharge is he was facing the

---

[10] The number 1 on the map is the shell casing, and the number 2 is the sandal.

location of Mr. Baker looking westerly in the scene" Priest Report, at 13. And, Mr. Priest further opined that there is absolutely no evidence to support the idea that Baker was standing on the grass (as pictured above) at the time of the shooting. *See* Priest Dep. at 170 ("Q: It's your opinion that [Jordan Baker] was in the alley, correct? A: Yes."); *id.* at 170-71 (discussing photographs of the grassy area further to the north of the alley, including the picture above, and when asked "it is not your opinion that . . . that is where the shooting took place," answering: "I don't have any evidence to support that."). These essential material facts—the location of Baker and the direction Castro was shooting—are thus in conflict by Castro's own expert's testimony.[11] That should end the matter as it concerns summary judgment altogether.

In addition to being a significant, material difference about where the shooting happened, the fact that Baker was to the west also pertains to, and undermines, Castro's claim that he was "charging" at him. When coupled with the trajectories, the location of Baker in the alley and very near the back of the building and turned significantly to his right further supports the Plaintiff's version of events that Baker was moving *away* from the officer when he was shot; otherwise Baker would have been moving into the side of the building. Accordingly, the fact Baker was at or very near the beginning of the blood trail, right near the side of the building, and the fact that he was turned in such a strong angle to the right

---

[11] Plaintiff's experts agree. In addition, the inference from the physical evidence without the retained experts also strongly supports an inference that Baker was shot in the alley, not on the grass. Accordingly, this fact would still be in material dispute if Castro's expert had not issued this opinion, both on account of Plaintiff's experts and, tellingly, even if they had not been retained at all. *Cf. Baulch v. Johns*, 70 F.3d 813 (5th Cir. 1995) (finding dispute of fact based upon autopsy report).

confirms what we saw with the trajectory evidence—Baker was moving away from the officer. Mr. Weaver's illustration, illustrating Plaintiff's version of events, is perhaps helpful:



The evidence also further supports an inference that Baker was moving away from the officer because, by moving to the west *away* from the officer, he could have had a chance of escaping, and his course of travel after being shot is consistent with continuing in that direction.[12]

---

[12] That Baker was west of Castro, down the alley, is of further significance because of the fact that, from where the bullet casing was found, the grassy area to the north is an upward slope, while the alley is a downward slope. See Ex. 29, Weaver Dep., at 198; Ex. 11, Arden Report at 4; Ex. 22, Torres Dep. Ex. 4.

This presents a further disputed issue of fact, on Castro's testimony alone. Before this litigation began, Castro testified that Baker was "charging towards" him, which is when he reached for his waistband. Ex. 5, Internal Affairs at 3; Ex. 4, Homicide Statement at 3. In his prior testimony, Castro never claimed that Jordan Baker was "crouched" as he now claims. Instead, Castro testified that Baker was in a "dead sprint," Ex. 6, Grand Jury Transcript at 89, and he was "running upright," i.e., making the "usual movements . . . people make as they run." *Id.* at 92-93.

### 3.  Disputes Concerning the Video and Whether Baker—Unarmed and Unclothed—Was Ever a "Threat"

Officer Castro has advanced the notion that Baker charged at him while screaming he wasn't going to jail, even though the officer pointed a gun at him. In addition to the objective basis for challenging this claim based upon the wound trajectories and scene evidence, Castro's highly improbable account, is further undermined by several other material evidence.

*First* is the video of the lead-up to the shooting. The crucial part here is the lengthy period of time Castro and Baker interacted in the well-lit parking lot. On Plaintiff's viewing, it is only after Officer Castro draws his weapon that, after walking away, Baker turns around to run. Indeed, Castro now admits that he drew his gun at Baker while they were face to face in the parking lot. This supports the strong inference that Baker was not about to "attack" the officer but instead was afraid for his life.

