IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ESTATE OF JORDAN BAKER, by and through administrator, JANET BAKER, | ) ) ) | No. 4:15-cv-3495 |
| | ) | |
| Plaintiff, | ) ) | Hon. Judge Sim Lake |
| v. | ) ) | |
| JUVENTINO CASTRO, *et al.* | ) ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CITY OF
HOUSTON'S MOTION FOR SUMMARY JUDGEMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES

I.     Nature and Stage of Proceedings ................................................................. 1

II.    Issues to Be Decided ................................................................................... 1

    A.  Whether the City is entitled to summary judgment on Plaintiff's equal protection *Monell* claim when a reasonable jury can conclude that the City of Houston's widespread custom of exhibiting racial bias against black Houstonian's during traffic stops was at work when Defendant Castro unlawfully stopped Jordan Baker on account of his being black? .............. 1

    B.  Whether the City is entitled to summary judgment on Plaintiff's deadly force *Monell* claim when a reasonable can jury conclude that the City of Houston's widespread custom of permitting officers to use deadly force with impunity and without any form of discipline was at work when Defendant Castro unlawfully shot and killed Jordan Baker? .................... 1

III.   Summary of Argument .............................................................................. 1

IV.   Applicable Legal Standard ......................................................................... 4

V.    Relevant Facts .......................................................................................... 6

    A.  The Jordan Baker Case ........................................................................ 6

        1.  Jordan Baker Was Stopped On Account of His Race and Castro's Use of Deadly Force Against Baker Was Unjustified ................................... 6

        2.  The City's Policies Were At Work In The Aftermath of the Shooting .......................................................................................... 6

    B.  The HPD's Systematic Bias Against Black Americans In Traffic Stops ......................................................................................... 9

        1.  Houston Racial Profiling Reports Document Statistically Significant Racial Disparities ............................................................ 9

        2.  HPD's Statistics Put Defendant on Notice, Well Before this Incident, that It Had a Significant Racial Policing Problem .......... 10

        3.  HPD Is Deliberately Indifferent ..................................................... 15

C. HPD Permits Officers to Use Deadly Force No Oversight and Encourages Unlawful Uses of Force By Creating Structures Designed to Conceal Contrary Evidence And Make Every Shooting Appear Justified ............. 16

    **1.** HPD has a practice of not investigating or disciplining officers for excessive use of deadly force ............................................................. 16

        a. The Unrecorded and Unauthorized "Walk-Through" ............... 19

        b. No Interviews of the Shooting Officer ........................................ 20

    **2.** Statistically Significant—And Troubling—Shooting Data Reveals that Every HPD Shooting is Deemed Justified ............................... 21

    **3.** There are Many Questionable, Troubling Deadly Force Incidents That The City Deemed Justified .................................................... 24

    **4.** Universally Justifying the Shooting of Unarmed Suspects Is Extremely Troubling and Encourages Constitutional Violations .................................................................... 28

    **5.** HPD Refuses to Implement Accountability in its Investigations .................................................................................. 31

    **6.** The City's Customs and Practices Were At Work in The Investigation of Castro Here ............................................................. 32

VI. A Reasonable Jury Can Find That Defendant City Of The City Is Liable For The Custom And Practices Of The Department That Are Evident In This Record ............................................................................................... 36

  A. The City is Liable for the Custom and Practices of the Department that Are Evident in this Record .......................................................... 37

  B. A Jury Must Determine Whether The City's Customs and Practices of Racially Disparate Policing Make the City Liable Here ............................ 38

  C. A Jury Must Determine Whether The City's Customs and Practices of Permitting Officers To Use Deadly Force With Impunity, Even Against the Unarmed, Make the City Liable Here .................................................. 41

  D. The City failed to Supervise, Discipline, and/or Train its Officers ............ 45

1.  HPD failed to discipline, supervise, or train officers regarding race-based policing ................................................................ 46

2.  HPD failed to supervise officers' use of deadly force ........................... 47

3.  HPD was deliberately indifferent in failing to train, supervise, or discipline ............................................................. 48

    a.  The City was on notice of racially disparate policing ..................... 49

    b.  The City was on notice of inadequate police shooting investigations, failure to discipline, and the likelihood of unjustified Shootings ........................................................ 49

E.  A Reasonable Jury Can Determine That City's Customs and Practices Were The Moving Force Behind the Violation of Jordan Baker's Rights ................................................................ 50

VII.  Summary Judgment is not Proper for Plaintiff's Indemnification Claim ........................................................................ 52

CONCLUSION ............................................................................ 53

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).........................................................4

*Bazan v. Hidalgo County,* 246 F.3d 481 (5th Cir. 2001) ..............................................5

*Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397 (1997)........ 46, 47

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ....................................................................5

*Brown v. Bryan Cnty.*, 219 F.3d 450 (5th Cir. 2000)...................................................46

*Carroll v. Ellington*, 800 F.3d 154 (5th Cir. 2015) .......................................................5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)..............................................................4

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) ..................................................37

*Columbia Ins. Co. v. Tibbott*, No. CV 11-1040, 2012 WL 13027068
    (D. Minn. July 24, 2012) .....................................................................................53

*Connick v. Thompson*, 563 U.S. 51 (2011) ..................................................................48

*Cruz v. City of Anaheim,* 765 F.3d 1076 (9th Cir. 2014) .............................................30

*Doe v. City of Chicago*, 360 F.3d 667 (7th Cir. 2004)..................................................52

*Doe v. Texas Ass'n of Sch. Boards*, Inc., 283 S.W.3d 451 (Tex. App. 2009) ..............52

*Farmer v. Brennan*, 511 U.S. 825 (1994) ....................................................................48

*Fed. Ins. Co. v. Sammons Fin. Grp., Inc.*, 595 F. Supp. 2d 962 (S.D. Iowa 2009).....53

*Flores v. City of Palacios*, 381 F.3d 391 (5th Cir. 2004) ........................................5, 16

*Fraire v. City of Arlington*, 957 F.2d 1268 (5th Cir. 1992)........................................37

*Gabriel v. City of Plano*, 202 F.3d 741 (5th Cir. 2000) ..............................................46

*Gates v. Tex. Dep't of Protective & Regulatory Servs.*,
    537 F.3d 404 (5th Cir. 2008) .................................................................................4

*Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) .................................. 44, 51

*Groark v. Timek*, 989 F.Supp.2d 378 (D. N.J. 2013) ................................................ 44

*Haggerty v. Tex. S. Univ.*, 391 F.3d 653 (5th Cir. 2004) ............................................ 5

*Hatcher v. Bement*, 676 F. App'x 238 (5th Cir. 2017) ................................................ 17

*James v. Harris County*, 577 F.3d 612 (5th Cir. 2009)......................................... 36, 37

*Kitchen v. Dallas Cty.*, 759 F.3d 468 (5th Cir. 2014)........................................... 46, 48

*Lawson v. Dallas Cnty.*, 286 F.3d 257 (5th Cir. 2002) ............................................... 37

*Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347 (5th Cir. 2005) ..................................... 4

*Meadours v. Ermel*, 483 F.3d 417 (5th Cir. 2007) ...................................................... 5

*Milan v. City of San Antonio*, 113 F. App'x 622 (5th Cir. 2004) ................................. 37

*Monaco v. City of Camden*, 2008 WL 8738213 (D. N.J. Apr. 14, 2008) ..................... 44

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978).............. 36, 37

*Netherlands Ins. Co. v. Main St. Ingredients, LLC*, 745 F.3d 909 (8th Cir. 2014).... 52

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).................................................. 38

*Pineda v. City of Houston*, 124 F. Supp. 2d 1057 (S.D. Tex. 2000) ........................... 46

*Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001)............................... 36, 47

*Ramirez v. Martinez*, 716 F.3d 369, 374 (5th Cir 2013) .............................................. 4

*Roberts v. City of Shreveport*, 397 F.3d 287 (5th Cir. 2005)...................................... 46

*Robinson v. Orient Marine Co.*, 505 F.3d 364 (5th Cir. 2007)...................................... 4

*Shapiro Sales Co. v. Alcoa, Inc.,* No. 4:06CV638 CDP, 2006 WL 2228987
(E.D. Mo. Aug. 3, 2006) ......................................................................................... 52

*Sanders-Burns v. City of Plano*, 594 F.3d 366 (5th Cir. 2010)................................... 48

*Santibanes v. City of Tomball, Tex.*, 654 F. Supp. 2d 593 (S.D. Tex. 2009) ........ 38, 51

*Scott v. Harris*, 550 U.S. 372 (2007) .................................................................. 4

*Shaw v. Reno*, 509 U.S. 630 (1993) ...................................................................... 39

*State Farm Fire & Cas. Co. v. McDonald Homes, Inc.*, No. CV 07-3982, 2008 WL 11349773 (D. Minn. May 8, 2008) ........................................................... 53

*Tarver v. City of Edna*, 410 F.3d 745 (5th Cir. 2005) ........................................... 4

*Taylor v. Johnson*, 257 F.3d 470 (5th Cir. 2001) ................................................. 39

*Tennessee v. Garner*, 471 U.S. 1 (1985) ............................................................. 16

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014) ............................................................... 5

*Turner v. Upton County*, 915 F.2d 133 (5th Cir. 1990) ........................................ 38

*United States v. Am. Commercial Lines, L.L.C.*, 875 F.3d 170 (5th Cir. 2017) ........... 4

*United States v. Brown*, 561 F.3d 420 (5th Cir. 2009) .......................................... 39

*Webster v. City of Houston*, 735 F.2d 838 (5th Cir. 1984) ............................... 37, 38

*Whren v. United States*, 517 U.S. 806 (1996) ...................................................... 46

*Zarnow v. City of Wichita Falls*, 614 F.3d 161 (5th Cir. 2010) ............................ 37

## Other Authorities

FED. R. CIV. P. 56 ................................................................................................. 4

U.S. CONST. AMD. XIV, § 1 ................................................................................. 3

**SUMMARY JUDGMENT EVIDENCE**

In support of this response, Plaintiff relies upon and incorporates herein by reference the following evidence:

1.      Deposition Excerpts of Janet Baker – FILED UNDER SEAL

2.      Wireless Store Video

3.      Enlarged Wireless Store Video

4.      Castro Homicide Statement – FILED UNDER SEAL

5.      Castro Internal Affairs Statement – FILED UNDER SEAL

6.      Castro Grand Jury Transcript – FILED UNDER SEAL

7.      Deposition Excerpts of Juvenito Castro

8.      Selected Scene Photos – FILED UNDER SEAL

9.      Statement of Magnolia Martinez – FILED UNDER SEAL

10.     Autopsy Report – FILED UNDER SEAL

11.     Dr. Jonathan Arden Declaration & Exhibits

12.     Deposition Excerpts of Dr. Roger Milton – FILED UNDER SEAL

13.     Brian T. Weaver Declaration & Exhibits

14.     Deposition of Michael Dirden & Exhibit 2

15.     Stephanie Seguino Declaration & Exhibits

16.     Deposition of Lt. Brady

17.     Deposition of Lt. Becker

18.     Jonathyn Priest Report

19.     Deposition Excerpts of Jonathyn Priest

20.     Jonathan Priest Supplemental Report

21.   Deposition of Bender

22.   Exhibit 4 from Investigator Torres Deposition (Scene Photo)

23.   Deposition Excerpts of Ofc. Menefee

24.   Andrew Scott Declaration & Exhibits

25.   Article, *Making Race Salient: Trayvon Martin and Implicit Bias in a Not Yet Post-Racial Society*, Cynthia Lee

26.   Article, *Violence against Individuals and Communities: Reflecting on the Trayvon Martin Case – An Introduction to the Special Issue*, Rebecca Toporek

