## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **ESTATE OF JORDAN BAKER, by** | § | |
| **And through administrator, JANET** | § | |
| **BAKER** | § | |
| _Plaintiff,_ | § | |
| | § | |
| **vs.** | § | **No. 4:15-cv-003495** |
| | § | |
| **JUVENTINO CASTRO, THE** | § | |
| **CITY OF HOUSTON, AND RPI** | § | |
| **MANAGEMENT COMPANY, LLC** | § | |
| _Defendants._ | § | |

## DEFENDANT CITY OF HOUSTON'S REPLY IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

TABLE OF CITATIONS .............................................................................................iii

INDEX OF EXHIBITS ................................................................................................v

I.  NATURE AND STAGE OF THE PROCEEDING ................................................ 1

II.  ISSUES TO BE RULED UPON BY THE COURT AND STANDARD OF REVIEW .......... 1

III.  SUMMARY OF THE ARGUMENT ................................................................ 1

IV.  OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE AND RESPONSE .................. 1

V.  ADDITIONAL FACTUAL BACKGROUND ...................................................... 4

    A.  Initial Walk-Through .................................................................... 4

    B.  Homicide Investigation .................................................................. 6

    C.  Homicide Investigator Training ........................................................ 7

    D.  Internal Affairs Investigation .......................................................... 7

    E.  Former Chief of Police Charles McClelland ........................................ 8

    F.  Racial Profiling Report ................................................................. 10

VI.  ARGUMENT AND AUTHORITIES ............................................................... 12

    A. Plaintiff cannot establish that the City had a policy or custom of stopping African-Americans without reasonable suspicion because of their race, and that custom or practice was a moving force behind the initial detention of Jordan Baker. .................................................... 13

    B. Plaintiff cannot establish that the City had a policy or custom of "accepting" unconstitutional police shootings. ................................................................. 17

    C.  Plaintiff cannot establish a failure to train, discipline or supervise that would support a claim under Section 1983. ........................................................................ 22

VII.  CONCLUSION .................................................................................... 25

CERTIFICATE OF SERVICE ...................................................................... 27

# TABLE OF CITATIONS

**Cases**

*Brown v. City of Houston,* 337 F.3d 539 (5th Cir. 2003) ................................................................ 12

*Burge v. Parish of St. Tammany,* 187 F.3d 452 (5th Cir. 1999) ..................................................... 1

*City of Canton, Ohio v. Harris,* 489 U.S. 378, 390-391, 109 S.Ct. 1197 (1989) .................. 22, 23

*Connick v. Thompson,* 131 S.Ct. 1350 (2011) .............................................................................. 23

*Estate of Davis,* 406 F.3d 375 (5th Cir. 2005) .............................................................................. 23

*Garza v. Harris County, Texas,* 2011 WL 3925020, at *4 (S.D. Tex. Sept. 7, 2011) ................. 14

*Mason v. Lafayette City-Par. Consol. Gov't,* 806 F.3d 268 (5th Cir. 2015) ............................... 16

*Peterson v. City of Fort Worth,* 588 F.3d 838 (5th Cir. 2009) ............................................... 13, 24

*Pineda v. City of Houston,* 291 F.3d 325 (5th Cir. 2002) ....................................................... 13, 24

*Rodriguez v. City of Houston,* 651 Fed. Appx. 282 (5th Cir. 2016) ............................................ 16

*Tolan v. Cotton,* ___ U.S. ___, 134 S.Ct. 1861 (2014) ................................................................ 12

*Webster v. City of Houston,* 735 F.2d 838  (5th Cir. 1984) ............................................... 13, 14, 16

*World Wide Street Preachers Fellowship v. Town of Columbia,* 591 F.3d 747 (5th Cir. 2009) .. 13

## Statutes

42 U.S.C. § 1983................................................................................................ 1, 13, 22

Federal Rule of Evidence 701 ............................................................................... 2

Federal Rule of Evidence 702 ............................................................................ 2, 3

Federal Rule of Evidence 703 ............................................................................... 2

Federal Rules of Evidence 704 .......................................................................... 2, 3

## INDEX OF EXHIBITS

Exh. 17          Deposition of Dwight Steward, Ph.D.

Exh. 18          Steward Expert Report

Exh. 19          Deposition of Jonathyn Priest taken December 27, 2017

Exh. 20          Priest Expert Report

Exh. 21          Deposition of Paul Adler taken January 31, 2018

Exh. 22          Adler Expert Report

## I.       NATURE AND STAGE OF THE PROCEEDING

This is a lawsuit brought under 42 U.S.C. § 1983 against the City of Houston ("Houston" or the "City") and Houston Police Officer Juventino Castro ("Castro"), arising out of an officer-involved shooting of Plaintiff's decedent Jordan Baker ("Baker").  Discovery is now closed, and Houston seeks summary judgment as to all claims against it.

## II.     ISSUES TO BE RULED UPON BY THE COURT AND STANDARD OF REVIEW

1.      Should the City's objections to the summary judgment evidence be sustained?

2.      Did the City of Houston have a policy, custom or practice that was promulgated with deliberate indifference to the rights of Baker, and that was the moving force behind a deprivation of Baker's constitutional rights?

**Standard of review:**  A summary judgment is reviewed de novo.  *Burge v. Parish of St. Tammany,* 187 F.3d 452, 464 (5th Cir. 1999).

## III.      SUMMARY OF THE ARGUMENT

Plaintiff has failed to raise a fact issue that would preclude summary judgment in favor of the City as to all claims.  Plaintiff cannot establish that the City had a policy, custom or practice that was the moving force behind a deprivation of Baker's constitutional rights.  Plaintiff has failed to proffer evidence of any custom or practice occurring for so long and so frequently that the conduct is an expected, accepted practice of HPD officers, or that such a practice was the moving force behind a violation of Baker's constitutional rights.  Additionally, Plaintiff has failed to establish a lack of training, supervision, or discipline that resulted in a deprivation of Baker's constitutional rights.

## IV.     OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE AND RESPONSE

1. **Statement of Magnolia Martinez (Exhibit 9)**. The City objects to Plaintiff's Exhibit 9, the statement of Magnolia Martinez, to the extent it is offered as opinion testimony as to whether a TASER could have been used. The statement indicates the witness did *not see or even hear* the actual shooting incident. She only briefly saw the officer run after the decedent toward the back of the stores. From that moment forward, the witness has no personal knowledge of the events and her statement is not competent summary judgment evidence. The witness does not have any scientific, technical, or other specialized knowledge, experience, or expertise, and was not designated as an expert. Any opinion testimony is not rationally based on the witness's perception or on sufficient facts or data, is not the product of reliable principles and methods, and would not be helpful to a jury. Thus, it is not admissible as either lay or expert opinion testimony under Federal Rules of Evidence 701, 702 and 703.

2. **Dr. Jonathan Arden Declaration and Exhibits (Exhibit 11)**. The City objects to Plaintiff's Exhibit 11, opinion testimony of Dr. Jonathan Arden ("Arden"), under Federal Rules of Evidence 702, 703, and 704. Defendants have filed a *Daubert* motion asserting their objections against Arden's proposed testimony (Dkt #108), which is incorporated by reference. Thus, the City asks this Court to sustain its objection and strike Exhibit 11 as inadmissible evidence.

3. **Brian Weaver Declaration, Exhibits and Deposition (Exhibits 13 and 27)**. The City objects to Plaintiff's Exhibits 13 and 27, the opinion testimony of Brian Weaver ("Weaver"), under Federal Rules of Evidence 702, 703 and 704. Defendants have filed a *Daubert* motion asserting these objections against Weaver's proposed testimony (Dkt # 115), which is incorporated by reference. Thus, the City asks this Court to sustain its objection and strike Exhibits 13 and 27 as inadmissible evidence.

