United States District Court
Southern District of Texas
**ENTERED**
August 31, 2018
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ESTATE OF JORDAN BAKER, by     §
and through Administrator,     §
JANET BAKER,     §
    §
      Plaintiff,     §
    §
v.     §     CIVIL ACTION NO. H-15-3495
    §
JUVENTINO CASTRO, THE CITY     §
OF HOUSTON, RPI MANAGEMENT     §
COMPANY, LLC, and RPI     §
INTERESTS I, LTD.,     §
    §
      Defendants.     §

## <u>MEMORANDUM AND RECOMMENDATION</u>

Pending before the court[1] is Defendant Juventino Castro's ("Defendant Castro") Motion for Summary Judgment (Doc. 107) and Defendant City of Houston's ("Defendant City") Motion for Summary Judgment (Doc. 112). The court has considered the motions, the responses, all other relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendant Castro's motion be **GRANTED** in part and **DENIED** in part and that Defendant City's motion be **GRANTED** in part and **DENIED** in part.

## I. Case Background

Plaintiff Estate of Jordan Baker ("Plaintiff") filed this civil-rights action against multiple defendants, including

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. <u>See</u> Doc. 22, Ord. Dated Feb. 19, 2016.

Defendants Castro and City (jointly the "Defendants"), alleging violations of Decedent Jordan Baker's ("Decedent") constitutional rights as well as state law claims in connection with a police stop, attempted arrest, and lethal shooting that occurred after Decedent rode his bicycle through the parking lot of a strip mall.[2]

## A. <u>Factual Background</u>[3]

Defendant Castro is a Houston Police Department ("HPD") officer assigned to the Narcotics Division.[4]  Decedent is a black male who was twenty-six years old at the time of his death.[5]  Decedent is survived by his son, J.B., and his mother, Janet Baker, who is the administrator of Decedent's estate.[6]

### 1. Recent Armed Robberies in the Area

On January 13, 2015, Defendant Castro began working an HPD-approved extra job providing security at a strip mall located at 5700 West Little York, Houston, TX (the "Strip Mall").[7]  There were

---

[2]    See Doc. 44, Pl.'s 2nd Am. Compl.

[3]    The parties submitted voluminous exhibits in support of their dispositive motions, some of which are duplicative.  For the court's convenience, the court attempts to cite to only one location in the record for each cited document with the exception of when deposition excerpts do not overlap.  The court has made no attempt to cite the first filed or the movant's or nonmovant's evidence of each document.

[4]    See Doc. 147-5, Ex. 4 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro Homicide Statement p. 1.

[5]    See Doc. 147-11, Ex. 10 to Pl.'s Resp. to Def. Castro's. Mot. for Summ. J., Autopsy Report of Jordan Baker  p. 2.

[6]    See Doc. 147-2., Ex. 1 to Pl.'s Resp. to Def. Castro's. Mot. for Summ. J., Deposition Excerpts of Janet Baker.

[7]    Doc. 147-5, Ex. 4 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro Homicide Statement p. 1.

more than forty armed robberies in the immediate surrounding area within the prior six weeks.[8]  At least five of these robberies had occurred at the Strip Mall.[9]  A total of eight armed robberies occurred in the area surrounding the Strip Mall on January 14 and 15, 2015, alone.[10]  Most, if not all, of the armed robberies had been committed by a suspect described as a black male wearing a hoodie and armed with a handgun.[11]  The armed robberies generally occurred between 7:00 p.m. and 9:00 p.m.[12]

### 2. Decedent Approaches Defendant Castro

On January 16, 2015, Defendant Castro was working his extra job at the Strip Mall.[13]  There had already been an armed robbery

---

[8]     See Doc. 147-5, Ex. 4 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro Homicide Statement p. 1; Doc. 153-47, Ex. 47 to Pl.'s Resp. to Def. City's Mot. for Summ. J., HPD Bulletin of Aggravated Robberies dated Feb. 3, 2014.

[9]     See Doc. 147-5, Ex. 4 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro Homicide Statement p. 1; Doc. 153-47, Ex. 47 to Pl.'s Resp. to Def. City's Mot. for Summ. J., HPD Bulletin of Aggravated Robberies dated Feb. 3, 2014.

[10]     See Doc. 147-5, Ex. 4 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro Homicide Statement p. 1; Doc. 153-47, Ex. 47 to Pl.'s Resp. to Def. City's Mot. for Summ. J., HPD Bulletin of Aggravated Robberies dated Feb. 3, 2014.

[11]     See Doc. 147-5, Ex. 4 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro Homicide Statement p. 1; Doc. 153-46, Ex. 46 to Pl.'s Resp. to Def. City's Mot. for Summ. J., HPD Bulletin of Aggravated Robberies dated Jan. 3, 2014; Doc. 153-47, Ex. 47 to Pl.'s Resp. to Def. City's Mot. for Summ. J., HPD Bulletin of Aggravated Robberies dated Feb. 3, 2014.

[12]     See Doc. 147-5, Ex. 4 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro Homicide Statement p. 1; Doc. 153-46, Ex. 46 to Pl.'s Resp. to Def. City's Mot. for Summ. J., HPD Bulletin of Aggravated Robberies dated Jan. 3, 2014; Doc. 153-47, Ex. 47 to Pl.'s Resp. to Def. City's Mot. for Summ. J., HPD Bulletin of Aggravated Robberies dated Feb. 3, 2014.

[13]     See Doc. 147-5, Ex. 4 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro Homicide Statement p. 1.

in the area while Defendant Castro was working at the Strip Mall that day.[14]  At approximately 8:40 p.m., Decedent rode his bicycle into the parking lot of the Strip Mall.[15]  Decedent was wearing a hoodie, but it is unclear whether the hoodie was pulled over Decedent's head while he was riding his bike.[16]  Defendant Castro was in full police uniform and was sitting in his white Chrysler 300 in the parking lot of the Strip Mall.[17]

Decedent rode his bicycle in a straight line through the parking lot towards Defendant Castro's vehicle.[18]  As Decedent approached Defendant Castro he suddenly noticed Defendant Castro, in full police uniform, sitting inside his vehicle with the lights on and windows rolled down.[19]  Decedent appeared surprised to see Defendant Castro and immediately turned around and began pedaling

---

[14]     See id.; 153-47, Ex. 47 to Pl.'s Resp. to Def. City's Mot. for Summ. J., HPD Bulletin of Aggravated Robberies dated Feb. 3, 2014.

[15]     See Doc. 147-3, Elec. Ex. 2 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Video of the Incident 20:41:00 to 20:42:00; Doc. 147-5, Ex. 4 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro Homicide Statement pp. 1-2.

[16]     See id. p. 2; Doc. 147-3, Elec. Ex. 2 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Video of the Incident 20:41:22 to 20:41:25.

[17]     See Doc. 147-5, Ex. 4 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro Homicide Statement p. 1;  Doc. 112-1, Ex. 1 to Def. City's Mot. for Summ. J., Dep. of Def. Castro pp. 36, 49, 304.

[18]     See Doc. 147-3, Ex. 2 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Video of the Incident 20:41:00 to 20:42:00; Doc. 147-5, Ex. 4 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro Homicide Statement p. 2.

[19]     See id.

at a high rate of speed in the other direction.[20]  Defendant Castro initiated a stop of Decedent shortly after Decedent pedaled away.[21]

### 3.  **The Stop**

The facts occurring immediately before the stop are in dispute.  In Plaintiff's version of the facts, Defendant Castro decided to stop Plaintiff immediately after Decedent turned in the other direction.[22]  Defendant Castro then nearly pinned Decedent against a hedge on the perimeter of the parking lot with his car in order to stop him.[23]  This caused Decedent to be knocked off of his bike.[24]

In Defendants' version of the facts, Defendant Castro attempted to drive by Decedent and talk to him before initiating a stop.[25]  Then, after Decedent repeatedly ignored Defendant Castro, Defendant Castro decided to initiate the stop.[26]  Defendant Castro

---

[20]   See Doc. 112-1, Ex. 1 to Def. City's Mot. for Summ. J., Dep. of Def. Castro pp. 163-64; Doc. 147-5, Ex. 4 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro Homicide Statement p. 2.

[21]   See id.

[22]   See Doc. 147-3, Elec. Ex. 2 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Video of the Incident, 20:41:00-20:42:00.

[23]   See id.; Doc. 147-9, Ex. 8 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Pictures of the Scene, Bates Numbers 518, 522.

[24]   See Doc. 147-3, Ex. 2 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Video of the Incident 20:41:40-20:42:00; Doc. 147-7, Ex. 6 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro's Grand Jury Test. p. 107; Doc 147-9, Ex. 8 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Pictures of Scene Bates Numbers 518, 522.

[25]   See Doc. 112-9, Ex. 5 to Def. City's Mot. for Summ. J., Def. Castro Homicide Statement p. 2.