*Second*, this video undermines Castro's claim that he believed Baker was armed. Castro had the opportunity to see Baker in a well-lit area without any shirt on, and he was able to observe both his back and his front. Castro claims he was afraid of weapons and his life certainly had an incentive to be looking for possible weapons and it is fair to infer that he did not see any sort of weapon based upon his opportunity, especially as a trained officer who had the chance to view Baker shirtless from the front and back. This is the same sort of inference Castro suggests the Court should make about whether Baker knew he was an officer. *See* Br., at p.15 ¶20 ("The evidence establishes that the Decedent knew or should have known

41

that Castro was a police officer because Castro was in full police uniform at all relevant times. . . .”). Indeed, *Garner* is directly on point. There, he stated that the suspect “appeared to be unarmed,” but he “could not be certain that was the case.” 471 U.S. at 20. The Court explained, “Restated in Fourth Amendment terms, this means [the officer] had no articulable basis to think Garner was armed.” *Id*. This fact is certainly part of the assessment of material evidence here.[13]

The only aggressive thing Baker ever did was swear at Castro. Ex. 9, Magnolia Martinez Statement. And as depicted in the video—where Baker and Castro slowly move across the parking lot—Baker was acting passive, tentative, and obviously afraid. Nor did Castro claim that he saw some sort of “bulge” in the pants. On the totality then, Plaintiff submits the inference in Plaintiff’s favor that flows from all of this evidence is that Baker was not reasonably at threat at all: he was unarmed, wearing sandals, and had no shirt on.

*Third*, the fact that Baker was actually unarmed certainly matters and is relevant to assessing the credibility of Castro’s story.  Castro’s claim that the fact that Baker was unarmed is “irrelevant” is an impossible leap. It is undisputed that Baker was on foot, and that he was shirtless before he ran into the alley. In that period of time, Baker and Castro interacted for nearly 30 seconds in a well-lit area

---

[13] Castro cites *Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991), for the proposition that the fact that Baker was not actually armed is “irrelevant.” *Reese* did not ever hold—contrary to Supreme Court precedent in *Garner*—that the fact that a suspect is unarmed is necessarily irrelevant. Instead, *Reese* involved a situation of a suspect inside of a car where the officer thought he was reaching under a seat out of the officer’s “line of sight,” unlike the circumstances here. *Manis v. Lawson*, 585 F.3d 839 (5th Cir. 2009). There, the officer had no way of knowing whether the suspect was actually armed because he had not had the opportunity to view him.

in the parking lot. Ex. 3 at 20:41:38-20:43:01; Ex. 8, at 553, 555. Officer Castro

claims that he thought Baker was reaching for a weapon despite all of that, but this

makes little sense. And, Plaintiff submits, this is circumstantial evidence

undermining Castro's account. As *Cruz* explained:

> In this case, there's circumstantial evidence that could give a
> reasonable jury pause. Most obvious is the fact that Cruz didn't have a
> gun on him, so why would he have reached for his waistband? Cruz
> probably saw that he was surrounded by officers with guns drawn. In
> that circumstance, it would have been foolish—but not wholly
> implausible—for him to have tried to fast-draw his weapon in an
> attempt to shoot his way out. But for him to make such a gesture when
> no gun is there makes no sense whatsoever. A jury may doubt that
> Cruz did this. Of course, a jury could reach the opposite conclusion. It
> might believe that Cruz thought he had the gun there, or maybe he
> had a death wish, or perhaps his pants were falling down at the worst
> possible moment. But the jury could also reasonably conclude that the
> officers lied.

765 F.3d at 1079-80. *See also Sherrod v. Berry,* 856 F.3d 802 (7th Cir. 1988 ) (en

banc) (Further, "impeachment by contradiction is a technique well recognized in the

federal courts by which specific errors in the witness's testimony are brought to the

attention of the trier of fact." For example, if an officer testifies that "I saw a shiny,

metallic object similar to a gun or a dangerous weapon in the suspect's hand," then

proof that the suspect had neither gun nor knife would be material and admissible

to the officer's credibility on the question of whether the officer saw any such thing

(and therefore had a reasonable belief of imminent harm."); *Pierre ex rel. Pierre v.

Hardy,* 2014 WL 454945, at *5 (E.D. La. Sept. 12, 2014) ("Although there is no

witness statement to  contradict Deputy Hardy directly, some of the circumstantial

evidence would allow a rational finder of fact to conclude that he used excessive

force.") (citing *Samples on Behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1332 (5th Cir.1988)).