27.   Deposition Excerpts of Brian T. Weaver

28.   Exhibit 2 to May Deposition

29.   Exhibit 8 to Bratton Deposition – FILED UNDER SEAL

30.   Exhibit 5 to May Deposition – FILED UNDER SEAL

31.   Lara Investigation File – FILED UNDER SEAL

32.   Exhibit 6 to Bratton Deposition – FILED UNDER SEAL

33.   Exhibit 7 to Bratton Deposition – FILED UNDER SEAL

34.   Exhibit 5 to Bratton Deposition – FILED UNDER SEAL

35.   Exhibit 9 to Bratton Deposition – FILED UNDER SEAL

36.   Dominguez Deposition

37.   Exhibit 3 to May Deposition

38.   Exhibit 4 to May Deposition

39.   Scott Deposition

40.   Exhibits 2-5 to Brady Deposition – FILED UNDER SEAL

41.    COH 313, Hernandez Statement – FILED UNDER SEAL

42.    Complaint History at COH1121 – FILED UNDER SEAL

43.    Exhibit 4 to Castro Deposition

44.    Exhibit 6 to Castro Deposition – FILED UNDER SEAL

45.    Exhibit 5 to Castro Deposition – FILED UNDER SEAL

46.    1/3/14 HPD Bulletin

47.    2/4/14 HPD Bulletin

48.    2009-14 HPD Racial Profiling Reports

49.    Racial Profiling Gender Report (Ex. 8 to Bender Dep.)

50.    Salazar-Limon Shooting Investigation – FILED UNDER SEAL

51.    Bratton Report

52.    See Lorie Fridell, Explaining the Disparity in Results Across Studies Assessing Racial Disparity in Police Use of Force: A Research Note

53.    Coronado Investigation File – FILED UNDER SEAL

54.    Baker-COH 6306-6564 (Horace Investigation) – FILED UNDER SEAL

55.    Ex. 10 to Bender Dep. (Lara Summary) – FILED UNDER SEAL

56.    Seguino Dep

57.    McClelland Deposition

58.    Gaithe Deposition

59.    May Deposition

60.    Kutcha Deposition

61.    Bratton Deposition

62.    Baker-COH 9821-23 – FILED UNDER SEAL

## I.      Nature and Stage of Proceedings

Pending before the Court is Defendant City of Houston's motion for summary judgment. Defendant seeks summary judgment for all of Plaintiff's claims against it. Plaintiff contests summary judgment related to the *Monell* claims that the City of Houston's policies and practices resulted in the deprivation of Jordan Baker's rights to equal protection and to be free from excessive deadly force.

## II.     Issues to Be Decided

A. Whether the City is entitled to summary judgment on Plaintiff's equal protection *Monell* claim when a reasonable jury can conclude that the City of Houston's widespread custom of exhibiting racial bias against black Houstonian's during traffic stops was at work when Defendant Castro unlawfully stopped Jordan Baker on account of his being black?

B. Whether the City is entitled to summary judgment on Plaintiff's deadly force *Monell* claim when a reasonable can jury conclude that the City of Houston's widespread custom of permitting officers to use deadly force with impunity and without any form of discipline was at work when Defendant Castro unlawfully shot and killed Jordan Baker?

## III.    Summary of Argument

The City of Houston's motion for summary judgment is just another act of deliberate indifference to the widespread, statistically significant unlawful customs that pervade the ranks of the Houston Police Department ("HPD"). The City refuses—to this day—to even admit that Officer Castro's treatment was problematic or even disputed in any way. The parties, it seems, could not be further apart in viewing the evidence and summary judgment record. The City has decided to simply ignore, as if they do not exist, any contrary facts or inferences and seeks summary judgment on the basis of facts it knows are hotly disputed.

The motion should be denied.

Plaintiff has adduced sufficient evidence for a jury to find that the City of Houston's policies and practices were the moving force behind the violation of Jordan Baker's rights to equal protection and to be free of excessive deadly force.[1]

As it concerns the equal protection claim, the evidence demonstrates that the HPD has engaged in racially disparate treatment of black drives in pervasive and statistically significant ways. The City produces yearly racial profiling reports which document these disparities, but the City pretends these disparities simply do not exist. The systemic, biased policing in the City of Houston contributed to Castro's treatment of Baker, and an unlawful traffic stop. Castro's bias—something well-cemented in the customs of the department—was on full display. Would a Castro have treated Baker the same way if he were not black? Absolutely not, and a reasonable jury could so find that was due to the City's systemic bias.

As it concerns the deadly force claim, the City has found that Castro's decision to shoot and kill an unarmed, half-naked, sandal-wearing citizen was totally justified. That is despite the fact that Castro has fronted an entirely preposterous version of events, including that Jordan Baker charged at an officer pointing a gun at him. This was no surprise because the City's widespread custom

---

[1] Plaintiff does not pursue *Monell* claims against the City with respect to Plaintiff's Fourth Amendment excessive force claim concerning the non-lethal use of force or under the Fourth Amendment for unlawful stops. The City's motion for summary judgment concerning the survival and wrongful death claims fail for the same reasons explained in Plaintiff's response to Defendant Castro's motion, and that discussion is incorporated by reference. Plaintiff does not advance any claims under Texas law, either.

was at work the very moment Castro pulled the trigger. Knowing he had killed an unarmed person unjustifiably, Castro knew, in accordance with practice and custom, all he needed to do was give a story that Baker gestured at him in order to be deemed "justified." Castro chose the "waistband" option and has been free of department scrutiny, even despite the fact that more and more contradictory evidence has come to light. That the City shows no interest in even trying to reconcile Castro's incredible account with the physical evidence and decided instead to blindly credit the "waistband" excuse, is thus illustrative that the City's customs remain at work in this case. Between 2009 and 2014, every single officer involved shooting was deemed justified. This was not a coincidence; it was by design. A reasonable jury, examining (1) the statistical evidence, and (2) the litany of similarly troubling shooting incidents involving unarmed suspects; (3) the City's faulty practices; (4) the City's faulty practices at work in this case; and (5) the fact that every single shooting between 2009 and 2014 was deemed justified could easily conclude that (a) the City's customs and practices were at work in this case; (b) that these customs and practices that contributed to Castro's unjustified killing of Jordan Baker; and (c), as a result, that the City is liable here. Accordingly, the City's motion should be denied with respect to Plaintiff's equal protection and deadly force *Monell* claims.

3

## IV.    Applicable Legal Standard

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is only appropriate when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *United States v. Am. Commercial Lines, L.L.C.,* 875 F.3d 170, 173  (5th Cir. 2017) (citing *Robinson v. Orient Marine Co.*, 505 F.3d 364, 365 (5th Cir. 2007)). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008). The burden is on the moving party to make such a showing. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 161 (1970).

In seeking summary judgment, the moving party must accept as true the *opposing* parties version of events in order assess whether, in the absence of factual disputes, judgment as a matter of law is appropriate. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *cf. Ramirez v. Martinez*, 716 F.3d 369, 374, 379 (5th Cir 2013) (looking at the plaintiff's "versions of the facts as supported by the summary judgment record"); *Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005) ("Any credibility

4

determination made between the officers' and [plaintiff's] version of events is inappropriate for summary judgment.") (citing *Bazan v. Hidalgo County,* 246 F.3d 481, 492 (5th Cir. 2001); *Carroll v. Ellington*, 800 F.3d 154, 168 (5th Cir. 2015) ("If a fact is not undisputed, we must 'accept the plaintiffs' version of the facts as true.'") (quoting *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004) (a court's qualified immunity inquiry at summary judgment requires the court "accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true")).

Where disputes of material fact exist, they preclude the imposition of summary judgment. *Meadours v. Ermel*, 483 F.3d 417, 423 (5th Cir. 2007) ("In order to determine the reasonableness in the case at bar, several key factual disputes must be resolved. . . . Given the necessity to determine these types of facts, this dispute is material to the outcome of the case and the officers are not entitled to summary judgment.") (citing *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004)). Viewing the facts in the light most favorable to the nonmoving party applies equally to more abstract factual disputes. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (emphasizing the "importance of drawing inferences in favor of the nonmovant, even when . . . a court decides only the clearly established prong of the [qualified immunity] standard.") (citing *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004).

## V.      Relevant Facts

### A.  The Jordan Baker Case

#### 1.  Jordan Baker Was Stopped On Account of His Race and Castro's Use of Deadly Force Against Baker Was Unjustified and Unlawful

Regarding the facts surrounding Defendant Castro's stop of Jordan Baker on account of his race and Castro's decision to shoot and kill Jordan Baker, Plaintiff expressly incorporates the statement of facts, including the exhibits and record, in the response to Defendant Castro's Motion for Summary Judgment. *See* Dkt. 147, at 17-21.

#### 2.  The City's Policies Were At Work In The Aftermath of the Shooting

After the shooting, Officer Castro met with his union attorney on the scene. Ex. 7, Castro Dep. at 85-86. The met for about 20-30 minutes. *Id.* at 92. At that point, as a matter of unwritten HPD custom and practice, Castro and his attorney stood in a circle with HPD internal affairs officers, HPD homicide officers, and others, to hear Castro's story about the shooting. *Id.* at 97-99. This then involved a walk-through of the scene, even as the "Crime Scene Unit" was still marking evidence. See Ex. 8, (Select Photos); Ex. 17, Becker Dep. at 45-47; Ex. 16, Brady Dep. at 55-61, 91.

At that time, Castro told those in the circle that he stopped Baker, at least in part, due to his race; that he ended up removing Baker's sweatshirt; that he immediately chased after Baker who ran behind the strip center; and that he shot and killed Baker because Baker was charging directly at him from the grassy area

past the alley and had reached for his "waistband" in the process, among other things. Ex. 17, Becker Dep. at 46-50, 52-59; Ex. 16, Brady Dep. at 91-102; See Dkt. 147, at 17-21.

That night, Castro went to the Department and, with his attorney, prepared and signed a sworn statement concerning the incident. Ex. 16, Brady Dep. at 104-106, 109. At the time, Castro had not seen the video from the surveillance store. Nor did Castro or his attorneys have the autopsy results. He repeated the same story he had told at the scene. *Id*. at 96.

During the internal affairs division ("IAD") investigation of the shooting Castro was never personally interviewed. Instead, he submitted another statement. By this time, though, Castro had seen the video from the wireless store. So, Castro and his attorney decided to change his statement, to make it conform to the video, including adding the fact that he and Baker interacted in the parking lot for more than 30 seconds, as seen on the tape. Ex. 5, Internal Affairs Statement; Ex. 60, Kuchta Dep at 19, 57-67. The fact that Castro changed his statement was never raised as an issue in the investigative process at all—there is not one mention of it in any document.