4.     **Stephanie Seguino Declaration, Exhibits and Deposition (Exhibits 15 and 56)**.  The City objects to Plaintiff's Exhibits 15 and 56, opinion testimony of Stephanie Seguino ("Seguino") under Federal Rules of Evidence 702, 703, and 704.  Defendants have filed a *Daubert* motion asserting these objections against Seguino's proposed testimony (Dkt # 116), which is incorporated by reference.  Thus, the City asks this Court to sustain its objection and strike Exhibits 15 and 56 as inadmissible evidence.

5.     **Lee, Toporek, and Fridell Articles (Exhibits 25, 26, and 52)**.  Houston objects to the Lee, Toporek, and Fridell articles (Plaintiff's Exhibits 25, 26, and 52) as they are not competent summary judgment evidence. The articles (1) are not sworn testimony; (2) are not affidavits, depositions, or admissible documentary evidence; (3) are advocacy pieces with no relation to this case; (4) are bare conclusions and are not supported by the evidence in this case; (5) do not establish the witnesses' qualifications as experts; (6) fail to set forth the facts and reasoning upon which the opinions are based; (7) contain conclusions of law; and thus fail to satisfy the standards set forth in Federal Rules of Evidence 702 and 703.  Furthermore, Plaintiff did not timely designate any of these authors as experts, and the articles were not produced in discovery of this case. Because Exhibits 25, 26 and 52 are not competent summary judgment evidence, the City respectfully requests that this Court sustain its objections and strike these exhibits as inadmissible.

6.     **Scott Declaration, Exhibits, and Deposition (Exhibits 24 and 39)**.  The City objects to Plaintiff's Exhibits 24 and 39, opinion testimony of former Florida police officer Andrew Scott ("Scott"), under Federal Rules of Evidence 702, 703, and 704.  Defendants have filed a *Daubert* motion asserting these objections against Scott's proposed testimony (Dkt #111) which is incorporated by reference. Thus, the City asks this Court to sustain its objection and strike Exhibits 24 and 39 as inadmissible evidence.

## V.     ADDITIONAL FACTUAL BACKGROUND

### A.     Initial Walk-Through

Officer-involved shootings are investigated by both the Homicide Division and the Internal Affairs Division of the Houston Police Department ("HPD").[1]  The Homicide Division conducts, in essence, a criminal investigation to determine whether the officer's actions are lawful.  The Internal Affairs Division conducts an investigation to discover any violations of HPD policy.[2]

The Homicide Lieutenant ensures that investigators exhaust all possible avenues of investigation, uncover any possible leads, and obtain all possible information that would either corroborate the versions of events told by witnesses, including those involved, or disprove those events.  He or she also ensures that the investigation is conducted in a timely manner.  The investigation should be as all-inclusive and exhaustive as possible.  In an officer-involved shooting, homicide detectives rely on the statement of the officer just as they would rely on the statement of any other witness to an event.  The officer, however, is the target of the investigation.[3]  Homicide Lt. Zachary Becker ("Becker") believes the homicide investigation in the Baker case was objective.[4]

An Internal Affairs investigation is confidential under Chapter 143 of the Texas Local Government Code.[5]  Thus, any information developed by the Internal Affairs Division ("IAD") is not necessarily shared with the Homicide Division.  However, the homicide detectives and investigators provide their work product to IAD.[6]  At the conclusion of the homicide investigation,

---

[1]   Deposition of Zachary Becker taken April 12, 2017 ("Becker Dep."), Dkt #153-17, at 27:15-28:3; 30:3-10; Deposition of Charles McClelland taken January 10, 2018 ("McClelland Dep."), Dkt #153-57, at 66:23-67:4.
[2]   Becker Dep., Dkt #153-17, at 27:15-28:3; 30:3-10; Deposition of Jon Kuchta taken January 19, 2018 ("Kuchta Dep."), Dkt #153-60, at 24:2-16; McClelland Dep., Dkt #153-57, at 99:11-100:2; 105:4-12.
[3]   Becker Dep., Dkt # 153-17, at 21:14-20; 22:18-23:10; 24:2-14; 43:22-44:6.
[4]   Becker Dep., Dkt #153-17, at 24:15-25:11.
[5]   McClelland Dep., Dkt 153-57 at 194:2-12; Tex. Loc. Gov't Code § 143.1214(b).
[6]   Becker Dep., Dkt #153-17, at 28:4-10; 31:6-11; Kuchta Dep., Dkt #153-60 at 23:18-22.

all information regarding an officer-involved shooting is presented to the District Attorney's office for its action.[7]  At the conclusion of the Internal Affairs process, that work product is presented to the Chief of Police as the basis for any administrative disciplinary decisions.[8]

Investigations of officer-involved shootings begin with a "walk-through" at the scene. Those present for the walk-through include personnel from the District Attorney's office, Internal Affairs, Homicide, the officer, the officer's counsel, and sometimes a command representative.[9] Lt. Becker attended the walk-through in the Baker case.[10]  Investigators asked Castro to tell them what happened, and to lead them through the scene to point out specifically when and how things happened.[11]  During the walk-through, IAD is not allowed to pose formal questions to the target because of restrictions on interrogations of officers that are statutory and require a formal written notice.[12]  Also, when a person asserts his or her right to counsel, homicide detectives scrupulously respect those wishes.  It is not uncommon in an officer-involved shooting for the officer to assert his or her right to counsel.[13]

During the walk through at the Baker scene, Castro described the events of the night.[14] Among other things, Castro told the investigators that there had been a number of robberies in the area, including at the strip center.  Castro had seen the man later identified as Baker ride into the parking lot on a bicycle, and then change course when he saw Castro.  Castro found that suspicious, given that the man matched the general description of suspects (black males wearing hoodies) who

---

[7]  Becker Dep., Dkt #153-17, at 28:11-29:12; Deposition of Matthew Brady taken March 9, 2017 ("Brady Dep."), Dkt #153-16, at 18:11-19:8.  McClelland Dep., Dkt #153-57 at 99:11-100:2.

[8]  Becker Dep., Dkt # 153-17, at 28:11-16.

[9]  Becker Dep., Dkt #153-17 at 18:18-19:9; 19:20-21:8; McClelland Dep., Dkt # 153-57 at 145:24-152:15; Brady Dep., Dkt # 153-16, at 23:3-25:5.

[10]  Becker Dep., Dkt #153-17, at 4:6-15; 10:12-21; 19:20-21:8.

[11]  Becker Dep., Dkt # 153-17, at 50:8-51:9

[12]  Becker Dep., Dkt # 153-17, at 50:8-51:9 Becker Dep., Dkt # 153-17, at 50:8-51:9.

[13]  Becker Dep., Dkt #153-17 at 34:21-35:7.