[26]   See id.

eventually asked Decedent to stop and speak with him.[27]  Decedent
then stopped his bicycle with his hands on the bicycle's
handlebars.[28]

### 4.   The Altercation and Shooting Following the Stop

The facts of what occurred after the stop are also contested.
Under Defendants' version of events, Decedent was very belligerent
towards Defendant Castro and repeatedly stated that he was not
going to jail.[29]  Decedent continually fidgeted with his pockets
which caused Defendant Castro to draw his weapon out of a concern
that Decedent possessed a weapon and was reaching for it.[30]
Defendant Castro then instructed Decedent to get on the ground and
Decedent initially complied.[31]  However, when Defendant Castro
attempted to handcuff Decedent, Decedent jumped to his feet and
rammed his shoulder or elbow into Defendant Castro's chest and
began to run back toward the Strip Mall.[32]  Defendant Castro was
able to get a hold of Decedent's hoodie, but Decedent squirmed out

---

[27]     See Doc. 112-1, Ex. 1 to Def. City's Mot. for Summ. J., Dep. of Def.
Castro pp. 166, 172-73, 175-77; Doc. 112-9, Ex. 5 to Def. City's Mot. for Summ.
J., Def. Castro Homicide Statement p. 2.

[28]     See Doc. 112-1, Ex. 1 to Def. City's Mot. for Summ. J., Dep. of Def.
Castro pp. 177-78.

[29]     See Doc. 112-9, Ex. 5 to Def. City's Mot. for Summ. J., Def. Castro
Homicide Statement p. 2.

[30]     See id. pp. 2-3.

[31]     See id. p. 3.

[32]     See id. p. 3.

6

of the hoodie and kept running.[33]   Decedent then stopped and was again given commands to get down.[34]   This time, Decedent did not comply and took off again towards the Strip Mall with Defendant Castro in pursuit.[35]   Decedent ran past the Strip Mall and towards a nearby bayou, then stopped and turned around to face Defendant Castro who had again drawn his weapon.[36]   Decedent then ran towards Defendant Castro in a crouch and began digging at his waistband.[37] Fearing for his life, Defendant Castro fired a shot at Decedent and hit him center mass.[38]   Decedent turned directions and began running alongside the back of the Strip Mall.[39]   Decedent did not make it far before falling face down.[40]   Defendant Castro then handcuffed Decedent and searched him for weapons before calling for an

---

[33]     See id.

[34]     See Doc 112-1, Ex. 1 to Def. City's Mot. for Summ. J., Def. Castro Dep. p. 209.

[35]     See id. p. 210.

[36]     See Doc. 112-9, Ex. 5 to Def. City's Mot. for Summ. J., Def. Castro Homicide Statement p. 4.

[37]     See Doc 112-1, Ex. 1 to Def. City's Mot. for Summ. J., Def. Castro Dep. pp. 226-29.

[38]     See id. pp. 127-28, 229; Doc 112-9, Ex. 5 to Def. City's Mot. for Summ. J., Def. Castro Homicide Statement p. 4.

[39]     See Doc 112-1, Ex. 1 to Def. City's Mot. for Summ. J., Def. Castro Dep. p. 230.

[40]     See id. pp. 55-58.

ambulance.[41]  Decedent died shortly thereafter.[42]

Under Plaintiff's version of events, Defendant Castro pulled his weapon on Decedent after there was a brief discussion following the stop.[43]  Decedent then tried to run away and Defendant Castro grabbed Decedent's hoodie, which Decedent was able to unzip and remove.[44]  Decedent walked away from Defendant Castro with his back turned to him.[45]  Decedent eventually turned to face Defendant Castro while continuing to back away slowly.[46]  Shortly thereafter, Decedent turned and ran behind the Strip Mall.[47]  Defendant Castro headed back towards his vehicle, stopped, and then chased after Decedent.[48]  Decedent tripped, allowing Defendant Castro to catch up to him.[49]  Decedent got up and started running away from

---

[41]    See id.

[42]    See Doc. 112-9, Ex. 5 to Def. City's Mot. for Summ. J., Def. Castro Homicide Statement p. 4.

[43]    See Doc. 147-8, Ex. 7 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro Dep. p. 195; Doc. 147-3, Elec. Ex. 2 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Video of the Incident 20:41:40-20:43:15.

[44]    See Doc. 147-8, Ex. 7 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro Dep. p. 195; Doc. 147-3, Elec. Ex. 2 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Video of the Incident 20:41:40-20:43:15; Doc 147-9, Ex. 8 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Pictures of Scene Bates Numbers 518, 522, 525.

[45]    See Doc. 147-3, Elec. Ex. 2 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Video of the Incident 20:41:40-20:43:15.

[46]    See id.

[47]    See id.

[48]    See id.

[49]    See Doc. 147-11, Ex. 10 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Autopsy Report of Decedent; Doc. 147-12, Ex. 11 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Arden Expert Report pp. 4-5; Doc 147-13, Ex. 12 to

Defendant Castro again, but Defendant Castro shot Decedent.[50] Decedent kept moving away from Defendant Castro before collapsing.[51] Defendant Castro then handcuffed Decedent and did not administer any medical aid to Decedent.[52]  Defendant Castro also did not check Decedent's pulse as he had been trained to do.[53]  Decedent remained conscious after being shot for up to two minutes.[54] Plaintiff contends that the only aggressive action Decedent took during the entire incident was to yell loudly at Defendant Castro.[55]  Due to the numerous injuries found on Decedent that are inconsistent with having been inflicted by the gunshot alone, Plaintiff also contends that Defendant Castro used excessive non-lethal force against Decedent during the events leading up to the shooting.[56]

It is undisputed that Decedent was unarmed and was not in

---

Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Milton Dep. pp. 40-50, 58-59.

[50]    See Doc. 147-12, Ex. 11 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Arden Expert Report pp. 3-6.

[51]    See id. p. 5.

[52]    See Doc. 147-8, Ex. 7 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro Dep. Excerpts pp. 83-84, 230-231.

[53]    See id. pp. 83-84.

[54]    See Doc. 147-12, Ex. 11 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Arden Expert Report p. 5.

[55]    See Doc. 147-3, Elec. Ex. 2 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Video of the Incident, 20:41:40-20:43:15; Doc. 147-10, Ex. 9 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Statement of Magnolia Martinez.

[56]    See Doc. 147-11, Ex. 10 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Autopsy Report of Decedent; Doc. 147-12, Ex. 11 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Arden Expert Report pp. 4-5; Doc 147-13, Ex. 12 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Milton Dep. pp. 40-50, 58-59; Doc. 147-3, Elec. Ex. 2 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Video of the Incident, 20:41:00-20:43:15.

possession of any contraband at the time of the incident.[57]

### 5.    The Investigation Following the Shooting

Following the shooting, the first person with whom Defendant Castro spoke was his attorney.[58]  After Defendant Castro met with his attorney, the Harris County District Attorney's Office formed a circle of approximately fifteen to twenty people referred to as the "shoot team".[59]  Defendant Castro and his attorney then joined the "shoot team" circle, which included important members of the HPD and the HPD's homicide and crime scene units.[60]  Upon joining the "shoot team" circle, Defendant Castro did a "walk-through" of the crime scene.[61]  The "walk-through" consisted of Defendant Castro's walking through the scene and explaining where certain things had happened.[62]  Later that same night, Defendant Castro went to the HPD office and, with his attorney present, typed and signed

---

[57]    See Doc. 112-1, Ex. 1 to Def. City's Mot. for Summ. J., Def. Castro Dep. p. 57.

[58]    See Doc. 153-7, Ex. 7 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Def. Castro Dep. pp. 85-86.

[59]    See id. pp. 97-99.

[60]    See id.

[61]    See id.; Doc. 153-17, Ex. 17 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Becker Dep. pp. 45-52.

[62]    See id.

a sworn statement of his encounter with Decedent.[63]

Following the incident, the Internal Affairs Division ("IAD") conducted an investigation of the shooting.[64]   As part of the investigation, Defendant Castro was given forty-eight hours to answer a set of written questions.[65]   Defendant Castro was never required to undergo a live interview regarding the incident.[66]   The IAD determined that Defendant Castro's shooting of Decedent was "intentional" and "justified."[67]

### 6.    Defendant City's Excessive Force Investigation Procedures

According to Matthew May, a police officer in the IAD, when the IAD investigates a shooting, the shootings are deemed either accidental or intentional, and either justified or not justified.[68] Other types of use of force incidents have additional more nuanced

---

[63]    See Doc. 153-16, Ex. 16 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Brady Dep. pp. 104-106, 109; Doc. 153-4, Ex. 4 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Def. Castro Homicide Statement.

[64]    See Doc. 153-60, Ex. 60 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Kuchta Dep. p. 19; Doc. 153-5, Ex. 5 to Pl.'s Resp. to Def. City's Mot. for Summ. J., IAD Investigation Summ.