Likewise, in *Samples*, the Court carefully noted the circumstantial evidence could support multiple inferences, and reversed a grant of summary judgment on that basis. 846 F.2d at 1332; *cf. Bridges v. Wilson,* 718 F. App'x 636, 641–42 (10th Cir. 2017) ("Since a jury could discount Wilson's credibility—in part, because there was "circumstantial evidence" that could discredit Wilson's version of the events— the district court concluded there were genuine issues of material fact.").

In short, the fact that Baker was unarmed, was shirtless, and was wearing sandals undermines Castro's impossible testimony. The video of their interactions also impeaches his account. Thus, when examined alongside the objective above discussed evidence—the bullet trajectories, the blood evidence, the video—the fact that Baker was unarmed, unclothed, and wearing sandals is not just relevant; it is independently sufficient to illustrate material disputes of fact that preclude summary judgment.

### 4. Disputes Whether Castro Fabricated the "Waistband" issue as Excuse He Knew Would be Credited

As explained above, Plaintiff disputes that Baker was reaching for his waistband while charging at Castro. On Plaintiff's facts, Baker was moving away and trying to run down the alley.

Putting the cards on the table, Plaintiff's position is that Castro made up the idea that Baker reached for his waistband in an attempt to justify his actions. Castro was the only living witness to the shooting, and Castro knew he would have

44

to give an account of what happened that would justify his conduct. In the hours and days after the shooting, Castro has given accounts that made his actions appear justified, but later proved to be demonstrably false; he explicitly *changed* his testimony after reviewing the video of the incident. And, he has changed it again in this litigation by claiming that Baker "crouched" as he ran at him. The statements must be viewed in their context. *Cf. United States v. Hackett*, 638 F.2d 1179, 1186–87 (9th Cir. 1980) (false exculpatory statements admissible to show consciousness of guilt); *United States v. Lomprez*, 472 F.2d 860, 863 (7th Cir. 1972) (same).

As mentioned above, and worth emphasizing here: "in the deadly force context, we cannot 'simply accept what may be a self-serving account by the police officer.' Because the person most likely to rebut the officers' version of events—the one killed—can't testify, "[t]he judge must carefully examine all the evidence in the record ... to determine whether the officer's story is internally consistent and consistent with other known facts." This includes "circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014)

The background pattern and practices in the department also influenced Castro's decisions. Specifically, the statistical evidence shows that one frequently invoked reason for shooting a civilian in Houston is some sort of gesture, and frequently something like reaching for a pocket or a waistband. Indeed, for all officer-involved shootings between 2009 and 2014, invoking a gesture as a justification happened in over 20% of cases. Ex. 15, at 20. The more telling fact,

though, is that a whopping 71.4% of the time that justification was invoked, the suspect was unarmed. And, instances in which HPD officers have been involved in extremely controversial, troubling shooting incidents, HPD officers have absolved themselves by claiming that the suspect gestured, and including by gesturing at their waistband. *See id. See also,* Ex. 24, at 24. These incidents are also well publicized. In the end, they support a department culture where Castro knew, as he consulted with his lawyer before making a statement, that claiming Baker "reached for his waistband" was the sort of justification that could keep him from being criminally charged or ever disciplined. And, that is exactly what happened.

Viewed through this lens, Castro's comments about the "waistband"—and the lack of corroboration—must be viewed in the broader context, which supports an inference that, as Plaintiff claims, Castro invented the "waistband" thing as a post-hoc justification that is actually false. Put differently, Baker being unarmed, from Plaintiff's view, is an important reason why Castro endeavored to tell the story in the way he did.

### 5.    Disputes About Baker's Injuries

Defendant Castro does not address, at all, the non-fatal injuries Jordan Baker suffered. Ex. 10, at 3-5, 10-11. On Plaintiff's facts, Jordan Baker was knocked off of his bicycle by Castro (something Castro denies) and tripped while running in the alley before he was shot. The latter scenario is relevant to Plaintiff's deadly force claim because, if Baker was substantially wounded, shirtless, and unarmed, that makes it even more unlikely that Baker would have, as Castro contends,

charged at the officer. In addition, the fact that Baker was shot *in the alley*, as opposed to by the grassy area by the storage facility, illustrates that Castro's testimony is contradicted by the evidence in another way: it is unlikely that Castro saw Baker the entire time he was running because you cannot see down the entry to the alley way when crossing past the side of the building. *See, e.g.*, Ex. 8, at 564.