The IAD process was designed to provide institutional support for Castro, not to scrutinize his actions in any way. To that end, though two witnesses were interviewed in the parking lot, investigators only included one of the witnesses in their official summary because she painted Baker in a less-favorable light than the other witness (who stated that Castro had an opportunity to use a TASER and the

only thing that Baker did aggressively was swear at the officer). Ex. 9, Martinez

Statement.  Likewise, IAD obtained the autopsy report from Jordan Baker's

examination. The autopsy report directly contradicts Castro's claim that Baker was

charging directly at him. This was of no moment for the HPD investigators because

they had already determined, before even receiving the report, that they would

credit Castro's account, including his claim about the "waistband." Ex. 60, Kuchta

Dep. at 106-110; Ex. 58, Gaithe Dep. at 36, 51-53, 65-68, 73. In addition, the

autopsy report indicated Baker had been badly injured outside of the gunshot

wound. This was never investigated. Finally, IAD took steps to affirmatively include

evidence in the file that, though it was unavailable to Castro at the time of the

shooting, supported Castro's narrative. The most troubling example pertains to a

bulletin in the file concerning the armed robberies Castro cited. The bulletin that

Castro claims to have looked at states that all of the suspects all wore ski masks or

bandanas and did not include any pictures. Ex. 7, Castro Dep. at 280-81; Ex. 46,

1/3/14 HPD Bulletin. However, in their file, IAD investigators used a bulletin

generated *after* the shooting, and that did contain photos. Ex. 60, Kuchta Dep. at

97-101; Ex. 47, 2/4/14 HPD Bulletin. The fact that the file included as part of the

"investigation" evidence of incidents happening *after* the shooting was of no moment

to the IAD. Ex. 60, Kuchta Dep. at 97-101.

Nothing changed as the IAD report made its way up the chain—no one ever

documented the fact that Castro had changed his statement, no one mentioned the

contradiction between the officer's account and the autopsy report, no one

8

investigated the non-fatal injuries, and the more "Baker-friendly" witness was completely ignored. Unsurprisingly, HPD deemed the shooting justified.

### B. The HPD's Systematic Bias Against Black Americans In Traffic Stops

#### 1. Houston Racial Profiling Reports Document Statistically Significant Racial Disparities

Pursuant to state law, the City each year publishes "Racial Profiling Reports," which aggregate citywide stop data and document certain stop outcomes. See Ex. 48, HPD Racial Profiling Reports for 2009-14. Between 2009 and 2014, each one of those reports reflected significant disparities between black citizens and those of other races, including obvious disparities with respect to the rate at which drives are stopped relative to their share of the population. *Id.*

Nonetheless, because the disparities were consistent from year to year, these reports declare that there was no racial profiling or anything of the sort, even though they were reflected in the data. *Id.* With these reports, the City would also cherry-pick the post-stop data it would include. For example, though it was understood that the "hit rate" is an important component of evaluating claims of racial bias in policing, the City would only include that figure when it seemed beneficial in some way. *Compare* Racial Profiling Analysis 2011, at 14 (including the "hit rate"), and Racial Profiling Analysis 2012, at 13 (including hit rate), *with* Racial Profiling Analysis 2013 (not mentioning the hit rate).

### 2. HPD's Statistics Put Defendant on Notice, Well Before this Incident, that It Had a Significant Racial Policing Problem.

In the five years leading up to the unlawful stop and subsequent shooting death of Mr. Baker, HPD officers stopped black drivers at a starkly higher rate than any other group. The objective data, compiled by the City of Houston itself, is powerful evidence of race-conscious policing in Houston.

This statistical data is stark evidence of a culture within HPD whereby police officer stop and otherwise target black citizens in a manner different than those of other races. Ex. 21, Seguino Dep. at 23-24; Ex. 24, Scott Supplemental Report at 5-6. To be sure, the City has official policies prohibiting racial profiling. Ex. 21, Bender 30(b)(6) Dep. ("Bender Dep.") at 42-43, 58; Ex. 49, Ex. 8 to Bender Dep. (Racial Profiling General Order). But, that is of no moment. Instead, in its unwritten customs, HPD officers target black drivers. Accordingly, the issue is not one of "a few bad apples," but rather one that permeates the department despite whatever its written policies say. *Id*.

Pointing to its written policies, the HPD denies any allegation of racial mistreatment. Ex. 21, Bender Dep. at 52. But the data paints a different picture. From 2009-14, black drivers in Houston were stopped at statistically significantly higher rates than those of other races.[2] Ex. 15, Seguino CV, Seguino Amended

---

[2] *See* Ex. 15, Seguino Rebuttal Report at 2-5 for an explanation about how the share of the population is calculated. One reason for examining stop data is because it generates a statistically robust dataset, which generates a meaningful method for establishing a baseline and examining police stops generally. Ex. 56, Seguino Dep.at *65*.

Report ("Seguino Report") at 4-5, 14-15. "Statistically significant" means that the numbers cannot be attributed to chance. *Id*. This held true each year. *Id*.

Stephanie Seguino, Ph.D., an economist and statistician, analyzed data from HPD's racial profiling reports. Ex. 15, Seguino CV, Seguino Amended Report ("Seguino Report") at 3; Ex. 48, HPD Racial Profiling Statistical and Comparative Reports, 2009-2014. She found that, from 2009-2013, a black driver in Houston was 57% more likely to be stopped than a non-black driver. Black drivers were 239% more likely to be stopped than Asian drivers. *Id. at 7*. Put differently, the data indicate that, for African Americans, they make up 23.1% of the population, but account for 32.7% of the City's stops, and did so consistently over time. *Id.* at 4-5

To examine the data further, Dr. Seguino constructed a disparity index, which examines the proportion of over (or under) representation of any racial group in a data set; this is a well-established and widely used method for examining disparities. *Id.* at 5. The "disparity index" provides a useful way of observing disparities over time and the data here showed consistent disparities:

Black and White + Hispanic Disparity Index: Ratio of Stop Rates to Population Shares



Note: If a group's share of all stops is equal to its share of the population, the disparity index equals 1 (shown as the green (horizontal) line indicating no disparity

The overall disparity index over the five year period is 1.4, which is statistically significant. Ex. 56, Seguino Dep. at 36-37, 66-67, 41-48; Ex. 15, Seguino Report at 6.  To put that number into perspective, on the assumption that people are stopped at roughly their proportional rate in the population, no disparity in policing by race would generate a disparity index of 1. Ex. 15, at 4-5, 14-15.

Concerning overrepresentation, and in the context of stop data, social scientists often use a benchmark that a consistent disparity index over 1.1 is statistically significant. The 1.4 index here demonstrates even more clearly that blacks are stopped by HPD officers more frequently than other racial/ethnic groups. Ex. 21, Seguino Dep.at 37-39, 67-68; Ex. 15, Seguino Report at 4-5, 14-15. That conclusion is further reinforced by the fact that the disparity index is consistent for each and every year, hovering at 1.4. Ex. 15, Seguino Report at 6-7.

But, that is not all. Racial disparities persist in the moments that follow the initial stop, and serve to reinforce the strong inference of racial bias in policing. Dr. Seguino then focuses on three different post-stop outcomes in the data: (a) those who were released or warned, (b) those who were searched, and (c) arrests. After mapping these groups out separately and over time, Dr. Seguino assessed the data for "evidence of racial disparities." *Id.* at 10. As it concerns those who were released or warned, Dr. Seguino found a statistically significant disparity with Blacks being released and warned more often. *Id.* Dr. Seguino recorded the scores of these tests in her report. *Id.* at 10-11. As it concerns search rates, Seguino found racial disparities here too, and across all years. *Id.* at 12. The same thing was true for arrest between 2011 and 2014—black arrest rates were higher each year. *Id.* at 13.

The post-stop outcomes of these stops reinforce Dr. Seguino's disparity index conclusion that the continuous disparity was not a result of chance, but was based on a widespread culture within HPD. Black drivers were 203% more likely to be searched than non-black drivers. *Id.* at 10, 12-13, 15; Ex. 15, Seguino Rebuttal Report at 5-6; Ex. 56, Seguino Dep., at 123. Black drivers were 456% more likely to be searched than Asian drivers. Ex. 15, Seguino Report at 10, 12-13, 15; Ex. 21, Seguino Dep.at 123.  This disparity is independently statistically significant. *Id*. at 10, 12-13, 15.

The evidence demonstrates that despite the higher stop and search rate, a higher percentage of black drivers were found not to have violated the law or to warrant any further police action. Ex. 15, Seguino Report at 11; Ex. 15, Seguino

Rebuttal Report at 8.  In short, this data, which was also consistent over the years, shows a statistically significant higher rate of stops of black drivers and a statistically significant higher rate of searches that proved unwarranted. Ex. 56, Seguino Dep.at 120-22. This strongly suggests that police were stopping and searching many black drivers without a valid reason to believe that they were violating the law. Ex. 15, Seguino Report at 11-12, 15.

The statistical significance of the data above is reinforced by: (1) the large size of the disparities; (2) the consistent pattern across all indicators; and (3) the consistency and persistence of the disparities across time. Ex. 15, Seguino Report at 15. These combined indicators demonstrate a strong inference of racial profiling. Ex. 15, Seguino Report at 15.

Based on this substantial statistical dataset and analysis, a reasonable jury can find that the data supports that black drivers are stopped on account of their race, not due to chance. Ex. 15, Seguino Report at 4, 7. Similarly, a reasonable jury can conclude that the data, known to HPD (since it was its own data), should have triggered HPD to investigate the problem and take action. *Id.* at 7, 15.[3]

---

[3] Of additional interest is the fact that racial disparities continue in shooting data as well. One half of all HPD shootings from 2009 to 2014 are of black citizens— twice their share of the population. Ex. 15, Seguino Report at 19, 24, Ex. 56, Seguino Dep.at 134; Scott Supplemental Report at 2.  Black citizens are 2.5 times more likely to be shot by HPD officers. Ex. 22, Scott Supplemental Report at 2. Tellingly, HPD officers never used the excuse of "reaching for waistband/into a pocket" as a reason to shoot a white person. Ex. 56, Seguino Dep.at 21. It routinely did, however, for many black people, including Mr. Baker.

### 3.  HPD Is Deliberately Indifferent

As identified more fully above, the disparities demonstrated in HPD's own data support a finding that HPD has a custom and practice of allowing officers to racially profile people of color in stops. Ex. 24, Scott Report at 23. Despite this objective data, HPD took no action to address this disparity.

Instead, HPD pretended that it had no disparity. Ex. 56, Seguino Dep. at 15-16; Ex. 24, Scott Report at 23. In fact, HPD expressly claims that these numbers do not show a pattern of racial profiling. Ex. 57, McClelland Dep. at133-34. This is quintessential deliberate indifference. As Dr. Seguino points out, the results stand in stark "contrast to the Houston Police Department's conclusions drawn in its annual Racial Profiling Statistical and Comparative Reports, 2009-2014." Ex.15, Report at 14. For example, the 2014 report states:

> The 2014 report reveals that there is no substantial, statistically significant evidence of racial profiling against any race/ethnic group represented in Houston…In conclusion, there exists neither evidence of systemic bias in practices of Houston police officers nor evidence that individual officers in the department have engaged in racial profiling.