[14]  Becker Dep., Dkt # 153-17 at 46:10-18.

had committed aggravated robberies in the area, together with the fact that Baker had been looking into the store fronts.  Castro described the initial interaction with Baker and his concern that Baker was putting his hands in or near his pockets despite Castro's commands not to do so.[15]

Officer Castro described that Baker shouldered or elbowed Castro backward.  In the ensuing struggle, Baker came out of his sweatshirt and ran northbound toward the end of the strip center. Castro radioed for backup.  Baker ran some distance and then stopped, turned around, and said, "I'm not going to jail" or words to that effect.  Castro described that Baker made some sort of motion toward his waistband and came at him.  Lt. Becker asked Castro to demonstrate where Baker was when Castro fired so they could get a rough determination of distance. It appeared to be about 8 to 10 feet, but no measurements were taken at that time.[16]

### B.      Homicide Investigation

Sgt. Matthew Brady was one of the homicide detectives who conducted the investigation. Sgt. Brady interviewed Castro before Castro provided a written statement.[17]   Although investigators can later go back and ask additional follow up questions, they do not typically conduct a second interview unless there is a need.[18]

As the Homicide Lieutenant, Becker prepared a summary of the investigation.  The summary was simply a summary, and not a catalog or lengthy description of every witness or all available evidence or information.  The summary was brief and did not include the Magnolia Martinez statement, *not* because her account was not favorable to the account provided by Castro, but rather for the sake of brevity.[19]

---

[15]  Becker Dep., Dkt 153-17 at 46:15-50:1.
[16]  Becker Dep., Dkt 153-17 at 46:15-50:1; 53:3-25.
[17]  Brady Dep., Dkt 153-16, at 23:3-25:5.
[18]  Becker Dep., Dkt # 153-17 at 66:22-68:16.
[19]  Becker Dep., Dkt # 153-17 at 66:22-68:16.

The matter of Officer Castro's conduct went before a grand jury, and Castro was "no billed." No bill means that the grand jury decided that the person in question, in this case Officer Castro, had not violated any criminal laws.[20]

## C.     Homicide Investigator Training

Homicide officers take multiple classes on best practices in conducting homicide investigations, including death investigation class, child death investigation class, a several-day kidnapping class, blood spatter analysis, and multiple interview and interrogation classes, in addition to learning their craft from on-the-job experience.[21] Additionally, homicide officers are required to undergo training on how to investigate officer-involved shootings.[22]

## D.     Internal Affairs Investigation

Internal Affairs Sergeant Jon Kuchta goes into investigations "with an open mind, so whatever evidence leads me to the facts, that's what I follow up on."[23] In Internal Affairs investigations, "[y]ou don't give credit to what the officer's saying. And you prove during your investigation whether he's lying or telling the truth and what his account of the events match up to the physical evidence that you obtain."[24] Kuchta compared Officer Castro's version of events to the physical evidence such as videos, scene diagrams, autopsy reports, statements from witnesses, and everything he could possibly get, to determine whether Officer Castro's statement was true or false.[25]

---

[20] Becker Dep., Dkt #153-17 at 118:10-25.
[21] Brady Dep., Dkt #153-16, at 25:6-11; 25:22-26:8; 29:14-24.
[22] Brady Dep., Dkt #153-16 at 14:16-15:12.
[23] Deposition of Jon Kuchta taken January 19, 2018 ("Kuchta Dep."), Dkt 153-60 at 11:24-12:1; 17:12-16; 23:10-17.
[24] Kuchta Dep., Dkt 153-60 at 17:17-25.
[25] Kuchta Dep., Dkt 153-60 at 19:7-13; 78:19-79:1.

Under Texas law, a police officer must be given 48 hours' notice before an internal affairs interrogation.[26]  When Officer Castro provided his statement, Kuchta read the entire statement right away.  If Sgt. Kuchta had had any additional questions or wanted more details about the incident, he would have asked for them.  Sgt. Kuchta does not recall if he asked for more details in this case.[27]  Officers typically bring their statement to IAD on a thumb drive.[28]  The administrative statement is not final until the officer signs it and agrees that the statement contains the correct answers to the questions the officer was initially asked.[29]

Sgt. Kuchta included crime bulletins in the IAD file because they were pertinent to the fact that there had been a rash of robberies in the area.  Sgt. Kuchta did not include the crime bulletin that Castro actually looked at because Castro had performed his own research, and Sgt. Kuchta did not know exactly which documents Castro reviewed.  It is common for officers to do their own research and obtain as many details as possible when working an extra job. There are numerous ways to find out about previous robberies in the area.  Even though the bulletins in the IAD file were dated February 4, they had already been out.  North Shepherd has a crime data analyst who publishes this information in North Shepherd crime bulletins.  Kuchta remembers that, at the time, there were numerous TV news broadcasts about the number of robberies in the area.[30]

## E.    Former Chief of Police Charles McClelland

McClelland was Chief of Police from April 14, 2010 until February 27, 2016.[31]  As Chief, McClelland was the final policy maker for HPD.[32]  As Chief, McClelland had someone review all officer-involved shootings from a training perspective.  Executive Assistant Chief ("EAC")

---

[26]  *See* TEXAS LOC. GOV'T CODE § 143.1014.  *See also* Kuchta Dep., Dkt #153-60 at 96:24-97:6.
[27]  Kuchta Dep., Dkt #153-60 at 57:2-10; 14-19.
[28]  Kuchta Dep., Dkt #152-60 at 58:6-59:3.
[29]  Kuchta Dep., Dkt #153-60 at 59:10-60:3.
[30]  Kuchta Dep., Dkt 153-60 at 97:10-102:25; 103:17-104:2
[31]  McClelland Dep., Dkt #153-57, at 6:16-7:9.
[32]  McClelland Dep., Dkt #153-57 at 8:15-18; 114:24-115:7

Oettmeier presided over a committee that reviewed every incident where officers were injured or killed, or killed someone else.  McClelland also directed EAC Buenik, commander over training at the time, to examine different training techniques that could reduce deadly encounters.[33] McClelland met with the special agent in charge of the FBI office in Houston and invited him to look at every single officer involved shooting.[34]

During McClelland's tenure as Chief, an Internal Affairs sergeant would complete the investigation, and a lieutenant would prepare a synopsis of the investigation.  A captain reviewed that report and it was sent to an assistant chief for review.  The report then went to the citizens review board, or Independent Police Oversight Board ("IPOB"), for review.[35]  The independent review board can make recommendations about more training, and can also send the case back for further investigation, additional evidence, or answers to questions.[36]  The Chief of Police makes the final decision about whether the shooting is justified or not.[37]

IAD has the responsibility to do the most complete, thorough, objective investigation it can.  It may not be possible to resolve all conflicts.[38]  Witnesses sometimes have a different version of events because they may not have seen the entire incident, or for a variety of reasons.[39] McClelland has no reason to believe any of the people working on IAD investigations were dishonest or were not being objective.[40]

McClelland is aware that the statistical data for officer-involved shootings between 2009 and 2014 indicates that such were found justified by HPD.  Justification means that the shootings

---

[33] McClelland Dep., Dkt #153-57 at 49:22-50:15.
[34] McClelland Dep., Dkt #153-57 at 99:11-100:2.
[35] McClelland Dep., Dkt #153-57 at 67:23-68:18; General Order 200-03, Investigation of Employee Misconduct, Dkt #112-13.
[36] McClelland Dep., Dkt #153-57 at 68:19-69:17.
[37] McClelland Dep., Dkt #153-57 at 67:11-14.
[38] McClelland Dep., Dkt #153-57 at 6:21-23; 69:24-70:3; 78:17-21; 79:7-14; 80:2-25.
[39] McClelland Dep., Dkt #153-57 at 76:14-77:14.
[40] McClelland Dep., Dkt #153-57 at 71:8-14.

were in compliance with HPD use of force policy as well as relevant law on use of force.  However, McClelland was also aware of shootings in which other actions of the officer were found to be outside department policy and appropriate disciplinary action was taken in each case.[41] McClelland pointed out that officers are held accountable for their actions and such is evidenced by administrative investigations and disciplines.[42]

McClelland does not believe there was a practice at HPD of saying that a suspect was reaching for his waistband or something like that to provide as an excuse for shooting an unarmed civilian.[43]  In the Baker case, McClelland asked whether the officer's account was consistent with the video and he was told that it was.[44]  McClelland believes that the shooting of Jordan Baker was justified, and that Officer Castro acted within departmental policy, state and federal law, and in accordance with his training.[45]  McClelland took one more step in addition to the Harris County grand jury reviewing this case.  In addition to that, the Baker case went to the FBI for independent review.[46]