[65]    See Doc. 153-59, Ex. 59 to Pl.'s Resp. to Def. City's Mot. for Summ. J., May Dep. pp. 20-22.; Doc. 153-60, Ex. 60 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Kuchta Dep. pp. 73-75.

[66]    See Doc. 153-59, Ex. 59 to Pl.'s Resp. to Def. City's Mot. for Summ. J., May Dep. pp. 20-22.; Doc. 153-60, Ex. 60 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Kuchta Dep. pp. 73-75.

[67]    See Doc. 153-5, Ex. 5 to Pl.'s Resp. to Def. City's Mot. for Summ. J., IAD Investigation Summ. p. 5.

[68]    See Doc. 153-59, Ex. 59 to Pl.'s Resp. to Def. City's Mot. for Summ. J., May Dep. pp. 37-40; Doc. 153-15, Ex. 15 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Seguino Expert Report p. 17.

classifications.[69]   A justified shooting means that the IAD has determined that the shooting met the criteria of the HPD policies and procedures.[70]  The IAD does not look at the history, if any, of complaints against an officer being investigated when determining whether a shooting was justified or not.[71]  The IAD investigation moves up the chain of command to the chief of police, who alone makes a final determination on whether or not discipline will be issued.[72]

Following a shooting by an HPD officer, like in the present case, the officer is allowed to do a "walk-through" of the scene to explain what happened.[73]  The officer is accompanied by his or her attorney during the "walk-through" and the "walk-through" is not recorded.[74]  The "walk-through" is a matter of unwritten custom as there are no written protocols or procedures regarding the "walk-through".[75]

---

[69]    See Doc. 153-59, Ex. 59 to Pl.'s Resp. to Def. City's Mot. for Summ. J., May Dep. pp. 37-38.

[70]    See id. p. 38.

[71]    See id. pp. 63-64, 83.

[72]    See id. pp. 27-31.

[73]    See Doc. 153-17, Ex. 17 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Becker Dep. pp. 18-21; Doc. 153-36, Ex. 36 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Dominguez Dep. pp. 37-41, 63-64.

[74]    See Doc. 153-17, Ex. 17 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Becker Dep. pp. 18-21; Doc. 153-36, Ex. 36 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Dominguez Dep. pp. 37-41, 63-64; Doc. 153-16, Ex. 16 to Def. City's Mot. for Summ. J., Brady Dep. p 165.

[75]    See Doc. 153-59, Ex. 59 to Pl.'s Resp. to Def. City's Mot. for Summ. J., May Dep. pp. 9-10.

It is HPD policy that the officer being investigated is not questioned until he has spoken with his attorney.[76]  The officer is never given a live interview.[77]  Rather, HPD practice from 2009-2014 was to give the officer forty-eight hours to answer written questions.[78]  The officer would generally answer the written questions in consultation with an attorney.[79]  In contrast, the HPD conducted live recorded interviews of a shooter when the shooter was a civilian.[80]

### 7.  Past Police Shooting Investigations

Plaintiff's expert, Stephanie Seguino ("Seguino"), conducted an analysis of past police shootings and the associated investigations.[81]  Seguino's report states that there were 194 intentional police shootings of civilians from 2009-2014.[82]  Of

---

[76]    See Doc. 153-17, Ex. 17 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Becker Dep. p. 34.

[77]    See Doc. 153-59, Ex. 59 to Pl.'s Resp. to Def. City's Mot. for Summ. J., May Dep. pp. 20-22.; Doc. 153-60, Ex. 60 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Kuchta Dep. pp. 73-75.

[78]    See Doc. 153-59, Ex. 59 to Pl.'s Resp. to Def. City's Mot. for Summ. J., May Dep. pp. 20-22.; Doc. 153-60, Ex. 60 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Kuchta Dep. pp. 73-75.

[79]    See Doc. 153-59, Ex. 59 to Pl.'s Resp. to Def. City's Mot. for Summ. J., May Dep. pp. 20-22.; Doc. 153-60, Ex. 60 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Kuchta Dep. pp. 73-75.

[80]    See Doc. 153-16, Ex. 16 to Def. City's Mot. for Summ. J., Brady Dep. pp. 16-17, 229.

[81]    See Doc. 153-15, Ex. 15 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Seguino Expert Report.  Defendants have objected to Seguino's report and expert testimony.  For the reasons discussed below, Defendants' objections are overruled.

[82]    See Doc. 153-15, Ex. 15 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Seguino Expert Report p. 17.

these shootings, eighty-one were of unarmed civilians.[83]  Notably, the IAD determined that all 194 intentional police shootings of civilians, including the eighty-one shootings of unarmed civilians, were justified.[84]

## B.  Procedural Background

Plaintiff filed its Original Complaint against Defendant Castro, Defendant City, RPI Interests, and RPI Management Company on December 02, 2015, alleging various violations of 42 U.S.C. § 1983 and multiple state law claims.[85]  On January 12, 2016, Plaintiff filed its First Amended Complaint.[86]  On April 26, 2016, the court granted Plaintiff leave to file a second amended complaint.[87]  On the same day, Plaintiff filed its Second Amended Complaint.[88]

On November 21, 2017, RPI Interests and RPI Management Company filed their motion for summary judgment.[89]  On January 25, 2018, Defendants RPI Interests and RPI Management Company were dismissed

---

[83]     See id. p. 22.

[84]     See id.; Doc. 153-59, Ex. 59 to Pl.'s Resp. to Def. City's Mot. for Summ. J., May Dep. p. 37.

[85]     See Doc. 1, Pl.'s Orig. Compl.

[86]     See Doc. 16, Pl.'s 1st Am. Compl.

[87]     See Doc. 43, Ord. Dated Apr. 26, 2016.

[88]     See Doc. 44, Pl.'s 2nd Am. Compl.

[89]     See Doc. 89, Defs.' RPI Interests and RPI Management Company's Mot. for Summ. J.

from this lawsuit following Plaintiff's agreed motion to dismiss.[90]
On February 27, 2018, Defendant Castro filed his pending motion for
summary judgment.[91]  On March 1, 2018, Defendant City filed its
pending motion for summary judgment.[92]  Plaintiff filed its response
to Defendant Castro's motion for summary judgment on May 5, 2018,
and its response to Defendant City's motion for summary judgment on
May 10, 2018.[93]  Defendant Castro filed a reply to Plaintiff's
response to Defendant Castro's motion for summary judgment on May
17, 2018.[94]  Defendant City filed a reply to Plaintiff's response
to Defendant City's motion for summary judgment on May 23, 2018.[95]
Plaintiff filed a sur-reply to Defendants' replies on July 5,
2018.[96]

## II.  Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that
no genuine dispute exists on any material fact and the moving party
is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);
Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Stauffer v.

---

[90]    See Doc. 103, Ord. Dated Jan. 25, 2018.

[91]    See Doc. 107, Def. Castro's Mot. for Summ. J.

[92]    See Doc. 112, Def. City's Mot. for Summ. J.

[93]    See Doc. 147, Pl.'s Resp. to Def. Castro's Mot. for Summ J.

[94]    See Doc. 159, Def. Castro's Reply to Pl.'s Resp. to Def. Castro's
Mot. for Summ. J.

[95]    See Doc. 167, Def. City's Reply to Pl.'s Resp. to Defendant City's
Mot. for Summ. J.

[96]    See Doc. 175, Pl.'s Sur-Reply to Defs.' Replies.

Gearhart, 741 F.3d 574, 581 (5th Cir. 2014).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  See Royal v. CCC & R Tres Arboles, L.L.C., 736 F.3d 396, 400 (5th Cir. 2013)(quoting Anderson, 477 U.S. at 248).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).  The movant may meet this burden by demonstrating an absence of evidence in support of one or more elements of the case for which the nonmovant bears the burden of proof.  See Celotex Corp., 477 U.S. at 322; Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1074 (5th Cir. 1997).  If the moving party carries its burden, the nonmovant may not rest on the allegations or denials in his pleading but must respond with evidence showing a genuine factual dispute.  Stauffer, 741 F.3d at 581 (citing Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)).

### III. Analysis

16

The claims currently filed against Defendant Castro consist of Plaintiff's claims brought through Section 1983 for: (1) excessive force; (2) unlawful seizure and detention; (3) equal protection; (4) failure to provide medical care; (5) wrongful death; (6) survival action; (7) race discrimination in violation of Section 1981; and (8) conspiracy to discriminate on basis of race in violation of Section 1985.[97]  Defendant Castro has filed for summary judgment on the basis of qualified immunity on all claims against him.[98]  Defendant Castro also argues that Plaintiff may not recover damages for loss of familial society, companionship, and association asserted on behalf of J.B. and Janet Baker.[99]

The claims currently filed against Defendant City consist of: (1) a Section 1983 municipal liability claim; and (2) a municipality indemnification claim.[100]  Defendant City argues that Plaintiff cannot meet its summary judgment burden on its municipal liability claim and that Plaintiff's indemnification claim is

---

[97]     See Doc. 44, Pl.'s 2nd Am. Compl. pp. 16-21.  Plaintiff has agreed to the dismissal of its Section 1985 conspiracy claim.  See Doc. 147, Pl.'s Resp. to Def. Castro's Mot. for Summ. J. p. 1.