### 6.   Baker Was, At Most, A Misdemeanor Suspect.

In his brief, Castro tries to shoe-horn in the interactions in front of the strip mall as part of his calculus. If the idea is that this threat "carried over" to the back alley, such an argument would be improper. The inquiry about the use of force is the threat, if any, *at the moment* of the use of force. *See Mason*, 806 F.3d at 276. And, the inquiry on deadly force—as opposed to excessive force more generally—is constrained to whether Baker posed a serious threat of physical harm to Castro. *See Bazan*, 246 F.3d at 488, 493.

Taking the facts in the light most favorable to Plaintiff—where there is no evidence that Castro and Baker actually collided—and the video of the moments immediately thereafter do not show any physical contact between Castro and Baker (in fact, they show the opposite), Plaintiff submits that there was still absolutely no reasonable suspicion of any crime.

But, Castro does not even take *his own* testimony in the light most favorable to Plaintiff, which is an error. Castro testified that after Baker was on his knees, and after having a gun pointed at him, Baker stood up. At this point, they collided as Baker was trying to get away. In so doing, Baker did not threaten Castro. Nor

did he punch or attack him. Instead, he tried to get away from the officer. Castro claims that Baker's shoulder collided with him in the process. It is undisputed that Castro suffered no injury. Castro Dep at 114-15. At most, then, this was a misdemeanor under Texas Penal Code § 22.01, even on the officer's account. *See* Texas Penal Code § 22.01(a)(3) (defining "intentional or knowing" "physical contact with another person"). Such a misdemeanor militates against the use of force. *See Trammell v. Gruge*, 868 F.3d 332, 340 (5th Cir. 2017) (finding a misdemeanor a minor offense militating against the use of force) (citing *Reyes v. Bridgwater*, 362 F. app'x 403, 407 n.5 (5th Cir. 2010) (finding the 'severity factor' from *Graham* militated against the use of force where the alleged crime was a misdemeanor).[14]

The video of Baker walking away from the officer, and their subsequent interaction in that video, casts strong doubt on the officer's account. Even if there were some sort of "threat" the fact that Castro and Baker were standing feet apart for nearly 30 seconds before Baker ran, and that Castro did not immediately follow illustrates that there was absolutely no reason to believe that Baker's act of standing up was some sort of violent or assaultive attack.

### D. Summary Judgment Is Improper, Even On Qualified Immunity Grounds, Due to the Extensive Material Factual Disputes

As the Fifth Circuit has frequently commented in excessive force cases, where "the material facts underlying [an] incident are hotly disputed," only a jury can resolve those disputes. Summary judgment cannot be granted. *Baulch v. Johns*, 70

---

[14] In the motion, Castro suggests that Baker had committed a third-degree felony of assault of a police officer. Br. At 16. This is a baseless assertion, even on Castro's own testimony, because there was absolutely no injury—just contact. See TEXAS PENAL CODE § 22.01(a)-(b).

F.3d 813 (5th Cir. 1995); *see also Lytle*, 560 F.3d at 417 ("[I]t is the job of the factfinder, not [the] court, to ultimately resolve the factual disputes and make inferences that fill the gaps in the facts.").

The sorts of factual disputes in this record are precisely those Courts find preclude summary judgment. In *Meadours v. Ermel*, for example, police officers shot and killed a mentally disturbed man who had a screwdriver but who had, at some point, climbed onto a dog house. 483 F.3d at 420-21. The officers claimed that the man charged at the officers with the screwdriver, and the plaintiff presented evidence that a bullet entered the victim's thigh at an upward angle, supporting the notion he was atop the doghouse when he was shot. *Id.* at 421 & n.2. Affirming the denial of summary judgment, the Fifth Circuit explained that "in order to determine reasonableness in the case at bar, several key factual disputes must be resolved," which included whether the victim was shot "while charging" at the officer or still atop the doghouse, posing no imminent threat. Indeed, and particularly salient here, the Fifth Circuit found that "the question of *when* and *where* [the victim] was shot is integral to determining whether the officers' actions were reasonable, and, consequently," the dispute about those facts was material. *Id.* at 423. The disputed facts meant that the officers were not entitled to qualified immunity. *Id.* at 423 n.5.