*Id.* Similar statements are concluded in the reports each year. *Id.*

But, the statements are false. For one, the reports do not actually include any statistical analysis on the racial differences in stops and outcomes. Indeed, when one reads the reports critically, it is absolutely unclear how the HPD can report, year after year, that blacks are stopped in substantially higher percentages than their proportional share of the population and still reach the conclusion that there is "no evidence" of any bias. And, the reports themselves are the very "evidence" of bias that the reports proclaim does not exist.

15

In response to the data, the City admits that from 2009-2014 it did nothing to address these numerical disparities because it claims that they are of no significance. *Id.* at 16; Ex. 15, Seguino Rebuttal Report at 4-5. Bender Dep.at 51-52; Ex. 24, Scott Report at 23, Scott Supplemental Report at 5-6. At a minimum, if the City were not deliberately indifferent, it would actually investigate these issues. But, it did not.

A reasonable jury can find that the identified custom, culture, and norms within HPD, to year-after-year target black citizens for more police action, informed Castro's actions when he shot Mr. Baker. Ex. 15, Seguino Rep. at 24; Ex. 21, Seguino Dep.at 85-86, 195-200. To underscore that point, in investigating Castro HPD did not ever investigate whether Castro improperly targeted Baker based on his race. Ex. 58, Gaithe Dep. at 30, 46.

## C. HPD Permits Officers to Use Deadly Force No Oversight and Encourages Unlawful Uses of Force By Creating Structures Designed to Conceal Contrary Evidence And Make Every Shooting Appear Justified

### 1. HPD has a practice of not investigating or disciplining officers for excessive use of deadly force.

HPD has a long-term practice of not subjecting its officers who use deadly force to any real scrutiny, thereby encouraging HPD officers to use deadly force without any concern for their constitutional obligation to only use it as a last resort when an officer *reasonably* believes that doing so is necessary to protect the officer or others. *See Tennessee v. Garner*, 471 U.S. 1, 3 (1985); *Flores v. City of Palacios,*

381 F.3d 391, 399 (5th Cir. 2004); *Hatcher v. Bement*, 676 F. App'x 238 (5th Cir. 2017).[4]

As above, evidence support that the culture of the department is far different from what the written policies would suggest. Plaintiff understands that the City has formal, written policies governing Internal Affairs Division ("IAD") investigations of rule violations for excessive force, and that it has written "Use of Force" General Orders, described as are G.O. 600-17 (use of force) and 200-03 (employee misconduct). *See* Ex. 59, May 30(b)(6) Dep. ("May Dep.") at 8-12; Ex. 28, (G.O. 200-03) Ex. 2 to May Dep.; Ex. 37, (G.O. ), Ex. 3 to May Dep.; Ex. 38, (G.O. on HPD Use of Force) Ex. 4 to May Dep. Here, again, it is not the written policies that make up the claim, but the unwritten customs that underlie them.

IAD investigations are conducted to determine if an officer violated HPD policy. Ex. 59, May Dep. at 14-15, 52, 54; Ex. 60, Kuchta Dep. at 24, 29, 32-33; Ex. 58, Gaithe Dep. at 28-29; Ex. 61, Bratton Dep. at 203. At all relevant times, IAD is responsible for investigating any HPD police shooting incident.[5] Ex. 59, May Dep. at

---

[4] A different way to state the issue would be that the City is so willing to credit any hunch or minor concern as a "significant threat of death or serious physical injury" that they have effectively lowered the standard so far that all an officer needs to do—at a level lower than even a *Terry* stop—is articulate some suspicion about feeling "threatened" and they will be justified.  The Department, of course, has ready examples it will accept, many of which (like "reaching for the waistband") are often impossible to verify and extremely difficult to contest.

[5] For non-shooting citizen complaints against an officer, the citizen has to sign a "sworn statement." Ex. 59, May Dep. at 18-19. For all excessive force complaints during the relevant time frame, only 15 officers were disciplined based on 706 complaints of excessive force. Ex. 24, Scott Report at 24-25.

41-42. To accomplish that task, it is important for the IAD investigation to consider all of the available evidence. Ex. 57, McClelland Dep. at 69-70, 92.

Unlike other areas, shooting incidents there are only two categories of findings—justified or not justified. Ex. 59, May Dep. at 37-38, 40, 55-56, 58-59; Ex. 57, McClelland Dep. at 101-102, 114.  A justified finding means that the shooting met the HPD policies and procedures. Ex. 59, May Dep. at 38.  IAD does not look at the history of complaints against an officer in deciding if a shooting is justified. Ex. 59, May Dep. at 63-64, 83. Nor has the HPD ever required an officer to undergo additional training as a result of a shooting Ex. 59, May Dep. at 58. Put differently, HPD addresses shootings as binary—they are either *entirely* justified or *entirely* not—and does not take any steps to *prevent* shootings in the future (like retraining) even where a shooting may be deemed justified but also preventable.[6]

All IAD investigations go up the chain of command all the way to the chief of police. Ex. 59, May Dep. at 27-31; Ex. 60, Kuchta Dep. at 33-34; Ex. 58, Gaithe Dep. at 34, 103-104: Ex. 57, McClelland Dep. at 67. The chief ultimately makes every disciplinary decision. Ex. 59, May Dep. at 31; Ex. 57, McClelland Dep. at 10, 13.

---

[6] The Lara shooting, described below, is a particularly salient example. There, a community reviewer found the shooting justified but preventable. The reviewer thought the officer should be given additional training, especially owing to the fact that there were other officers there that did not shoot. See Ex. 31; Lara Shooting Investigation at COH 8446-49 (Ex. 10 to Bender Dep.), ("I do not feel—based on the events described—and the fact the Officer Hernandez did not fire her gun, that officer McGown should have fired her gun on someone who was not point or near to pointing a dangerous weapon toward her. . . . [B]etter training needs to be provided to officers." (underlined emphasis in original)). No such retraining was done or even communicated to officer or training division. Ex. 21, Bender Dep. at 106-11.

For HPD police homicides, both the homicide division and the Internal
Affairs Division investigate, with the IAD investigation typically following. Ex. 59,
May Dep. at 16-18, 80-81. These investigations are not undertaken like typical
police investigations. Instead, they are full of procedures that leave gaps in the
knowledge of the investigators.

### a.   The Unrecorded and Unauthorized "Walk-Through"

Perhaps the most suspect procedure is the "walk-through" of the shooting
scene. This is a custom and policy—like the one alleged in this action—that is
completely unwritten. Ex. 59, May Dep. at 10-11; Ex. 28, (G.O. 200-03) Ex. 2 to May
Dep.; Ex. 37, (G.O.), Ex. 3 to May Dep.  Specifically, under HPD's "walk-through"
procedure a police officer who shoots someone does a near-immediate walk-through
of the scene with legal representation to explain the shooting while getting the
opportunity to examine the scene. Ex. 36, Dominguez Dep. at 37-41, 63-64, Ex. 17,
Becker Dep. at 18-21, 32-34; Ex. 16, Brady Dep. at 55; Ex. 61, Bratton Dep. at 94-
96, 202. This walk-through is not recorded. *Id*. Investigators recognize that an
officer who shot someone has an incentive in the walk-through to tell a version that
makes the shooting look justified. Ex. 17, Becker Dep. at 23-24; Ex. 57, McClelland
Dep. at 145-47. Defendants' expert agrees that an officer who committed an
unjustified shooting has an incentive to lie to make the shooting look justified. Ex.
61, Bratton Dep. at 175-76. Despite this obvious incentive and plain opportunity for
contamination, HPD investigators do not record the "walk-through" or, indeed, any
conversation with an officer about a police shooting Ex. 16, Brady Dep. at 17, 165;
Ex. 61, Bratton Dep. at 96.

19

### b. No Interviews of the Shooting Officer

It is HPD policy to not gather any information until after the officer can talk to a lawyer. Ex. 36, Dominguez Dep. at 62; Ex. 17, Becker Dep. at 34; Ex. 61, Bratton Dep. at 94-95. An officer has 48 hours to consult with a lawyer before he ever has to give any information in an investigation. Ex. 59, May Dep. at 17. Even then, the officer in shooting cases is never formally interviewed or questioned orally.

The HPD practice from at least 2009-14 was to give written questions to an officer in a police shooting, and the officer had 48 hours to work with legal counsel and provide written answers only—there was no live interview. Ex. 59, May Dep. at 20-22, 68-69; Ex. 28, Ex. 2 to May Dep.; Ex. 16, Brady Dep. at 15-16, 242; Scott Supplemental Report at 4; Ex. 59, May Dep. at 68-9; Ex. 60, Kuchta Dep. at 74; Ex. 36, Dominguez Dep. at 62.

Moreover, before asking written questions, investigators alerted the officer involved in the shooting to all of the evidence that HPD has so the officer can explain away the evidence in the written response. Ex. 59, May Dep. at 23. In the event that an officer gives differing version of events (like here), HPD does not have a requirement that the officer be examined. Ex. 59, May Dep. at 24-25. Although an investigator could give follow up written questions, the same process would follow. Ex. 59, May Dep. at 22.  Obviously, this contrasts sharply with procedures for non-police shootings, where HPD finds it important to conduct recorded interviews of the shooter to have a record of their story. Ex. 16, Brady Dep. at 16-17, 229.

But not for police shootings. From 2006-2014, HPD policy and practice did not allow interviews of an officer involved in a police shooting. Ex. 59, May Dep. at 10-12; Ex. 28, (G.O. 200-03); Ex. 2 to May Dep.; Ex. 37, (G.O. on HPD firearm discharge), Ex. 3 to May Dep.; Ex. 38, (G.O. on HPD Use of Force), Ex. 4 to May Dep.; Ex. 61, Bratton Dep. at 179, 199 (did not see any interview in reviewing 18 shooting investigations). This HPD policy and practice not to do a formal personal interview was maintained even in circumstances in which HPD received evidence contrary to the officer version of shooting. Ex. 24, Scott Report at 26, Scott Supplemental Report at 3; Ex. 39, Scott Dep. at 204-05, 207-08; Ex. 59, May Dep. at 22, 68-69; Ex. 36, Dominguez Dep. at 62. HPD IAD sergeant Kuchta admits that it is important to re-interview witnesses because people remember different things over time. Ex. 60, Kuchta Dep. at 23. But HPD did not allow that for officers involved in shootings.

### 2. Statistically Significant—And Troubling—Shooting Data Reveals that Every HPD Shooting is Deemed Justified

A reasonable jury could infer that the City's customs concerning shootings not only exist, but that they also encourage uses of deadly force, *and* they were at work in Castro's decision to shoot Jordan Baker and then claim he did so because Baker was "reaching for his waistband."