## F.  Racial Profiling Report

State law required McClelland to issue the racial profiling reports to the Mayor and City Council, and to the State of Texas.[47]  The racial profiling reports, prepared by the Planning and

---

[41] McClelland Dep., Dkt #153-57 at 32:3-8; 100:3-23; 103:3-17; 103:25-105:3; 185:18-186:7; 211:5-6. For example, Officer Coronado received a significant suspension for policy violations in the Ventura shooting case, even though the shooting itself was justified.  "If I'm over, over the legal limit sitting here and someone walks through that door and said I'm going to kill you and start reaching in your pocket, I may still be in a position so that I could comply with the law and defend myself and use deadly force."  McClelland Dep., Dkt #153-57 at 192:10-24.
[42] McClelland Dep., Dkt #153-57 at 90:3-91:8.
[43] McClelland Dep., Dkt #153-57 at 210:23-211:4
[44] McClelland Dep., Dkt #153-57 at 214:18-216:14.
[45] McClelland Dep., Dkt #153-57 at 29:15-17; 179:9-16; 216:15-217:16.
[46] McClelland Dep., Dkt #153-57 at 216:15-217:6.
[47] McClelland Dep., Dkt #153-57 at 128:12-129:17.

Research Department based on all the data points, indicate that there was no pattern of racial profiling in traffic stops in the City of Houston.[48]

In reviewing the reports, McClelland did not see a pattern of racial profiling.  A multitude of factors go into compiling the statistical data.  Across the country, African Americans are disproportionately represented throughout the criminal justice process.  McClelland understands that, being African American.  However, officers have no control over their assignments.  Even though Houston is very diverse, there are enclaves where neighborhoods are almost 90 percent African American or 90 percent white. An officer has no control over where he or she is assigned or to what calls he or she is dispatched.[49]  Some ethnic enclaves generate a lot of police calls. There are things that go into the data set that the officer has no control of.[50]

Every officer in the Houston Police Department has been trained on racial profiling.  When an officer's engagement with someone is self-initiated, the officer must have probable cause, reasonable suspicion, some type of justification that he must document.[51]  Every chief is concerned that officers are justified when they make any type of stop.  That is why officers are trained.  HPD officers receive more training than the state requires.  Officers must document their stops.  Those are some of the safeguards that are in place.[52]  McClelland has no evidence or information that would lead him to believe that racial profiling is happening.[53]

McClelland took steps to ensure more public confidence in the complaint process.  He removed the perjury clause off the affidavit.  He gave the public more avenues to make complaints

---

[48] McClelland Dep., Dkt #153-57 at 130:1-12; 133:3-134:1.
[49] McClelland Dep., Dkt #153-57 at 134:2- 135:25.
[50] McClelland Dep., Dkt #153-57 at 136:1-17.
[51] McClelland Dep., Dkt #153-57 at 136:21-137:9.
[52] McClelland Dep., Dkt 153-57, at 137:10-22.
[53] McClelland Dep., Dkt #153-57, at 137:10-138:4; 138:21-139:5.

without confronting an HPD officer.  For example, he allowed complaints to be submitted by mail and email, or through the local office of the NAACP or LULAC or even the Harris County jail.[54]

Racial profiling is illegal.  If someone brought him information that it was happening, McClelland would have a duty and an obligation to do something about it.  No one ever did.[55]

## VI.    ARGUMENT AND AUTHORITIES

Under *Tolan v. Cotton*, when considering evidence, all reasonable inferences are to be resolved in favor of the non-moving party. *Tolan v. Cotton,* ___ *U.S.* ___, 134 S.Ct. 1861, 1863 (2014).  That does not mean, however, that the non-moving party may concoct a fantastical theory by stringing together speculation and unsubstantiated allegations, and then claim to have created a fact issue.   Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation or only a scintilla of evidence will not defeat summary judgment. *See Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir. 2003).  Plaintiff has not come forward with competent summary judgment evidence sufficient to create a fact issue that (1) the City had a custom, policy, or practice of stopping African American citizens without reasonable suspicion, which was a moving force behind the initial detention of Jordan Baker; or (2) the City of Houston had a custom, policy or practice of permitting officers to shoot unarmed citizens with impunity, which was a moving force behind Officer Castro's use of force in this case.

Because the evidence and testimony show no unconstitutional customs, policies or practices, Plaintiff has been forced to rely on experts to contrive – contrary to the evidence – supposed practices of allowing racial profiling and excessive force in police shootings.  However, rather than explaining the evidence, these purported "experts" are attempting to *explain away* the plain facts and evidence.  The City has moved to exclude the testimony of Plaintiffs' experts.  The

---

[54]  McClelland Dep., Dkt #153-57 at 137:23-138:17.
[55]  McClelland Dep., Dkt #153-57, at 140:25-141:5.

evidence speaks for itself and the Plaintiff has failed to carry its burden in this case.  The City is entitled to summary judgment.

## A.      Plaintiff cannot establish that the City had a policy or custom of stopping African-Americans without reasonable suspicion because of their race, and that custom or practice was a moving force behind the initial detention of Jordan Baker.

To prevail on a claim under Section 1983, Plaintiff must demonstrate that the City "had a policy or custom, of which . . . a [municipal] policymaker [could] be charged with actual or constructive knowledge" that acted *as the moving force behind a constitutional violation*. *World Wide Street Preachers Fellowship v. Town of Columbia,* 591 F.3d 747, 756 (5th Cir. 2009) (citing *Pineda v. City of Houston,* 291 F.3d 325, 328 (5th Cir. 2002)) (emphasis added).  Here, Plaintiff completely ignores the City's longstanding policies prohibiting racial profiling and discrimination.[56]  Instead, Plaintiff has attempted to use an expert to demonstrate statistically that HPD had a custom or practice of making traffic stops based on race.  This effort is unavailing.

If a plaintiff alleges or attempts to prove that a custom for which a municipality is liable is based on the actions of the municipality's employees, the plaintiff must show a pattern of *similar incidents* that occurred *for so long or so frequently* that the course of conduct warrants attributing knowledge to the governing body that the conduct is an expected, accepted practice of the municipality's employees.  *Webster v. City of Houston,* 735 F.2d 838, 842 (5th Cir. 1984).  "A pattern requires similarity and specificity; prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question. *Peterson v. City of Fort Worth,* 588 F.3d 838, 851 (5th Cir. 2009).  "A 'handful' of instances do not constitute a pervasive custom or practice. *Garza v. Harris County, Texas,* 2011 WL 3925020, at *4 (S.D. Tex. Sept. 7,

---

[56] *See* Dirden Report, Exh. 2-2, Dkt #112-4, pp. 8-10; Dirden Dep., Exh. 2, Dkt #112-2, at 105:20-106:4, 144:5-8; G.O. 600-42, Racial Profiling Prohibited, Exh. 14 (Dkt #112-18); G.O. 300-14, Extra Employment, Exh. 12 (Dkt #112-16), p. 2; G.O. 200-08, Conduct and Authority, Exh. 10 (Dkt #112-14), pp. 1-2 ("Employees shall respect the rights of individuals and shall not engage in discrimination, oppression, or favoritism . . ..").

2011); *see also Peterson,* 588 F.3d at 858 (twenty-seven allegations of excessive force over a five-year period insufficient to establish a pattern of excessive force).  A plaintiff must show that there exists a *direct causal link* between a municipal policy or custom and the alleged constitutional deprivation. *Webster*, 735 F.2d at 842.