[98]     See Doc. 107, Def. Castro's Mot. for Summ. J. pp. 3-4.

[99]     See id. pp. 21-22.

[100]     See Doc. 44, Pl.'s 2nd Am. Compl. pp. 21-23.  Language in Plaintiff's response to Defendant City's motion for summary judgment indicates that Plaintiff believes it has asserted wrongful death and survival statute claims against Defendant City.  See Doc. 44, Pl.'s 2nd Am. Compl. p. 2 n.1.  However, Plaintiff's second amended complaint specifically pleads its wrongful death and survival claims against only Defendant Castro.  See Doc. 44 Pl.'s 2nd Am. Compl. pp. 21-23.  Accordingly, the court finds that no wrongful death or survival statute claims exist against Defendant City.

procedurally improper.[101]

Additionally, Defendants have made numerous objections to Plaintiff's responses and the summary judgment evidence presented by Plaintiff in its responses.[102]  These objections will be briefly considered before turning to Defendants' motions for summary judgment.

**A. Rulings on Defendants' Objections**

Defendant Castro objects to the length of Plaintiff's response.[103]  On May 22, 2018, the court granted Plaintiff leave to file excess pages nunc pro tunc in response to Defendants' motions for summary judgment.[104]  Accordingly, Defendant Castro's objection is overruled.

Defendant Castro objects to Plaintiff's "Nature and Stage of Proceedings" section in Plaintiff's response on the grounds that it raises a new cause of action for the use of non-fatal force.[105]  Contrary to Defendant Castro's contention, Plaintiff's complaint includes allegations of excessive lethal and non-lethal force.[106]

---

[101]   See Doc. 112, Def. City's Mot. for Summ. J. pp. 2-3.

[102]   See Doc. 159, Def. Castro's Reply to Pl.'s Resp. to Def. Castro's Mot. for Summ. J. pp. 2-11; Doc. 167, Def. City's Reply to Pl.'s Resp. to Def. City's Mot. for Summ. J. pp. 1-3.

[103]   See Doc. 159, Def. Castro's Reply to Pl.'s Resp. to Def. Castro's Mot. for Summ. J. p. 2.

[104]   See Doc. 164, Ord. Dated May 22, 2018.

[105]   See Doc. 159, Def. Castro's Reply to Pl.'s Resp. to Def. Castro's Mot. for Summ. J. pp. 2-3.

[106]   See Doc. 44, Pl.'s 2nd Am. Compl. p. 7.

Accordingly, Defendant Castro's objection is overruled and the court will consider both lethal and non-lethal force in assessing Plaintiff's excessive force claim.

Defendant Castro objects to the section in Plaintiff's response titled "Relevant Undisputed Facts" on the grounds that the facts "mischaracterize the evidence" and "are speculative with regards to decedent's state of mind."[107]  Defendant Castro asks that this section be stricken from Plaintiff's response.  The court does not consider pleadings as evidence when ruling on a motion for summary judgment.  See Fontenot v. Upjohn Co., 780 F.2d 1190, 1196 (5th Cir. 1986).  Rather, the court considers the proper summary judgement evidence presented in determining whether factual disputes are present.  Accordingly, Defendant Castro's objection is unnecessary and overruled.

Defendant Castro next objects to the deposition excerpt exhibits of Defendant Castro, Dr. Roger Milton, Michael Dirden, Jonathyn Priest, and Officer Menefee, on the grounds that they "are misleading and fail to provide the Court with the entire testimony proffered" by the witness.[108]  Defendant Castro requests that the court consider the entirety of the deposition testimony of each witness.  The court declines Defendant Castro's suggestion that it must sift through the entirety of all depositions for facts that

---

[107]   Doc. 159, Def. Castro's Reply to Pl.'s Resp. to Def. Castro's Mot. for Summ. J. p. 3.

[108]   Id. pp. 3-9.

support Defendant Castro's motion for summary judgment.  Defendant

Castro's objection is overruled.

Defendants object to the Declaration and Exhibits of Dr.

Jonathan Arden, which are attached as Plaintiff's Exhibit 11 to

both responses.[109]  Defendants argue that Dr. Arden's testimony and

exhibits are not proper expert evidence.[110]  Defendants have filed

a Daubert[111] motion further detailing their arguments.[112]  In an

order to be issued concurrently with this memorandum, the court

denies Defendants' Daubert motion directed to Dr. Arden's

testimony.  Accordingly, for the reasons set out in the

aforementioned order, the objection is overruled.

Defendants object to the Declaration and Exhibits of Dr.

Stephanie Seguino, which is attached as Plaintiff's Exhibit 15 to

both responses.[113]  Defendants argue that Dr. Seguino's testimony

and exhibits are not proper expert evidence.  Defendants have filed

a Daubert motion further detailing their arguments.[114]  In their

---

[109]    See id. p. 4; Doc. 167, Def. City's Reply to Pl.'s Resp. to Def. City's Mot. for Summ. J. p. 2.

[110]    See Doc. 159, Def. Castro's Reply to Pl.'s Resp. to Def. Castro's Mot. for Summ. J. p. 4; Doc. 167, Def. City's Reply to Pl.'s Resp. to Def. City's Mot. for Summ. J. p. 2.

[111]    Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

[112]    See Doc. 108, Defs.' Mot. to Exclude Test. of Dr. Arden.

[113]    See Doc. 159, Def. Castro's Reply to Pl.'s Resp. to Def. Castro's Mot. for Summ. J. p. 4; Doc. 167, Def. City's Reply to Pl.'s Resp. to Def. City's Mot. for Summ. J. p. 2.

[114]    See Doc. 116, Defs.' Mot. to Exclude Test. of Stephanie Seguino.

20

Daubert motion, Defendants object to the portions of Dr. Seguino's testimony and report that pertain to racial bias and to the justifications used by the HPD in "use of force" investigations. In ruling on these motions for summary judgment, the court finds it unnecessary to consider any of the challenged testimony of Dr. Seguino. At this time, the court only considers Dr. Seguino's report and testimony as it pertains to: (1) the number of intentional police shootings; (2) whether the suspects were armed or unarmed in the police shootings; and (3) the findings of IAD investigations of the police shootings. Accordingly, the court declines to rule on this objection at this time.

Defendants object to the the Statement of Magnolia Martinez, which is attached as Exhibit 9 to both of Plaintiff's responses.[115] Defendants argue that Martinez should not be allowed to opine on whether Defendant Castro could have used a taser. The court finds it unnecessary in ruling on these motions for summary judgment to consider whether or not a taser could have been used by Defendant Castro. Accordingly, the court declines to rule on this objection at this time.

Finally, Defendants object to the following that are attached as exhibits to both of Plaintiff's responses: (1) Brian Weaver's Declaration, Exhibits and Deposition; (2) the Lee, Toporek, and

---

[115]   See Doc. 159, Def. Castro's Reply to Pl.'s Resp. to Def. Castro's Mot. for Summ. J. pp. 3-4; Doc. 167, Def. City's Reply to Pl.'s Resp. to Def. City's Mot. for Summ. J. p. 2.

Fridell articles; and (3) Andrew Scott's Declaration and exhibits.[116] In ruling on the motions for summary judgment, the court finds it unnecessary to consider the articles or proffered expert testimony. Accordingly, the court declines to rule on these objections at this time.

## B. Plaintiff's Section 1983 Claims Against Defendant Castro

A plaintiff can establish a prima-facie case under 42 U.S.C. § 1983 ("Section 1983")[117] for the deprivation of civil rights by establishing: (1) a violation of a federal constitutional or statutory right; and (2) that the violation was committed by an individual acting under the color of state law. <u>Doe v. Rains Cty. Indep. Sch. Dist.</u>, 66 F.3d 1402, 1406 (5th Cir. 1995). Section 1983 creates no substantive rights, but does provide remedies for deprivations of rights created under federal law. <u>Graham v. Connor</u>, 490 U.S. 386, 393-94 (1989).

Government officials are entitled to qualified immunity from liability for civil damages "unless [(1)] the official violated a

---

[116]   <u>See</u> Doc. 159, Def. Castro's Reply to Pl.'s Resp. to Def. Castro's Mot. for Summ. J. pp. 3-11; Doc. 167, Def. City's Reply to Pl.'s Resp. to Def. City's Mot. for Summ. J. pp. 2-3.