The same is true here—the questions about Baker's location and what was happening at the time are "integral" to determining the reasonableness of Castro's actions, rendering summary judgment unavailable. *See also Lytle v. Bexar County*, 560 F.3d 404 (5th Cir. 2009) (where an officer shot and killed a passenger in a car,

and the officer claimed that the car backed toward him, the district court found that the parties "genuinely disputed the direction and distance" that the car traveled when the officer fired").

Indeed, the Fifth Circuit has found summary judgment inappropriate based upon disputed facts related to autopsy reports and other medical evidence—without the additional evidence that Plaintiff has adduced here. In *Baulch v. Johns*, 70 F.3d 813 (5th Cir. 1995), the Court found that an autopsy report showed a disputed issue of fact as to whether the officer was acting in self-defense or whether the suspect was retreating from the officer, analogous to this matter. The Fifth Circuit affirmed: "Faced with conflicting evidence, the district court determined that there was a genuine issue of material fact concerning the lawfulness of the force employed" by the officer. *Id.* 70 F.3d at 815. Similarly, in *Baker v. Putnal*, the Court found that a genuine issue of fact precluded summary judgment based, among other things, on the medical examiner's report given that the "nature of the wounds indicate that Baker, Jr. was not facing [the officer] when he was shot," which was a "more of a question of fact than a court may dispose of on summary judgment." 75 F.3d 190, 198 (5th Cir. 1996).

The foregoing cases also make clear that a police officer is not entitled to qualified immunity where facts related to the underlying constitutional violation are disputed. Other circuits have reached the same conclusions. *See,* .e.g, *Dufour-Dowell v. Cogger*, 152 F.3d 678, 680 (7th Cir. 1998) ("Because the facts are in hot dispute, the officers cannot seek pretrial refuge behind a claim of qualified

immunity.  Raising a defense of qualified immunity in the face of disputed facts that control the answer to the question is a waste of everybody's time."); *Zia Trust Co. ex. rel. Causey v. Montoya*, 587 F.3d 1150, 1155 (10th Cir. 2010) (denying summary judgment and qualified to officer upon determining that the officer did not have probable cause to believe there was a serious threat of serious physical harm); *Ellison v. Lesher*, 796 F.3d 910, 916-917 (8th Cir. 2015) (denying summary judgment in deadly force case where disputed facts were, from the officer, that plaintiff had charged at him, waived a weapons, and allegedly disobeyed multiple commands from the officer, and instead crediting Plaintiff's account that he was not wielding the cane, and concluding that if the officer shot plaintiff "while he was simply standing in his apartment and holding no cane, then there were no reasonable grounds to believe that [plaintiff] posed a serious threat of death or serious physical injury to the officers or others"); *Williams v. Village of Maywood*, 2016 WL 4765707, at *5-*6 (N.D. Ill. Sept. 13, 2016) (denying summary judgment where disputed fact was whether victim of shooting had a gun or was unarmed).

### E. Castro Violated The Constitution By Refusing to Provide Medical Care to Jordan Baker After Shooting Him

Regardless of whether a jury ultimately determines that Castro's decision to shoot an unarmed, partially-clothed civilian is justified, it is undisputed that when Baker was shot he was "seized." *Garner,* 471 U.S. at 7.

Individuals seized by police officers have a right to "basic human needs, including medical care" under the constitution. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996). There is ample reason to believe that such claims

should be analyzed under a completely objective standard under the Fourth Amendment. *See, e.g., Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) (objective standard for force claims even when in pretrial detention); *Currie v. Chhabra*, 728 F.3d 626, 629 (7th Cir. 2013) ("Fourth Amendment's 'objectively unreasonable' standard [applies] to both 'conditions of confinement' and 'medical care' claims brought by arrestees who have not yet had their *Gerstein* hearing.").[15]

Before *Kingsley*, and in this Circuit, a seized individual's constitutional right to medical care is violated where "an officer acts with deliberate indifference to a substantial risk of serious medical harm and resulting injuries"; mere negligence is not enough. *Mace v. City of Palestine*, 333 F.3d 621, 625 (5th Cir. 2003). That said, a "government official's knowledge of a substantial risk of harm may be inferred if the risk was obvious." *Baldwin v. Harris Cty. Sheriff Dep't*, No. 4:16-CV-2966, 2018 WL 496957, at *3 (S.D. Tex. Jan. 19, 2018) (citing *McIntosh v. Smith*, 690 F. Supp. 2d 515, 528 (S.D. Tex. 2010) (in turn citing *Farmer v. Brennan*, 511 U.S. 825 (1994)).