To start, there statistically significant data supports such a finding. Plaintiff obtained and analyzed data concerning every single police shooting by an HPD officer between 2019 up until the January 2014 shooting of Jordan Baker by Defendant Castro. Ex.15, Seguino Report at 17. Dr. Seguino created a dataset of

every such incident by combining data from the Homicide Division and IAD (who keep separate statistics). The number of incidents in the dataset is 194, and excludes accidental shootings. Dr. Seguino examined patterns in the data, specifically when it comes to the types of justifications offered by the officer(s) involved, as compared against the sort of whether the suspect had a weapon, was unarmed, or somewhere in between. *Id.* at 18. As reported in the HPD data, some shootings had multiple justifications, which Dr. Seguino then aggregated into mutually exclusive categories based upon the primary justification given. *Id.* at 19. With the removal of 19 instances where additional suspects were not part of the shooting removed, that data looks as follows:

**Aggregate Justification Related to Officer Assessment of Threat**

| Aggregate justification code | Justification for UOF | Number of UOF incidents | Frequency as % of all justifications |
|---|---|---|---|
| 1 | Suspect fired or attacked officer or other person | 71 | 33.2% |
| 2 | Suspect drew or revealed weapon | 78 | 36.4% |
| 3 | Suspect attempted to draw weapon | 11 | 5.1% |
| 4 | Suspect gestured | 49 | 22.4% |
| 5 | Other | 5 | 2.8% |

Note: Each category in this table is aggregated from the primary justification totals reported in Column 2 of Table 5. Category 1: Primary justifications 1-5, Category 2: Primary justifications 6-9, Category 3: Primary justifications 10-11, Category 4: Primary justifications 12-15, Category 5: Primary justifications 17-18. In 19 instances, additional suspects were recorded per incident that were not part of the UOF encounter. They are not included in the totals reported here.

22

Significant here, in 49 instances—or 22.4%—of the time, the officer's justification for shooting the suspect was not a weapon, an attack or anything like that. Instead, it was some sort of gesture.

Dr. Seguino also analyzed whether there were any statistically significant trends concerning whether a suspect was armed or unarmed. There were. Specifically, the data look like this:

**Aggregate Categories of Justification by Unarmed/Armed**

|  | Number | | As percent of justification | | As percent armed/unarmed | |
|---|---|---|---|---|---|---|
|  | (1) Unarmed | (2) Armed | (3) Unarmed | (4) Armed | (5) Unarmed | (6) Armed |
| Suspect fired or attacked officer or other person | 21 | 49 | 30.0% | 70.0% | 32.8% | 32.9% |
| Suspect drew or revealed weapon | 1 | 78 | 1.3% | 98.7% | 1.6% | 52.3% |
| Suspect attempted to draw weapon | 2 | 9 | 18.2% | 81.8% | 3.1% | 6.0% |
| **Suspect gestured** | **35** | **14** | 71.4% | 28.6% | 54.7% | 9.4% |
| Other | 4 | 0 | 100.0% | 0.0% | 6.3% | 0.0% |
| **Total** | 63 | 150 | 29.6% | 70.4% | 98.4% | 100.7% |

*Id.* at 21.

Notably, for the "suspect gestured" category, the percentage of cases in which that primary category of justification was used when the suspect was unarmed was 71.4 percent (Column 3), with the remainder (28.6 percent) applied where the suspect was armed (Column 4). Accordingly, a "gesture justification" is more

23

frequently used as a reason for deadly force when suspects are unarmed, and the difference is large and statistically significant. *Id*. As a subset of other gestures, the "waistband" was invoked in 20 instances involving deadly force—and in 80% of those occasions the suspect was unarmed. *Id*. at 23.

The next step is to compare, of course, whether or not there were any differential outcomes from an investigative process based upon the type of justification involved. There were not. Instead, every single time—in 100% of HPD police shootings in the dataset, City deemed the shooting to be justified. Ex. 59, May Dep. at 36-37; Scott Supplemental Report at 3; Ex. 15, Seguino Report at 22; Ex. 24, Scott Report at 23-25.  This perfect rate of no discipline strongly indicates that HPD has a course of conduct, custom and practice to allow officers who shoot to go unquestioned and undisciplined. Ex. 24, Scott Report at 27, Scott Supp. Report at 3.

### 3.  There are Many Questionable, Troubling Deadly Force Incidents That The City Deemed Justified

Relevant here, the 100% HPD justified shooting rate for its officers even applied to all 81 shootings of unarmed citizens. Ex. 15, Seguino Report at 22. Thus, regardless of whether there was documented unprofessional *other* conduct, or questionable circumstances, HPD officers were always found justified in their uses of deadly force, including among those who were unarmed. This figure supports an inference that the City permits deadly force among its officers with impunity. Ex. 24, Scott Supplemental Report at 3.

Indeed, Plaintiff is not merely relying on the statistical data alone—which is powerful. But, there are a number of specific incidents in the same period of time

that, especially given their notoriety and publication, both put the City on notice of the issue and reveal the depth of the problem. These include:

- **2/24/10: The Shooting of Steven Guidry.** Mr. Guidry was shot in the neck during a traffic stop where the officer forcibly removed him from the car and then claimed he reached toward his waistband area, and where the officer claimed that in response to refusing to exit the car the officer claims that Mr. Guidry said "What are you going to do, shoot me?" Ex. 61, Bratton Dep. at 134-140; Ex. 34, Ex. 5 to Bratton Dep. (Guidry investigation summary).

- **5/25/10: The Shooting of Gene Horace**. In another case involving the claim that the victim was reaching for a waistband, an officer shot an unarmed man in the back while he was running away. HPD found it justified based solely because the officer's claim that the man reached for his waistband and despite the fact that Mr. Horace denied it. Like the Coronado Shooting, the City found the shooting justified even though it sustained two other charges against the officer. Ex. 61, Bratton Dep. at 150-54, 163-65, 304; Ex. 32, Ex. 6 to Bratton Dep., Horace investigation summary; Ex. 54, Baker-COH 006306-006564.

- **10/30/10: The Shooting of Ricardo Salazar-Limon.** Mr. Salazar-Limon was shot in the back by an HPD officer after a traffic stop where the officer claimed that Mr. Salazar-Limon was reaching for his waistband, while turning his body. Ex. 50, Salazar-Limon Shooting Investigation, Baker COH 6565-6813.

25

- **2/9/11: The Coronado Shooting of the Ventura Brothers**. In this instance, an officer who had been drinking at a bar and was legally intoxicated when he shot two unarmed citizens (killing one) after intervening in a situation outside of a bar. Ex. 24, Scott Supplemental Report at 3; Ex. 57, McClelland Dep. at 185-91; Ex. 61, Bratton Dep. at 181-83, 187-192, 238-240; Ex. 29, Ex. 8 to Bratton Dep. (Coronado shooting summary). The officer there (like here) claimed that one of the citizens was reaching for his waistband, thereby justifying the shooting. The City found the shooting justified *despite* the fact that the officer was intoxicated and committed other policy violations in the incident, crediting his account over other witnesses. Ex. 24, Scott Supplemental Report at 3; Ex. 53, Coronado investigation file; Ex. 59, May Dep. at 32-33; Ex. 30, Ex. 5 to May Dep.; Ex. 57, McClelland Dep. at 60-61; Ex. 61, Bratton Dep. at 117.

- **7/9/12: The Shooting of Rufino Lara.** The City also found justified the shooting by another officer of an unarmed man, Mr. Lara, for allegedly reaching for his waistband while he was walking away. Ex. 24, Scott Supplemental Report at 5; Ex. 31,Lara Investigation File; Ex. 21, Bender Dep. at 109, Ex. 55, Ex. 10 to Bender Dep.; Ex. 61, Bratton Dep. at 242-249. Two witnesses at the scene in that case rebutted the officer's contention that Mr. Lara was reaching into his waistband—one saying that his hands were on the wall. Ex. 61, Bratton Dep. at 242-245. As noted above, at n. 6, though

26

reviewers had concerns about the instance, and suggested training HPD did absolutely nothing to provide any response.

- **9/24/2012: Shooting at an Unknown Suspect.** Another unarmed man was shot at while running from the police after stealing food from a food truck because the man allegedly reached for his waistband. He had committed no violent act and no weapon was actually seen or recovered.  Ex. 61, Bratton Dep. at 264-70, 281-82; Ex. 62, Backer COH 9821-23. The City found the incident justified.

- **12/12/14: The Shooting of Michael Walker**. Mr. Walker was suspected of PCP use and had already been shot once after a traffic stop when he walked away from the officers, who claimed he was reaching in his jacket, after which Mr. Walker was shot again.

In this litigation, Terry Bratton, a retired HPD officer disclosed as an expert, has purported to analyze 18 shooting incidents, some of which are included above, and many of which are controversial. *See* Ex. 51, Bratton Report at 3-14. Bratton's continued defense of every single one of these shootings—and the City's handling of them—is additional evidence of the problem addressed in the data here.[7]

Whether it is "reaching for the waistband," "turning away from the officer," or "erratic behavior" Houston Police officers are *always* deemed justified; and their fears about weapons—even when proven wrong—are always credited by the

---

[7] Plaintiff's contention is not, of course, that every single shooting of an unarmed suspect was unjustified. Some of them plainly were. However, the flipside is true as well: some of the shooting incidents, though deemed justified by the City, were *not*.

department. A hunch or a suspicion about a weapon is *always* deemed reasonable. Indeed, Mr. Bratton's opinion suggests that the mere "inability of an officer to see the suspect's hands" can be sufficient to justify the use of deadly force. See 51, Bratton Report at 3-14. This calloused, dangerous view—advanced by the City in this litigation—actually amply support's Plaintiff's *Monell* claim.

As evident by the frequent protests and publically expressed concerns about the shooting of unarmed suspects in the City of Houston reveal, (see Scott's Report, for example), there are strong reasons to believe that the City's practice of deeming the decision to possibly end someone's life always okay is actually just the opposite—it is quite unreasonable. And, a jury could reasonably conclude that the City has gone quite far afield. *Cf. Lytle v. Bexar County,* 560 F.3d 404 (5th Cir. 2009) (explaining that "the reasonableness of an officer's conduct under the Fourth Amendment is often a question that requires the input of a jury," both because the jury "must resolved disputed fact issues" and "because the use of juries in such cases strengthens our understanding of Fourth Amendment reasonableness").

### 4. Universally Justifying the Shooting of Unarmed Suspects Is Extremely Troubling and Encourages Constitutional Violations

Due to its reflexive, systemic efforts to deem every shooting by a police officer—even drunk officers who have violated other department policies—the City has encouraged constitutional violations. As Defendant's police practices expert, Michael Dirden, testified—HPD policies directly impact officer behavior, including their exercise of discretion, on an individual level:

Q. So it should say my knowledge and review of the Houston Police Department's internal directives lead me to conclude that they are more than sufficient to guide the behavior and performance of its officers and to control the discretion of its officers in a manner consistent with the standards of the profession?
[Dirden] A. Correct.
Q. Okay. And so it's your opinion as expressed here that the Houston Police Department's directives do guide the behavior and performance of police officers?
[Dirden] A. Yes.

Ex. 14, Dirden Dep. at 81-82.