Here, Plaintiff has not demonstrated a pattern of actions that occurred *for so long or so frequently* that the conduct is an expected, accepted practice of HPD officers.  In fact, Plaintiff has not come forward with *even one* incident in which an officer stopped an African-American citizen without reasonable suspicion because the citizen was black.  Without demonstrating a pattern of actions, Plaintiff's equal protection claim against the City cannot stand.

Because Plaintiff cannot establish a pattern of unconstitutional conduct, it has attempted to use HPD statistics of traffic stops, which are statutorily compiled,[57] to attempt to create a fact issue that the City has a practice or custom permitting racial discrimination or profiling.  Plaintiff theorizes that these statistics show that (1) HPD officers have a custom and practice of making traffic stops based on race; (2) Castro was aware of and engaged in this common practice; and (3) Castro, therefore, stopped Jordan Baker without reasonable suspicion based on his race.  This attempt to fabricate a custom, pattern or practice fails.

First, as discussed in Defendants' Motion to Exclude or Limit Opinion Testimony of Plaintiff's Expert Dr. Stephanie Seguino ("Seguino") (Dkt #116), Plaintiff's analysis of HPD stop, search and use of force data are based on a number of defective underlying assumptions and nonsensical comparisons.[58]  Seguino's analyses are in direct conflict with generally accepted methodologies, principles and practices used to study issues related to police racial profiling.[59]

---

[57] *See* TEXAS CODE CRIM. PROC. §§ 2.131, 2.133, 2.134.
[58] *See* Dkt #116; Report of Dwight D. Steward, Ph.D. ("Steward Report"), Exhibit 17, at p. 4, ¶ 7; Deposition of Dwight Steward taken February 22, 2018 ("Steward Dep."), Exhibit 18, at 135:9-142:7.
[59] *See* Dkt # 116; Steward Report, Exh. 17, at ¶¶ 7, 11, 22, 23; Steward Dep., Exh. 18, at 135:9-148:22; 152:13-156:1.

For example, Seguino's methodology used to study HPD traffic stops is not generally accepted in the racial profiling research literature, relies on aggregated data rather than actual populations, and does not distinguish between the overall Houston population and actual relevant driving population.[60]  Seguino also notes that "[t]here is no established statistical threshold for interpretation of disparity indices," and yet she purports to do just that.[61]  These are but a few flaws in Seguino's methodology.  Seguino's proposed testimony is unscientific and inherently unreliable, and should be excluded. *See* Dkt #116.

Second, even if Seguino's disparity calculations were reliable – which they are not – the statistics she provides in no way demonstrate that *any* traffic stops were improperly made – on the basis of race or for any other reason.  In fact, the statistics show just the opposite.  The HPD Annual Racial Profiling Statistical and Comparative Reports (Dkt #153-48) demonstrate that "there exists neither evidence of systemic bias in the practices of Houston police officers nor evidence that individual officers in the department have engaged in racial profiling."[62]  Seguino has failed to demonstrate a custom or practice of making improper traffic stops on the basis of race, and Plaintiff has failed to establish the adoption of such a custom and practice by a policy maker – in this case, the policy maker for HPD, Chief Charles McClelland.  Instead, the record demonstrates that HPD had in place policies, training and practices *prohibiting* racial profiling and discrimination.[63]

Third, even if Seguino were able to demonstrate a custom or practice of making traffic stops on the basis of race, this case did not involve a traffic stop.  This case involved a situation in

---

[60]  *See* Dkt #116, Steward Report, Exh. 17, at ¶¶ 8, 16-19; Steward Dep., Exh. 18, at 135:9-142:7.

[61]  *See* Steward Report, Exh. 17, at ¶25; Steward Dep. At 105:2-106:13.

[62]  Dkt 153-48, p. 253 of 266.  *See also* Dkt 153-48, pp. 21, 45, 62-63, 87, 103, 120, 135, 147, 160-161, 173, 188-189, 208, 211, 225, and 238 of 266; McClelland Dep., Dkt 153-57 at 130:1-12; 133:41-134:1; 137:23-138:4 ("I didn't have any evidence . . . or information that would lead me to believe that [racial profiling] was occurring.").

[63]  McClelland Dep., Dkt 153-57 at 130:1-12; 133:41-134:1; 137:23-138:4; 138:21-139:5; 140:25-141:5; Dirden Report, Exh. 2-2 (Dkt 112-4), pp. 8-10; Dirden Dep., Exh. 2 (Dkt #112-2) at 105:20-106:4; 144:5-8; 144:9-11; G.O. 600-42, Racial Profiling Prohibited, Exh. 14, p.1 (Dkt #112-18); G.O. 300-14, Extra Employment, Exh. 12 (Dkt #112-16) p. 2; G.O. 200-08, Conduct and Authority, Exh. 10 (Dkt #112-14), pp. 1-2.

which Castro decided to follow an individual through the parking lot due to his suspicious behavior, to identify him and determine the reason for his being on the premises. *See* Dkt 107-1 at pp. 164-176.  Plaintiff has failed to come forward with *even one inci*dent in which a Houston police officer stopped an African-American citizen without reasonable suspicion because of race. Plaintiff has failed to demonstrate a *pattern of conduct occurring so long or so frequently* that the course of conduct warrants attributing knowledge to the governing body that the conduct is an *expected, accepted practice* of the municipality's employees. *See Webster v. City of Houston,* 735 F.2d 838, 842 (5th Cir. 1984).

Finally, in order for the supposed pattern or practice to support municipal liability, the plaintiff must demonstrate that the pattern or practice was the *moving force* behind a violation of Plaintiff's constitutional rights. *Rodriguez v. City of Houston,* 651 Fed. Appx. 282, 284-285 (5th Cir. 2016).[64]  To satisfy the element of moving force, the plaintiff must show a direct causal connection between the policy, custom or practice and the constitutional deprivation, and that the municipality adopted the policy with deliberate indifference to the known or obvious fact that such a constitutional deprivation would occur.  *Id.,* citing *Mason v. Lafayette City-Par. Consol. Gov't,* 806 F.3d 268, 280 (5th Cir. 2015).  Plaintiff has brought forth no evidence that any policymaker for the City adopted or knowingly enforced a custom of permitting officers to make traffic stops (or stops of any kind) of citizens without reasonable suspicion on the basis of race.  Similarly, Plaintiff has brought forth no evidence that Castro was aware of any such a practice, much less that Castro considered the supposed practice when he asked to speak to Baker.  The City is, therefore, entitled to summary judgment on Plaintiff's equal protection claim.

---

[64] Here, Plaintiff does not even attempt to demonstrate a causal connection between any so-called "custom or practice" and Officer Castro's actions.  She merely contends that some undefined "customs" of the Houston Police Department "were at work."  *See* Dkt #152, *passim.*

**B.      Plaintiff cannot establish that the City had a policy or custom of "accepting" unconstitutional police shootings.**

Plaintiff has outrageously mischaracterized the evidence and testimony in a vain effort to conjure up a fact issue as to excessive force shootings.  Nevertheless, the summary judgment evidence establishes that the City does not have a custom, policy or practice of permitting officers to shoot with impunity.  Thus, Plaintiffs' claims against the City of Houston fail.

As discussed in the City's Motion for Summary Judgment (Dkt #112), the City has a longstanding policy governing use of force.[65]  Knowing that she cannot establish a policy of unconstitutional shootings, Plaintiff has attempted to establish that Houston police officers have a custom and practice of committing unconstitutional shootings of civilians.  Plaintiff relies on two theories: (1) that Houston conducts perfunctory investigations designed to cover up illegal police shootings, and (2) that certain incidents of officer-involved shootings establish a custom and practice of unconstitutional shootings.  Plaintiff's claims fail under both these theories.