[117]   The provision reads, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

statutory or constitutional right [(2)] that was clearly established at the time of the challenged conduct." Reichle v. Howards, 566 U.S. 658, 664 (2012)(citing Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)).  Courts have discretion to determine in which order the two prongs are considered.  al-Kidd, 563 U.S. at 735.  Qualified immunity protects an officer regardless of whether the error was "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  Pearson v. Callahan, 555 U.S. 223, 231 (2009)(internal quotations omitted)(quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004)).  By pleading qualified immunity in good faith, a summary judgment movant shifts the burden to the nonmovant to rebut the movant's assertion.  Brumfield v. Hollins, 551 F.3d 322, 326 (5th Cir. 2008).

Plaintiff alleges violations of the following constitutional rights: (1) Fourth/Fourteenth Amendment protection against excessive force; (2) Fourth/Fourteenth Amendment protection against unlawful seizure and detention; (3) Fourteenth Amendment right to equal protection; (4) a detainee's Fourteenth Amendment right to medical care; and (5) Section 1981 protection against race discrimination.  In addition to the above claims, Plaintiff brings through Section 1983, claims for violations of the Texas wrongful death and survival statutes against Defendant Castro.

As a preliminary matter, Defendant Castro does not argue that any of the allegedly violated constitutional protections were not

clearly established at the time of the incident, nor would he be on solid ground to do so.  See, e.g., Graham v. Connor, 490 U.S. 386, 392-99 (1989)(excessive force); Terry v. Ohio, 392 U.S. 1, 9 (1968)(unreasonable search and seizure); Washington v. Davis, 426 U.S. 229, 239 (1976) (equal protection); Hare v. City of Corinth, Miss., 74 F.3d 633, 647-48 (5th Cir. 1996)(failure to provide medical care); Meinecke v. H & R Block of Houston, 66 F.3d 77, 83 (5th Cir. 1995)(Section 1981 race discrimination).  Additionally, Defendant Castro does not argue that he was not acting under color of state law at the time of the challenged conduct.  Thus, the only appropriate question for the court regarding each claim is whether Plaintiff has produced sufficient evidence to create a fact issue as to whether Defendant Castro violated one of Decedent's federal constitutional or statutory rights.  See Doe, 66 F.3d at 1406; Reichle, 566 U.S. at 664.

## 1. Excessive Force

In order to establish a Section 1983 excessive force claim, a plaintiff must show: (1) an injury; (2) that resulted directly and only from the use of force that was excessive; and (3) that the force used was unreasonable.  Carnaby v. City of Houston, 636 F.3d 183, 187 (5th Cir. 2011)(citing Freeman v. Gore, 483 F.3d 404, 416 (5th Cir. 2007)).

The particular circumstances factor into whether the officer acted reasonably in terms of the amount of force deployed.  See

Tarver v. City of Edna, 410 F.3d 745, 751-53 (5th Cir. 2005).  "The objective reasonableness of the force . . . depends on the facts and circumstances of the particular case, such that the need for force determines how much force is constitutionally permissible." Collier v. Montgomery, 569 F.3d 214, 218-19 (5th Cir. 2009)(internal quotations omitted)(quoting Bush v. Strain, 513 F.3d 492, 501 (5th Cir. 2008)).  An officer may use deadly force if he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."  Tenn. v. Garner, 471 U.S. 1, 11 (1985).

Reasonableness considerations regarding the need for and the amount of force necessary include: 1) whether the suspect was armed; 2) whether the suspect posed an immediate threat to the safety of the officers or the public; 3) whether the suspect resisted arrest; 4) whether a warrant was employed and the severity of the crime for which the suspect was to be arrested; 5) whether more than one suspect or police officer was involved; and 6) whether other dangerous or exigent circumstances existed at the time of arrest.  See Graham, 490 U.S. at 396; Garner, 471 U.S. at 11; Brown v. Glossip, 878 F.2d 871, 874 (5th Cir. 1989). Reasonableness is judged from the perspective of a reasonable officer on the scene, not in hindsight.  Ramirez v. Knoulton, 542 F.3d 124, 128 (5th Cir. 2008).  In judging an officer's actions, the court must recognize the difficulty of making split-second judgment

calls under high pressure conditions and accord the officer appropriate latitude. Graham, 490 U.S. at 396-97.

Plaintiff received numerous injuries and died from the force used by Defendant Castro that is allegedly excessive. Thus, the pertinent question is whether the force used was unreasonable. Defendant Castro contends that the force used against Decedent was reasonable under the circumstances.[118] However, at the summary judgment stage the question is whether there is a genuine dispute of any material fact. See Celotex Corp., 477 U.S. at 322. Plaintiff has presented evidence that Defendant Castro shot Decedent, who was unarmed, as Decedent was trying to run away from Defendant Castro, which is presumptively non-threatening to the safety of Defendant Castro.[119] The use of deadly force in this scenario would be unreasonable. Garner, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). Thus, a genuine dispute of a material fact exists that precludes granting summary judgment on Plaintiff's excessive deadly force claim.

Regarding Plaintiff's claim of excessive non-lethal force, it is unclear whether Defendant Castro has moved for summary judgment on the claim. Regardless, Plaintiff has presented evidence of

---

[118]   See Doc. 107, Def. Castro's Mot. for Summ. J. pp. 14-16.

[119]   See Doc. 147-12, Ex. 11 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Arden Expert Report pp. 3-6.

26

numerous non-lethal injuries sustained by Decedent that occurred before the shooting.[120]   Plaintiff has also presented evidence that force may have been used against Decedent as a part of the investigatory stop and that force may have been used without probable cause.[121]   Additionally, Plaintiff was by himself and unarmed, and Defendant Castro was not arresting Decedent pursuant to a warrant.[122]   In light of the above factors and the evidence, the court cannot hold that Defendant Castro's actions were objectively reasonable for the purposes of summary judgment. Therefore, summary judgment is also inappropriate on Plaintiff's excessive force claim for non-lethal force.

## 2. Unlawful Seizure and Detention

"[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry, 392 U.S. at 16.   Although probable cause is required to support a warrantless arrest, police officers may detain an

---

[120]   See Doc. 147-11, Ex. 10 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Autopsy Report of Decedent; Doc. 147-12, Ex. 11 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Arden Expert Report pp. 4-5; Doc 147-13, Ex. 12 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Milton Dep. pp. 40-50, 58-59; Doc. 147-3, Elec. Ex. 2 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Video of the Incident, 20:41:00-20:43:15.

[121]   See Doc. 147-3, Ex. 2 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Video of the Incident 20:41:40-20:42:00; Doc. 147-7, Ex. 6 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro's Grand Jury Test. p. 107; Doc 147-9, Ex. 8 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Pictures of Scene Bates Numbers 518, 522.

[122]   See Doc. 147-3, Ex. 2 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Video of the Incident 20:41:00-20:43:15; Doc. 112-1, Ex. 1 to Def. City's Mot. for Summ. J., Def. Castro Dep. pp. 57, 186-87.

individual for investigative purposes based on the less demanding standard of a reasonable suspicion of criminal activity. Goodson v. City of Corpus Christi, 202 F.3d 730, 736 (5th Cir. 2000). Reasonable suspicion is a less stringent standard than probable cause and exists "when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." U.S. v. Estrada, 459 F.3d 627, 631 (5th Cir. 2006). In other words, investigative stops are constitutional when based on "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Navarette v. California, 572 U.S. 393, 396-97 (2014) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).

As mentioned above, a warrantless arrest must be supported by "probable cause to believe that a criminal offense has been or is being committed." Devenpeck v. Alford, 543 U.S. 146, 152 (2004). The standard for the existence of probable cause is an objective one requiring that the officer draw a reasonable conclusion from the facts available to him at the time of the arrest. Id.; see also Blackwell v. Barton, 34 F.3d 298, 303 (5th Cir. 1994)(stating that probable cause exists if a reasonable person, based on the facts available at the time, would believe that an offense has been committed and that the individual being arrested is the guilty party).