Here, there can be no doubt that Defendant Castro's actions were objectively unreasonable and illustrated deliberate indifference to Jordan Baker's serious medical needs. It is undisputed that Castro shot Baker through the heart and both lungs. Ex. 10. It is undisputed that Castro did not attempt to undertake first aid or perform any other emergency medical care. Ex. 7, at 58, 83-84; Ex. 4, at 4.

---

[15] A number of Courts have applied the Fourth Amendment reasonableness test to emergency medical care claims, rather than analyzing them under a heightened standard requiring "deliberate indifference" or some other form of subjective knowledge. *See id.* at 629-30 (citing *Chambers v. Pennycook*, 641 F.3d 898, 905 (8th Cir.2011); *Aldini v. Johnson*, 609 F.3d 858, 860 (6th Cir.2010); *Pierce v. Multnomah Cnty.*, 76 F.3d 1032, 1043 (9th Cir.1996); and Catherine T. Struve, *The Conditions of Pretrial Detention*, 161 U. PENN L. REV. 1009, 1013 (2013)).

Instead, Castro arguably made matters worse: he handcuffed Jordan Baker's hands to his belt behind his back and left Baker to die, and possibly suffocate to death while still bleeding, face down on the ground in a dark and rough alley. The need for medical care was obvious, yet Castro did nothing.

Castro's motion, again, has failed to take the facts in the light most favorable to Plaintiff. Here, it is undisputed that after shooting Baker Castro provided absolutely no aid whatsoever. Castro watched Baker fall to the ground, and he knew that the gunshot ███████████████" because Castro could hear Baker ████████████ Ex. 6, at 94.  Rather than provide any aid, and recognizing that Baker was still alive, Castro proceeded to handcuff Baker—face down—in the gravel alley. Ex. 4, at 4. Castro did not even take his pulse, Ex. 7, at 83-84. Instead, it was his training "just to handcuff him." *Id.* at 84, and then Castro ███████████ ████████████ Ex. 6, at 138. In the next 4-5 minutes before EMTs arrived, Castro did absolutely nothing to attempt to render any aid to Mr. Baker. Ex. 7, at 84-85.

In defense of this claim, Castro's only resort is to point to the fact that he called 911. But this was plainly insufficient—the whole point of providing first aid would be to attempt to keep Baker alive *until* the ambulance arrived, when those officials could take over. But Castro made no attempt to do that, making his conduct deliberately indifferent and unlawful.

### F. Plaintiff's Wrongful Death and Survival Claims Are Federal Claims

Defendants inexplicably discuss state law immunity as it concerns Plaintiff's wrongful death and survival claims. But Plaintiff had pleaded these claims as federal causes of action. *See* Second Amended Complaint, Dkt. 44, at 19-20.

And they are well established. The Fifth Circuit has "consistently held that a parent may recover damages analogous to state law wrongful death damages in a § 1983 action based on the violation of her child's civil rights." *Flores v. Cameron Cty.*, 92 F.3d 258, 271 (5th Cir. 1996) (citing *Rhyne v. Henderson County*, 973 F.2d 386, 391 (5th Cir.1992)). Such claims are properly brought on behalf of the estate but also the surviving family member's rights as well. *Id.; see also, e.g.*, *Robinson v. Johnson*, 975 F. Supp. 950, 954 (S.D. Tex. 1996) ("The Fifth Circuit has held . . . that a parent may recover damages for "mental anguish, suffering and loss of companionship, contribution, society, affection and comfort" in a § 1983 action based on the violation of her child's civil rights that resulted in his death.").

In assessing these claims, the federal court looks to the applicable state law—here the state law of Texas—for gap-filling as to who can bring the claims. *Rhyne*, 973 F.2d at 391. "The Texas Civil Practice and Remedies Code provides that only "the surviving spouse, children, and parents of the deceased" may bring an action to recover damages for wrongful death. *Dyer v. City of Mesquite, Texas*, 2017 WL 118811, at *13 (N.D. Tex. Jan. 12, 2017) (quoting TEX. CIV. PRAC. & REM. CODE § 71.004 (West, Westlaw through 2015 Sess.).