What that means here, however, is that the City has encouraged unjustified uses of deadly force by crediting, supporting, *and* facilitating erroneous policing. At this juncture, given the data, there are two possible scenarios: (1) officers invoke a "gesture" as a justification because they know it will be treated as accepted, or their actual reason for the use of deadly force, or (2) Houston officers consistently experience threat perception failure. *See* Seguino Report at 23. Threat perception failures occur when an officer mistakenly perceives that a suspect is armed due to the misidentification of a nonthreatening object … or movement. *See* Lorie Fridell, *Explaining the Disparity in Results Across Studies Assessing Racial Disparity in Police Use of Force: A Research Note*, 42 Am. J. Crim. Just. 502, 504 n. 1 (2017) (citing George Fachner & Steven Carter, U.S. Department of Justice, COLLABORATIVE REFORM INITIATIVE: AN ASSESSMENT OF DEADLY FORCE IN THE PHILADELPHIA POLICE DEPARTMENT (2015)), attached as Exhibit 52. Plainly, neither allowing officers to invoke inapplicable justifications to receive impunity nor engaging in systemic threat perception failure is acceptable. Both encourage and facilitate constitutional violations.

To elaborate, if officers know that all they need to say is that the suspect was "fidgeting" or was "reaching for their waistband" in order to justify killing an unarmed citizen, even where the officer's account may contradict other evidence, the lack of accountability is certainly directly linked with unjustified uses of force. Likewise, on the other hand, if Houston officers are consistently invoking a concern about the presence of a weapon that they feel justifies the use of deadly force, and they are mistaken they have misjudged the situation in a serious way.

At a minimum, the City should do something to consider *why* this justification has been invoked, and question whether it is either some sort of false excuse or gross misjudgment underlying the mistaken concern about a weapon. To be sure, it makes little sense for an unarmed suspect to be "reaching for their waistband" in any sort of dangerous way, and the fact that the person is unarmed is circumstantial evidence that the officer has made a mistake. *See Cruz v. City of Anaheim,* 765 F.3d 1076, 1077-80 (9th Cir. 2014) ("In this case, there's circumstantial evidence that could give a reasonable jury pause. Most obvious is the fact that Cruz didn't have a gun on him, so why would he have reached for his waistband? Cruz probably saw that he was surrounded by officers with guns drawn. In that circumstance, it would have been foolish—but not wholly implausible—for him to have tried to fast-draw his weapon in an attempt to shoot his way out. But for him to make such a gesture when no gun is there makes no sense whatsoever.").

The City of Houston has taken no steps to examine this issue critically. Instead, the department (as it has in this case) has endorsed and defended every

single deadly-force decision without taking any effort to pause; this conduct results in a department atmosphere where constitutional violations are encouraged.

Finally, it bears mentioning that the fact that the Houston Police Department deemed every shooting between 2009 and 2015—almost 200 uses of deadly force—justified in every instance is inconsistent with accepted police practices indicating adequate measures of accountability. At best, it would be "highly unusual" that all of the officer involved shootings were deemed either accidental or justifiable. *Id.* Evaluating the totality of the evidence, including both the troublesome investigation procedures and outcomes, the City "permits a course of conduct, custom and practice that allows officers who are involved in shootings to go relatively unquestioned and undisciplined, which is inconsistent with generally accepted police practices and procedures. *Id.* at 27.

### 5.   HPD Refuses to Implement Accountability in its Investigations

Despite finding 100% of its police shootings justified from 2009-2014, including the one-third of the cases in which the victim was unarmed, HPD's shooting investigation policies and procedures did not change. Ex. 59, May Dep. at 34-36. In fact, HPD made no changes in policy or training between 2009-2014 to address the problems in its investigation system – even after a lawsuit required it to evaluate its system. Ex. 24, Scott Supplemental Report at 4-5; Ex. 59, May Dep. at 70; Ex. 57, McClelland Dep. at 53, 64 (cannot recall any recommendations stemming from looking at police shootings).

In his decades of law enforcement experience, Plaintiff's expert Andrew Scott never saw another police agency internal investigation system that refused to even

interview an officer in person. Ex. 24, Scott CV, Scott Report at 26. The failure to require an in-person officer interview is inconsistent with generally accepted police practices and procedures and fundamental homicide investigation procedures. *Id.* at S*cott Supplemental Report at 4*. To put the lack of interview into perspective, HPD does interview police officers when the issue is driving accidents, but it does not when the issue is a citizen complaint or fatal police shooting. Ex. 7, Castro Dep. at 252-53.  HPD shooting investigations are inadequate. Ex. 24, Scott Report at 25-27.

Indeed, in his decades of work related to policing, Mr. Scott has never seen another police agency that did not physically interview an officer who was involved in a shooting, much less one that refused to conduct follow-up interviews with officers who were involved in a shooting when there was a need for clarification of facts. Ex. 24, Scott Report at 26.

### 6.  The City's Customs and Practices Were At Work in The Investigation of Castro Here

The HPD investigation of Defendant Castro was inadequate. Of course, HPD's IAD found Castro's fatal shooting of Mr. Baker to be justified. Ex. 59, May Dep. at 65; Ex. 57, McClelland Dep. at 179, 216-18. The same flaws in the police shooting investigation identified above were also present in the Baker shooting investigation.

To start with, consistent with HPD practice, Castro was allowed to walk-through the scene of the shooting with his lawyer, Aaron Suder, after meeting others and discussing the shooting in a circle. Ex. 36, Dominguez Dep. at 42-49; Ex. 17, Becker Dep. at 45, 50-52, 103-104; Ex. 16, Brady Dep. at 84, 87.

Before and during the walk-through, Castro consulted Suder. Ex. 16, Brady Dep. at 87-88, 99. At the beginning of the walk-through, Castro and Suder met with investigators while standing in a circle in the mall parking lot. Ex. 16, Brady Dep. at 83, 91; Ex. 40, Exs. 2-5 to Brady Dep. The walk-through happened before Castro was required to give a written statement. Ex. 16, Brady Dep. at 57-58. The walk-through was not recorded.

After the walk-through, consistent with HPD practice, Castro drafted a written statement with his lawyer. Ex. 16, Brady Dep. at 104-106, 109. Also consistent with HPD practice, Castro was not interviewed; he only had to give a written statement made in consultation with a lawyer. Ex. 7, Castro Dep. at 251. Nobody asked Castro to supplement or give more complete answers for his written statements. *Id.* at 257.

HPD found Castro's shooting to be justified even without any interview to examine his story relative to the evidence. Scott Supplemental Report at 4; Ex. 59, May Dep. at 34; Ex. 58, Gaithe Dep. at 59-60; Ex. 59, May Dep. at 22; Castro. *Ex. 16, Brady Dep. at 16*. This was true even though the homicide investigator received the video of the scene after the initial statement from Castro, which should have raised a number of concerns about Castro's veracity. Ex. 16, Brady Dep. at 28, 76-78, 115.  Similarly, investigators did not even go back and ask Castro about inconsistencies between the physical evidence (like the bullet path and the location of the shooting) and Castro's story. Ex. 24, Scott Report at 25-26, Scott

Supplemental Report at 4; Ex. 39, Scott Dep. at 204-05, 207-08; Ex. 59, May Dep. at 24; Ex. 58, Gaithe Dep. at 39-40, 42, 67; Ex. 59, May Dep. at 23.

The IAD investigators responsible for the Baker shooting investigation admit that it is important to compare to the officer's story to the physical evidence of an autopsy, but the report was completed before the autopsy report was even received. Ex. 60, Kuchta Dep. at 106-110; Ex. 58, Gaithe Dep. at 36, 73. The autopsy report about the bullet path in Mr. Baker's body is, therefore, not included in the IAD investigation. Ex. 58, Gaithe Dep. at 51-53, 65, 67-68, 73. Had IAD bothered to include the autopsy report, it would have revealed that the bullet path is inconsistent with Castro's account, which should be a cause for concern that needs to be investigated. Ex. 61, Bratton Dep. at 136.

Despite that obvious concern, the homicide investigator determined that there was nothing to investigate about whether the bullet path was consistent with Castro's account. Ex. 16, Brady Dep. at 31-33. Nor did the investigator do any additional probing after he received the autopsy report. Ex. 16, Brady Dep. at 145-146, 210. Instead, he simply based his decision based on what Castro said happened. Ex. 16, Brady Dep. at 108.

Similarly, none of the investigators looked at Castro's history of citizen complaints to see if they might shed light on the incident. Ex. 16, Brady Dep. at 226-27. Instead, they simply concluded that "each case is individual." Ex. 60, Kuchta Dep. at 94; Ex. 58, Gaithe Dep. at 58-59, 85.

If they had looked, they would have seen that when Castro shot Mr. Baker, Castro had a long history of excessive force and race-based complaints. At the time of the shooting Castro had been investigated by IAD approximately ten times. Ex. 7, Castro Dep. at 44-45, 70, 245-46.  In the five years before he shot Mr. Baker, Castro had five complaints for excessive force. Ex. 42, Complaint history at COH1121. The complaints against him included:

> D.F. made a complaint that Castro choked him and slammed his head against a car in September 2008. Ex. 7, Castro Dep. at 249; Ex. 43, Ex. 4 to Castro Dep. at 1210, 1244. Based on Castro's denial in an administrative written statement (no interview), IAD did not sustain the complaint. *Ex. 43, Ex. 4 to Castro Dep. at 1210-1212.*

> C.R., and several neighborhood witnesses, complained that HPD officers, including Castro beat C.R., a black man, in November 2009. Ex. 44, Ex. 6 to Castro Dep. at 1296-97, 1372-82. C.R. released medical records, which included a nose fracture, to back up his complaint. *Id. at 1340.* Based on the written denials of the officers, IAD exonerated Castro. *Ex. 44, Ex. 6 to Castro Dep. at 1300.*

> In 2008, W.G. complained to HPD that Castro called him a "nigger lover" and a "fucking nigger." Ex. 45, Ex. 5 to Castro Dep. at 1127, 1161-72. Castro admits that he stopped W.G. because he thought he was disrespectful. Ex. 7, Castro Dep. at 261-62. But based on Castro's blanket denial, IAD did not sustain the complaint. Ex. 45, Ex. 5 to Castro Dep. at 1127-28.

> From 2011-12, Defendant Castro shot and killed three animals while on duty. Ex. 42, Complaint history at COH1121.

Castro was never disciplined based on a citizen complaint. His only discipline was for having three car accidents (HPD actually interviewed him for that). Ex. 7, Castro Dep. at 246-47. Moreover, Castro knows of nobody in his assignment who was ever disciplined based on a citizen complaint. Ex. 7, Castro Dep. at 268-69.

HPD's investigations of Castro for fatally shooting Jordan Baker were consistent with HPD policy. Ex. 59, May Dep. at 34, 65; Ex. 14, Dirden Dep. at 56.

## VI. A Reasonable Jury Can Find That Defendant City of Houston is Liable To Plaintiff Under *Monell*

Municipalities are liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978). *Monell* and its progeny are designed to guard against precisely the kind of municipal acquiescence to officer misconduct as happened here. *Monell,* 436 U.S. at 691. Where a law enforcement agency has tacitly authorized misconduct by failing to meaningfully train, investigate, or discipline unconstitutional acts by its officers, a jury may find it liable for Plaintiff's injuries.

Plaintiff may establish municipal liability under § 1983 by proving that Mr. Baker's constitutional rights were violated by an "action pursuant to official municipal policy" or misconduct so pervasive among non-policymaking employees of the municipality "as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691. The question is whether Castro's misconduct was committed pursuant to a policy or custom of the Houston Police Department that was the "moving force" behind the constitutional violations. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell,* 436 U.S. at 694); *James v. Harris County*, 577 F.3d 612, 617-18 (5th Cir. 2009)).