**1.  The Houston Police Department conducted a thorough investigation of the Baker shooting.**

The Houston Police Department investigates all weapons discharges.  Both the Internal Affairs Division and the Homicide Division conduct investigations of all officer-involved shootings of citizens.[66]  The Internal Affairs Division and the Homicide Division are responsible for conducting timely, thorough, and objective investigations.[67]  The results of the homicide investigation are referred to the District Attorney's office for review and presentation to a grand

---

[65]  Dirden Dep., Exh. 2, Dkt #112-2, at 144:9-11; G.O. 600-17, Use of Force, Exh. 7, Dkt #112-11, p. 1.
[66]  See G.O. 200-16, Exh. 11, Dkt 112-15, pp. 1-2; Becker Dep., Dkt 153-17, at 27:15-28:3; 30:3-10; Kuchta Dep., Dkt 153-60, at 24:2-16; McClelland Dep., Dkt 153-57, at 99:11-100:2; 105:4-12.
[67]  Becker Dep., Dkt # 153-17 at 21:14-20; 22:18-23:10; 24:2-25:11; 43:22-44:6; Kuchta Dep., Dkt #153-60 at 17:12-25; 19:7-13; 57:2-10; 57:14-19; McClelland Dep., Dkt #153-57, at 6:21-23; 69:24-70:3; 78:17-21; 79:7-14; 80:2-25.

jury.  The results of the Internal Affairs investigation are referred to the Chief of Police for a final determination whether any HPD policies have been violated and if so, the appropriate discipline.[68]

Here, both IAD and the Homicide Division conducted thorough investigations of the circumstances of the death of Jordan Baker.[69]  The investigation began with a walk-through of the scene, at which representatives of the Homicide Division, IAD, and the District Attorney's office were present, as were Castro and his union lawyer.[70]  McClelland testified that the walk-through is the first step in any investigation of an officer-involved shooting (rather than an "unauthorized" walk-through as Plaintiff now asserts).[71]  Furthermore, contrary to Plaintiff's bald, unsubstantiated allegation that Officer Castro was never interviewed, Castro was, in fact, interviewed by officers on the scene, and he also later provided a statement as part of the Internal Affairs Investigation.[72]  Castro also answered questions from the District Attorney's office and the HPD Homicide Division at the scene on the night of the shooting.[73]

Both the Internal Affairs and the Homicide investigations were reviewed by their respective chains of command, the IPOB, the Administrative Disciplinary Committee, and the Chief of Police.[74]  Additionally, the Homicide file was provided to the District Attorney's office in connection with the DA's investigation of the incident.  The Civil Rights Division of the DA's Office conducted its own independent investigation, and presented its findings and evidence to the

---

[68]  Becker Dep., Dkt #153-17 at 21:14-20; 22:18-23:10; 24:2-25:11; 28:11-29:12; 43:22-44:6; Brady Dep., Dkt 153-16 at 18:11-19:8; Kuchta Dep., Dkt #153-60 at 17:12-25; 19:7-13; 57:2-10; 57:14-19; McClelland Dep., Dkt #153-57, at 6:21-23; 67:11-69:14; 69:24-70:3; 78:17-21; 79:7-14; 80:2-25.

[69]  Dirden Report, Dkt 112-4, p. 8; Becker Dep., Dkt #153-17 at 4:6-15; 10:12-21; 19:20-21:20; 46:10-50:1; 66:22-68:16; 118:10-25; Brady Dep., Dkt # 153-16 at 23:3-25:5; 28:13-23; Kuchta Dep., Dkt 153-60 at 11:24-12:1; 23:10-17; 17:12-16; 19:7-13; 57:2-10; 57:14-19; 78:19-79:1; HPD Internal Affairs Issue Record #45359-2014, Dkt #107-4; HPD Homicide Division Case #006830214-O, Dkt 107-6.

[70]  Becker Dep., Dkt #153-17 at 4:6-15; 10:12-21; 18:18-19:9; 19:20-21:8; McClelland Dep., Dkt #153-57 at 145:24-152:15; Brady Dep., Dkt 153-16 at 23:3-25:5.

[71]  McClelland Dep., Dkt #153-57 at 145:24-152:15.

[72]  Castro Dep., Exh. 1, Dkt # 112-1, at 61:16-63:20; Becker Dep., Dkt 153-17 at 50:8-51:9; 46:10-50:1; 53:15-25; 53:5-14; Brady Dep., Dkt 153-16 at 23:3-25:5.

[73]  Castro Dep., Exh. 1, Dkt # 112-1, at 67:4-17.

[74]  Dirden Report, Exh. 2, Dkt 112-2, p. 8.

Grand Jury, which no-billed Officer Castro.[75]   Additionally, McClelland sent the case to the FBI for an independent review.[76]

Plaintiff argues that the HPD investigations were deficient in part because Castro was permitted to have his attorney present during questioning at the scene.  However, as Becker and McClelland testified, the homicide investigation is a criminal investigation to determine whether the officer's actions are lawful.[77]  Thus, Castro had a right to have a lawyer present.[78]  Plaintiff also urges that the investigations were deficient because Internal Affairs gave Officer Castro 48 hours' notice before requiring his written statement as to the events surrounding the shooting incident.  However, Chapter 143 of the Texas Local Government Code requires that an officer receive at least 48 hours' notice before any Internal Affairs interrogation.[79]

Plaintiff also argues, with no evidentiary support, that the IAD investigators tried to cover up an unconstitutional shooting by failing to include *in the investigative summary* a statement of a witness who *did not see or hear* the shooting. Dkt 152 at 7.  This argument is completely contrary to the evidence and testimony.  Lt. Becker, who prepared the summary, testified that he gave "a summary of the investigation and not a – a lengthy description of every single witness or piece of evidence or piece of information that we have."  He testified that he did *not* exclude the statement from the summary because it painted Officer Castro in a less favorable light.[80]  Furthermore, the statement is included in the IAD investigation report and in the file.[81]  If a cover up were intended, it would be a poor cover up indeed that would include the statement in the file at all.

---

[75]  Dirden Report, Exh. 2, Dkt #112-2, p. 8; Becker Dep., Dkt #153-17 at 118:10-25.
[76]  McClelland Dep., Dkt #153-57 at 216:15-217:6.
[77]  Becker Dep., Dkt 153-17 at 27:15-28:3; 30:3-10; McClelland Dep., Dkt 153-57 at 105:4-12.
[78]  *See also* General Order 200-03, Investigation of Employee Misconduct, Exh. 9, Dkt 112-13, p. 5.
[79]  Kuchta Dep., Dkt 153-60 at 96:24-97:6; *See* Texas Loc. Gov't Code § 143.1014(a).  *See also* G.O. 200-03, Investigation of Employee Misconduct, Exh. 9, Dkt 112-13, p. 5; IAD report at BAKER-COH 00351.
[80]  Becker Dep., Dkt #153-17 at 66:22-68:16.
[81]  *See* HPD Internal Affairs Issue Record #45359-2014, Dkt #107-4, at BAKER-COH 000336-33.