28

When the facts are resolved in Plaintiff's favor, Defendant Castro based his decision to stop Decedent on the facts that Decedent: (1) matched the description of almost all aggravated robbery suspects; (2) was wearing a hoodie like most of the aggravated robbery suspects; (3) was at a location that had been robbed numerous times in an area where an alarming number of robberies had occurred recently; (4) arrived in the parking lot of the Strip Mall during the time frame that almost all robberies in the area had occurred; (5) appeared surprised to see Defendant Castro; and (6) upon seeing Defendant Castro, immediately turned around and pedaled his bike at a high rate of speed in the other direction.[123]  These "specific and articulable facts" coupled with the rational inferences from them would lead a reasonable person in Defendant Castro's position to form a reasonable suspicion of criminal activity by Decedent.  See Navarette, 572 U.S. at 369-97; Illinois v. Wardlow, 528 U.S. 119, 125, (2000) (holding that an officer had reasonable suspicion where suspect was present in an area of heavy crime and fled at the sight of police); United States v. Michelletti, 13 F.3d 838, 841 (5th Cir. 1994)(holding that officers had reasonable suspicion where suspect "had just turned

---

[123]     See Doc. 147-11, Ex. 10 to Pl.'s Resp. to Def. Castro's. Mot. for Summ. J., Autopsy Report of Jordan Baker  p. 2; Doc. 147-3, Elec. Ex. 2 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Video of the Incident 20:41:00 to 20:42:00;Doc. 147-5, Ex. 4 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro Homicide Statement pp. 1-2; Doc. 112-1, Ex. 1 to Def. City's Mot. for Summ. J., Dep. of Def. Castro pp. 163-64; Doc. 153-46, Ex. 46 to Pl.'s Resp. to Def. City's Mot. for Summ. J., HPD Bulletin of Aggravated Robberies dated Jan. 3, 2014; Doc. 153-47, Ex. 47 to Pl.'s Resp. to Def. City's Mot. for Summ. J., HPD Bulletin of Aggravated Robberies dated Feb. 3, 2014.

and run evasively at the mere sight of a patrol car"). Accordingly, summary judgment is appropriate on Plaintiff's unlawful seizure and detention claim to the extent it pertains to Defendant Castro's decision to conduct an investigatory stop of Decedent, and to the extent that such a stop was properly conducted.[124]

The facts are in dispute regarding nearly everything that occurred after Defendant Castro's decision to stop Decedent. Some of the relevant factual disputes include: (1) whether Decedent was knocked off his bike by Defendant Castro; (2) whether the investigatory stop was properly conducted; (3) when the investigatory stop escalated to a warrantless arrest necessitating probable cause; and (4) whether Defendant Castro attempted to arrest Decedent before any crime, if any, was committed. These factual disputes, along with others, will need to be resolved by a jury. Accordingly, summary judgment is inappropriate on Plaintiff's unlawful seizure and detention claim to the extent the claim pertains to conduct following Defendant Castro's decision to do an investigatory stop of Decedent.

### 3. Racial Discrimination

Plaintiff's claims of an equal protection violation and racial discrimination pursuant to Section 1981 both fall under the

---

[124]   The court draws this distinction because there is evidence that Defendant Castro may have conducted an improper investigatory stop by knocking Decedent off of his bicycle as a part of the investigatory stop.

umbrella of racial discrimination.

In order to state a claim under the Equal Protection Clause, a plaintiff first must allege "that two or more classifications of similarly situated persons were treated differently" by a state actor. <u>Gallegos-Hernandez v. United States</u>, 688 F.3d 190, 195 (5th Cir. 2012). Similarly, in order to maintain a Section 1981 claim, Plaintiff is required to show that Decedent was treated less favorably than others outside of his protected class. <u>Meinecke</u>, 66 F.3d at 83 ("The same evidentiary procedures for allocating burdens of proof applies to discrimination claims under [Section 1981 and Title VII].");  <u>Alkhawaldeh v. Dow Chem. Co.</u>, 851 F.3d 422, 426 (5th Cir. 2017)(Plaintiff in Title VII case was required to show that he was treated less favorably than a similarly situated person.), <u>reh'g</u> <u>denied</u> (Apr. 27, 2017).

In regards to both claims, Plaintiff has failed to specifically identify how Decedent was treated any differently or less favorably than someone outside of his protected class.[125] Rather, Plaintiff claims that Decedent was: (1) subject to "unequal treatment on the basis of race"; (2) targeted "for police action based on his race."; and (3) stopped "on the basis of his race and gender".[126]  Plaintiff has not met its burden of pleading that Decedent was treated differently or less favorably than a similarly

---

[125]   <u>See</u> Doc. 147, Pl.'s Resp. to Def. Castro's Mot. for Summ. J. pp. 15-22.

[126]   Doc. 44, Pl.'s 2nd Am. Compl. pp. 17-18.

situated individual of a different classification.

In addition to inadequately pleading its causes of action, Plaintiff has not provided appropriate evidence of any intentional racial discrimination.  The court recognizes that Plaintiff has provided limited evidence of past allegations against Defendant Castro and evidence of a potentially widespread Defendant City policy of stopping vehicles on the basis of a driver's race.[127] However, none of this evidence pertains to the current incident involving Decedent.

Plaintiff also takes great issue with the fact that race was a factor involved in Defendant Castro's decision to conduct an investigatory stop of Decedent.[128]  However, race was one of many factors used in Defendant Castro's decision to stop Decedent, and race was only a factor because Decedent was the same race as the suspects in almost all of the armed robberies in the area.  The court has determined that Defendant Castro is entitled to qualified immunity on his decision to stop Decedent and Plaintiff's racial profiling claims fail to do more than simply point to Decedent's race.  Similarly, Plaintiff has adduced no evidence that race was a motivating factor in Defendant Castro's alleged: (1) use of

---

[127]    See Doc. 153-15, Ex. 15 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Seguino Expert Report pp. 3-16; Doc. 153-43, Ex. 43 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Ex. 4 to Def. Castro Dep. pp. 1210-12; Doc. 153-44, Ex. 44 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Ex. 6 to Def. Castro Dep. p. 1300; Doc. 153-45, Ex. 45 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Ex. 5 to Def. Castro Dep. pp. 1127-28.

[128]    See Doc. 147, Pl.'s Resp. to Def. Castro's Mot. for Summ. J. p. 2.

excessive force; (2) unlawful seizure and arrest following the decision to stop Decedent; and (3) unconstitutional failure to provide medical care to Decedent.   The jury would be left to speculate as to Defendant Castro's motivation.

In order to defeat summary judgment on racial discrimination claims, Plaintiff is required to provide evidence of more than just Decedent's race itself.   See Meinecke, 66 F.3d at 83; Gallegos-Hernandez, 688 F.3d at 195.   Accordingly, summary judgment is appropriate in favor of Defendant Castro on Plaintiff's equal protection claim and Section 1981 claim.

### 4. Failure to Provide Medical Care

Arrestees and pretrial detainees have a Fourteenth Amendment due process right to "be secure in [their] basic human needs, such as medical care and safety." Hare v. City of Corinth, Miss., 74 F.3d 633, 647-48 (5th Cir. 1996); see also United States v. Gonzales, 436 F.3d 560, 573 (5th Cir. 2006).   With regard to the right to medical care, a state official's "episodic act or omission" violates the right "if the official acts with subjective deliberate indifference to a detainee's rights." Jacobs v. W. Feliciana Sheriff's Dept., 228 F.3d 388, 393 (5th Cir. 2000)(internal quotations omitted)(quoting Nerren v. Livingston Police Dep't, 86 F.3d 469, 473 (5th Cir.1996)).   Plaintiff must show that Defendant Castro's conduct demonstrates a "subjective awareness of a substantial risk of serious harm and a failure to

take reasonable measures to abate this risk." <u>Kitchen v. Dallas County, Tex.</u>, 759 F.3d 468, 482 (5th Cir. 2014), <u>abrogated on other grounds</u> by <u>Kingsley v. Hendrickson</u>, 135 S. Ct. 2466, 2470 (2015).

The parties agree that Plaintiff can only succeed on his claim for failure to provide medical care if Defendant Castro is shown to have had a "subjective intent to cause harm" to Plaintiff.[129] Plaintiff has provided evidence that Decedent did not die immediately after he was shot, but rather died due to blood loss a few minutes later.[130] Defendant Castro has admitted to handcuffing Decedent after he was shot and lying face down.[131] Defendant Castro has also admitted to administering no medical care to Decedent and not even checking Decedent's pulse as he was trained to do.[132] These facts preclude the court from granting summary judgment on this claim because a jury could reasonably infer from these facts that Defendant Castro was deliberately indifferent to Decedent's medical needs. A jury will need to weigh the evidence presented by both parties to determine Defendant Castro's subjective intent in not providing any medical care to Decedent after shooting him.

### 5. Wrongful Death and Survival Statutes

---

[129]   Doc. 107, Def. Castro's Mot. for Summ. J. p. 19; Doc. 147, Pl.'s Resp. to Def. Castro's Mot. for Summ J. p. 52.

[130]   <u>See</u> Doc. 147-12, Ex. 11 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J. p. 5.

[131]   <u>See</u> Doc. 147-8, Ex. 7 to Pl.'s Resp. to Def. Castro's Mot. for Summ. J., Def. Castro Dep. Excerpts pp. 83-84, 230-231.

[132]   <u>See</u> <u>id.</u>

Section 1988 incorporates both the Texas Wrongful Death Statute ("TWDS") and the Texas Survival Statute ("TSS"). See Pluet v. Frasier, 355 F.3d 381, 383–84 (5th Cir. 2004); Rodgers v. Lancaster Police & Fire Dept., 819 F.3d 205, 209 (5th Cir. 2016). Section 1988 "provides that state common law is used to fill the gaps in administration of civil rights suits." Pluet, 355 F.3d at 383. Accordingly, Plaintiff is required to have standing under the TWDS and TSS in order to bring its Section 1983 wrongful death and survival statute claims. See id. at 384.