54

Plaintiff's claims here are proper. As in *Dyer*, Plaintiff's claims are advanced on behalf of the Estate, J.B., and Janet Baker. Plaintiff's allegations and evidence concerning both J.B. and Janet Baker meet the standard enunciated in the applicable cases (interpreting Texas, as opposed to another state or circuit's law). *See, e.g.*, *Robinson*, 975 F. Supp. at 954 ("In order to successfully maintain a claim for loss of parental consortium resulting from injury to the parent-child relationship, the plaintiff must show that the defendant physically injured the child's parent in a manner that would subject the defendant to liability. The child may recover for such nonpecuniary damages as loss of the parent's love, affection, protection, emotional support, services, companionship, care, and society. (citation omitted)); *cf. Turk v. Mangum*, 268 F.Supp.3d 921, 932 (S.D. Tex. 2017) (discussing the applicable standards).

In sum, there should be no doubt that Plaintiff—as the administrator of Baker's estate and in her own right—has "standing to bring survival and wrongful death actions under 42 U.S.C. § 1983." *Estate of Sizer by & through Sizer v. Cameron*, No. A-15-CA-01143-SS, 2017 WL 2418316, at *1 (W.D. Tex. June 1, 2017) (citing *Brazier v. Cherry*, 293 F.2d 401, 406-07 (5th Cir. 1961) (incorporating both a state's survival statute and its wrongful death statute to provide full remedies for § 1983 violations), and *King ex rel. Chaney v. Texas Med. Bd.,* 576 F. App'x 353, 354–55 (5th Cir. 2014)).

Defendants' conclusory argument, which cites the wrong area of law, should be ignored and the motion denied.

As a related matter, the foregoing also forecloses Defendant Castro's argument that Ms. Baker and J.B., Jordan Baker's son, are prevented from seeking damages under § 1983 under a wrongful death theory. *See* Br. At P. 21, ¶¶32-34. To the contrary, Janet Baker, individually, *is* represented in this lawsuit. *See* Second Amended Complaint, Dkt. 44, at ¶8. J.B.'s interests are maintained therein as well. *Id.* Defendants claim that "there is no evidence" that J.B. is Baker's son other than conclusory statements in the complaint. Not so. For one, this ignores Janet Baker's sworn deposition testimony, as well as her interrogatory responses, and other evidence (including the probate proceedings). *See* Ex. 1, at 41, 52.[16]

In addition, the law cited above illustrates that Defendants' reliance upon a court in another state applying the law from another circuit is inapposite. Here, as a case arising out of Texas and the Fifth Circuit, Fifth Circuit law, with gaps filled by Texas law, applies here. Under that established law, Plaintiff's wrongful death and survival claims can proceed under §1983. *Robinson*, 975 F. Supp. at 954.

## CONCLUSION

Plaintiff respectfully requests that this Court deny Defendant Castro's motion for summary judgment and set this matter for trial.

---

[16] Defendants' argument is so tangential and cursory that it should be rejected on that basis alone. *Cf. Rutherford v. Harris County, Texas,* 197 F.3d 173, 193 (5th Cir.1999) (noting that "we will not consider an issue that is inadequately briefed").Regardless, Plaintiff has not endeavored to obtain and provide to the Court the probate proceeding documents for the sake of judicial economy. Should the court desire additional evidence on this issue, Plaintiff is happy to provide.

RESPECTFULLY SUBMITTED,


/s/ David B. Owens
*One of Plaintiffs' Attorneys*


Jon Loevy                                  Billy Joe Mills
Mark Loevy-Reyes                           FIRMEQUITY
David B. Owens                             858 West Armitage Avenue
LOEVY & LOEVY                              Suite 101
311 N. Aberdeen St., 3rd Fl.               Chicago, IL  60614
Chicago, IL 60607                          (847) 207-9064
(312) 243-5900

57

## <u>CERTIFICATE OF SERVICE</u>

I, David B. Owens, an attorney, hereby certify that on May 9, 2018, I filed the foregoing using the Court's CM/ECF system, which effected service on all counsel.

<u>/s/ David B. Owens</u>
*One of Plaintiff's Attorneys*