### A. The City is Liable for the Custom and Practices of the Department that Are Evident in This Record

An "official policy" for *Monell* liability may be shown through "a persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Lawson v. Dallas Cnty.*, 286 F.3d 257, 263 (5th Cir. 2002) (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984) (*en banc*)); *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166 (5th Cir. 2010); *James*, 577 F.3d at 617-18. A cognizable policy for purposes of § 1983 liability may, therefore, be evidenced by custom "even though such a custom has not received formal approval through the body's official decisionmaking channels," *Milan v. City of San Antonio*, 113 F. App'x 622, 625 (5th Cir. 2004) (quoting *Monell*, 436 U.S. at 691).

Moreover, a custom may be shown by proof that "serious incompetence or misbehavior was general or widespread throughout the police force." *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992). It is hardly surprising that the customs that Plaintiff alleges—condoning unlawful racial policing and failing to control officer's excessive use of deadly force—were never formally adopted. In response to the City's touting of its written policies, it is important to note: "the existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 131 (1988).

Absent written policy, therefore, Houston may be liable if its policymakers condone or otherwise adopt the creation of a custom by knowingly ratifying the illegal or unconstitutional actions of subordinate, non-policymaking employees. *Santibanes v. City of Tomball, Tex.*, 654 F. Supp. 2d 593, 611 (S.D. Tex. 2109) (*citing Turner v. Upton County*, 915 F.2d 133, 136 (5th Cir. 1990)). "A persistent, widespread practice of officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents the municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (*en banc*).

This type of municipal policy is premised on the logical principle that the municipal action, not what is on paper, is paramount: "If the decision to adopt [a] particular course of action is properly made by that government's authorized decision makers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). "More importantly, where action is directed by those who establish government policy, the municipality is *equally responsible whether that action is to be taken only once or to be taken repeatedly*." *Id*. (emphasis added).

### B.  A Jury Must Determine Whether The City's Customs and Practices of Racially Disparate Policing Make the City Liable Here

Under the Equal Protection Clause of the Fourteenth Amendment, state actors are prohibited from denying "any person . . . the equal protection of laws."

38

U.S. CONST. AMD. XIV, § 1. It has long been recognized that a central purpose of the Equal Protection Clause "is to prevent the States from purposely discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993).

To prove an equal protection claim, Plaintiff need only demonstrate that Defendant Castro singled out Jordan Baker for "disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group." *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001). However, "[r]acial discrimination need only be one purpose, and not even a primary purpose, of an official action for a violation to occur." *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009).

Understanding the jury will be required to determine Castro's liability on this claim at trial, the only question is whether a reasonable jury could find for the Plaintiff against the City on this claim. Plainly, the answer is yes.

The City's argument is that because (1) there are written policies against racial profiling, (2) Plaintiff can cite to no custom, policy or practice that Houston discriminated against African American individuals. Br. at 17-18. The argument, which is woefully inadequate, fails.

For one, Plaintiff's claim is not about the City's written policies. It is about the customs and practices of the department that are unwritten but persist nonetheless. And, Plaintiff does not bear the burden at summary judgment—the City bears the initial burden.

Moreover, the City itself admits that race was a factor in Castro's decision to stop Baker. *Id.* at 19.[8] The City seems to believe that Castro would have been permitted to stop Baker the moment he biked into the strip mall, or, for that matter, any black male wearing a sweatshirt at the strip mall that night. If that is the City's position, then there is no doubt that the stop was unconstitutional. Indeed, it is precisely this sort of notion that, under the Equal Protection Clause, the constitution prohibits.

The City's position is deeply troubling and, a reasonable jury could find that it bespeaks systemic racial bias against black Americans.

The City cannot show that no reasonable jury could find in its favor and that it is entitled to judgment as a matter of law. Indeed, the City has just decided to ignore the record evidence. And, while Plaintiff understands that the City need not negate the elements of Plaintiff's case, it must have a good faith basis for contending that there is no evidence in support of Plaintiff's claims. The City has not done so.

Plaintiff has disclosed two experts whose opinions go directly to the *Monell* issues (Seguino and Scott), and Plaintiff fought long and hard to get discovery on the City's practices. *See Dckt 75 and 94, Plaintiff's motions to compel.* The foregoing, *supra* at 9-16, well describes the reason a reasonable jury could conclude that, as happened with Jordan Baker, the City of Houston's customs and policies were at work in Castro's decision to target him on account to his race.

---

[8] Plaintiff's counsel has confirmed that "face" at the top of page 19 should say "race."

Indeed, the City does not and has not accounted for the statistically significant disparities in the stop data in the city, and across a number of years, nor has the City at all done anything to illustrate that the absence of a custom or policy in the face of the data. Instead, the racial profiling reports—which attempt to mask the disparities—are indicative of deliberate indifference.

To be sure, there is no doubt that the evidence here is widespread enough throughout the police force—that is precisely what the aggregate data is. And, there can be no doubt that the City was aware of the figures in the reports—it produce the reports and has the raw data to boot. In the end, as Dr. Seguino concluded, the stark, pervasive, and mutually-reinforcing racial disparities in the City's own data and the City's own failure to even take one step to investigate or cure those disparities, strongly supports an inference of systemic racial bias in the Department. Ex. 56, Seguino Dep. at 15-16, 200-02; Ex. 15, Seguino Rep. at 4, 7, Seguino Rebuttal Rep. at 4-5; Ex. 24, Scott Rep. at 23. A jury must hear this claim.

### C. A Jury Must Determine Whether The City's Customs and Practices of Permitting Officers To Use Deadly Force With Impunity, Even Against the Unarmed, Make the City Liable Here

As it concerns Plaintiff's custom or practice claim regarding the use of deadly force, the City's argument as the same as above—point to written policies, and then claim Plaintiff has no evidence. This strategy is disingenuous. The City has again ignored the summary judgment standard; has ignored the facts in the record; and has ignored the extensive evidence Plaintiff produced.

But, Plaintiff has identified five categories of evidence that support his custom or practice claim: (1) the statistical dataset concerning all shootings between 2009 and 2014; (2) an analysis of certain underlying shooting cases reflected in the data; (3) identification of faulty practices that support Plaintiff's claims; (4) evidence that those practices were at work in this case; and (5) the fact that, in the end, 100% of the analyzed shootings were deemed justified.

*First,* as the City knows, Plaintiff's expert created a dataset examining every intentional police shooting in the years running up to the shooting of Baker by Defendant Castro. The statistically significant results well-support Plaintiff's widespread practice claims and include the facts: that 100% of all shootings analyzed were deemed justified; that there are statistically significant associations with the treatment of armed versus unarmed victims; that the data reflect and support an inference of threat perception failure; that the City has done nothing to impose any discipline or even retraining in the wake of shooting incidents.

*Second,* there are many troubling shooting incidents that took place in this period of time that not only reveal these policies but also should have given the City ample notice that the City was, and still appears to be, encouraging unnecessary deadly force by treating their officers with impunity. In sum, the City permits and encourages officers to invoke even the most minimal justification in order to receive complete protection from the Department, which in turn fosters deadly force among the ranks.

Third, the so-called shooting "investigations are flawed and include admitted unwritten practices and customs (a fact supporting Plaintiff's claims). The two customs that stand out the most for fostering ineffective investigations were the officer "walk-through" and the refusal to personally interview an officer on the record about the shooting.

HPD's practice of allowing officers to conduct a "walk-through" of the shooting scene with a lawyer allowed the officer to develop an exculpatory narrative of the shooting. HPD did not record the evolution of the narrative developed in the walk-through. This gave the officer the ability to see the evidence and begin to explain it without going on record so that (like here) the officer could change that narrative if other evidence arose (like a video of the incident). This is contrary to accepted police practices. HPD's own investigators admit that they would not conduct regular police investigations this way—they want witnesses on record.

Compounding this troublesome practice was HPD's agreement to never question an officer about what happened in the shooting. This meant that inconsistencies were not explored or developed, and officers were not pressed on them. HPD's investigators were aware that this is not an effective police practice. They would not conduct regular police investigations this way. HPD investigators would also not expressly refuse to consider the history of a non-police officer who committed a shooting. Yet, HPD investigators were adamant that each police shooting is a "separate incident," so that the investigators would never look at an

officer's history of citizen complaints, no matter how egregious, in evaluating the shooting.

Fourth, as discussed above, the treatment of Castro in this case is evidence that the practices of the department are at work. That is, "a jury could look to the City's inaction in the face of Plaintiff's own allegations of serious police misconduct as evidence of the custom that existed prior to the shooting incident." *Monaco v. City of Camden*, 2008 WL 8738213, at *8-*9 (D. N.J. Apr. 14, 2008). Indeed, in language that strikes a chord with Plaintiff's *Monell* claims here, another court explained that:

> Like its pre-incident conduct, Atlantic City's post-incident conduct is relevant to whether it has a custom of condoning excessive force by its officers and whether it has a longstanding custom of conducting sham IA investigations designed to insulate police officers from discipline or criticism. "Events after a disputed incident often shed light both on the intent of participants, and on institutional or individual patterns of behavior.

*Groark v. Timek*, 989 F.Supp.2d 378, 398 (D. N.J. 2013); *see also Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) ("If that episode of such dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City of Borger. If prior policy had been violated, we would expect to see a different reaction. If what the officers did and failed to do on August 11, 1981 was not acceptable to the police chief, changes would have been made."). The same is true here.

To be sure, Plaintiff's claim is that the investigation was inadequate and purposefully so; that this shooting fits into the widespread trend seen in the data; and that the fact that Castro claims Jordan Baker reached for his waistband is *evidence* that the policy is at work. The investigation into the Baker shooting is relevant and a part of the claim here

Finally, as a result of these problematic investigation practices, every single one of HPD's officer shootings from 2009-2014 was found to be justified, including the one-third of which (i.e. 81) involved unarmed victims of the shootings. As identified above, many of these shootings involved very troublesome facts, including one incident that generated much public scrutiny of an intoxicated officer shooting and killing a man for the offense of "reaching for his waistband" after an argument in a bar. All of this is sufficient for a reasonable jury to find that the City's practices and customs were the moving force behind Castro's actions that night.

### D. The City failed to Supervise, Discipline, and/or Train its Officers

Compounding HPD's custom of accepting both race-based policing and unjustified police shootings (by pretending that they did not exist), Plaintiff claims that the City of Houston failed to train or supervise its officers regarding race-based policing and the excessive use of deadly force.

Plaintiff can establish that Defendant City of Houston is liable here because: (1) it had a custom of failing to supervise, discipline and/or train its employees; (2) it maintained the custom with deliberate indifference to the risk it would result in the violations of clearly established constitutional rights; and (3) the custom was the moving force behind the constitutional violation here—the violation of Mr. Baker's

right to equal protection and to be free from excessive force. *See Kitchen v. Dallas Cty.*, 759 F.3d 468, 484 (5th Cir. 2014) (*abrogated on other grounds*); *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005); *Brown v. Bryan Cnty.*, 219 F.3d 450, 457 (5th Cir. 2000).