Next, Plaintiff argues that the Internal Affairs investigation was rigged because it ignored inconsistencies between the autopsy results concerning the bullet path, and Castro's statement. Here, Plaintiff relies on its expert, Brian Weaver, who has concocted a scenario in which Baker was running *away* from Castro, but somehow managed to contort his body so that his chest was facing Castro while he was running away.  Defendants have filed a *Daubert* motion to exclude Weaver's testimony as unreliable and irrelevant (*see* Dkt 115).  In reality, the autopsy results are entirely consistent with Castro's statement that Baker was advancing on him at the time Castro fired his weapon.  The autopsy report, contained in the IAD file (Dkt #107-4 at BAKER-COH 453-463), states that Baker had a "[g]unshot wound of the chest", and that the "direction of the wound path is front to back, left to right and slightly downward."[82]  This is consistent with Castro's testimony that Baker was advancing toward him, and IAD Lieutenant Gaithe so testified.[83]

Plaintiff also complains that HPD allows officers who shoot to go unquestioned and undisciplined. Dkt 152, p. 24.  Again, this conclusion is completely contrary to the evidence.  IAD and Homicide perform thorough investigations of all officer involved shootings, in addition to the investigation performed by the District Attorney's Office.  McClelland sent this case to the FBI for review, and he invited the FBI to review any and all officer-involved shootings.  Bratton testified that in every incident where an officer-involved shooting had been found to be unjustified, the officer was fired.[84]  Moreover, even where the shooting itself may be justified based on self-defense, there may be other policy violations that warrant discipline, as in the case of Officer

---

[82]  Dkt #107-4 at BAKER-COH 455
[83]  Castro Dep., Exh. 1, Dkt #112-1, at 226:3-17; Expert Report of Jonathyn Priest ("Priest Report"), Exh. 20, pp. 9, 13; Deposition of Jonathyn Priest taken December 27, 2017 ("Priest Dep."), Exh. 19, at 95:24-98:5; 144:7-18; Expert Report of Paul Adler ("Adler Report"), Exh. 22 at pp. 8-10; Deposition of Paul Adler taken January 31, 2018 ("Adler Dep."), Exh. 21, at 170:21-172:8; 220:21-222:14; 89:24-90:11; 123:20-124:4; Gaithe Dep., Dkt 153-58, at 36:10-37:19; 51:14-52:2; 52:14-53:18.
[84]  Bratton Dep., Exh. 3, Dkt 112-5, at 75:13-77:20; 182:25-185:10.

Coronado, who received a lengthy suspension because his blood alcohol level was over the legal limit at the time of the shooting.[85]

In summary, Plaintiff has failed to establish that the investigation of the Baker shooting was intended to cover up an unjustified shooting. Furthermore, Plaintiff has failed to establish a custom and practice of the Houston Police Department conducting cursory investigations in order to cover up unjustified shootings, or that Castro was aware of such an alleged practice and that it was a "moving force" behind Castro's discharging his weapon in this case.

### 2. Plaintiff has not established a custom, pattern or practice of Houston police officers using "reaching for the waistband" as an excuse to shoot unarmed citizens.

With no evidentiary support, Plaintiff argues that an officer need only say that the suspect was reaching for his waistband, and HPD will accept that explanation as a pretext for shooting an unarmed civilian. This argument is, again, contrary to the summary judgment evidence. Bratton testified that the mere movement of the hands to the waistband is *not* justification for the use of deadly force under acceptable police practices.[86] Bratton analyzed *each case* upon which Plaintiff relies for its argument, and found that in each case, the officer's actions were consistent with accepted police practices, and that the officer's conduct was warranted in self-defense or the defense of others.[87] Additionally, the cases were only similar in that each case involved the shooting of a suspect who later turned out to be unarmed. Each case had its own unique set of facts, and not all the cases involved a suspect reaching for his waistband.[88] Plaintiff has failed to

---

[85]  McClelland Dep., Dkt #153-57, at 32:3-8; 185:18-186:7; 192:10-24.
[86]  Bratton Report, Exh. 3-1, Dkt 112-6 at pp. 2, 13; Bratton Dep., Exh. 3, Dkt 112-5 at 113:15-114:21; 118:10-120:20; 148:6-12; 206:23-207:4; 279:23-281:19; 282:4-283:20.
[87]  *See generally* Bratton Report, Exh. 3-1, Dkt #112-6, at pp. 2-13.
[88]  For example, the Salazar-Limon suspect was stopped for excessive speed; there were multiple occupants of the vehicle; the officer detected a strong odor of alcohol; when the officer attempted to secure the suspect, the suspect resisted, attempted to push the officer into a moving lane of traffic, then attempted to push the officer over the freeway guardrail; the officer drew his weapon and gave verbal commands to stop and show his hands which the suspect did not follow, and then reached toward his waistband. *See* Bratton Report, Exh. 3-1, Dkt #112-6, at p. 3.

establish that HPD has a custom or practice of allowing officers to shoot unarmed civilians merely

for reaching toward their waistbands.  Similarly, Plaintiff has failed to show any causal connection

between the supposed custom and Officer Castro's actions.

**C.    Plaintiff cannot establish a failure to train, discipline or supervise that would support a claim under Section 1983.**

In resolving the issue of a city's liability for failure to train, "the focus must be on adequacy

of the training program in relation to the tasks the particular officers must perform. *City of Canton,*

*Ohio v. Harris,* 489 U.S. 378, 390-391, 109 S.Ct. 1197, 1205-1206 (1989).  Additionally, for

liability to attach, "the identified deficiency in a city's training program must be closely related to

the ultimate injury." *Id.,* 489 U.S. at 391, 109 S.Ct. at 1206.

---

The Ventura suspect was involved in a physical altercation in a parking lot. The officer, later found to be intoxicated and off duty, was attempting to break up the altercation.  Verbal attempts to intervene were ignored.  The officer identified himself as a Houston police officer, and was attacked by two suspects.  One suspect yelled that he had a gun like the police officer did.  The officer, believing what the suspect said, drew his weapon and fired.  Another suspect was attempting to advance toward the officer in a manner as though he was going to tackle the officer, and the officer fired again.  *See* Bratton Report, Exh. 3-1, Dkt 112-6, at p. 3.

The Pate suspect was stopped for speeding and driving recklessly; the suspect was verbally yelling and ignoring the officer's commands to stop and was walking away; the officer brought the suspect back to the patrol car and told Pate to place his hands on the car.  Pate pushed off the car as the officer was holstering his weapon.  The suspect then struck the officer and knocked him to the ground.  During the assault by Pate, the officer's badge was ripped off his uniform shirt; the officer, fearing serious bodily injury and possibly death if he were to have his weapon taken from him, fired at Pate.  Despite being shot, Pate continued to assault the officer, flipping him on the ground, at which time the officer fired a second time.  *See* Bratton Report, Exh. 3-1, Dkt # 112-6, at p. 5.

The Pean suspect had been leaving his hospital room naked and going to the nurse's station, acting erratically.  Pean's behavior was causing a disturbance, and the officers attempted to talk to Pean to calm him down.  Pean began to grab objects and throw them.  Pean began swinging objects and striking one of the officers, and was fighting and resisting both officers.  Pean was on top of one officer beating him with his fists.  Pean then turned to the other officer, who was trying to pull him off the first officer, and struck that officer in the face, knocking him to the ground.  One officer deployed his TASER in an attempt to stop Pean's assault on the officers.  Pean was not affected by the TASER darts striking him, and pulled the darts from his body.  The other officer, who was bleeding profusely, fearing both officers would be killed, discharged his weapon.  *See* Bratton Report, Exh. 3-1, Dkt # 112-6, at pp. 6-7.

In the Lara case, officers were dispatched to an assault in progress with a report that the victim had been threatened with a knife.  When the officers arrived, Lara began to walk away quickly.  Lara was found to be intoxicated. Lara ignored verbal commands in English and Spanish by the officer to stop and show his hands. Lara finally stopped and placed one hand on the wall, keeping the other hand concealed. The officer instructed Lara to drop what he had in the concealed hand.  Lara turned abruptly toward the officer, as he pulled his hand from his shirt with an object in that hand.  The officer, fearing for her immediate safety and believing there was a knife or possibly a gun involved, fired one shot, striking Lara.  Bratton Report, Exh. 3-1, Dkt #112-6, at p. 7.