Under the TWDS, "[a]n action to recover damages . . . is for the exclusive benefit of the surviving spouse, children, and parents of the deceased."  Tex. Civ. Prac. Rem. Code § 71.004(a). However, "[i]f none of the individuals entitled to bring an action have begun the action within three calendar months after the death of the injured individual, his executor or administrator shall bring and prosecute the action unless requested not to by all those individuals."  Tex. Civ. Prac. Rem. Code § 71.004(c). Under the TSS, the estate of the injured person has standing.  Tex. Civ. Prac. Rem. Code § 71.021(b).

This action was brought by the administrator of Decedent's estate, on behalf of the estate and wrongful death beneficiaries, more than three months after Decedent's death.  No other individuals entitled to bring a TWDS claim have brought such a claim separately.  Accordingly, Plaintiff has proper standing under

both the TWDS and TSS.   Tex. Civ. Prac. Rem. Code §§ 71.004(c),
71.021(b) (a survival action "survives to and in favor of the . .
. estate of the injured person"); <u>Transco Leasing Corp. v. United
States</u>, 896 F.2d 1435, 1443 (5th Cir. 1990)(finding that the
executor of the estate may bring TWDS claim on TWDS beneficiaries'
behalves).

Defendant Castro argues that summary judgment is appropriate
on Plaintiff's wrongful death and survival statute claims because
Defendant Castro is entitled to qualified immunity on Plaintiff's
other Section 1983 claims.   Thus, Plaintiff has no constitutional
violation with which to bring these claims through Section 1983.

In order to recover on a wrongful death claim under Section
1983 Plaintiff must show: (1) a constitutional violation; and (2)
a causal connection between the violation or omission and the death
of Decedent.   <u>Montano v. Orange Cty., Texas</u>, 842 F.3d 865, 882 (5th
Cir. 2016).   Similarly, to recover on a survival statute claim
under Section 1983 Plaintiff must show: (1) a constitutional
violation; and (2) a causal connection between the violation and
the injury to Decedent that the survival statute claim redresses.
<u>See</u> <u>id.</u> at 879-80.

Plaintiff's allegation is essentially that Defendant Castro's
unconstitutional excessive force, improper seizure, and failure to
provide medical care directly caused numerous injuries to and the
death of Decedent.   The alleged causal connection between these

36

alleged constitutional violations and Decedent's injuries is clear. Accordingly, because, as discussed above, Plaintiff's excessive force, improper seizure, and failure to provide medical care claims survive summary judgment, so do Plaintiff's wrongful death and survival action claims.

In related arguments applicable to only Plaintiff's wrongful death claim, Defendant Castro argues that: (1) Plaintiff may not recover damages for deprivation of familial association; and (2) because they are not named plaintiffs, Decedent's son, J.B., and mother, Janet Baker, cannot recover their damages for loss of familial society, companionship, and association arising from Decedent's death.[133]

As discussed above, Plaintiff has proper standing to bring this TWDS claim. Given that Plaintiff itself has no remedies under the TWDS, it would be illogical for Plaintiff to have standing, but to not be able to represent the interests of those individuals that actually have remedies available under the TWDS. See Tex. Civ. Prac. Rem. Code § 71.004(a), (c); Transco Leasing Corp. v. United States, 896 F.2d 1435, 1443 (5th Cir. 1990)("[A]lthough the executor has authority to prosecute an action for wrongful death, the actual claimants are the statutory beneficiaries. . . ."). Accordingly, Plaintiff may represent Janet Baker and J.B. Baker's interests in the wrongful death claim.

---

[133]   See id. pp. 21-22.

Defendant Castro also argues that Plaintiff must show that Defendant Castro "intended to interfere with a particular relationship protected by the freedom of intimate association" in order to recover under the TWDS.[134]   As the court understands Plaintiff's pleadings, Plaintiff does not claim any damages related to the freedom of intimate association, which is an entirely different type of claim than a TWDS claim.   Rather, Plaintiff seeks damages for the loss of companionship and mental anguish suffered by Janet and J.B. Baker due to Decedent's death.[135]   A parent that has lost a child may recover damages for loss of companionship and mental anguish under the TWDS.   See Grandstaff v. City of Borger, Tex., 767 F.2d 161, 172 (5th Cir. 1985).   Similarly, a child who has lost a parent may recover damages under the TWDS for loss of companionship and mental anguish.   See Cavnar v. Quality Control Parking, Inc., 696 S.W.2d 549, 551 (Tex. 1985), abrogated on other grounds by Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507 (Tex. 1998).   Thus, damages for the loss of companionship and mental anguish are available to J.B. and Janet Baker under the TWDS.

**6.   Official Immunity**

Defendant Castro makes a short argument that he is entitled to

---

[134]   See Doc. 107, Def. Castro's Mot. for Summ. J. p. 21.

[135]   See Doc. 44, Pl.'s 2nd Am. Compl. pp. 18-19.

official immunity on Plaintiff's state law claims.[136]  As discussed
above, Plaintiff's claims against Defendant Castro are all federal
claims as they are brought pursuant to Section 1983.  Accordingly,
Defendant Castro's official immunity argument does not apply.

## C. Plaintiff's Claims Against Defendant City

As discussed above, Plaintiff advances two claims against
Defendant City: (1) Section 1983 municipality liability; and (2)
indemnification.[137]

### 1. Municipality Liability

A city may be held liable under Section 1983 only for its own
illegal acts, not pursuant to a theory of vicarious liability.
Connick v. Thompson, 563 U.S. 51, 60 (2011).  To succeed on a claim
under Section 1983, the plaintiff must demonstrate that the city
"had some inadequate custom or policy that acted as the moving
force behind a constitutional violation."  Forgan v. Howard Cty.,
Tex., 494 F.3d 518, 522 (5th Cir. 2007) (citing Monell v. Dep't of
Soc. Servs. of N.Y., 436 U.S. 658, 690-91 (1978)); see also
Connick, 563 U.S. at 61.  "Official municipal policy includes the
decisions of a government's lawmakers, the acts of its policymaking
officials, and practices so persistent and widespread as to
practically have the force of law."  Connick, 563 U.S. at 61.  The
burden on the plaintiff is to "identify the policy, connect the

---

[136]    See Doc. 107, Def. Castro's Mot. for Summ J. p. 4.

[137]    See id. pp. 21-23.

policy to the county itself and show that the particular injury was incurred because of the execution of that policy." Bennett v. City of Slidell, 728 F.2d 762, 767 (5th Cir. 1984).

Plaintiff advances two theories under which Defendant City is liable under Section 1983.[138]   First, Plaintiff argues that Defendant City has failed to adequately train and supervise its officers thereby encouraging them to: (1) use excessive force; (2) conduct unlawful seizures; and (3) treat individuals unequally on the basis of race.[139]   Second, Plaintiff argues that Defendant City has inadequate policies and customs of failing to adequately investigate, punish, or discipline officers who: (1) use excessive force; (2) conduct unlawful seizures; or (3) treat individuals unequally on the basis of race.[140]

As discussed above, summary judgment should be granted on Plaintiff's race discrimination and Equal Protection claims. Therefore, no underlying race discrimination violation exists for which Defendant City can be held liable on a municipal liability theory.   Additionally, Plaintiff's arguments regarding municipal liability in the unlawful seizure context are all based on a theory

---

[138]   Plaintiff's Second Amended Complaint lists three reasons that Defendant City is liable under a Section 1983 municipal liability theory. However, Defendant City only lists three reasons by distinguishing Defendant City and the HPD.   As the HPD is considered in the analyses of both municipality liability theories, the court will only do the two analyses.

[139]   See Doc. 44, Pl.'s 2nd Am. Compl. pp. 21-22.

[140]   See id.

that Defendant City permits, encourages, or fails to train HPD officers regarding racial profiling.[141]   Accordingly, the only remaining claims that Defendant City can be held liable for are: (1) inadequate policies and customs of failing to adequately investigate, punish, or discipline officers who use excessive deadly force; and (2) failure to train and supervise officers regarding the use of excessive deadly force.[142]

### i. Inadequate Policies and Customs

It is first important to discuss whether inadequate policies and customs of investigating, punishing, and disciplining police officers who shoot civilians could be a "moving force" behind an unconstitutional use of excessive deadly force by a police officer. Forgan, 494 F.3d at 522.  Where a reckless disregard for human life and safety is "prevalent among the city's police officers [and] threatens the life and security of those whom they encounter, and if that recklessness is attributable to the instruction or example or acceptance of or by the city policymaker, the policy itself is a repudiation of constitutional rights."  Grandstaff v. City of Borger, Tex., 767 F.2d 161, 170 (5th Cir. 1985).  If a police officer is aware that his reckless use of deadly force will be met

---

[141]     See Doc. 152, Pl.'s Resp. to Def. City's Mot. for Summ. J. pp. 45-50. It also appears that Plaintiff is no longer pursuing municipal liability claims against Defendant City on any unlawful seizure theories.  See id. p. 2 n.1.