Put another way, Plaintiff can establish Defendant City of Houston's liability for failure to supervise, discipline, or train by showing that HPD deliberately chose not to supervise, discipline, or train its officers despite being on notice that its supervision, discipline, and training supervising regimen failed to prevent tortious conduct by its officers. *See Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir. 2000) (citing Board *of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997)); *Pineda v. City of Houston*, 124 F. Supp. 2d 1057, 1078 (S.D. Tex. 2100). A reasonable jury could find Defendant City of Houston liable as follows.

### 1. HPD failed to discipline, supervise, or train officers regarding race-based policing

The Equal Protection Clause prohibits selective enforcement of the law based on race. *Wren v. United States*, 517 U.S. 806 (1996). Although it has a written policy on the subject, HPD took no meaningful steps to discipline, train, or supervise its officers to prevent selective policing based on race, even in the face of its own data demonstrating the widespread racial disparity in police stops.

Chief Bender admits that from 2009-2014, HPD did not institute any effort to train its officers to address racially selective policing despite the year-after-year data showing racial disparities in HPD officers stopping black people. *Ex. 21, Bender Dep. at 51*. Only a jury can weigh whether this amounts to a failure to

46

train.[9] The same is true of the City's failures to investigate or even acknowledge or discipline any officer concerning racial profiling, as reflected in the City's own reports.

### 2. HPD failed to supervise officers' use of deadly force

Based upon an intensive dataset of every shooting incident in the relevant time period, Plaintiff has identified the significant police shooting investigation deficiencies in Section V(C).

The failure to adequately investigate instances of misconduct can independently establish municipal liability: "continued adherence to an approach that they know or should have known has failed to prevent tortious conduct by employees." *Brown*, 520 U.S. at 408. *See also Piotrowski*, 237 F.3d at 581-82 (acknowledging that failure to investigate and discipline police officers can be basis of failure to supervise liability).

Plaintiff intends to present both the evidence of the investigation inadequacies described above and an explanation from law enforcement expert, Andrew Scott, to explain the extent to which those inadequacies depart from accepted police practices both in conducting investigations and also in controlling

---

Plaintiff recognizes that the City sends its officers to substantial state-law training. But, that is of no moment here. Instead, it is the City's own, personal data that Plaintiff contends put the City on notice of a substantial problem with racial disparities *despite* the training it had already implemented. Indeed, the City appears to have adopted a form of an "early warning" system to alert it to racial profiling and allow it to take corrective action—there is no evidence that the City, despite the pervasive disparities—has implemented or used such a system. And, Captain Bender testified to the contrary. *See* Ex. 15, Seguino Report at 16.

officer behavior. Armed with that evidence, a reasonable jury could conclude that HPD failed to supervise its officers.

As it concerns the failure to discipline, Plaintiff will not repeat what was made plain above, but a reasonable jury could easily conclude that Houston has failed to adequately discipline its officers for their uses of deadly force. It simply has not disciplined any such officers. And, it did so even in the most egregious of situations where officers were drunk or had committed other violations of policy. Indeed, as the walkthrough and process in this case reveal, the HPD process is not designed to "discipline" an officer for shooting someone at all; it is a mechanism for insulating and protecting uses of deadly force rather than scrutinizing them at all.

### 4. HPD was deliberately indifferent in failing to train, supervise, or discipline

Plaintiff has sufficient evidence to take to a jury that HPD was deliberately indifferent in failing to train, supervise, or discipline its officers. One way to establish deliberate indifference is to demonstrate that a municipality had "[n]otice of a pattern of similar violations," which were "fairly similar to what ultimately transpired" when the plaintiffs own constitutional rights were violated. *Kitchen*, 759 F.3d at 481 (*citing Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010)). *See also Connick v. Thompson*, 563 U.S. 51, 62 (2011) (pattern of similar constitutional violations can establish notice of need to address). Moreover, the City of Houston can be found to be deliberately indifferent if there is an obvious, substantial risk to the public from its inaction. *See Farmer v. Brennan*, 511 U.S. 825, 843 (1994) ("[A] prison official [may not] escape liability ... by showing that,

while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific [individual].").

There is sufficient evidence in the record to allow a reasonable jury to find for Plaintiff on the basis that HPD policymakers were on notice for purposes of deliberate indifference either because: (1) there was a known pattern of similar misconduct; and/or (2) the risk of inaction was obvious.

### a. The City was on notice of racially disparate policing

A jury could certainly find that HPD had notice of a widespread pattern of racial disparity in its officers' stops of black drivers. It generated the data that demonstrated this notice. Even though HPD policymakers (incredibly) claim that this data did not put HPD on notice of an actual pattern, at minimum it put them on notice of the *risk* of unconstitutional misconduct by its officers.

### b. The City was on notice of inadequate police shooting investigations, failure to discipline, and the likelihood of unjustified shootings

HPD policymakers were also on notice of a pattern of likely unjustified shootings. Every police shooting investigation made its way to the Chief of Police.

The Chief was, therefore, aware of the multiple incidents of questionable police shootings. He was also aware that one-third of HPD's police shootings were of unarmed people. Officers routinely justified those shootings by claiming some movement that allegedly appeared as if the citizens were reaching for non-existent

weapons. A jury could find that the rate was so high that those explanations that the Chief must have known them to be pre-textual.

Coupled with those troublesome shootings was an investigation regimen that was not designed to fully examine and evaluate the complete circumstances behind police shootings. HPD policymakers were aware of those inadequate investigation procedures because every investigation made its way through the chain of command up to the Chief of Police, who was responsible for making the ultimate determination of whether shootings were justified.

The policymakers were, therefore, on notice of the pattern of similar unconstitutional misconduct—excessive deadly force.[10] They were also aware of the deficient investigation and disciplinary procedures for police shootings. Knowledge of each of these put HPD policymakers on notice of constitutional misconduct and/or, at minimum, the *risk* of unconstitutional misconduct.

### E.  A Reasonable Jury Can Determine That City's Customs and Practices Were The Moving Force Behind the Violation of Jordan Baker's Rights

Finally, the above customs and practices—(a) of race-based policing, (b) the encouragement of excessive deadly force, and (c) and failing to train and/or supervise to prevent each) were the cause of the deprivation of Mr. Baker's rights to equal protection under the law and/or to be free of excessive deadly force. Only a jury can determine the causation issue here. When a plaintiff alleges a "policy of turning a blind eye and knowingly refusing to thwart the unconstitutional conduct

---

[10] Mr. Scott, Plaintiff's police practices expert, has cited and discussed newspaper articles about officer-involved shootings and about the absolute lack of discipline for this reason as well. There can be no doubt that the HPD knew about these issues— they were raised far and wide.

of its police officers," it is reasonable for a jury to infer that an officer engaged in the misconduct "with the knowledge that the City would exact no consequence for his actions." *Santibanes*, 654 F. Supp. 2d at 614.

At this stage, therefore, Plaintiff has enough evidence to present to a jury to ask it to find causation based on the customs identified here. *Id.* (citing *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 170 (5th Cir. 1985) (noting that if reckless disregard for human life by police officers is "attributable to the instruction or example or acceptance of or by the city policymaker, the policy itself is a repudiation of constitutional rights," and where police officers know that use of deadly force in conscious disregard to the rights and safety of others will meet with the approval of city policymakers, the moving force requirement is satisfied)).

More specifically, Defendant Castro admits that he knew his conduct would not be seriously questioned. He had never been questioned before by IAD when citizens made multiple misconduct complaints against him. Moreover, he was not disciplined in any of those cases—all he had to do was write out a blanket denial of the conduct to avoid scrutiny. He also knew of no other officer who was ever subjected to discipline based on these types of citizen complaints. In short, Plaintiff will present evidence to the jury that Castro knew that based on the above customs HPD was looking the other way and/or would have his back if someone from outside HPD ever complained about his misconduct. A reasonable jury could find causation, and only a jury can evaluate that issue.

## VIII. Summary Judgment is not Proper for Plaintiff's Indemnification Claim

The City of Houston is correct that its ordinance requires it to indemnify its employees for any judgment, attorney's fees, and costs assessed against a covered person for which it has an obligation to provide legal representation. Dckt. 112-20. There is no limitation in that ordinance that limits Plaintiff's ability here to invoke that indemnification requirement. Nor has the City of Houston identified any.

The City has ignored that third-parties have an interest in the underlying indemnity, where applicable. *See, e.g.*, *Doe v. Texas Ass'n of Sch. Boards*, Inc., 283 S.W.3d 451, 460 (Tex. App. 2009) (third party had standing to enforce indemnity agreement). In addition, the City's concern is premature, as there is not yet a judgment. Courts across the country have recognized the importance of waiting until a judgment is entered to rule on the issue of indemnification. *See*, *e.g. Netherlands Ins. Co. v. Main St. Ingredients, LLC*, 745 F.3d 909 (8th Cir. 2014); *Doe v. City of Chicago*, 360 F.3d 667, 672-73 (7th Cir. 2004). ("[w]e have warned repeatedly against trying to resolve indemnity before liability," the court held that the district judge erred by ruling on the city's responsibility for the tortious conduct of its police officer "before the actual facts bearing on the issue were determined.); *Shapiro Sales Co. v. Alcoa, Inc.,* No. 4:06CV638 CDP, 2006 WL 2228987, at *3 (E.D. Mo. Aug. 3, 2006) ("Where the controlling facts are unknown . . . resolution of the duty to indemnify must await the facts. As one court noted, '[a] finding in the underlying actions that [the defendant] is not liable would make this Court's determinations as to the duty to indemnify merely advisory opinions.'") (*internal citations omitted).*; *Columbia Ins. Co. v. Tibbott*, No. CV 11-1040, 2012 WL

13027068, at *4 (D. Minn. July 24, 2012) ("[T]he duty to indemnify depends on a finding of liability . . . . Thus, any ruling on the duty to indemnify is premature."); *State Farm Fire & Cas. Co. v. McDonald Homes, Inc.*, No. CV 07-3982 (PAM/JSM), 2008 WL 11349773, at *3 (D. Minn. May 8, 2008) (denying motion for summary judgment and holding that "a ruling on the duty to indemnify is in any event premature."); *Fed. Ins. Co. v. Sammons Fin. Grp., Inc.*, 595 F. Supp. 2d 962, 979 (S.D. Iowa 2009) (Duty to indemnify "is often based on the actual facts which establish liability…").

Because factual issues relating to Castro's liability have yet to be resolved and are questions of fact for the jury, this Court should decline to make a preemptory finding and deny Defendant's motion on summary judgment on indemnification.

## CONCLUSION

Plaintiff respectfully requests that this Court deny Defendant City of Houston's motion for summary judgment and set this matter for trial.

RESPECTFULLY SUBMITTED,

/s/ David B. Owens
*One of Plaintiffs' Attorneys*

Jon Loevy
Mark Loevy-Reyes
David B. Owens
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900

Billy Joe Mills
FIRMEQUITY
858 West Armitage Avenue
Suite 101
Chicago, IL  60614
(847) 207-9064

## <u>CERTIFICATE OF SERVICE</u>

I, David B. Owens, an attorney, hereby certify that on May 9, 2018, I filed the foregoing using the Court's CM/ECF system, which effected service on all counsel.


<u>/s/ David B. Owens</u>
*One of Plaintiff's Attorneys*