It is undisputed that the Houston Police Department's training meets or exceeds the standards required by Texas Commission on Law Enforcement ("TCOLE"), the body charged with establishing training standards for Texas peace officers.[89]  Likewise, it is undisputed that Officer Castro was current in his training, and that he was a certified Texas peace officer at all times relevant to this lawsuit.[90]  Plaintiff has not identified any way in which the City's officer training was deficient, much less how any supposed deficiency was "closely related to the ultimate injury." Accordingly, Plaintiff has failed to establish that any "failure to train [the City's] employees in a relevant respect . . .amount[ed] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick v. Thompson,* 131 S.Ct. 1350, 1359 (2011)(citing *City of Canton v. Harris,* 489 U.S. 378, 388 (1989)).

In the context of a failure to train, discipline or supervise allegation, there usually requires a pattern of similar incidents in which citizens were deprived of their constitutional rights. *Estate of Davis,* 406 F.3d 375, 383 (5th Cir. 2005).  "Prior incidents cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Id.*  In this case, there is no pattern of similar incidents on which Plaintiff can rely to support a constitutional claim against the City.  Additionally, Plaintiff cannot put forth any evidence that the policymaker for HPD, the Chief of Police, chose to retain a training program where he was on actual or constructive notice that a particular omission in that program causes his officers to violate citizens' constitutional rights similar to that which Plaintiffs allege happened in this case.  Although Plaintiff attempts to point to a few cases in which suspects were shot, and then turned out to be unarmed, Plaintiff cannot show how those cases are similar to the present case to put the Chief of Police on

---

[89]  Dirden Report, Exh. 2-2, Dkt 112-4, p. 3; Dirden Dep., Exh. 2, Dkt 112-2, at 144:12-25; 145:1-6; Bratton Report, Exh. 3-1, Dkt 112-6, p. 2 .
[90]  Dirden Report, Exh. 2-2, Dkt 112-4, p. 6; Castro Dep., Exh. 1, Dkt 112-1, at 44:10-13; Castro Certification Records, Exh. 4, Dkt #112-8.

notice that his training program was deficient.  The Fifth Circuit has held that a small number of incidents in one of the nation's largest cities and police forces cannot support a pattern of illegality to support a failure to train claim. *See Pineda v. City of Houston,* 291 F.3d 325, 329 (5th Cir. 2002).

For a municipality to be liable for failure to supervise under Section 1983, a plaintiff must present evidence that it was obvious that "the highly predictable consequence" of not supervising its officers would lead to the violations of constitutional rights of citizens. *Peterson v. City of Fort Worth, TX,* 588 F.3d. 838, 850 (5th Cir. 2009).  Plaintiffs cannot point to any admissible summary judgment evidence that a highly predictable consequence of not supervising its officers, like Officer Castro, would lead to officers shooting citizens similar to that which occurred in this case. On the contrary, Michael Dirden testified as to the multi-level periodic review process required for each officer.[91]  Chief Dirden also testified about the internal controls and measures HPD takes to identify, investigate, and correct behaviors or circumstances that present challenges to optimal performance.[92]

Plaintiffs' argument that HPD does not discipline officers who use excessive force is likewise completely contrary to the evidence.  Bratton testified that in each case where an officer was not justified in the use of deadly force, that officer was fired. Additionally, Plaintiff's claim that HPD did not discipline an officer "where officers were drunk or had committed other violations of policy" is not supported by the evidence.  McClelland testified that in cases where the officers' actions were outside department policy, appropriate disciplinary action was taken.[93]

Plaintiff also misrepresented the testimony of Assistant Chief Lori Bender, claiming that Bender admitted HPD did not make any effort to train its officers to address racially selective

---

[91]  Dirden Dep., Exh. 2, at 79:20-81:22; 122:14-25; 124:11-125:6; 136:7-137:4; Dirden Report, Exh. 2-2, pp. 5-6.
[92]  Dirden Dep., Exh. 2, at 18:5-21:18; 42:1-9; 74:19-79:19; 84:22-85:21; 122:14-25; 123:5-125:6; 126:2-127:24; 136:7-137:4; 137:18-141:4; Dirden Report, Exh.2-2, pp. 5-6.
[93]  McClelland Dep., Dkt # 153-57 at 32:3-8; 100:3-23; 103:3-17; 103:25-105:3; 185:18-186:7; 211:5-6.

policing despite data establishing racial profiling. Dkt 152 at 46 (citing to Bender Deposition, Dkt 153-21) at p. 51.  Chief Bender said nothing of the kind.  In fact, Chief Bender testified that HPD officers are *not* trained that minor infractions can be used as a *pretext* for racial profiling, and that she was aware of no report indicating any instances of racial profiling.[94]

Finally, Plaintiff argues the City failed to supervise Castro for previous complaints. However, there is no pattern of similar violations arising from training or supervision that is so clearly inadequate as to be obviously likely to result in a constitutional violation.  Plaintiff relies on three incidents in which Officer Castro discharged his firearm at animals.  In each case, the firearms discharge was investigated and found to be justified.  A review of the Internal Affairs files for the other incidents on which Plaintiff relies likewise fails to demonstrate a pattern of similar incidents, and in each case, the allegation was not sustained or the officers were exonerated[95].  Accordingly, there is no indication of a failure to supervise that would give rise to municipal liability in this case.

## VII.    CONCLUSION

For the reasons discussed above, Defendant the City of Houston respectfully requests that this Court sustain its objections to Plaintiff's summary judgment evidence, grant its Motion for Summary Judgment, and enter final summary judgment dismissing all claims against it.

---

[94]  Deposition of Lori Bender, Dkt 153-21, at 48:2-54:5 ("Officers are never taught to stop a motor vehicle without there being a traffic violation, without reasonable suspicion or probable cause.") *See also* Dkt #153-48, pp. 21, 45, 62-63, 87, 103, 120, 135, 147, 160-61, 173, 188-189, 208, 211, 225, 238, and 253 of 266.
[95]  *See* Dkt #153-42, 153-43, 153-44, 153-45.

Respectfully submitted,

RONALD C. LEWIS
City Attorney

DONALD J. FLEMING
Section Chief, Labor, Employment, & Civil Rights

By:  /s/ Suzanne R. Chauvin
     JENNIFER F. CALLAN
     Senior Assistant City Attorney
     ATTORNEY IN CHARGE
     SBN: 00793715
     FBN: 22721
     Phone: (832) 393-6286 (direct)
     Jennifer.Callan@houstontx.gov

     SUZANNE R. CHAUVIN
     Senior Assistant City Attorney
     SBN: 04160600
     FBN: 14512
     Phone: (832) 393-6219 (direct)
     Suzanne.Chauvin@houstontx.gov

     City of Houston Legal Department
     P.O. BOX 368
     Houston, TX  77001-0368
     Main: (832) 393-6491
     Fax: (832) 393-6259

     **ATTORNEY FOR DEFENDANTS
     JUVENTINO CASTRO AND CITY
     OF HOUSTON**

**CERTIFICATE OF SERVICE**

I certify that on the 23rd day of May, 2018, the foregoing Defendant City of Houston's Reply in Support of its Motion for Summary Judgment was electronically filed with the Clerk of the court using the CM/ECF system, which will send notification to the attorney(s) of record listed below:

Jon Loevy                                              Billy Joe Mills
Mark Loevy-Reyes                              FIRMEQUITY
Arthur Loevy                                        444 N. Wabash Ave., 5th Floor
David B. Owens                                   Chicago, IL 60611
LOEVY & LOEVY                             **Attorney for Plaintiff**
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
**Attorneys for Plaintiff**

By:    /s/ Suzanne R. Chauvin
        SUZANNE R. CHAUVIN