[142]     Plaintiff has clarified that it is not pursuing municipality liability claims against Defendant City on any theories involving excessive non-lethal force.  See Doc. 152, Pl.'s Resp. to Def. City's Mot. for Summ. J. p. 2 n.1.

with the approval of city policymakers, the "moving force" requirement is satisfied. See id. Thus, if Defendant City possesses an inadequate policy or custom of investigating, punishing, and disciplining police officers who use excessive deadly force, then that policy or custom could be the "moving force" behind the alleged unconstitutional use of excessive force by Defendant Castro. Id.

Among the noteworthy customs and policies employed by the IAD when investigating the shooting of a civilian by a police officer are that the IAD: (1) uses fewer classifications than for other types of use of force incidents; (2) does not look at the police officer's complaint history; and (3) gives the police chief the sole final disciplinary determination.[143] Additionally, general HPD custom and policy following the shooting of a civilian provides that the shooting police officer is: (1) not questioned until he has spoken with an attorney; (2) allowed to do an unrecorded "walk-through" of the scene, while accompanied by an attorney; (3) never given a live interview; and (4) given forty-eight hours to answer written questions with an attorney's assistance.[144]   It is also

---

[143]     See Doc. 153-59, Ex. 59 to Pl.'s Resp. to Def. City's Mot. for Summ. J., May Dep. pp. 27-31, 37-38, 63-64, 83.

[144]     See Doc. 153-16, Ex. 16 to Pl.'s Resp to Def. City's Mot. for Summ. J., Brady Dep. p. 165; Doc. 153-17, Ex. 17 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Becker Dep. pp. 18-21, 34; Doc. 153-36, Ex. 36 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Dominguez Dep. pp. 37-41, 63-64; Doc. 153-59, Ex. 59 to Pl.'s Resp. to Def. City's Mot. for Summ. J., May Dep. pp. 9-10, 20-22.; Doc. 153-60, Ex. 60 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Kuchta Dep. pp. 73-75.

noteworthy that it is standard procedure to conduct a live, recorded interview of any shooter in a non-police shooting.[145]

The summary judgment evidence shows that in a total of 194 intentional shootings of civilians from 2009 to 2014, the five years prior to the incident involving Decedent and Defendant Castro, all 194 shootings were deemed justified by the IAD.[146] Eighty-one of these shootings were of unarmed civilians.[147] The uniform outcomes of the past police shooting investigations along with the less adversarial treatment of a police shooter raises a fact issue regarding Defendant City's policies and customs that have found all eighty-one intentional police shooting of unarmed civilians to be justified.  A jury could reasonably find that Defendant City had an unofficial policy and custom of turning a blind eye to its officers' excessive uses of force.

Given the above customs or policies of Defendant City and the HPD, and the consistent results of all investigations conducted from 2009 to 2014, Plaintiff has raised a fact issue regarding whether Defendant Castro "used deadly force with the knowledge that [Defendant City] would exact no consequence for his actions."

---

[145]    See Doc. 153-16, Ex. 16 to Def. City's Mot. for Summ. J., Brady Dep. pp. 16-17, 229.

[146]    See Doc. 153-15, Ex. 15 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Seguino Expert Report p. 22; Doc. 153-59, Ex. 59 to Pl.'s Resp. to Def. City's Mot. for Summ. J., May Dep. p. 37.

[147]    See Doc. 153-15, Ex. 15 to Pl.'s Resp. to Def. City's Mot. for Summ. J., Seguino Expert Report p. 22

Santibanes v. City of Tomball, Tex., 654 F. Supp. 2d 593, 614 (S.D. Tex. 2009). Accordingly, summary judgment is inappropriate on Plaintiff's municipality liability claim under an inadequate policies and procedures regarding excessive force theory. Id.; Grandstaff, 767 F.2d at 170.

### ii. Failure to Train

Courts have recognized that, under limited circumstances, the failure to train or to supervise its employees may give rise to local-government liability under Section 1983. See Connick, 563 U.S. at 61; Zarnow v. City of Wichita Falls, Texas, 614 F.3d 161, 169-70 (5th Cir. 2010). In failure-to-train cases, a plaintiff must prove: "(1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question." Id. at 170. The Supreme Court has cautioned, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick, 563 U.S. at 61.

A local government can be held liable only when its failure to train or to supervise amounted to deliberate indifference to the constitutional rights of its citizens. Id. (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989)). In order to

44

prove deliberate indifference by the municipality, a plaintiff must generally show a pattern of similar constitutional violations by untrained employees. Id. at 62.  Where the question is not whether the officers received any training in the constitutional requirements, but whether the officers received adequate training, the plaintiff cannot rely on proof that additional training would have created a better officer or would have reduced the likelihood of a constitutional violation but must prove that the "officers were so untrained as to be unaware" of constitutional limitations. See Pineda v. City of Houston, 291 F.3d 325, 333 (5ᵗʰ Cir. 2002); see also Harris, 489 U.S. at 391.

Plaintiff does not cite to any evidence in support of its claim that the HPD failed to train or supervise its officers regarding excessive force.  Rather, Plaintiff claims that "[t]he failure to adequately investigate instances of misconduct can independently establish municipal liability . . ."[148]  Plaintiff is technically correct.  However, failure to investigate is an entirely different form of municipal liability than failure to train or supervise.[149]  Additionally, Plaintiff does not even allege that there is a pattern of constitutional violations present in untrained individuals.[150]  Plaintiff has not provided any evidence

---

[148]   Doc. 152, Pl.'s Resp. to Def. City's Mot. for Summ. J. p. 47.

[149]   Plaintiff's failure to investigate theory is included in the above analysis.

[150]   See Doc. 152, Pl.'s Resp. to Def. City's Mot. for Summ. J. pp. 45-50.

or even an argument sufficient to support Plaintiff's failure to train claim regarding excessive force. Accordingly, Plaintiff's Section 1983 municipality liability claim based on a failure to train theory is dismissed.

### 2. Indemnification

Defendant City argues that Plaintiff does not have a direct cause of action against it for Defendant Castro's actions because any statutory indemnity would be owed to Defendant Castro, not Plaintiff.[151] Sec. 2-304 states that Defendant City "shall, subject to the exclusions and other provisions of this section, pay judgments, attorney's fees and costs assessed against a covered person in a lawsuit for which [Defendant City] has an obligation to provide legal representation under section 2-303, above." Houston Code of Ordinances, Sec. 2-304. Defendant City does not contend that Defendant Castro is not a "covered person" or that Defendant City was not required to provide him with legal representation. Sec. 2-305 provides that "to receive the benefits of the legal representation and indemnification provisions of this article a covered person must . . . ." Houston Code of Ordinances, Sec. 2-305. The language of the local ordinance clarifies that the indemnity provisions are for the benefit of "covered persons", of which Plaintiff is not. See Houston Code of Ordinances, Sec. 2-302 (defining the term "covered person").

---

[151]    See Doc. 112, Def. City's Mot. for Summ. J. pp. 24-25.

46

Plaintiff argues that "third-parties have an interest in the underlying indemnity, where applicable."[152]  The case law cited by Plaintiff to support the proposition applies much more narrowly by holding that an indemnity provision could be enforced by a third-party intended beneficiary to a contract.  See Doe v. Texas Ass'n of Sch. Boards, Inc., 283 S.W.3d 451, 460–61 (Tex. App.—Fort Worth 2009, pet. denied).  Here, there is no identified contract and Plaintiff is certainly not an intended beneficiary.

For these reasons, the court grants Defendant City's motion on Plaintiff's indemnification cause of action.  However, the court notes that this ruling is not to have any effect on whether Defendant City will be required to indemnify Defendant Castro if Plaintiff is successful on one of its claims against him.

### 3.    Governmental Immunity

Defendant City makes a short argument that it is entitled to governmental immunity on Plaintiff's state law claims against it.[153] As discussed above, Plaintiff's only remaining claim is a federal claim brought pursuant to Section 1983.  Accordingly, Defendant City's governmental immunity argument does not apply.

### IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant Castro's motion be **DENIED** as to Plaintiff's claims for excessive

---

[152]    See Doc. 152, Pl.'s Resp. to Def. City's Mot. for Summ. J. p. 52.

[153]    See Doc. 112, Def. City's Mot. for Summ J. pp. 22-23.

force, unlawful seizure and detention occurring after Defendant Castro's decision to conduct an investigatory stop, Defendant Castro's failure to provide medical care, wrongful death, and survival action. As to all other claims of Plaintiff's against Defendant Castro, the motion is **GRANTED.**

Based on the foregoing, the court also **RECOMMENDS** that Defendant City's motion be **DENIED** as to Plaintiff's claim for municipality liability on a theory of failure to adequately investigate, punish, and discipline prior instances of excessive force, and **GRANTED** as to all other claims of Plaintiff's against Defendant City.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 31st day of August, 2018.

48

U.S. MAGISTRATE JUDGE